# Exhibit 5

CONDENSED TRANSCRIPT

```
 1

 2                UNITED STATES DISTRICT COURT

 3        FOR THE NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE

 4

 5   MANUEL G. FAUSTO and LUZ,      )
     FAUSTO,                        )
 6                                  )
                    Plaintiffs,     )
 7                                  )
                                    )
 8        vs.                       )Case No. CO7 05658 JW (RS)
                                    )
 9   CREDIGY SERVICES CORPORATION;  )
     CREDIGY RECEIVABLES, INC.;     )
10   CREDIGY SOLUTIONS, INC.;       )
     RYAN MILLER; RICARDO VENTURA;  )
11   BRETT BOYDE; PAULO PERES;      )
     THOMPSON; and DOES 1-10,       )
12   inclusive,                     )
                                    )
13                   Defendants.    )
     _____)

14

15

              DEPOSITION OF JASON SEAN WILLIAMS
16

17        BE IT REMEMBERED:  That pursuant to Notice of

18   Taking Deposition and on Tuesday, the 22nd day of 2008,

19   commencing at the hour of 9:13 a.m. of said day, before

20   me, Lisa Solomon, C.S.R., License Number CSR-8058,

21   personally appeared JASON SEAN WILLIAMS, called as a

22   witness herein, at the offices of Talty Court Reporters,

23   2131 The Alameda, Suite D, San Jose, California, and

24   being by me first duly affirmed, was examined as a

25   witness in said cause.
```

1      A    It -- it looks like it is.   It looks like many

2   PowerPoint presentations that I've seen, so I would have

3   to say yes.

4      Q    Do you know how it's disseminated to the

5   employees?

6      A    I would have to ask Brian Siler.   However, when

7   I've seen training sessions take place in the past,

8   typically written and displayed electronically on some

9   type of a presentation system.

10     Q    Have you seen this particular document

11  displayed on some kind of presentation system during a

12  training session?

13     A    I could not state with certainty that it was

14  this particular document.

15     Q    When an employee is -- and I'm sorry, did you

16  say that -- that the document -- the training manual

17  would also be provided in hard copy to employees?   I

18  don't know if you get that or --

19     A    Yes.

20     Q    I want --

21     A    Yes.

22     Q    -- must be asleep.

23          When this training manual is provided to the

24  employees, do they have to sign some kind of

25  confidentiality form?

CONDENSED TRANSCRIPT

1      A    I'm not sure of whether they have to sign a

2   confidentiality form or not.

3      Q    Do they sign any document about the training

4   manual?

5      A    We track the training for all personnel,

6   what -- when they completed the training and what dates,

7   but as to whether or not they sign anything, I do not

8   know.

9      Q    Where's the training tracked?

10     A    I would have to ask Brian Siler how that's

11  accounted for.  I do not know personally how they track.

12  I just know that it is tracked.

13     Q    So when you say the training is tracked, is --

14  is there some kind of ongoing training that is being

15  tracked?

16     A    Yes.  To my knowledge, Mr. Siler conducts

17  ongoing training as well.  So he will periodically carry

18  out additional training with a refresher training with

19  people that have already went through training

20  previously.

21     Q    What initial training is provided before a

22  collector's allowed to begin making collection calls?

23     A    You know, again, to my knowledge, this training

24  manual is presented and those personnel spend -- may

25  spend a couple of days, I don't know the exact time

CONDENSED TRANSCRIPT

1   frame, with Mr. Siler in a training class going over

2   this training material, talking about different

3   scenarios, and doing exercises before any of those

4   personnel are ever allowed to make outbound phone calls.

5       Q    How large is the size of the class in number of

6   students?

7           MR. KAMINSKI:  Objection.  Vague and ambiguous.

8   Calls for speculation.  Vague as to time.

9           THE WITNESS:  Again, I think it has varied over

10  time.  I think generally I'd say the classes are

11  relatively small.  Probably no more than ten or 15

12  people.

13  BY MR. WILCOX:

14      Q    Is there a particular classroom where this is

15  conducted?

16      A    Yes, we actually have a training -- dedicated

17  training room at Credigy Services Corp.

18      Q    Where is that located?

19      A    At 3950 Johns Creek Court, Suite 100, Suwanee,

20  Georgia.

21      Q    Is there a particular classroom number?  Is it

22  on a certain floor?

23      A    It's on the first floor.  It's only a one-floor

24  building.  The room, I believe, is designated with a

25  marquee in front of the door that says "training room,"

1    but I would have to double check.

2        Q    So, as I understand, this training manual is

3    provided to the employees.  And I don't know where --

4    where you guys put it.  There was a test that you had

5    out in front of you?

6        A    Yes.  I believe you were referring to FA15 to

7    FA18.

8        Q    Yeah.  FA15 to FA19, I'll just hand over to

9    you.  And if you could take a moment to look that over.

10   Is that one of the tests that Credigy has created and

11   uses to train its employees?

12       A    Yes.

13       Q    And I take it the tests are also stored in

14   normal course of business at Credigy?

15       A    Yes.

16       Q    Where are those tests stored?

17       A    You're talking about the actual tests that

18   individuals have completed?

19       Q    Yes.

20       A    Again, I would have to talk with our human

21   resources department and Brian Siler.  I'm not sure

22   where those tests are stored.

23       Q    Are collection employees that take this test

24   required to sign them with the date and name of who is

25   taking the test?

Page 52

1    A    Well, referring to FA15, the document does

2    indicate that the -- the test taker must put their name

3    and the date on the document.  And to my knowledge, you

4    know, we do track these on an individual basis.

5         As to whether or not the employees sign them,

6    again, I would have to talk to Mr. Siler.  There is a

7    signature block on the bottom of FA19 indicating a place

8    for the employee's signature and the trainer's

9    signature.

10   Q    You don't know if they are stored in a

11   personnel file or somewhere else at Credigy?

12   A    Again, I would have to check with Mr. Siler and

13   our human resources.  But I would -- I would suspect

14   that these tests may be stored either by the human

15   resources department in the personnel file or by

16   Mr. Siler's training files.

17   Q    That particular test you have in front of you,

18   FA15 to FA19, do you know when that was put into use,

19   what date?

20   A    It indicates on FA15, July 2006.

21   Q    And I'll note that it states updated July 2006.

22   Do you know if there was -- actually, thanks.  You're

23   flipping through it, and we see that there are different

24   updates.

25   A    FA16 indicates it was updated May 2006.  FA17

1    indicates it was updated July 2006.  There's no

2    additional date on FA18.  There's no additional date on

3    FA19.  All of which are part of the document FA18 and

4    FA19, which begins at FA17, which is noted as updated

5    July 7th.

6        Q   As these tests are updated, are they then

7    reissued to the collectors to retake?

8        A   Again, to my -- my knowledge, Mr. Siler engages

9    in periodic refresher training with personnel.  In fact,

10   it notes on FA19 that -- excuse me.  This document FA19

11   notes on the signature block "Incorrect items on the

12   above FDCPA refresher test were reviewed and discussed

13   in detail with the employee."  But, you know, I would

14   have to speak with Mr. Siler to get the exact details on

15   the training periods.

16       Q   So if a collector working for Credigy has taken

17   a number of these tests, there should be a record of

18   that?

19       A   You're talking about Credigy Services Corp.?

20       Q   Credigy Services Corp., yes.

21       A   Yes, there should be a record of the tests of

22   some sort.

23       Q   Dated and signed by the particular collector?

24       A   Again, I would have to check with Mr. Siler as

25   to whether or not their policy is to retain the date and

Page 54

1    signed tests.

2        Q    Do you conduct any of the FDCPA training?

3        A    No.

4        Q    Have you received any of the FDCPA training?

5        A    Any of the FDCPA training that's being

6    conducted by Credigy Services Corp.?

7        Q    Yes.

8        A    I've never participated in one of the Credigy

9    Services Corp. FDCPA training classes, no.

10       Q    Have you ever spoken to someone at Credigy

11   about what is actually happening inside the classroom?

12       A    I've merely observed these training sessions

13   when I've been in the building, and I've seen the

14   training material that's being utilized.

15       Q    Did you talk with anyone at Credigy before

16   coming to the deposition today about what takes place

17   inside the classroom in regard to training?

18       A    No.  I just based it off of my observations and

19   the material that has been produced by our training

20   department as what's used for training.

21       Q    Does Credigy conduct side by sides?

22            MR. KAMINSKI:  Objection.  Vague and ambiguous

23   as to the phrase "side by sides."  Could you rephrase,

24   Counsel, or specify, clarify.

25   BY MR. WILCOX:

CONDENSED TRANSCRIPT

1    Q    Perhaps -- Mr. Williams, do you understand the

2    phrase "side by side"?

3    A    If you could explain it.  Are you talking about

4    Credigy Services Corp., or what are you talking about?

5    Q    I understand Credigy Services Corp. to be the

6    actual entity that collects on the debts that are owned

7    as assets by Credigy Receivables, Inc.  Is that correct?

8    A    That's correct.

9    Q    Okay.  So I'm asking whether Credigy Services

10   Corp. conducts side by sides with its collectors?

11   A    And what do you mean by "side by sides"?

12   Q    Have you heard the term "side by sides" before?

13   A    Never heard the term "side by sides."

14   Q    You mentioned earlier that collection

15   supervisors may monitor telephone conversations.

16   A    Yes.

17   Q    What's the purpose of monitoring the telephone

18   conversations?

19   A    The purpose of monitoring telephone

20   conversations is to make sure that employees are

21   complying with the training material the way that

22   they've been trained to speak with consumers.

23   Q    Does the collection supervisor make a written

24   record after performing one of these monitoring

25   exercises?

---

1    A   To my knowledge, no.  But I would have to check

2  with our operations department to see if there were any

3  logs maintained by the collection supervisors when they

4  monitor particular creditors.  There may very well be.

5    Q   Who's the operations department?

6    A   The operations department is what I will call

7  generally the department responsible for the collection

8  function of Credigy Services Corporation.

9    Q   So they interact with the collection

10  supervisors?

11    A   Correct.

12    Q   And if the collection supervisors had a written

13  record of one of these monitoring events, it would be

14  stored with the operations department as opposed to the

15  supervisor himself?

16    A   I -- I believe it would probably be stored not

17  with the supervisor himself, but yes, within the

18  department, if it exists.  But I would have to check

19  with the operations department to check on their policy

20  with regard to that.

21    Q   And just to clarify though, you are unsure

22  whether or not Credigy actually has records of

23  monitoring the phone calls?

24    A   That's correct.  I can't state from my -- my

25  knowledge whether or not records are maintained when

CONDENSED TRANSCRIPT

```
 1    phone calls are monitored.

 2        Q    To not -- to your knowledge, how many

 3    collectors are employed in the Brazil facility?

 4        A    And "the Brazil facility," you mean Credigy

 5    Solucoes Financeiras?

 6        Q    Yes.

 7        A    How many collectors are employed in that

 8    facility?

 9        Q    Yes.

10        A    Collectors that are doing what?

11        Q    Debt collection activities.

12        A    In where -- where?

13        Q    Does the Brazil entity employ debt collectors?

14        A    It does, yes.

15        Q    How many?

16        A    For the United -- for -- any collectors that

17    work on behalf or contracted to Credigy Services Corp.,

18    currently I think that there's -- there's probably less

19    than 30.  At -- at times in the past it may have been as

20    many as 60 or 75.

21        Q    Do the debt collectors that perform collection

22    activities relating to Credigy owned accounts, do they

23    receive the same training as those debt collectors

24    working for Credigy in the U.S.?

25        A    Yes.
```

CONDENSED TRANSCRIPT

1    Q    Where do they undergo that training?

2    A    They undergo that training at the office of

3    Credigy Solucoes in Brazil.

4    Q    So not in the American facility?

5    A    That's correct.

6    Q    Who's the trainer in Brazil?

7    A    I believe Mr. Siler has been to Brazil on a

8    couple of occasions.  He's also trained personnel that

9    work with him for him at Credigy Solucoes.

10    Q    So as I --

11    A    I don't know their -- the names of those

12    individuals off the top of my head.

13    Q    So as I understand it, Mr. Siler has gone to

14    Brazil to conduct some training, and he's also trained

15    others in Brazil to conduct the training?

16    A    Correct.  Again, at -- at Credigy Solucoes in

17    Brazil, correct.

18    Q    Are the debt collectors in Brazil provided the

19    same training manual we spoke about earlier, FA20 to

20    FA42?

21    A    To my knowledge, yes.

22    Q    Do you know when that training manual was first

23    provided to the employees in Brazil?

24    A    I don't know the exact date that this was first

25    provided to the employees in Brazil, no.

Page 59

1    Q    So you don't know if Credigy ever provided that

2    training manual to the employees in Brazil?

3    A    No, it's not what I said.  I said I don't know

4    the exact date when the training manual was provided to

5    employees in Brazil.

6    Q    Okay.  How do you know that training manual was

7    provided to anyone in Brazil?

8    A    Well, I've been to Brazil and seen training

9    sessions going on in Brazil.  And this document was

10   produced by our training department as the training

11   material that's been provided to any collectors working

12   for Credigy Services Corp.

13   Q    This same document that's sitting in front of

14   you now?

15   A    That was provided by our training area, yes.

16   Q    So you've seen FA20 to FA42 while you witnessed

17   a training session in Brazil?

18   A    Again, what I said is that our training

19   department has provided FA20 to FA42 as the training

20   manual that's in use.  And I have observed training

21   sessions going on in Brazil personally, but I cannot

22   verify that they were using FA20 to FA42 as the training

23   material personally.

24   Q    Can you tell me what training materials they

25   were using?

1       A    Well, again, they were using the training

2    material provided by our training department, which our

3    training department has indicated all Credigy Services

4    Corporation personnel that we're using FA20, FA42.  And

5    again, we brought some additional documents.

6       Q    I'm sorry, I've gotten confused somewhere

7    there.  What I'm asking is this:  How do you personally

8    know which training manual's used in Brazil?

9       A    I only know that our training department has

10   produced -- and meaning Credigy Services Corp.  Brian

11   Siler is responsible for training.  And the operations

12   area has produced this training manual and some

13   additional material that we haven't got to yet.  And

14   indicated that this is the training material that is

15   utilized to train collection personnel at Credigy

16   Services Corp. and any employees of Credigy Solucoes

17   Financeiras that are contracted to Credigy Services

18   Corp.

19           So, the training department has provided these

20   documents to me.  I have personally observed training

21   sessions going on in both the United States and at the

22   office of Credigy Solucoes in Brazil, but I can't verify

23   that this particular document was in use when I

24   personally observed those training sessions.  As I

25   indicated, to my knowledge, this training material may

CONDENSED TRANSCRIPT

1    be updated periodically over time.

2        Q    Can you explain why Credigy doesn't have a date

3    on the training manual?

4            MR. KAMINSKI:  Objection.  Argumentative.  It

5    calls for speculation.  Lacks foundation.

6            THE WITNESS:  I -- no, I can't -- I can't tell

7    you why there's not a date on the training manual.

8    BY MR. WILCOX:

9        Q    When was the last time you were at the Brazil

10   location?

11       A    Last December.  I was at the office of Credigy

12   Solucoes.

13       Q    How long were you there for?

14       A    I was there on that occasion for two days.

15       Q    Did you witness any training sessions in that

16   visit?

17       A    No, I did not.

18       Q    When was the time you witnessed a training

19   session when you were in Brazil?

20       A    Probably in either 2004, 2000 and 5.

21       Q    What are the names of the people in Brazil that

22   Mr. Siler has trained to then go on and conduct further

23   training?

24       A    Again, I indicated I do not know the names of

25   the individuals at Credigy Solucoes Financeiras that

CONDENSED TRANSCRIPT

1    that a machine maintained by LiveVox dials a particular

2    phone number.  If the call is connected to a live

3    person, then LiveVox would then connect the call to a

4    live person at, for example, Credigy Services Corp.

5         The other product that was in use to my

6    knowledge, was what I would call an automated voice

7    messaging product.  This is a product that may leave a

8    message on some type of recording device, maintained on

9    the phone number that's being called.

10    Q    If LiveVox was making an automated call using

11    this product that leaves an automated voice mail message

12    and an actual human picks up, what would happen?

13    A    I'm not sure what would happen.  I'm not sure

14    if LiveVox would detect that was a human and then

15    transfer the call to a live person.  I would have to

16    check on that.

17    Q    In regard to the first product you mentioned,

18    the call would then be routed to a live person, a live

19    debt collector; is that right?

20    A    Correct.

21    Q    And you mentioned the tracking notes.  What are

22    the tracking notes?

23    A    Tracking notes are what I would call

24    generically.  These are textual comments, meaning these

25    are comments regarding some specific action that was

CONDENSED TRANSCRIPT

1          So I would presume based on that fact that this

2     screen shot was generated on or after January 9th, 2008.

3     And I would -- could narrow it down further by looking

4     at some other documents.

5          Q   So this screen shot was created at Credigy and

6     it's stored currently at Credigy?

7          A   The screen shot is stored on this piece of

8     paper.

9          Q   The computer in which the screen shot was taken

10    from is -- I take it a Credigy computer?

11         A   Yes.  It's a -- it's a computer data system

12    that's maintained by Credigy Services Corp. called

13    Simplect.

14         Q   Why don't you flip to page FA2, which is the

15    next page in.  Are these tracking notes as you referred

16    to them earlier?

17         A   They are.

18         Q   And I know you've mentioned that you've

19    reviewed the tracking notes already on the Fausto

20    account.  Are these indeed the tracking notes that

21    Credigy has regarding the Fausto account?

22         A   Yes.

23         Q   Okay.  And they go FA2 to FA14?

24         A   That's correct.

25         Q   I'll refer you to date December 3rd, 2000 and 7

Page 97

1    on FA2.  Over in the right column there's a column

2    header "Collector," and then below that is "eisilva,"

3    S-i-l-v-a.  Do you see that?

4        A    I do.

5        Q    Is eisilva a debt collector in the Brazil

6    Credigy location?

7        A    To my knowledge, eisilva is a debt collector in

8    the Brazilian location maintained by Credigy Solucoes

9    under contract to Credigy Services Corp.

10       Q    How do you know that?

11       A    Well, for one, the -- at this point in time we

12   did not at Credigy Services Corp. have any or many

13   internal collectors at Credigy Services Corp. in Atlanta

14   remain.

15            So at this point in time, December 3rd, 2007,

16   most all -- and it could have been all, I'd have to

17   double check, of the calls that Credigy Service Corp.

18   were made were being handled by contracted employees

19   provided by Credigy Solucoes.

20            I also would have to look back at the notes and

21   I can determine -- for example, looking on FA04 on the

22   date of April 10, 2007, that a letter was issued with

23   the letter code DD02 CSC BZ, which indicates to me that

24   at that time this account was being worked by the

25   personnel provided by Credigy Solucoes.

1    three credit bureaus on December 19th, 2006, that

2    Mr. Fausto disputed owing this debt?

3        A    I don't know from this document whether or not

4    it was reported as disputed.  I would have to probably

5    obtain, if we could, the historical data that was

6    submitted to the credit bureau on 12/19/2006 in the

7    Metro 2 format to see how the account was reported.

8        Q    Has Credigy Services Corp. made any attempt to

9    obtain that data?

10       A    I am not sure if we have produced that material

11   in the documents here.  I don't recall having seen it,

12   but I may be wrong.  I would need to review the material

13   because it was quite a few documents.  If it wasn't

14   pro -- produced, I would have to check to see if that

15   information was available internally and/or possibly

16   could be available from either of the three consumer

17   reporting agencies.

18           MR. KAMINSKI:  And I'm going to just impose an

19   objection to the extent that it may exceed plaintiffs'

20   deposition notice of the witness.

21   BY MR. WILCOX:

22       Q    Is the information that Credigy Services Corp.

23   provides to credit bureaus the type of information that

24   Credigy keeps internally in its records?

25           MR. KAMINSKI:  Objection.  Vague and ambiguous.

CONDENSED TRANSCRIPT

1    Q    Okay.  And then below that there's another step

2  to the dispute resolution team supervisor?

3    A    I don't -- I believe today that Miranda Ayoette

4  directly supervising the team members on the dispute

5  resolution team with no intermediary manager.

6    Q    So then looking at the note entries of November

7  20th, 2006, and November 24th of 2000 and 6 --

8    A    Are we done with this letter or --

9    Q    You can leave it there.

10   A    All right.

11   Q    -- were Credigy policies and procedures

12  followed?

13   A    And you -- again, you're referring to

14  December -- November 24th, 2006?

15   Q    Yes.

16   A    In that case no -- no, Credigy policies and

17  procedures were not followed.  If they were, this

18  November 7th letter from Manuel Fausto would have been

19  properly identified as a cease and desist letter under

20  the FDCPA, and it was not so identified.

21   Q    Has Credigy taken any disciplinary action

22  against kervin?

23   A    I do not know personally whether any

24  disciplinary action was taken against him.  I would -- I

25  would have to review his personnel file to answer that

1    question.

2        Q    Has Credigy taken any disciplinary action

3    against SBlackwell?

4        A    Again, I do not know personally of any such

5    disciplinary action.  I would have to review her

6    personnel file to -- to answer that question.

7        Q    So whether or not any disciplinary action was

8    taken against SBlackwell or kervin, would appear in

9    their personnel files?

10       A    Yes, there -- if there was disciplinary action,

11   that would be documented in their personnel files.

12       Q    Is failing to properly notate an account a

13   basis for disciplinary action?

14       A    It could be.  In other cases it could be simply

15   a mistake.  Looking at the November 7th letter, it -- it

16   says, "Cease and" -- "cease further communication with

17   me about this account."  But it's possible that the

18   person just made a mistake here.  So if it was an honest

19   mistake, no.  But if it was careless behavior,

20   absolutely.

21       Q    Was today the first time you noticed this

22   mistake?

23       A    What mistake?  The failure to notate as cease

24   and desist?

25       Q    Yeah.

CONDENSED TRANSCRIPT

1    Fausto account?

2        A    I do not.

3        Q    Did Vinicius speak to rgoncalves about the

4    Fausto account?

5            MR. KAMINSKI:  Objection.  Calls for

6    speculation.

7            THE WITNESS:  I -- I -- again, I have no idea.

8    BY MR. WILCOX:

9        Q    Did anyone at Credigy speak to rgoncalves about

10   the Fausto account?

11           MR. KAMINSKI:  Object.  Calls for speculation.

12           THE WITNESS:  It's possible.  I have no idea.

13   BY MR. WILCOX:

14       Q    Who would know?

15           MR. KAMINSKI:  Objection.  Calls for

16   speculation.

17           THE WITNESS:  Whether anyone at Credigy spoke

18   to her about the Fausto account?

19   BY MR. WILCOX:

20       Q    Yes.

21           MR. KAMINSKI:  The question is also vague and

22   ambiguous as to time.  Ron, any specific time?

23   BY MR. WILCOX:

24       Q    Can you answer the question?

25           MR. KAMINSKI:  Well, it's vague and ambiguous

CONDENSED TRANSCRIPT

```
 1   BY MR. WILCOX:

 2        Q    I'm going to preface my question by asking you

 3   to please not tell me about any conversation you've had

 4   with a -- your attorneys.  My question's specifically

 5   about whether you've spoken to any other Credigy

 6   employees about what investigation was conducted.

 7        A    No.

 8        Q    Do you have any knowledge as to whether Credigy

 9   conducted an investigation into the Fausto matter?

10        MR. KAMINSKI:  Vague and ambiguous with respect

11   to the phrase "Fausto matter."

12        THE WITNESS:  Well, I am certainly aware that

13   we have reviewed the claims of Fausto in response to

14   this pending litigation and produced the documents and

15   those things that we produced until now in response to

16   them.

17   BY MR. WILCOX:

18        Q    Who reviewed the claims?

19        A    The attorneys representing Credigy.

20        MR. KAMINSKI:  Objection.  He doesn't want any

21   communications raised or anything being gained by

22   attorney-client privilege.

23   BY MR. WILCOX:

24        Q    Other than the attorneys, who at Credigy

25   reviewed the claims?
```

Page 208

```
1        A    I don't know.

2        Q    Has Credigy taken any disciplinary action

3    against any of the collectors that worked on the Fausto

4    account?

5        A    I -- I -- again, I -- we have the personnel

6    files here, and I can review the personnel records, but

7    I don't know specifically what disciplinary action was

8    taken against any employees without reviewing the

9    personnel files.

10       Q    I'll hand you what's been Bate stamped as FA183

11   to FA226 that was produced by your counsel today just to

12   help you with that.

13       A    All right.

14       Q    Take a moment -- actually, just take a moment

15   first and tell me if those are indeed the personnel

16   records of the -- some of the Credigy employees that

17   worked on the Fausto account which the defendant has

18   produced today?

19       A    Yes, these were the -- appear to be the

20   employee records -- some -- some employee records from

21   Credigy Solucoes Financeiras.

22       Q    And those are stored and kept in the normal

23   course of business with Credigy?

24       A    These are records of Credigy Solucoes that are

25   maintained in the ordinary course of its business.
```

CONDENSED TRANSCRIPT

1   speculation.  Lacks foundation.  Assumes facts not in

2   evidence.

3            THE WITNESS:  No, I did not.

4   BY MR. WILCOX:

5       Q    What's the net worth of Credigy?

6            MR. KAMINSKI:  Objection.  I'll instruct the

7   witness not to answer at this time.  The witness doesn't

8   have the information, plus the information regarding net

9   worth has not yet been produced.  And pursuant to

10  agreement between counsel, that will -- certainly

11  unaudited financial information will be provided to

12  counsel during the mediation of this matter.

13           MR. WILCOX:  Counsel, to save us all a lot of

14  time, I've got a great number of questions regarding

15  financial condition I'm about to launch into.  I will

16  not do that and not consume our time if you understand

17  I'm reserving a right to ask those questions at a later

18  date after we met and confer to deal with the issue,

19  because I don't want to waste Mr. William's time.

20           MR. KAMINSKI:  I appreciate that.  That's fine,

21  Mr. Wilcox.

22  BY MR. WILCOX:

23      Q    Do the collectors in Brazil earn bonuses or

24  commissions?

25      A    To my knowledge, yes.

CONDENSED TRANSCRIPT

1      A    We received a letter on -- that was dated

2    November 7th from Mr. Fausto that I would interpret as a

3    cease and desist letter.  Although we did not properly

4    code it on our system at the time we received it.

5      Q    Did Credigy also receive a letter from

6    Mr. Fausto indicating that he disputed the debt?

7      A    I believe we did, yes.

8      Q    Can you explain why in its answer, Credigy

9    denied having received the certified letter disputing

10   the debt?

11         MR. KAMINSKI:  Objection.  Calls for

12   information protected by the attorney-client and

13   attorney-work-product privileges.  The deposition is not

14   the proper form in which to seek discover on legal

15   contentions.

16         THE WITNESS:  Again, I didn't review --

17         MR. KAMINSKI:  No, no --

18         MR. WILCOX:  I'm sure you understand I'm asking

19   him about a factual issue, not a legal contention, and a

20   matter of public record.

21         MR. KAMINSKI:  Still, I'm instructing the

22   witness not to answer.

23   BY MR. WILCOX:

24     Q    Mr. Williams, what facts support Credigy's

25   denial of having received the second certified mail

CONDENSED TRANSCRIPT

1    letter from Mr. Fausto?

2          MR. KAMINSKI:  I interpose the same objection

3    and instruct the witness not to answer.

4          THE WITNESS:  Again, I'm not aware of the

5    denial of the receipt, and I don't know anything about

6    it.

7    BY MR. WILCOX:

8      Q    Who at Credigy provided the answers for the

9    answer?

10     A    Again, I don't know who provided the answers

11   for the answer.

12     Q    Is it against Credigy policy to talk over a

13   debtor while a debtor is trying to speak?

14          MR. KAMINSKI:  Objection.  Vague and ambiguous

15   It's an incomplete hypothetical.

16          THE WITNESS:  I -- I --

17          MR. KAMINSKI:  Calls for speculation.

18          THE WITNESS:  I -- I don't understand what you

19   mean by "talk over a debtor."

20   BY MR. WILCOX:

21     Q    Sure.  Let's say that a Credigy debt collector

22   is having a conversation with a debtor and the debtor is

23   trying to talk.  If the debt collector talks over that

24   person while he's -- while the consumer is trying to

25   speak, would you approve of that?

CONDENSED TRANSCRIPT

1    Fair Debt Collection Practices Act that puts an

2    additional burden on a debt collector, we train for

3    that.

4            If the state counterpart is identical, and it's

5    scoped relative to Credigy Services Corp., then the --

6    it's not an exception, it's covered within the FDCPA

7    training.

8            You know, there may be some particular language

9    that needs to go on letters or something like that, but

10   that's not something that collectors are doing.  They're

11   not writing letters.

12       Q    Are there any particular written documents

13   regarding the Rosenthal Act that are handed out to

14   Credigy's debt collectors?

15       A    Again, I would have to review the training

16   material that we provided.  I thought perhaps I saw

17   something that talked about the state-based differences

18   in the additional material we've brought today, but I

19   need to look through the training material.

20       Q    Can you point to what additional training

21   materials were brought today so we don't lose focus

22   here.

23       A    Sure.  Can we clear some of this stuff off the

24   table here first?  I mean we have these employee files,

25   FA183 to FA226.  David?

Page 234

1    A    No.

2    Q    Has Credigy ever recorded phone calls?

3    A    Not to my knowledge.

4    Q    It's my understanding from discovery responses

5    that data regarding outgoing phone calls such as phone

6    bills are purged after 90 days.  Is that accurate?

7    A    Yes.  To my knowledge, phone bills on outbound

8    phone calls we don't keep those because each bill

9    typically is about a 1,000 pages of detailed bills,

10   maybe 800 to 1,000 pages.  We may keep the last couple

11   of months.  We wouldn't have an archive of a 1,000-page

12   phone calls.

13   Q    I believe we talked earlier that Credigy

14   received the lawsuit on or about January 2nd, 2000 and

15   8.  Is that right?

16   A    The date that I noted was January 4th, which

17   was the date as noted in the tracking notes when the

18   counterclaim flag was activated on this case indicating

19   that there was adverse litigation pending.

20   Q    Did Credigy preserve the 90 days of telephone

21   billing statements leading up to January 4, 2000 and 8?

22   A    When -- I don't know.  I have no idea whether

23   we have -- you're talking about 90 days prior to January

24   4th?

25   Q    Sure.

CONDENSED TRANSCRIPT

```
 1      A    2008.  Not to my knowledge.

 2      Q    What is Credigy's document retention policy in

 3   regard to telephone bills when it receives a lawsuit

 4   alleging telephone abuse?

 5      A    I -- I don't know what our specific policy

 6   would be in regard to that.  But I would have to look

 7   into it further to answer that question.

 8      Q    Did Credigy ever pull Mr. Fausto's credit

 9   report?

10      A    Not to my knowledge, no.

11      Q    After learning that the -- after learning on

12   January 4, 2000 and 8, that the cease and desist letter

13   was not noted accurately, did Credigy talk to any of its

14   employees about what had happened?

15           MR. KAMINSKI:  Objection.  Calls for

16   information protected by the attorney-client privilege.

17   BY MR. WILCOX:

18      Q    I'm not asking you if any of your outside

19   counsel conducted an investigation.  What I'm asking you

20   is, did anyone at Credigy talk to the individuals

21   involved in making those entries regarding the cease and

22   desist letter?

23           MR. KAMINSKI:  Other than its attorneys.

24           THE WITNESS:  I -- I don't know.  I have no

25   idea.
```

CONDENSED TRANSCRIPT

1    BY MR. WILCOX:

2        Q    Have other consumers complained in the last

3    three years that Credigy is continuing to attempt to

4    collect debts despite cease and desist letters?

5            MR. KAMINSKI:  Objection.  Vague and ambiguous.

6            THE WITNESS:  You asked the same question

7    earlier.

8            MR. KAMINSKI:  Asked and answered.

9    BY MR. WILCOX:

10       Q    What's the answer?

11       A    I gave the answer earlier.  You want me to give

12   it again?

13       Q    Please.

14       A    What I said earlier was that, to my knowledge,

15   there's certainly been cases where there has been a

16   cease and desist received and it was improperly

17   characterized due to human error and subsequent to that

18   there was a complaint from a consumer.  As to whether or

19   not that's happened in the last three years, I could not

20   say.

21       Q    Has Credigy received any Better Business Bureau

22   complaints stating that they were engaging in unlawful

23   collection practices?

24           MR. KAMINSKI:  Objection.  Vague as to time.

25   BY MR. WILCOX:

```
 1      Q    Within the last three years.

 2      A    I don't know whether we've received any

 3   complaints specifically alleging what you stated, in the

 4   last three years.  I don't know.

 5      Q    Has Credigy been sued by any consumers in the

 6   last three years whereby the consumer indicated that

 7   Credigy failed to abide by cease and desist letters?

 8      A    I don't know whether we have been sued over

 9   that issue in the last three years.  I don't know.

10      Q    Has Credigy received complaints from consumers

11   other than Mr. Fausto that the alleged First Select debt

12   is a debt that the consumer doesn't owe?

13           MR. KAMINSKI:  Objection.  Vague as to time.

14           THE WITNESS:  Has Credigy Services Corp.

15   received complaints from debtors saying "I don't owe a

16   particular debt"?

17   BY MR. WILCOX:

18      Q    Let me restate the question to make it clear.

19           My understanding in this case is that Credigy

20   purchased debts from First Select, Inc.

21      A    Correct.

22      Q    And Mr. Fausto obviously indicated to Credigy

23   that he disputed owing the debt, right?

24      A    I would have to read his letter to say exactly

25   what he stated as to what -- disputing the debt.
```

CONDENSED TRANSCRIPT

1      Q    So are they like in manila folders?

2      A    Yes, I believe they have files -- physical

3    files if they have a consumer -- a dispute that they

4    investigate under that FDCPA.

5      Q    Would you say there are more than 100 such

6    disputes made by consumers in the last three years?

7           MR. KAMINSKI:  Objection.  Calls for

8    speculation.

9           THE WITNESS:  By "dispute," you mean a dispute

10    in request for a verification debt under that FDCPA?

11    BY MR. WILCOX:

12      Q    Sure.

13      A    Sure.  In the last three years more than a

14    hundred, sure.

15      Q    What about disputes where -- written disputes

16    where a consumer says, "I don't owe this debt", would

17    there be more than 100?

18      A    I don't know the exact number where -- where

19    someone says "I don't owe this debt" in the last three

20    years.  I don't know that number.

21      Q    Would you estimate it's more than 100?

22      A    Again, I have no idea.  I'd have to go review

23    the files and talk to the resolution team, but, you

24    know, I'm sure that we receive those kinds of dispute "I

25    don't owe the debt."

STATE OF CALIFORNIA   )

COUNTY OF SANTA CLARA)

<u>CERTIFICATE</u>

I, Lisa R. Smith, a Certified Shorthand

Reporter, License No. CSR-8058, certify that the witness

in the foregoing deposition, JASON SEAN WILLIAMS, was

duly sworn by me to tell the truth in the within

entitled cause.  Said deposition was reported by me, a

Certified Shorthand Reporter and a disinterested person,

to the best of my ability, and thereafter transcribed

into typewriting under my direction and supervision.

Date:  5/13/08

Lisa R. Smith, C.S.R.
License No. CSR-8058

The signing of the deposition by the deponent

was waived by stipulation at the time of the taking of

the deposition. _____

The deponent personally appeared on

the_____day of_____2008, and upon said date read

and signed the deposition. _____

Upon completion of the deposition, the deponent

was notified that it was ready for signature, but did

not sign said deposition for the following

reason:_____

252

Exhibit 6

CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MARTHA VASQUEZ PINTOR,

              Plaintiff(s),

       vs.                NO: C07-06428 JF-HRL

CREDIGY SERVICES CORPORATION,

CREDIGY RECEIVABLES, INC.,

CREDIGY SOLUTIONS, INC.,

BRETT BOYDE, MARK DOE and

DOES 1-10, inclusive,

              Defendant(s).

_____/

30(b)(c) DEPOSITION OF JASON S. WILLIAMS

DATE:          Wednesday, April 23, 2008

TIME:          9:05 A.M.

LOCATION:     TALTY COURT REPORTERS, INC.
              2131 The Alameda, Suite D
              San Jose, CA 95126

REPORTER:     Patricia Hope Sales, CRR
              CSR License Number C-4423

CONDENSED TRANSCRIPT

Page 16

1    record, this account was -- had an expired statute of

2    limitations.

3              (Reporter clarification.)

4              THE WITNESS:  Had an expired statute of

5    limitations.

6    BY MR. WILCOX:

7        Q.  Do you know what date the statute of

8    limitations expired?

9              MR. KAMINSKI:  Objection.  Calls for a legal

10   conclusion.

11             THE WITNESS:  I would have to refer to another

12   document to give you the answer to that.

13             Based on the system rules of Simplect is what I

14   could tell you, what Simplect interprets as an expired

15   SOL.

16   BY MR. WILCOX:

17       Q.  Would the document you referred to be the cover

18   sheet that we looked at yesterday during the Fausto

19   deposition?

20             I think you called it a screenshot?

21       A.  Screenshot.

22             Yes.  I could refer to that document.  Or I

23   could refer -- I could most likely tell from this

24   document as well.

25       Q.  Okay.  You can take a look in there if that may

Page 17

1    have the answer in there.

2        A.   (Reviewing document(s).)

3            MR. KAMINSKI:  Let's go off the record for a

4    second.  Thank you.

5            (Whereupon, the witness and counsel

6            conferred off the record outside

7            the conference room.)

8            MR. WILCOX:  We are back on the record.  It's

9    approximately 9:24 A.M.  The deponent and counsel have

10   returned to the room after stepping outside while the

11   question was pending.

12   BY MR. WILCOX:

13       Q.  Mr. Williams, do you have an answer to that

14   question?

15       A.  Again, let me review the document.

16       Q.  Please.

17       A.  All right.

18           (Reviewing document(s).)

19           I thought I would be able to tell from this

20   document, but I in fact would have to look at the

21   screenshot for this account that you are referring

22   to.

23       Q.  Okay.

24           Jumping to March 15th, April 18th, May 19th and

25   June 14th, are those also --

CONDENSED TRANSCRIPT

1          MR. KAMINSKI:  Objection.  Compound, invades

2     attorney-client privilege --

3          THE WITNESS:  I'm not --

4          MR. KAMINSKI:  -- lacks foundation.

5          THE WITNESS:  Well, I was going to say I don't

6     really understand your question.  If you could break it

7     down a little bit.

8     BY MR. WILCOX:

9       Q.  Happy to.

10          Did Credigy speak with fferrao regarding the

11     allegations made by Ms. Vasquez regarding Credigy's

12     violations of the Fair Debt Collection Practices Act?

13          MR. KAMINSKI:  Objection.  Assumes facts not in

14     evidence, misstates the facts in this case, states a

15     legal conclusion, is vague and ambiguous, calls for

16     speculation, and I'll instruct the witness not to

17     answer the question as phrased.

18          Also invades the attorney-client privilege.

19          (Marked question indexed.)

20     BY MR. WILCOX:

21       Q.  What investigation did Credigy make into the

22     allegations raised by Ms. Vasquez?

23          MR. KAMINSKI:  Independent of attorney-client

24     privilege, if you know.

25          THE WITNESS:  The only investigation that I'm

CONDENSED TRANSCRIPT

Page 91

1    aware of is merely as a result of the documents that

2    have been produced to me for review in this case.  I

3    have not spoken with anyone internally about the

4    investigation of this case.  I don't know anything

5    about the internal investigation of this case.  I have

6    just reviewed the documents that have been provided to

7    me for this particular case.

8    BY MR. WILCOX:

9        Q.  Does Credigy allow its collectors to threaten

10   consumers with arrest?

11       A.  No, it does not.

12           And by "Credigy" in that case I would be

13   referring to Credigy Services Corp and Credigy Soluçoes

14   Financeiras.

15       Q.  Why does Credigy not allow its collectors to

16   threaten arrest?

17       A.  Because it would be a violation of applicable

18   law.

19       Q.  In the note entry made on April 20th, 2007, it

20   indicates, "Debtor called in and said that received our

21   letter, but told that lives in disable," or "disab,"

22   "and cannot pay the account, is paying rent and has no

23   one to help her."

24           What is your understanding of what that

25   means?

CONDENSED TRANSCRIPT

1    that this tells us that there was an automated

2    prerecorded message left to the best of my knowledge.

3        Q.  Does Credigy instruct LiveVox to make automated

4    prerecorded calls to cell phones?

5        A.  No.  Credigy instructs LiveVox to make phone

6    calls to particular phone numbers.

7        Q.  Are some of the phone numbers provided by

8    Credigy to LiveVox cell phone numbers?

9            MR. KAMINSKI:  Objection.  Calls for

10   speculation, lacks foundation.

11           THE WITNESS:  I don't know.

12   BY MR. WILCOX:

13       Q.  Does Credigy have any practice against

14   providing LiveVox phone numbers that are cell phone

15   numbers for these prerecorded campaigns?

16           MR. KAMINSKI:  Objection.  Vague and ambiguous,

17   calls for speculation.

18           THE WITNESS:  To my knowledge, I'm not aware of

19   the exact filtering criteria that may be utilized to

20   select phone numbers for particular accounts to send to

21   LiveVox.  I would have to review the phone number

22   filtering criteria associated with the LiveVox process

23   in order to answer that question.

24   BY MR. WILCOX:

25       Q.  Are there written documents regarding this

TALTY COURT REPORTERS, INC.                    (408) 244-1900   FAX:  (408) 244-1374

CONDENSED TRANSCRIPT

1    criteria you just mentioned?

2        A.  I'm not sure whether or not there is a written

3    document or whether there may be a programmatic

4    procedure which carries out some specific selection

5    criteria.

6        Q.  Have you ever seen any written documents

7    regarding the criteria used for the LiveVox system?

8        A.  I have not reviewed any documents of that

9    nature, no.

10       Q.  Have you reviewed any documents that indicate

11   Credigy has a practice against allowing LiveVox to use

12   prerecorded messages to cell phone numbers?

13       A.  Again, I have not reviewed any documents

14   regarding the specific policies or practices in place

15   relative to the selection of phone numbers sent to

16   LiveVox.  I would have to research that and review any

17   information that was available to answer that

18   question.

19       Q.  But you haven't seen any documents?

20       A.  Again, I haven't seen any documents related to

21   the selection of phone numbers that are sent to

22   LiveVox, that's correct.

23       Q.  May 2nd, 2007, what is happening in that note?

24       A.  In this note there is an indication that the

25   account was moved between portfolios.

CONDENSED TRANSCRIPT

1      A.  I do not see any phone calls having occurred in
2  September of 2007, no.
3      Q.  Do you see any tracking notes indicating any
4  phone calls occurred regarding the Vasquez account in
5  August of 2007?
6      A.  I do not see any phone calls that took place in
7  August of 2007, no.
8      Q.  Do you see in the tracking notes any phone
9  calls which took place regarding the Vasquez account in
10 July of 2007?
11     A.  I do not.
12     Q.  Did you speak to Credigy -- I'm sorry.
13         Did you speak to LiveVox before coming here
14 today at all?
15     A.  I did not.
16     Q.  Did anyone at Credigy -- Credigy speak to
17 LiveVox about whether or not calls were being made on
18 the Vasquez account in the months of July, August or
19 September of 2007?
20         MR. KAMINSKI:  Objection.  Calls for
21 speculation.
22         THE WITNESS:  I do not know the answer to that
23 question.  I don't know if anybody talked to LiveVox,
24 no.
25 / / /

CONDENSED TRANSCRIPT

1    BY MR. WILCOX:

2        Q.   Do you know if there was testing conducted

3    regarding this particular training document?

4        A.   I believe it's the ordinary course of business

5    relative to training material to conduct tests as, you

6    know, carried out by Brian Siler or by other personnel

7    that might be employed by Credigy Soluçoes in Sao Paolo

8    when material is -- training material is presented in

9    the ordinary course of business to conduct testing on

10   that training material.

11       Q.   Did you see in your review of the personnel

12   files earlier of the debt collectors in Brazil in the

13   matter of Mr. Brett Boyde -- did you see any tests

14   relating to this particular training document?

15       A.   I did not, no.

16       Q.   Would the tests be written tests or verbal?

17       A.   I believe that the tests would probably be

18   similar to the ones we looked at yesterday, which were

19   written tests, but it's -- it's possible that there are

20   also oral quizzes.  But I suspect that the tests are

21   written in nature.  I'd have to speak with Brian Siler

22   to confirm that.

23       Q.   Is it your belief that's a PowerPoint

24   presentation?

25       A.   Based on the layout and design of the document,

DEPONENT:  JASON WILLIAMS  4-23-08

## CERTIFICATE

1

2    I, Patricia Hope Sales, a Certified Shorthand

3 Reporter, License Number 4423, hereby certify that the

4 witness in the foregoing deposition, JASON S. WILLIAMS,

5 was duly sworn by me to tell the truth in the

6 above-entitled cause; that said deposition was taken at

7 the time and place therein named; that the testimony of

8 said witness was reported by me, a disinterested

9 person, to the best of my ability, and was thereafter

10 transcribed by means of computer-aided transcription

11 under my direction and supervision.

12    IN WITNESS WHEREOF, I have hereunto set my hand.

13 Date:  May 13, 2008    *Patricia Hope Sales*

14    Signing of the deposition by the deponent was

15 waived by stipulation at the time of the taking of the

16 deposition.    _____

17    The deponent personally appeared on the _____ day

18 of _____, _____ and upon said date read and

19 signed the deposition. _____

20    Upon completion of the transcript of the

21 deposition, the deponent was notified that it was ready

22 for signature, but did not sign said deposition for the

23 following reason:

24 Date: _____   _____

25

150