1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5    MANUEL G. FAUSTO, ET      )  C-07-0568-JW
     AL.,                      )
6                             )  MARCH 18, 2009
              PLAINTIFFS,      )
7                             )  VOLUME 2
              V.               )
8                             )  PAGES 97 - 230
     CREDIGY SERVICES, ET      )
9    AL.,                      )
                              )
10            DEFENDANTS.       )
     _____   )
11

12

13         THE PROCEEDINGS WERE HELD BEFORE

14        THE HONORABLE UNITED STATES DISTRICT

15                 JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFFS: HUMPHREYS, WALLACE & HUMPHREYS
                         BY:  DAVID HUMPHREYS
18                            LUKE WALLACE
                              PAUL CATALANO
19                       9202 SOUTH TOLEDO AVENUE
                         TULSA, OKLAHOMA 74137
20
                         THE LAW OFFICE OF RONALD WILCOX
21                       BY:  RONALD WILCOX
                         2160 THE ALAMEDA
22                       FIRST FLOOR
                         SAN JOSE, CALIFORNIA 95126
23
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
24

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074

                                                          97

1

2

A P P E A R A N C E S: (CONT'D)

3

4    FOR THE PLAINTIFFS:        THE LAW OFFICE OF BALAM O.
                                LETONA
5                               BY:  BALAM O. LETONA
                                1337 PACIFIC AVENUE
6                               SUITE 203
                                SANTA CRUZ, CALIFORNIA 95060
7

8
     FOR THE DEFENDANTS:        SIMMONDS & NARITA
9                               BY:  TOMIO NARITA
                                44 MONTGOMERY STREET
10                              SUITE 3010
                                SAN FRANCISCO, CALIFORNIA
11                              94104

12
                                STEWART & ASSOCIATES
13                              BY:  JEFFREY B. LUCAS
                                     JOHN E. GILLESPIE
14                              3950 JOHNS CREEK COURT
                                SUITE 100
15                              SUWANEE, GEORGIA 30024

16
     ALSO PRESENT:              STEPHANIE SCHMITT
17                              KATY THORESEN

18

19

20

21

22

23

24

25

                                                          98

1

<u>INDEX OF PROCEEDINGS</u>

2

3      FOR PLAINTIFFS' OPENING STATEMENT P. 120

4      FOR DEFENDANTS' OPENING STATEMENT P. 135

5

       FOR THE PLAINTIFFS:

6

7      **JASON SEAN WILLIAMS**      AS-ON CROSS-EXAM P. 160

8

9

10                        <u>INDEX OF EXHIBITS</u>

11

12                            IDENT.        EVIDENCE

13     FOR THE PLAINTIFFS:

14     2                                      187

15

16

17

18

19

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA                MARCH 18, 2009

2                 P R O C E E D I N G S

3

4          (WHEREUPON, THE PROCEEDINGS IN THIS

5    MATTER WERE HELD OUT OF THE PRESENCE OF THE JURY:)

6          THE COURT:  BE SEATED.  WE HAVE ALREADY

7    STARTED FOR THE DAY?  SUMMON THE JURY.  AND IT IS

8    MY PRACTICE TO GIVE THE JURY A SET OF INSTRUCTIONS

9    IN WRITING.  SO I MIGHT MAKE SOME CHANGES IN

10   WRITING.  SO YOU HAVE A COPY.

11         MR. NARITA:  DID YOUR CLERK INFORM YOU

12   THAT WE HAD A BRIEF MATTER THAT WE WANTED TO

13   ADDRESS BEFORE THE JURY WAS PRESENT?

14         THE COURT:  NO.  WHAT WAS IT?

15         MR. NARITA:  WELL, I HAD A CLARIFICATION

16   ABOUT THE OPENING STATEMENT, BUT I WANTED TO MAKE

17   IT BEFORE YOUR HONOR.

18         THE COURT:  WHAT IS YOUR QUESTION?

19         MR. NARITA:  MY QUESTION IS YESTERDAY WE

20   TALKED A LITTLE BIT ABOUT THE EMOTIONAL DISTRESS

21   CLAIMS AND THE WAY I UNDERSTOOD YOUR COMMENTS IS

22   THAT IT WOULD BE OKAY FOR THE DEFENDANTS TO TALK

23   ABOUT THINGS THAT CAUSED THE PLAINTIFF STRESS

24   DURING THE YEAR IN QUESTION, DURING THE YEAR 2007.

25         AND I JUST WANT TO MAKE SURE I DON'T RUN

                                                        100

1    AFOUL OF THE JUDGE'S RULING ON THIS, BUT I DO HAVE

2    SWORN TESTIMONY FROM BOTH OF THE PLAINTIFFS ABOUT

3    SOME VERY UPSETTING EVENTS IN THEIR LIVES IN 2007

4    THAT I'D LIKE TO TELL THE JURY ABOUT TODAY.

5              I WANT TO TELL THEM ABOUT THE CAR

6    ACCIDENT.  I WANT TO TELL THEM ABOUT HOW THEY BOTH

7    TESTIFIED THAT THEY WERE UPSET BY, YOU KNOW, THEIR

8    ARRESTS AND DEALING WITH THAT WHOLE SITUATION.

9              THAT HAPPENED RIGHT DURING THIS YEAR

10   WHERE THEY SAY THAT MY CLIENTS WERE CAUSING THEM

11   STRESS, AND I ALREADY HAVE THEM TESTIFYING UNDER

12   OATH ABOUT THAT STRESS.  AND I FEEL THAT'S FAIR,

13   BUT ONCE AGAIN, YOUR HONOR, I WANT TO BE SURE.

14             THE COURT:  I'M SORRY.  I DON'T KNOW

15   ENOUGH ABOUT THE FACTS.  AND THIS WAS NOT ADDRESSED

16   IN THE MOTIONS IN LIMINE?

17             MR. NARITA:  WELL, IT WAS ONE OF THE

18   ISSUES THAT WAS SORT OF BUZZING AROUND IN THE

19   MOTIONS, YOUR HONOR.

20             THE COURT:  BUZZING AROUND IS NOT IT.

21   WHAT WAS IT PRECISELY THAT YOU WANT TO SAY ABOUT AN

22   ACCIDENT OR AN ARREST?

23             MR. NARITA:  WELL, THERE ARE TWO

24   ACTUALLY.  MRS. FAUSTO WAS INVOLVED IN A VERY

25   SERIOUS CAR ACCIDENT IN MAY OF 2007.  SHE HIT A

101

1    SMALL GIRL ON A BIKE.  MRS. FAUSTO WENT TO THE

2    HOSPITAL THAT DAY AND SHE WAS TREATED FOR THE

3    STRESS AND IT CONTINUED FOR WEEKS AFTER.  SHE

4    ALREADY TOLD ME ABOUT THAT IN HER DEPOSITION.

5            THE COURT:  WHAT ELSE?

6            MR. NARITA:  SHE WAS ALSO CHARGED FOR

7    THAT BY THE DISTRICT ATTORNEY AND SHE TOLD ME THAT

8    WAS A STRESSFUL EVENT AND ULTIMATELY THAT GOT

9    RESOLVED BUT ALL OF THAT HAPPENED OVER A SIX- OR

10   SEVEN-MONTH PERIOD RIGHT AROUND THIS TIMEFRAME.

11   THAT'S ONE.

12           THE COURT:  WHAT IS YOUR RESPONSE?

13           MR. WALLACE:  MY RESPONSE IS THAT SHE

14   PLED TO A MISDEMEANOR OF RECKLESS DRIVING AND IF

15   HE'S GOING TO BRING UP CHARGES AND THERE WAS A

16   CHARGE INITIALLY OF HIT AND RUN AND ONCE THEY DUG

17   INTO THE FACTS OF IT THEY DECIDED THERE WASN'T ANY

18   EVIDENCE OF A HIT AND RUN.  IT WAS CONFUSION AT THE

19   SCENE.

20           AND SO I UNDERSTAND HIS POINT BECAUSE MY

21   CLIENT DID TESTIFY THAT THAT WAS A VERY TRAUMATIC,

22   WHICH IT WOULD BE, TRAUMATIC EVENT.  I DON'T HAVE A

23   PROBLEM WITH THAT.

24           WHAT I HAVE A PROBLEM IS WITH HIM

25   SUGGESTING TO THE JURY THAT SHE WAS CHARGED WITH

102

1    HIT AND RUN AND SHE NEVER PLED TO IT AND THAT WAS

2    WHAT THE FINAL CHARGES WERE.

3             THE COURT:  SO I'LL SUSTAIN WITH RESPECT

4    TO THE CHARGE ITSELF BECAUSE IT DOES SUGGEST SOME

5    CRIMINAL CONDUCT THAT IS BEYOND THE STRESS ITSELF,

6    BUT SINCE SHE TESTIFIED ABOUT EVENTS SUCH AS HAVING

7    THIS AUTOMOBILE ACCIDENT AND INDEED THERE BEING A

8    TICKET OR SOMETHING ISSUED IN RELATIONSHIP TO IT.

9             MR. NARITA:  WELL, YOUR HONOR, JUST TO

10   CLARIFY, THERE WAS A CRIMINAL COMPLAINT FILED BY

11   THE MONTEREY COUNTY DISTRICT ATTORNEY FOR HIT AND

12   RUN.

13             NOW, LATER ON PURSUANT TO A PLEA

14   AGREEMENT, A FEW OF THE CHARGES WERE DROPPED AND

15   SHE PLED GUILTY TO A MISDEMEANOR AND SHE WAS PUT ON

16   PROBATION.  THIS DRAGGED OUT OVER A SERIES OF

17   MONTHS AND SHE HAD TO HIRE A CRIMINAL DEFENSE

18   ATTORNEY.

19             THE COURT:  LET ME DO IT THIS WAY -- I

20   DON'T HAVE TIME WITH THE JURY STANDING BY TO DEAL

21   WITH THIS LEVEL OF DETAIL.

22             MR. NARITA:  SURE.

23             THE COURT:  IT DOES SEEM TO ME IF YOU'RE

24   OFFERING THIS FOR AN IMPROPER PURPOSE, NAMELY,

25   CHARACTER, NAMELY, YOU WANTED TO PROVE THAT A

103

1    PERSON WHO WAS IN A HIT AND RUN SHOULD NOT RECEIVE

2    A VERDICT IN THIS CASE, THAT WOULD BE IMPROPER.

3    AND THAT'S WHY I WAS TRYING TO CHARACTERIZE IT IN

4    THE WAY OF LEAVING THE NATURE OF A CHARGE BECAUSE A

5    CHARGE IS NOT EVIDENCE OF GUILT, AND I DON'T WANT

6    TO SLOP OVER INTO THAT AREA.

7           HOWEVER, I THINK WE CAN PROBABLY COME TO

8    AN ACCOMODATION.  I JUST CAN'T DO IT FAST ENOUGH TO

9    INCLUDE IT IN YOUR OPENING STATEMENT.

10          SO HAVING NOT BROUGHT IT TO MY ATTENTION

11   PRIOR TO NOW, YOU SHOULD NOT USE IT IN YOUR OPENING

12   STATEMENT OR YOU CAN DEFER YOUR OPENING STATEMENT

13   AND COME BACK TO IT LATER AND I CAN DEAL WITH IT AT

14   THAT TIME.

15          MR. NARITA:  THAT'S FINE, YOUR HONOR.  I

16   WILL NOT MENTION ANY CRIMINAL CHARGE DURING THE

17   OPENING STATEMENT.

18          I DO WANT TO BE ABLE TO MENTION THE

19   ACCIDENT ITSELF BUT NOT ANY CRIMINAL CHARGE.

20          THE COURT:  YOU MAKE YOUR OBJECTIONS IF

21   HE STARTS TO GO ASTRAY.

22          MR. WALLACE:  I WILL DO THAT, YOUR HONOR.

23   YOUR HONOR, I APOLOGIZE, HE PRESENTED ME THIS

24   MORNING WITH SOME SLIDES HE WANTS TO PRESENT TO THE

25   JURY AND I DON'T HAVE A PROBLEM WITH MOST OF THEM,

                                                    104

1    BUT THE LAST ONE I BELIEVE IS OUT OF BOUNDS.

2            THE COURT:  CAN I SEE THE SLIDE?

3            MR. WALLACE:  YES, YOUR HONOR.  HERE IT

4    IS.

5            THE COURT:  WHICH ONE IS IT?

6            MR. WALLACE:  IT'S THE LAST ONE.

7            THE COURT:  ATTORNEY REPRESENTATION?

8            MR. WALLACE:  YES, YOUR HONOR.

9            (PAUSE IN PROCEEDINGS.)

10           THE COURT:  WHAT IS YOUR OBJECTION?

11           MR. WALLACE:  MY OBJECTION IS WE'RE

12   DEALING WITH A LOT OF DISPUTED FACTS AND IT'S

13   MISLEADING.

14           ONE IS THAT WHEN MY CLIENT RETAINED

15   COUNSEL.  COUNSEL FOR CREDIGY WANTS TO PRESENT

16   EVIDENCE THAT MY CLIENT SHOULD HAVE MITIGATED THEIR

17   CONDUCT, THEIR WRONG CONDUCT BY HIRING A LAWYER,

18   AND HE WANTS TO SUGGEST THAT THEY HAD DONE THAT

19   AND, IN FACT, THEY DIDN'T DO THAT.

20           THE COURT:  WELL, THIS IS, AGAIN, THIS IS

21   NOT THE KIND OF THING THAT I CAN DEAL WITH THE JURY

22   WAITING.  AND YOU SHOULD UNDERSTAND THAT MY

23   CRIMINAL CASE HAS NOW GONE AWAY SO I HAVE THE

24   MORNING FREE TO DEAL WITH THESE KINDS OF THINGS.

25           THE FACT OF CONSULTING AN ATTORNEY, THE

                                                    105

1    DATE OF THE CONSULTATION IS NOT PROTECTED BY THE

2    ATTORNEY-CLIENT PRIVILEGE.

3              MR. NARITA:  THAT'S ALL I'M GOING TO SAY.

4              THE COURT:  BUT TO CHARACTERIZE THE

5    EFFECT OF THIS IS ARGUMENT.  SO OPENING STATEMENTS

6    ARE RESTRICTED TO WHAT FACTS YOU'RE GOING TO

7    PRESENT.  YOU MAY NOT ARGUE IN YOUR OPENING

8    STATEMENT.

9              I HAVE OFTEN HEARD LAWYERS CALL IT THE

10   OPENING ARGUMENT.  THERE IS NO SUCH THING.

11             YOU CAN TELL THE JURY WHAT YOU EXPECT THE

12   EVIDENCE TO BE, BUT YOU CAN'T ARGUE THAT THIS WILL

13   PROVE THAT THEY DON'T HAVE DAMAGES AND THEY WERE

14   LYING DURING THIS WHOLE PERIOD OF TIME.  THAT'S

15   ARGUMENT AND YOU HAVE TO RESERVE ON THAT.

16             NOW, TO THE EXTENT THAT IT SEEMS TO ME

17   THAT I DON'T KNOW WHAT THESE QUOTES ARE ON THIS

18   SLIDE IF THEY ARE -- ARE YOU OBJECTING TO THE

19   QUOTED LANGUAGE?

20             MR. WALLACE:  I'M OBJECTING TO IS THE

21   BALAM LETONA.

22             THE COURT:  WHAT?

23             MR. WALLACE:  COUNSEL FOR PLAINTIFF, HE

24   WAS NOT INVOLVED AT THE TIME THAT THIS -- THEY'RE

25   LOOKING TO SAY THAT MR. LETONA WAS INVOLVED IN

                                              106

1    REPRESENTING OUR CLIENTS AT THE TIME IN 2006 AND

2    THE TESTIMONY FROM WATSONVILLE LAW CENTER.

3              THE COURT:  ARE YOU OBJECTING TO THE

4    QUOTED LANGUAGE?

5              MR. WALLACE:  NO, I'M NOT.

6              THE COURT:  THEN YOU CAN USE THAT EXHIBIT

7    AS LONG AS YOU DON'T CHARACTERIZE IT IN A FASHION

8    THAT RUNS AFOUL OF THE RULES OF OPENING STATEMENT.

9              SUMMON THE JURY.

10             MR. NARITA:  THANK YOU.

11             (WHEREUPON, THE FOLLOWING PROCEEDINGS

12   WERE HELD IN THE PRESENCE OF THE JURY:)

13             THE COURT:  HOW IS THAT COLD?

14             JUROR:  BETTER TODAY.  NOT AS CONTAGIOUS.

15   I'LL BE SITTING OVER HERE IN THE CORNER.

16             THE COURT:  OKAY.  PLEASE BE SEATED.  IN

17   A MOMENT I'M GOING TO HAVE MS. GARCIA GIVE YOU A

18   COPY OF MY OPENING INSTRUCTIONS, AND WE'LL START

19   THE FORMAL PROCESS, BUT I WANTED TO MAKE A COUPLE

20   OF COMMENTS.

21             IT'S OBVIOUS TO YOU THAT THE LIGHTS IN

22   THE COURTROOM HAVE BEEN DIMMED A LITTLE BIT.

23   THAT'S BECAUSE THE PARTIES WANT TO USE THAT

24   PROJECTOR AND THE LIGHT THERE KIND OF SQUASHES OUT

25   THE SCREEN.

107

1          SO THERE MAY BE OCCASIONS WHEN WE TURN

2    THE LIGHTS UP OR DOWN.  IT SHOULDN'T AFFECT YOU AT

3    ALL.  IT'S DESIGNED TO ASSIST YOU IN KIND OF SEEING

4    THE MATERIALS THAT THEY PRESENT DURING THE COURSE

5    OF THEIR PROCESS.

6          ALSO TODAY I WANTED TO ACKNOWLEDGE THAT

7    TODAY WE HAVE SOME LAW STUDENTS WHO ARE HERE

8    OBSERVING THIS TRIAL PROCESS, AND SOME OF THEM CAME

9    INTO CHAMBERS AND I DESCRIBED A LITTLE BIT ABOUT

10   THE CASE.

11         AND I KNOW THAT THEY HAVE A CLASS TO

12   ATTEND LATER THIS AFTERNOON SO THEY'LL GET UP AND

13   LEAVE AT SOME POINT.  AND I HOPE THAT YOU'LL

14   UNDERSTAND THAT I HAVE GIVEN THEM PERMISSION TO DO

15   THAT AND THAT SHOULDN'T DISTURB US AT ALL.

16         AND MEMBERS OF THE PUBLIC OCCASIONALLY

17   WILL COME BY AND WATCH THE TRIAL, AND YOU'LL SEE

18   THEM COMING AND GOING BUT THAT'S JUST BECAUSE WE'RE

19   AN OPEN COURT AND ANYONE IN THE PUBLIC IS WELCOME

20   TO ATTEND.

21         HAND OUT MY OPENING INSTRUCTIONS.

22         IT COULD BE AS I READ IT, I'LL MAKE

23   CHANGES IN THE LANGUAGE.  YOU ARE TO BE GUIDED BY

24   THE INSTRUCTIONS AS I DELIVER THEM TO YOU, AND I'LL

25   ALWAYS TRY TO FOLLOW IT OUT BY A DERIVATIVE

108

1    MODIFICATION INSTRUCTION.

2             LADIES AND GENTLEMEN, YOU'RE NOW THE JURY

3    IN THIS CASE, AND I WANT TO TAKE A FEW MINUTES TO

4    TELL YOU SOMETHING ABOUT YOUR DUTIES AS JURORS AND

5    TO GIVE YOU SOME INSTRUCTIONS.  AT THE END OF THE

6    TRIAL I'LL GIVE YOU MORE INSTRUCTIONS.

7             DURING VARIOUS POINTS IN THE TRIAL WHEN I

8    FIND IT APPROPRIATE, I WILL GIVE YOU ADDITIONAL

9    INSTRUCTIONS.  ALL OF THE INSTRUCTIONS WHICH I GIVE

10   TO YOU ARE IMPORTANT.  YOU MUST FOLLOW ALL OF THEM.

11            IN EVERY LEGAL DISPUTE THERE ARE TWO

12   KINDS OF QUESTIONS.  THE FIRST KIND OF QUESTION ARE

13   QUESTIONS OF FACT.  FOR EXAMPLE, IN MANY LAWSUITS

14   THERE IS A DISPUTE BETWEEN THE PARTIES OVER WHETHER

15   OR NOT A PARTICULAR EVENT ACTUALLY TOOK PLACE.  AND

16   IF IT DID TAKE PLACE, WHETHER OR NOT IT CAUSED

17   ECONOMIC OR OTHER TYPES OF HARM.  AND IF SO, HOW

18   MUCH HARM WAS CAUSED.

19            UNDER OUR SYSTEM A JURY IS IMPANELLED TO

20   LISTEN TO THE EVIDENCE AND BASED ON THAT EVIDENCE

21   THE JURY DECIDES WHETHER OR NOT THE DISPUTED EVENT

22   TOOK PLACE OR NOT AND THE AMOUNT OF DAMAGES, IF

23   ANY, WHICH SHOULD BE AWARDED.

24            AS JURORS IN THIS CASE YOUR FIRST DUTY IS

25   TO LISTEN TO THE EVIDENCE AND MAKE A DECISION ABOUT

1    WHAT HAPPENED AND IF THE PLAINTIFFS SUFFERED

2    DAMAGES AND IF SO, HOW MUCH TO AWARD.

3              THERE MIGHT BE INSTANCES WHEN WHAT THE

4    PLAINTIFFS CLAIM TOOK PLACE WILL BE DIFFERENT FROM

5    WHAT THE DEFENDANTS CLAIM TOOK PLACE.

6              YOU MUST LISTEN TO THE EVIDENCE AND BASED

7    ON THAT EVIDENCE MAKE YOUR DECISION ABOUT WHAT TOOK

8    PLACE.

9              IN OTHER WORDS, YOU MUST DECIDE THE FACTS

10   OF THE CASE.  YOU AND YOU ALONE ARE THE JUDGES OF

11   THE FACTS.

12             A SECOND KIND OF QUESTION INVOLVED IN

13   LEGAL DISPUTES ARE CALLED QUESTIONS OF LAW.  AN

14   EXAMPLE OF A QUESTION OF LAW IS:  "WHAT MUST THE

15   PLAINTIFF PROVE IN ORDER TO BE ENTITLED TO A

16   VERDICT IN FAVOR OF THE PLAINTIFF?"

17             IN OUR LEGAL SYSTEM THE JUDGE IS

18   RESPONSIBLE FOR DECIDING QUESTIONS OF LAW.  IN WHAT

19   I CALL JURY INSTRUCTIONS, I WILL TELL YOU THE LAW

20   WHICH APPLIES TO THIS CASE.  THE STATEMENTS I AM

21   MAKING TO YOU BEFORE YOU BEGIN TO RECEIVE EVIDENCE

22   ARE JURY INSTRUCTIONS.

23             THE FINAL STEP IN THE PROCESS IS CALLED

24   THE VERDICT.  BASED ON YOUR DECISION ON THE FACTS

25   AND APPLYING THE LAW WHICH I WILL GIVE TO YOU, YOU

1    WILL BE ASKED TO DECIDE IN FAVOR OF THE PLAINTIFFS

2    OR THE DEFENDANTS.

3           THEREFORE, YOU WILL HEAR THE EVIDENCE,

4    DECIDE WHAT THE FACTS ARE, AND THEN APPLY THOSE

5    FACTS TO THE LAW WHICH I WILL GIVE TO YOU.  AND

6    THAT'S HOW YOU'LL REACH YOUR VERDICT.

7           IN DOING SO, YOU MUST FOLLOW THE LAW

8    WHETHER YOU AGREE WITH IT OR NOT.

9           THE EVIDENCE WILL CONSIST OF THE

10   TESTIMONY OF WITNESSES, DOCUMENTS, AND OTHER THINGS

11   RECEIVED INTO EVIDENCE AS EXHIBITS AND ANY FACTS ON

12   WHICH THE LAWYERS AGREE OR WHICH I INSTRUCT YOU TO

13   ACCEPT.

14          AS YOU LEARNED DURING THE JURY SELECTION

15   PROCESS, THIS IS A CIVIL CASE INVOLVING MANUEL

16   FAUSTO AND LUZ FAUSTO, WHO ARE THE PLAINTIFFS AND

17   CREDIGY SERVICES CORPORATION, CREDIGY RECEIVABLES,

18   INC., CREDIGY SOLUTIONS, INC., LUIS RENATO SILVA

19   NUNES, BRETT BOYDE, AND PAULO PERES, WHO ARE THE

20   DEFENDANTS.

21          PLAINTIFFS ALLEGE THAT DEFENDANTS ENGAGED

22   IN INTRUSIVE AND ABUSIVE ATTEMPTS TO COLLECT ON A

23   DEBT IN VIOLATION OF STATE AND FEDERAL LAWS.

24          IN A LAWSUIT SUCH AS THIS, THE LAW

25   PROVIDES THAT A PARTY IS ENTITLED TO A VERDICT IN

111

1    ITS FAVOR ONLY IF THAT PARTY PRESENTS A SUFFICIENT

2    AMOUNT OF EVIDENCE.  WE CALL THIS BURDEN OF PROOF.

3    IN THIS CASE YOU WILL HEAR ABOUT PREPONDERANCE OF

4    THE EVIDENCE.

5         WHEN A PARTY HAS A BURDEN OF PROVING A

6    CLAIM BY A PREPONDERANCE OF THE EVIDENCE, THAT

7    MEANS THAT THE PARTY HAS TO PRODUCE EVIDENCE WHICH

8    CONSIDERED IN THE LIGHT OF ALL OF THE FACTS, LEADS

9    YOU TO BELIEVE THAT WHAT THAT PARTY CLAIMS IS MORE

10   LIKELY TRUE THAN NOT.

11        DURING THE TRIAL YOU WILL HEAR EVIDENCE

12   FROM BOTH SIDES.  IF YOU WERE TO PUT THE EVIDENCE

13   ON OPPOSITE SIDES OF THE SCALES, THE PARTY WITH THE

14   BURDEN OF PROOF ON A MATTER BY A PREPONDERANCE OF

15   THE EVIDENCE WOULD HAVE TO MAKE THE SCALES TIP

16   SLIGHTLY ON THAT PARTY'S SIDE.  IF THAT PARTY FAILS

17   TO MEET THIS BURDEN, THAT VERDICT MUST BE FOR THE

18   OPPOSING PARTY.

19        SOME OF YOU MIGHT HAVE HEARD ABOUT PROOF

20   BEYOND A REASONABLE DOUBT.  THAT IS A STRICTER

21   STANDARD.  THAT IS, IT APPLIES TO A CRIMINAL CASE

22   AND IT REQUIRES MORE PROOF THAN A PREPONDERANCE OF

23   THE EVIDENCE.  THE REASONABLE DOUBT STANDARD DOES

24   NOT APPLY TO A CIVIL CASE AND YOU SHOULD,

25   THEREFORE, PUT IT OUT OF YOUR MINDS.

1            THE EVIDENCE FROM WHICH YOU ARE TO DECIDE

2    WHAT THE FACTS ARE CONSISTS OF ONE, THE SWORN

3    TESTIMONY OF WITNESSES BOTH ON DIRECT AND

4    CROSS-EXAMINATION, REGARDLESS OF WHO CALLS THE

5    WITNESS; TWO, THE EXHIBITS WHICH HAVE BEEN RECEIVED

6    INTO EVIDENCE; AND, THREE, ANY FACTS TO WHICH ALL

7    OF THE LAWYERS AGREE OR STIPULATE.

8            THE FOLLOWING THINGS ARE NOT EVIDENCE AND

9    YOU MUST NOT CONSIDER THEM AS EVIDENCE IN DECIDING

10   THE FACTS OF THIS CASE:

11           1.  STATEMENTS AND ARGUMENTS OF THE

12   ATTORNEYS;

13           2.  QUESTIONS AND OBJECTIONS OF THE

14   ATTORNEYS;

15           3.  TESTIMONY THAT I INSTRUCT YOU TO

16   DISREGARD;

17           4.  ANYTHING THAT YOU MAY HAVE SEEN OR

18   HEARD WHEN THE COURT IS NOT IN SESSION, EVEN IF

19   WHAT YOU SEE OR HERE IS DONE OR SAID BY ONE OF THE

20   PARTIES OR BY ONE OF THE WITNESSES.

21           EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL

22   EVIDENCE.  DIRECT EVIDENCE IS TESTIMONY BY A

23   WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR

24   HEARD OR DID.

25           CIRCUMSTANTIAL EVIDENCE IS INDIRECT

113

1    EVIDENCE, THAT IS, IT IS PROOF OF ONE OR MORE FACTS

2    FROM WHICH ONE CAN FIND ANOTHER FACT.

3         FOR EXAMPLE, IF THE FACT IN A GIVEN CASE

4    IS THE QUESTION OF WHETHER OR NOT JOHNNY ATE THE

5    CHERRY PIE, TESTIMONY BY A WITNESS THAT HE SAW

6    JOHNNY PUT THE PIE IN HIS MOUTH AND EAT IT WOULD BE

7    DIRECT EVIDENCE OF THIS FACT.

8         HOWEVER, IF THE QUESTION OF FACT ON

9    ANOTHER DAY IS WHETHER JANE ATE THE CHERRY PIE AND

10   IN THAT CASE NO ONE SAW HER EAT IT BUT A WITNESS

11   TESTIFIES THAT HE WALKED INTO THE KITCHEN WITH JANE

12   SITTING AT THE TABLE WITH THE EMPTY PIE TINS IN HER

13   HANDS AND CHERRY PIE ON HER FACE, THAT WOULD ONLY

14   BE DIRECT EVIDENCE THAT SHE WAS IN THE KITCHEN AND

15   SHE HAD PIE ON HER FACE BUT IT WOULD BE

16   CIRCUMSTANTIAL EVIDENCE FROM WHICH A PERSON COULD

17   FIND THAT JANE ATE THE PIE.

18        HOWEVER, THERE COULD BE OTHER

19   CIRCUMSTANCES WHICH WOULD EXPLAIN WHY SHE HAD THE

20   TINS IN HER HANDS AND PIE ON HER FACE.  YOU MUST

21   LISTEN TO ALL OF THE FACTS AND MAY DRAW REASONABLE

22   CONCLUSIONS FROM THOSE FACTS.

23        FACTS MAY BE PROVED BY EITHER DIRECT OR

24   CIRCUMSTANTIAL EVIDENCE AND YOU ARE TO CONSIDER

25   BOTH TYPES OF EVIDENCE.  THE LAW PERMITS YOU TO

114

1    GIVE EQUAL WEIGHT TO BOTH, BUT IT IS FOR YOU TO

2    DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

3              THERE ARE RULES OF EVIDENCE WHICH CONTROL

4    WHAT CAN BE RECEIVED INTO EVIDENCE.

5              WHEN A LAWYER ASKS A QUESTION OR OFFERS

6    AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER

7    SIDE THINKS THAT IT IS NOT PERMITTED BY THE RULES

8    OF EVIDENCE, THE LAWYER MAY OBJECT.

9              IF I OVERRULE THE OBJECTION, THE QUESTION

10   MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I

11   SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

12   ANSWERED AND THE EXHIBIT CANNOT BE RECEIVED.  AND

13   WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU

14   MUST IGNORE THE ANSWER AND NOT GUESS WHAT THE

15   ANSWER WOULD HAVE BEEN.

16             SOMETIMES I MAY ORDER THAT EVIDENCE BE

17   STRICKEN FROM THE RECORD AND THAT YOU DISREGARD OR

18   IGNORE THE EVIDENCE.  THAT MEANS THAT WHEN YOU ARE

19   DECIDING THE CASE YOU MUST NOT CONSIDER THE

20   EVIDENCE WHICH I TOLD YOU TO DISREGARD.

21             IN DECIDING THE FACTS OF THE CASE YOU

22   MUST HAVE TO DECIDE WHICH WITNESSES TO BELIEVE AND

23   WHICH WITNESSES NOT TO BELIEVE.  YOU MAY BELIEVE

24   EVERYTHING A WITNESS SAYS OR ONLY PART OF IT OR

25   NONE OF IT.

115

1           IN DECIDING WHAT TO BELIEVE, YOU MAY

2    CONSIDER A NUMBER OF FACTORS, INCLUDING THE

3    FOLLOWING:

4           1.  WAS THE WITNESS ABLE TO SEE OR HEAR

5    OR KNOW THE THINGS THAT THE WITNESS TESTIFIED TO?

6           2.  WHAT WAS THE QUALITY OF THE WITNESS'S

7    MEMORY?

8           3.  WHAT WAS THE WITNESS'S MANNER WHILE

9    TESTIFYING?

10          4.  DOES THE WITNESS HAVE AN INTEREST IN

11   THE OUTCOME OF THE CASE OR ANY MOTIVE, BIAS OR

12   PREJUDICE?

13          5.  IS THE TESTIMONY OF THE WITNESS

14   CORRECTED BY ANYTHING THAT THE WITNESS SAID OR

15   WROTE BEFORE TRIAL OR BY OTHER EVIDENCE?

16          6.  HOW REASONABLE IS THE WITNESS'S

17   TESTIMONY WHEN CONSIDERED IN THE LIGHT OF OTHER

18   EVIDENCE WHICH YOU BELIEVE?

19          NOW, IF YOU WISH YOU MAY TAKE NOTES TO

20   HELP YOU REMEMBER WHAT WITNESSES SAID.

21          IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO

22   YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO TO THE

23   JURY ROOM TO DECIDE THE CASE AND DO NOT LET

24   NOTE-TAKING DISTRACT YOU SO THAT YOU DO NOT HEAR

25   OTHER ANSWERS BY OTHER WITNESSES.

116

1         WHEN YOU LEAVE AT NIGHT YOUR NOTES SHOULD

2    BE LEFT IN THE JURY ROOM.

3         IF YOU DO NOT TAKE NOTES, YOU SHOULD RELY

4    UPON YOUR OWN MEMORY OF WHAT WAS SAID AND NOT BE

5    OVERLY INFLUENCED BY THE NOTES OF OTHER JURORS.

6         IF YOU NEED TO SPEAK WITH ME, SIMPLY USE

7    YOUR NOTE PADS TO GIVE THE NOTE TO THE CLERK OF

8    COURT OR TO THE COURT REPORTER OR DIRECTLY TO ME.

9         YOU MAY USE YOUR NOTES TO LET US KNOW IF

10   YOU'RE HAVING DIFFICULTY HEARING OR UNDERSTANDING A

11   PARTICULAR PART OF THE CASE.

12        IT IS THE POLICY OF THE COURT NOT TO

13   PERMIT JURORS TO WRITE QUESTIONS FOR THE WITNESSES,

14   HOWEVER, IF THERE ARE SOME ASPECTS OF THE CASE THAT

15   YOU FIND CONFUSING, PLEASE WRITE A NOTE TO ME AND

16   I'LL BRING IT TO THE ATTENTION OF THE ATTORNEYS.

17        ORDINARILY WE'LL TAKE BREAKS IN THE

18   MIDDLE OF OUR SESSION, HOWEVER, IF ANY ONE OF YOU

19   NEED A BREAK BEFORE THE SCHEDULED TIME, SIMPLY

20   RAISE YOUR HAND AND GET MY ATTENTION AND WE'LL TAKE

21   A BREAK.

22        FEEL FREE TO STAND AROUND, GET TO THE

23   WATER COOLER IF YOU WISH TO.

24        LET ME SAY A FEW WORDS ABOUT YOUR CONDUCT

25   AS JURORS.  FIRST, DO NOT TALK TO EACH OTHER OR

117

1    ANYONE ELSE ABOUT THE CASE OR ABOUT ANYONE WHO HAS

2    ANYTHING TO DO WITH IT UNTIL THE END OF THE CASE

3    WHEN YOU GO TO THE JURY ROOM TO DECIDE ON YOUR

4    VERDICT.  ANYONE ELSE INCLUDES YOUR FAMILY AND

5    FRIENDS.  YOU MAY TELL THEM YOU'RE A JUROR, BUT

6    DON'T TELL THEM ANYTHING ABOUT THE CASE UNTIL AFTER

7    YOU HAVE BEEN DISCHARGED BY ME.

8            SECOND, DO NOT LET ANYONE TALK TO YOU

9    ABOUT THE CASE OR ABOUT ANYONE WHO HAS ANYTHING TO

10   DO WITH IT.  IF SOMEONE SHOULD TALK TO YOU, PLEASE

11   REPORT IT TO ME IMMEDIATELY.

12           THIRD, DO NOT READ ANY NEWS ARTICLES

13   ABOUT THE CASE OR LISTEN TO ANY TELEVISION NEWS

14   ABOUT THE CASE.

15           FOURTH, DO NOT DO ANY RESEARCH SUCH AS

16   CONSULTING DICTIONARIES OR REFERENCE MATERIALS AND

17   DO NOT MAKE ANY INVESTIGATION ABOUT THE CASE ON

18   YOUR OWN.

19           I SHOULD MODIFY THIS BECAUSE I READ A

20   NEWS ARTICLE THE OTHER DAY OF A JURY WHO WAS

21   TWITTERING AND DOING ALL KINDS OF OTHER THINGS

22   DURING THE COURSE OF THE TRIAL.

23           DO NOT USE ANY ELECTRONIC DEVICE TO

24   RESEARCH THE CASE AND DON'T GOOGLE THE PARTIES OR

25   ANYTHING.  WAIT UNTIL THE EVIDENCE COMES IN DURING

118

1    THE COURSE OF THE CASE.

2          FIFTH, IF YOU NEED TO COMMUNICATE WITH

3    ME, AS I SAID, SIMPLY GIVE A NOTE TO MS. GARCIA,

4    OUR COURTROOM DEPUTY CLERK OR TO THE COURT REPORTER

5    OR TO ME.

6          FINALLY, DO NOT MAKE UP YOUR MIND ABOUT

7    WHAT THE VERDICT SHOULD BE UNTIL AFTER YOU HAVE

8    GONE TO THE JURY ROOM TO DECIDE THE CASE AND YOU

9    AND YOUR FELLOW JURORS HAVE DISCUSSED THE EVIDENCE.

10   KEEP AN OPEN MIND UNTIL THEN.

11         NOW, WE HAD A LITTLE BIT OF A DELAY IN

12   GETTING STARTED BECAUSE THE PARTIES STARTED

13   BRINGING UP MATTERS THAT THEY WANTED TO DISCUSS

14   WITH ME OUT OF YOUR PRESENCE.

15         I HAVE ORDERED THE PARTIES TO SCHEDULE

16   HEARINGS OTHER THAN THE TIMES OF TRIAL.  SOMETIMES

17   IT MAY BE NECESSARY TO MEET DURING THE TIME WE HAVE

18   FOR TRIAL, BUT IF SO I WILL BE DOING MY BEST TO

19   MAKE SURE THAT THE GOAL IS TO ADVANCE THE PROMPT

20   PROCEEDINGS.

21         THE TRIAL MAY BEGIN.  EACH SIDE MAY MAKE

22   AN OPENING STATEMENT.  AN OPENING STATEMENT IS NOT

23   EVIDENCE.  IT IS SIMPLY AN OUTLINE TO HELP YOU

24   UNDERSTAND WHAT THAT PARTY EXPECTS THE EVIDENCE

25   WILL SHOW.  A PARTY IS NOT REQUIRED TO MAKE AN

1    OPENING STATEMENT.

2              AT THIS POINT THE COURT WILL CALL ON

3    COUNSEL FOR PLAINTIFFS FOR ANY OPENING STATEMENTS

4              MR. WALLACE:  THANK YOU, YOUR HONOR.

5              **(WHEREUPON, COUNSEL FOR THE PLAINTIFFS**

6    **MADE HIS OPENING STATEMENT.)**

7              MR. WALLACE:  GOOD AFTERNOON.  MR. MANUEL

8    FAUSTO AND MS. LUZ FAUSTO ARE HERE TO PUT A STOP,

9    TO STAND UP, TO SHED LIGHT UPON THE FRAUD, THE

10   DECEIT, AND THE WRONGFUL PRACTICES OF THE CREDIGY

11   COMPANIES AND THEIR EMPLOYEES.  THAT'S WHAT THIS

12   CASE IS ABOUT.

13             MR. AND MRS. FAUSTO HAVE BEEN MARRIED 40

14   YEARS.  THEY HAVE LIVED IN GONZALES FOR ABOUT 18

15   YEARS.

16             AND TO SAY THAT GONZALES IS FAR DIFFERENT

17   THAN WHERE WE ARE RIGHT HERE AND RIGHT NOW WOULD BE

18   AN UNDERSTATEMENT.

19             MR. FAUSTO HAS A SECOND GRADE EDUCATION.

20   HE KNOWS HOW TO READ A LITTLE AND WRITE A LITTLE

21   BIT IN SPANISH.

22             MRS. FAUSTO HAS A SIXTH GRADE EDUCATION.

23   SHE KNOWS HOW TO READ AND WRITE IN SPANISH.

24             MR. FAUSTO FOR THE LAST 12 OR SO YEARS

25   HAS WORKED FOR DOLE IN THE FIELDS CUTTING

                                                    120

1    VEGETABLES SIX DAYS A WEEK TEN OR PLUS HOURS A DAY.

2            MRS. FAUSTO DID THE SAME UNTIL ABOUT

3    THREE YEARS AGO TO SUPPORT THEIR FAMILY AND THEIR

4    CHILDREN.  THE EVIDENCE WILL BE, AND YOU'LL HEAR

5    FROM SOME OF THEM, THEY HAVE NINE CHILDREN.  NINE

6    CHILDREN.

7            THESE NINE CHILDREN THEY'RE INCREDIBLY

8    PROUD OF BECAUSE THEY HAVE GONE TO COLLEGE, EXCEPT

9    FOR ONE, THE YOUNGEST WHO IS 14 AND A SOPHOMORE IN

10   HIGH SCHOOL.

11           WE'RE TALKING ABOUT CHILDREN WHO HAVE

12   GRADUATED FROM COLLEGE, WHO HAVE SERVED IN THE

13   ARMY, WHO HAVE SERVED IN IRAQ.

14           WE'RE TALKING ABOUT CHILDREN WHO ARE VICE

15   PRINCIPALS OF WATSONVILLE HIGH SCHOOL.

16           WE'RE TALKING ABOUT GUIDANCE COUNSELORS

17   IN SCHOOLS.

18           WE'RE TALKING ABOUT CHILDREN WHO ARE

19   WORKING ON THEIR MASTERS.

20           YOU'RE GOING TO HEAR FROM A NUMBER OF

21   THESE.  WE WILL BRING SOME IN OUR CASE, AND THEY

22   SUBPOENAED A BUNCH OF THEM.

23           OSCAR IS FINISHING UP HIS LAST YEAR IN

24   COLLEGE AT HARTNELL AND HE WORKS TWO JOBS.  HE HAS

25   A GRADE POINT OF ABOUT 3.8.

                                                    121

1          LIKE I SAID, THEY'RE INCREDIBLY PROUD FOR

2    THEIR KIDS.  THEY HAVE WORKED HARD FOR THEM AND

3    THEIR KIDS WORK HARD FOR THEM, TOO.

4          THIS, IF YOU WILL CALL IT RELATIONSHIP,

5    THAT WE'RE HERE TO TALK ABOUT BEGAN IN 2006.  MY

6    CLIENTS IN GONZALES RECEIVED A LETTER FROM A

7    COMPANY CALLED CREDIGY SERVICES WRITING ON BEHALF

8    OF CREDIGY RECEIVABLES.  THIS LETTER IS DATED IN

9    AUGUST OF 2006.

10          THEY'LL BOTH TELL YOU, AND I'M SURE

11    CREDIGY WILL TELL YOU, TOO, THEY HAVE NEVER HEARD

12    OF CREDIGY BEFORE IN THEIR LIFE.

13          THIS LETTER WAS SAYING THAT THEY OWED

14    CREDIGY SOME $17,000.  WELL, MRS. FAUSTO LOOKED

15    OVER THE LETTER AND WAS SHOCKED.

16          A FEW DAYS LATER SHE GETS A CALL FROM

17    CREDIGY.  WE'LL SEE IN THEIR LOG WHAT THEY SAY

18    ABOUT THAT CALL.  IT'S AN EIGHT-MINUTE CALL.

19          AND IN THEIR LOG AS A DEBT COLLECTOR,

20    THEY DOCUMENT THEIR PHONE CALLS AND WHAT IS SAID

21    AND WHAT THEY TELL PEOPLE.  AND THEY'LL TELL YOU

22    THAT'S THEIR POLICY AND PROCEDURE SO THEY KNOW WHAT

23    HAPPENS.

24          SO IN THIS EIGHT-MINUTE PHONE CALL YOU'RE

25    GOING TO HEAR THEY TYPED IN FIVE WORDS IN AN

1    EIGHT-MINUTE PHONE CALL.  MRS. FAUSTO WILL TELL YOU

2    WHAT SHE GOT.  THAT SHE WAS WORRIED.  AND SHE

3    SOUGHT OUT HELP.

4            THE LETTER THAT I'M TALKING ABOUT

5    REFERENCED WELLS FARGO.

6            NOW, MY CLIENTS WILL NOT DISPUTE THEY HAD

7    HEARD OF WELLS FARGO.  IN FACT, THEY HELD A WELLS

8    FARGO CREDIT CARD ONCE UPON A TIME BACK IN THE

9    '90S.

10           WE'RE IN 2006 NOW.  AND THEY GET THAT

11   LETTER ABOUT A WELLS FARGO CARD.  WELL, IMMEDIATELY

12   THEY BELIEVED, THEY DIDN'T KNOW IT, THAT THEY HAD

13   TAKEN CARE OF THAT MATTER.

14           THE EVIDENCE WILL BE THAT THEY HAD A

15   WELLS FARGO CREDIT CARD FROM LIKE 1991 TO '98.  AND

16   IT HAD AN APPROXIMATE CREDIT CARD LIMIT ON IT OF

17   ABOUT $1100.  AND TOWARD THE END THEY HAD ABOUT A

18   CREDIT OF ABOUT $900.  AND THEY REACHED A POINT

19   WHERE THEY WEREN'T MAKING ANY MORE CHARGES ON THIS

20   CREDIT CARD.  THEY WERE MAKING PAYMENTS EVERY

21   MONTH, BUT THEY WOULD SEE THAT THE BALANCE WASN'T

22   COMING DOWN.  THE BALANCE WAS GOING UP EVERY MONTH.

23           MRS. FAUSTO WILL TESTIFY THAT SHE WENT

24   INTO THE LOCAL WELLS FARGO BRANCH TO TALK TO THEM

25   ABOUT IT AND SEE IF THEY COULD MAKE AN AGREEMENT

1    ABOUT A PAYOFF AND STOP THE INTEREST.  THEY

2    WOULDN'T DO IT.

3           SO WHAT THEY DECIDED TO DO IS SEEK OUT

4    SOME HELP.  THEY WENT TO A COUPLE OF COMPANIES AND

5    THEY ENDED UP AT A PLACE CALLED ABC CONSULTING.

6    THE COMPANY BUSINESS BASICALLY IS TO CONTACT A

7    CREDITOR AND TRY TO WORK OUT AN ARRANGEMENT THROUGH

8    PAYMENTS OR LUMP SUM PAYMENTS ON THE ACCOUNT.  IT

9    WAS SUGGESTED THAT MAYBE THEY SHOULD FILE

10   BANKRUPTCY ON THAT AND THEY DIDN'T WANT TO DO THAT

11   AND THEY DIDN'T DO THAT.

12          WHAT THEY DID WAS THAT THEY HIRED THIS

13   GUY FROM ABC CONSULTING, HAROLD BLANCO.  THEY PAID

14   HIM ABOUT $150 AND FOR THAT HE STARTED CONTACTING

15   WELLS FARGO AND HE HAD NEGOTIATIONS WITH THEM.

16          AND ULTIMATELY THEY CAME IN AND THEY

17   BROUGHT IN ABOUT TWO OR THREE MONEY ORDERS, AND

18   THEY PAID $1300 TO $1500 IN MONEY ORDERS THAT WERE

19   FILLED OUT TO WELLS FARGO.

20          THEY'LL TELL YOU THAT AT THAT POINT IN

21   TIME THEY DIDN'T HEAR ANOTHER WORD FROM WELLS FARGO

22   OR ANYONE ELSE.  SEVEN AND A HALF YEARS LATER THEY

23   GET THE CREDIGY LETTER SEEKING NOW $17,000.  JUST A

24   LITTLE SHY OF $17,000.

25          SO THEY GO TO SEEK HELP, AND THEY CALL IT

                                                    124

1    LA MANSANA. IT'S IN WATSONVILLE. IT'S A COMMUNITY

2    SERVICES ORGANIZATION THAT HAS SEVERAL DIFFERENT

3    SERVICES THERE, OUTREACH, HELP, AND THINGS LIKE

4    THAT.

5         AND ONE OF THE CLINICS THERE IS CALLED

6    THE WATSONVILLE LEGAL CLINIC. AND IT'S A PRO BONO

7    LEGAL CLINIC, KIND OF LIKE A TRIAGE CENTER WHERE

8    PEOPLE COME IN AND SEEK HELP AND THEY GIVE THEM THE

9    BEST HELP THEY CAN, BUT THERE'S NO REPRESENTATION.

10   THEY JUST GIVE THEM SOME GUIDANCE.

11        AND THEY WENT IN AND THEY VISITED WITH A

12   COUPLE OF THE PARALEGALS OR LEGAL ASSISTANTS AND

13   OUT OF THAT THEY HELPED THEM WRITE A LETTER. THEY

14   WROTE A LETTER TO CREDIGY. AND YOU'LL SEE THIS

15   LETTER. IT'S WITHIN JUST A COUPLE OF WEEKS AFTER

16   THEY GET THE CREDIGY LETTER.

17        AND THEY TELL CREDIGY: WE DON'T BELIEVE

18   WE OWE IT. WE'RE DISPUTING THIS DEBT, AND WE WANT

19   SOME PROOF LIKE A CONTRACT OR SOMETHING THAT SHOWS

20   THAT WE ACTUALLY OWE THIS. AND THEY SENT THAT

21   LETTER BY CERTIFIED MAIL TO CREDIGY.

22        WELL, CREDIGY GETS THIS LETTER AND THEY

23   DO WHAT THEY DID EVERY SINGLE TIME, WHICH IS THEY

24   TURN AROUND AND PUMP OUT A FORM LETTER. AND THIS

25   FORM LETTER DOESN'T ANSWER THE QUESTION. THE FORM

125

1    LETTER FROM CREDIGY, WHO THEY NEVER HEARD OF AGAIN,

2    SENDS BACK A LETTER AND SAYS WE RECEIVED YOUR

3    DISPUTE, ACKNOWLEDGES IT, SEE THE ACCOUNT

4    VERIFICATION ON THE BACK PAGE.

5            AND YOU'LL SEE THE ACCOUNT VERIFICATION

6    IN A FEW MINUTES.  AND THE ACCOUNT VERIFICATION IS

7    NOTHING MORE THAN A DOCUMENT, A PIECE OF PAPER THAT

8    THEY TYPED INTO THE WORD PROCESSING PROGRAM.  IT

9    SAYS CREDIGY ON IT.  IT SAYS ACCOUNT NUMBER.  AND

10   IT SAYS SOME OTHER INFORMATION, BUT IT DOESN'T

11   INCLUDE A LETTER FROM WELLS FARGO VERIFYING THAT

12   THEY EVER SOLD THE ACCOUNT.  IT DOESN'T INCLUDE A

13   CONTRACT OR ANY OTHER DOCUMENTATION OTHER THAN

14   THEIR SELF-GENERATED PAPER WORK, ONE PAGE.

15           MY CLIENTS GET THE LETTER AND THEY GO

16   BACK TO WATSONVILLE LEGAL CLINIC, LA MANSANA, AND

17   THEY MEET WITH THEM AGAIN AND OUT OF THAT THEY

18   PREPARE ANOTHER LETTER TO CREDIGY.  AND THEY TELL

19   CREDIGY, WE DISPUTED IT, WE ASKED FOR

20   DOCUMENTATION.  YOU DIDN'T GIVE IT TO US.  WE DON'T

21   BELIEVE WE OWE THIS DEBT.  SO FOR THAT REASON WE'RE

22   NOT GOING TO PAY IT.  YOU DIDN'T SEND US WHAT WE

23   ASKED FOR.

24           THIS IS YOUR ORDER NOW TO NEVER CONTACT

25   US AGAIN, TO NEVER WRITE US AGAIN.  AND THEY WILL

126

1    ADMIT THAT THAT LETTER HAS LEGAL SIGNIFICANCE.

2    IT'S CALLED A CEASE AND DESIST LETTER. AND ONCE

3    THEY RECEIVED THAT, THEY'LL TELL YOU, THEY'RE

4    SUPPOSED TO STOP ALL CONTACT. AND AT THAT POINT

5    THEIR OPTIONS ARE THEY CAN GO TO THE COURTHOUSE AND

6    THEY CAN SUE AND THEY CAN GET A JUDGMENT.

7            BUT HERE -- THEY HAVE TO GO TO THE

8    COURTHOUSE AND PROVE IT UP, BUT HERE THEY DIDN'T DO

9    THAT.

10           HERE THE EVIDENCE WILL BE THAT OVER THE

11   NEXT YEAR IN ABOUT TWO MONTHS THEY CALLED MY

12   CLIENT'S HOME 90 TIMES.

13           YOU'LL SEE SOME OF THESE PHONE CALLS,

14   THEIR LOGS ON WHAT WAS THEY SAY WAS SAID AND YOU'LL

15   SEE SOME OTHER INFORMATION ABOUT REALLY WHAT WAS

16   SAID.

17           NOW, THIS CREDIGY COMPANY, THE EVIDENCE

18   WILL BE THAT THAT THIS WELLS FARGO INFORMATION,

19   THEY DIDN'T GO BUY IT FROM WELLS FARGO. THEY

20   BOUGHT IT FOR PENNIES ON THE DOLLAR FROM SOME

21   COMPANY WHO HAD GOT IT FROM ANOTHER COMPANY WHO HAD

22   BOUGHT IT FROM WELLS FARGO. SO IT'S LIKE THREE

23   LAYERS WERE REMOVED.

24           YOU'RE GOING TO HEAR ABOUT THE CALLS.

25   AND IN ONE OF THESE CALLS, IN ADDITION TO BEING

127

1    SUSPICIOUS BECAUSE THEY NEVER HEARD OF CREDIGY, THE

2    COLLECTOR TELLS THEM, WE'RE CALLING ABOUT A CAR

3    LOAN.  THESE COLLECTORS TELL THEM THAT THEY'RE

4    CALLING FROM CREDIGY ATLANTA WHEN, IN FACT, THE

5    EVIDENCE WILL BE THAT CREDIGY BACK IN 2006 OR 2005,

6    THEY HAD A BIG OPERATION THERE WITH A LOT OF

7    COLLECTORS BUT THEY DECIDED TO SHUT THAT PART OF IT

8    DOWN OR SCALE IT WAY BACK AND THEY FARMED IT

9    OFFSHORE TO BRAZIL AND THEY OPENED ANOTHER COMPANY

10   IN BRAZIL.

11            AND THE COLLECTION CALLS THAT ARE CALLED

12   IN THIS CASE, ALL 90 ATTEMPTS, WERE INITIATED BY

13   THIS BRAZILIAN OUTFIT WHO'S PART OF CREDIGY HERE IN

14   AMERICA.

15            NOW, THESE COLLECTION CALLS YOU'RE GOING

16   TO SEE THAT IN NOVEMBER OF 2007 MY CLIENT, YOU

17   KNOW, HAD -- THERE WOULD BE TIMES WHEN SHE WAS HOME

18   AND SHE HAD CALLER I.D. AND SHE WOULD SEE THAT

19   PHONE RINGING AND SHE KNEW WHAT NUMBER IT WAS AND

20   SHE WOULDN'T ANSWER IT.

21            AND SHE WILL TELL YOU THAT PHONE RANG AND

22   RANG AND RANG AND RANG.

23            AND THERE'S TIMES WHEN SHE DID ANSWER IT

24   TO DEAL WITH THEM.  AND SHE WILL TELL YOU ABOUT THE

25   THINGS THEY SAID, THE FALSE THINGS LIKE "THIS IS

                                              128

1       GOING TO BE ON YOUR CREDIT FOREVER.  THIS IS GOING

2       TO BE, THIS DISPUTE THAT YOU SENT INTO CREDIGY, IT

3       WAS RESOLVED BY OUR LEGAL DEPARTMENT."  NOT TRUE.

4               "WE'RE GOING TO TAKE LEGAL ACTION AGAINST

5       YOU."  NOT TRUE.

6               YOU KNOW WHY?  BECAUSE THE EVIDENCE WILL

7       BE THAT THE STATUTE OF LIMITATIONS, WHICH IS

8       SOMETHING IN THE LAW THAT SAYS IF YOU'VE GOT A

9       CLAIM, YOU HAVE TO BRING IT BY A CERTAIN TIME

10      PERIOD AND IF YOU DON'T, YOU CAN'T SUE ON IT AFTER

11      THAT.

12              WHEN THEY BOUGHT THIS ACCOUNT, THE

13      STATUTE OF LIMITATIONS EXPIRED LIKE WITHIN SIX

14      MONTHS AFTER THEY BOUGHT THE ACCOUNT.  THAT'S THE

15      LAST DATE THAT THEY COULD EVER SUE ON THIS THING

16      AND THEY KNEW THAT.

17              BUT THAT DIDN'T STOP THEM FROM SAYING

18      WHAT THEY SAID TO MY CLIENTS.

19              NOW, IF WE HAD A SITUATION WHERE, YOU

20      KNOW, THEY'RE SAYING WE'VE GOT THE LOGS AND THE

21      LOGS -- THE EVIDENCE WILL BE THAT THE LOGS LOOK

22      PRETTY GOOD.  I MEAN, THEY DON'T LOOK LIKE THEY'RE

23      THAT BAD OF CONVERSATIONS.  BUT IT DOESN'T STOP

24      THERE.

25              MY CLIENT WILL TELL YOU THAT SHE WAS

                                                    129

1    WORRIED THAT SOMEBODY MIGHT NOT BELIEVE HER THAT

2    THEY WERE SAYING THINGS LIKE THIS TO HER.  AND SO

3    SHE RECORDED THE CONVERSATIONS, THE LAST

4    CONVERSATION SHE HAD WITH THEM.

5          AND YOU'LL HEAR THAT FOR THOSE OF YOU WHO

6    KNOW SPANISH, YOU'LL PICK UP ON IT THAT THEY'RE

7    SAYING THEY'RE A CREDIT BUREAU, THEY'RE A CREDIT

8    AGENCY.  THAT IT'S GOING TO BE ON THEIR CREDIT

9    FOREVER.  THAT IT'S BEEN RESOLVED BY THE LEGAL

10    CLINIC.  THAT TYPE OF STUFF.  YOU'LL HEAR IT.

11    WE ALSO HAVE AN EXPERT COMING THAT IS A

12    TRANSLATOR WHO HAS TRANSLATED THIS THING, AND

13    YOU'LL SEE THE TRANSCRIPT OF IT.  AND YOU'LL BE

14    ABLE TO COMPARE FOR YOURSELF THEIR LOG AND WHAT

15    ACTUALLY WAS SAID.  THEY'RE NIGHT AND DAY.

16    SO ROLLING BACK TO THESE DISPUTE LETTERS

17    IN AUGUST AND IN THE CEASE AND DESIST LETTER,

18    CREDIGY WILL TELL YOU THAT THEY DIDN'T RECOGNIZE

19    THE CEASE AND DESIST LETTER.  THAT THERE WAS AN

20    ERROR MADE IS WHAT THEY'RE GOING TO TELL US.  THAT

21    SOMETHING FAILED IN THE SYSTEM.

22    WELL, WHEN WE HEARD THAT, WE DECIDED TO

23    TALK TO THE PEOPLE AT CREDIGY, AND WE DID.  WE WENT

24    DOWN AND DEPOSED SOME OF THE PEOPLE THAT WERE IN

25    THE DEPARTMENT THAT ACTUALLY DEALT WITH THIS VERY

130

1    LETTER TO SEE WHAT WAS GOING ON THERE.

2              AND CREDIGY -- WE'RE TALKING ABOUT A LADY

3    NAMED LETICIA POSTON AND ANOTHER LADY NAMED KIM

4    ERVIN.  YOU'LL HEAR FROM THEM, AND THEY WILL TELL

5    YOU ABOUT THE CIRCUMSTANCES THAT WERE GOING ON AT

6    CREDIGY.

7              CREDIGY, THE EVIDENCE WILL BE, HAD AN

8    UNTOLD NUMBER OF COLLECTORS, LOTS OF COLLECTORS TO

9    CALL AND ON THE BILLS BUT THE PEOPLE WHO DISPUTE

10   THE LETTERS AND TELLING THEM TO CEASE AND DESIST

11   AND STOP, THAT DEPARTMENT WAS WOEFULLY SHORT.  THEY

12   ASKED FOR HELP.  THEY WANTED PEOPLE TO COME IN AND

13   HELP THEM BECAUSE THEY HAD TONS OF STUFF TO DEAL

14   WITH, AND THEY DIDN'T HAVE TIME TO DEAL WITH IT.

15             THEY WILL TALK ABOUT HOW THEY ASKED FOR

16   HELP AND THEY SAID, "LOOK, YOUR DEPARTMENT DOESN'T

17   MAKE MONEY."

18             THESE WERE CREDIGY EMPLOYEES.  THEY WILL

19   TALK ABOUT THE ENVIRONMENT THAT CREDIGY CREATED.

20             AND THE EVIDENCE WILL BE THAT THIS WASN'T

21   A BONA FIDE ERROR.  THIS WAS AN ENVIRONMENT THAT

22   CREDIGY CREATED THAT CAUSED THIS PROBLEM, THE

23   REASON THEY DIDN'T RECOGNIZE THE CEASE AND DESIST.

24             YOU'LL SEE RIGHT AFTER THEY PROCESSED THE

25   CEASE AND DESIST AND TOLD COLLECTIONS THEY CALLED

131

1    MY CLIENT. AND IT'S A LENGTHY CALL. AND IN THAT

2    CALL THE LOG NOTES LOOK PRETTY INNOCENT.

3          MY CLIENT WILL TELL YOU THAT IT WAS

4    ANYTHING BUT.

5          THE ISSUE ABOUT THEIR CEASE AND DESIST

6    LETTER CAME UP AND THE LOG SAYS, "TOLD HER IT'S

7    RESOLVED. IT'S OVER WITH. WE'RE GOING TO CONTINUE

8    TO COLLECT, WE'RE GOING TO DO WHATEVER WE WANT."

9    AND THAT'S WHAT THEY DID.

10         SO THE EVIDENCE WILL BE THAT MY CLIENT

11   SENT THEM THE CEASE AND DESIST LETTER AND THAT

12   CREDIGY TOOK THAT INFORMATION AND OVER THE NEXT

13   YEAR CALLED THEM AND TRIED TO GET THEM ON THE PHONE

14   90 SOMETHING TIMES. AND AT THE END OF IT MY CLIENT

15   RECORDED A CONVERSATION WITH THEM AND THAT

16   CONVERSATION WILL REVIEW THE FACT THAT THEIR LOGS

17   DO NOT REVEAL THE TRUTH.

18         AND THAT ONCE THAT INFORMATION WAS GIVEN

19   TO CREDIGY AND THEY WERE ABLE TO LOOK AT IT AND SEE

20   WHAT THEY HAD DONE, WHAT DID THEY DO? THEY TURNED

21   AROUND AND SUED MY CLIENT FOR RECORDING THE CALL

22   THAT EXPOSES WHAT THEY HAD DONE.

23         SO IN THIS CASE THEY'RE SUING MY CLIENT

24   FOR DAMAGES FOR RECORDING A CONVERSATION.

25         NOW, THE EVIDENCE WILL BE -- BECAUSE I

                                                    132

1    WENT AND TOOK THE DEPOSITION OF A GUY NAMED PAULO

2    PERES.  HE'S THE BIGGEST GUY IN BRAZIL OVER THEIR

3    OPERATIONS.

4           AND HE SAID HE TOLD ME IN THOSE ROOMS

5    WHERE THEY'RE MAKING THESE CALLS, IT'S LIKE A

6    BOILER ROOM, AND THEY HAVE COLLECTORS SIDE BY SIDE

7    IN A ROOM.  AND EVERY COLLECTOR CAN OVERHEAR WHAT

8    THE NEXT GUY, WHAT HE'S SAYING.  SO IT'S NOT LIKE A

9    CONFIDENTIAL CONVERSATION.

10          BECAUSE THEY'RE SUING MY CLIENT SAYING

11   SHE RECORDED A CONFIDENTIAL CONVERSATION, AND,

12   THEREFORE, IT'S UNLAWFUL.

13          YOU'RE GOING TO HEAR THAT PAULO PERES

14   SAID THAT THEY HAVE THESE GUYS THAT WALK AROUND THE

15   ROOM WHEN THE COLLECTORS ARE ON THE PHONE AND THEY

16   HAVE A HEADSET AND THEY CAN TAP IN AND LISTEN TO

17   ANY CONVERSATION THEY WANT BY ANY COLLECTOR.

18          YOU'LL HEAR THAT THEY MAKE NOTES OF EVERY

19   CONVERSATION.

20          IN FACT, YOU'LL SEE THEIR OWN LETTER THAT

21   SAYS THAT WE MONITOR ALL CONVERSATIONS, OR MAY

22   MONITOR ALL CONVERSATIONS, BUT YET THEY SUED MY

23   CLIENT FOR ACTUALLY RECORDING AND PROVING THAT WHAT

24   THEY'RE SAYING IN THE LOGS IS WRONG.

25          NOW, WE'RE NOT HERE TO SAY THAT WE'RE

                                                   133

1      PERFECT BECAUSE WE'RE ABSOLUTELY NOT.  MY CLIENTS

2      HAVE HAD RUN-INS IN THEIR LIFE.  THERE'S NO DOUBT

3      ABOUT THAT.  THEY'RE HUMAN BEINGS.

4             NOW, WHILE THEY ARE SAYING IS THAT WHAT

5      THEY WERE SUBJECTED TO HERE WAS DISTRESSING AND

6      UPSETTING AND CAUSED THEM HARM, THEY'RE NOT SAYING

7      THAT EVERYTHING THAT EVER HAPPENED IN THEIR LIFE

8      WAS CAUSED BY CREDIGY.  THAT'S NOT THE CASE.

9             BUT WHAT THEY'RE SAYING IS THAT WHAT

10     CREDIGY DID TO THEM WAS WRONG AND THAT THEY EXPOSED

11     IT AND THEY THINK THAT THEY SHOULD BE STOPPED AND

12     HELD RESPONSIBLE FOR WHAT THEY HAVE DONE.

13            YOU'RE GOING TO -- WHAT IS INTERESTING

14     ABOUT THIS CASE IS THAT YOU'RE GOING TO GET TO SEE

15     A SIDE OF THIS BUSINESS, YOU KNOW, WE HEAR ABOUT IT

16     ALL OF THE TIME, BUT YOU'RE GOING TO GET TO SEE A

17     SIDE OF THE BUSINESS THAT IS NOT REVEALED UNLESS

18     YOU SEE AN EXPOSE OF WHAT GOES ON IN THE DEBT

19     COLLECTOR BUSINESS.  IT'S GOING TO BE VERY

20     INTERESTING.

21            THEY HAVE THEIR CORPORATE REPRESENTATIVE,

22     JASON SEAN WILLIAMS, AND HE'S GOING TO VISIT WITH

23     YOU ABOUT WHAT THEY DO AND WHAT THEY HAVE DONE IN

24     THIS CASE.

25            AND I APPRECIATE YOUR TIME.  THANK YOU.

                                                      134

1              THE COURT:  VERY WELL.  AT THIS POINT

2     WE'LL CALL UPON THE DEFENDANT TO MAKE ANY OPENING

3     STATEMENT AT THIS TIME.

4              MR. NARITA:  THANK YOU, YOUR HONOR.

5              **(WHEREUPON, COUNSEL FOR THE DEFENDANTS**

6     **GAVE HIS OPENING STATEMENT.)**

7              MR. NARITA:  WELL, THANK YOU VERY MUCH

8     EVERYONE FOR BEING HERE.  AND AGAIN MY NAME IS

9     TOMIO NARITA, AND I REPRESENT ALL OF THE

10    DEFENDANTS.

11             AND MR. WALLACE JUST HAD HIS CHANCE TO

12    TELL YOU WHAT HE THINKS THIS CASE IS GOING TO BE

13    ABOUT, WHAT HE THINKS THE EVIDENCE IS GOING TO SHOW

14    WHEN IT COMES IN AND SO NOW IS MY CHANCE.

15             WHAT THIS CASE IS ABOUT IS ABOUT TWO AND

16    A HALF YEARS AGO A VERY WELL TRAINED, A VERY HARD

17    WORKING EMPLOYEE OF CREDIGY SERVICES COMPANY MADE A

18    MISTAKE, MADE A MISTAKE IN THE WAY THAT SHE HANDLED

19    A LETTER.

20             AND THE FAUSTOS AND THEIR ATTORNEY ARE

21    HERE TO TRY AND GET YOU TO GIVE THEM A LOT OF MONEY

22    FOR THAT.  THAT'S WHAT THIS CASE IS ABOUT.

23             NOW, YOU'RE GOING TO HEAR IN THIS CASE

24    ABOUT HOW CREDIGY RECEIVABLES COMPANY BOUGHT THE

25    FAUSTOS' ACCOUNT FROM ANOTHER COMPANY.

                                                      135

1          YOU'RE GOING TO HEAR ABOUT HOW CREDIGY

2     SERVICES CORPORATION MADE A PHONE CALL TO TRY AND

3     REACH THE FAUSTOS.

4          MR. WALLACE ALLUDED TO THAT FIRST PHONE

5     CALL IN AUGUST OF 2006.  AND YOU'RE GOING TO HEAR

6     THAT WITHIN THREE WEEKS OF THAT FIRST CALL, WITHIN

7     THREE WEEKS OF THAT FIRST CONVERSATION THAT THEY

8     WENT TO SEE A LAWYER ABOUT WHAT THEY COULD DO.

9          NOW, THEY HAVE BEEN WORKING WITH LAWYERS

10    EVERY SINCE.

11         NOW, LET'S TAKE A LOOK AT WHO GOT SUED

12    BECAUSE OF ALL OF THIS.

13         OKAY.  THE FIRST PERSON I WANT TO TELL

14    YOU ABOUT IS PAULO PERES.  THIS IS PAULO PERES.

15    YOU'LL HEAR FROM HIM IN THIS CASE (INDICATING).

16         NOW, MR. PERES WAS THE DIRECTOR OF

17    OPERATIONS IN SAO PAULO, BRAZIL AT CREDIGY'S

18    AFFILIATE THERE CREDIGY SOLUCOES FINANCEIRAS

19    LIMETADA.

20         SO AT THE TIME ALL OF THIS IS GOING ON

21    WHAT IS MR. PERES DOING?  HE'S GETTING UP EVERY DAY

22    AND GOING TO HIS JOB IN BRAZIL, AND HE'S WORKING

23    WITH A TEAM OF PEOPLE THERE.  AND YOU'RE GOING TO

24    SEE THE EVIDENCE, HE AND HIS WHOLE TEAM ARE ONLY

25    COLLECTING ON ACCOUNTS FROM BRAZIL, IN THE COUNTRY

136

1    OF BRAZIL.

2              SO HE, WHEN ALL OF THIS IS GOING ON, HE

3    DOESN'T HAVE ANYTHING TO DO WITH THE UNITED STATES,

4    SO WHY IS HE HERE?  WHY HAS HE BEEN SUED?

5              WELL, I'LL TELL YOU, YOU'RE GOING TO SEE

6    EVIDENCE OF ONE LETTER WITH HIS NAME ON IT.  AND

7    HERE IT IS.  IT'S EXHIBIT 190.  SEE.  THIS IS ONE

8    LETTER DATED DECEMBER 22ND, 2006.

9              AND WE CAN BLOW UP THE SIGNATURE BLOCK AT

10   THE BOTTOM THERE.  THAT'S A BLOWUP AT THE BOTTOM.

11   THAT'S A TYPEWRITTEN SIGNATURE BLOCK IN THIS FORM

12   LETTER.  IT SAYS, "PAULO PERES, COLLECTIONS MANAGER

13   OF CREDIGY SERVICES CORPORATION."

14             SO HE DIDN'T SIGN THIS LETTER, BUT HIS

15   TYPEWRITTEN NAME APPEARS AT THE BOTTOM OF IT.  AND

16   THIS ONE LETTER, THIS SINGLE LETTER WAS MAILED TO

17   MR. FAUSTO.  AND THAT'S IT.  THAT'S MR. PAULO

18   PERES'S CONNECTION TO THIS WHOLE CASE, THAT

19   TYPEWRITTEN SIGNATURE AT THE BOTTOM OF THAT ONE

20   LETTER.

21             I WANT YOU TO LISTEN REALLY CAREFULLY

22   THROUGHOUT THIS WHOLE CASE AND SEE IF YOU HEAR ANY

23   OTHER EVIDENCE CONNECTING PAULO PERES TO THIS CASE.

24   YOU WON'T.

25             IN FACT, BEFORE WE CAME TO TRIAL, I TOOK

                                                    137

1  MR. FAUSTO'S DEPOSITION.  I ASKED HIM "HAVE YOU

2  EVER HEARD OF THE NAME PAULO PERES?  DO YOU KNOW

3  WHO HE IS?"  NO, HE HAD NO IDEA.  I SAID, "DO YOU

4  KNOW IF YOU SUED HIM?"  AND HE SAID, "NO, I DON'T

5  KNOW."

6          LET ME INTRODUCE YOU TO THE NEXT PERSON

7  WHO GOT SUED:  BRETT BOYDE.  NOW, HE'S A FORMER

8  EMPLOYEE OF CREDIGY SERVICES CORPORATION WORKING

9  AND LIVING DOWN IN ATLANTA, GEORGIA.

10          SO AT THE TIME ALL OF THIS IS GOING ON

11  BRETT BOYDE WORKS FOR CREDIGY SERVICES CORPORATION.

12  HE'S A FORMER EMPLOYEE NOW, BUT HE'S THE CUSTOMER

13  SERVICE SUPERVISOR, OKAY.

14          AND WHEN YOU HEAR ALL OF THE EVIDENCE,

15  YOU'RE GOING TO FIND OUT MR. BOYDE NEVER CALLED

16  MR. FAUSTO.  MR. BOYDE NEVER CALLED MRS. FAUSTO.

17  MR. BOYDE NEVER EVEN TRIED TO CALL ANYONE IN THEIR

18  FAMILY EVER.  HE DOESN'T MAKE CALLS.  HE DOESN'T DO

19  IT.

20          SO WHY WAS HE SUED?  WHY WAS BRETT BOYDE

21  SUED?  WELL, YOU'LL SEE THAT MR. FAUSTO WENT TO THE

22  WATSONVILLE LAW CENTER AND HAD A LETTER WRITTEN FOR

23  HIM.  AND I'LL SHOW IT TO YOU IN A MINUTE.

24          AND THAT LETTER ASKED FOR SOME

25  INFORMATION THAT WAS SENT TO CREDIGY AND CREDIGY

138

1    GOT IT.  THE LETTER ASKED FOR SOME INFORMATION

2    ABOUT HIS ACCOUNT.

3         SO MR. BOYDE SIGNED A LETTER AND

4    RESPONDED.  WHY DON'T WE TAKE A LOOK AT THAT.  IT'S

5    EXHIBIT 139.

6         SO HERE IT IS.  IT'S A SEPTEMBER 28,

7    2006.  THAT'S MR. BOYDE'S SIGNATURE THERE AT THE

8    BOTTOM.  AND THIS IS THE LETTER THAT MR. BOYDE

9    WRITES IN RESPONSE TO MR. FAUSTO'S REQUEST FOR

10   INFORMATION.  OKAY.

11        NOW, THE SECOND PAGE OF THAT LETTER, ON

12   THE SECOND PAGE, THIS IS THE INFORMATION THAT

13   MR. FAUSTO WAS ASKING FOR.  THIS IS THE ACCOUNT

14   VERIFICATION STATEMENT.  AND YOU CAN SEE UP AT THE

15   TOP MR. FAUSTO HAD ASKED, "WHAT IS THE NAME OF THE

16   ORIGINAL CREDITOR?"  WHAT IS THEIR ADDRESS HE ASKED

17   IN THAT LETTER.

18        AND SO IT WAS PROVIDED TO HIM.  WELLS

19   FARGO.  AND THERE IS THE P.O. BOX.  HE EVEN GAVE

20   HIM THE ACCOUNT NUMBER OF THE CREDIT CARD AND THE

21   DAY THE ACCOUNT WAS OPENED.  AND THE BALANCE AT

22   ASSIGNMENT WAS $3200 AND CHANGE.

23        HE ALSO SUPPLIED MR. FAUSTO THE NAME OF

24   THE NEXT COMPANY IN LINE THAT OWNED THE ACCOUNT

25   FIRST SELECT, INC.  THERE'S FIRST SELECT AND THAT'S

139

1    THEIR ADDRESS THAT HE SUPPLIED AND THE BALANCE

2    INFORMATION WHEN THE ACCOUNT WAS TRANSFERRED TO

3    CREDIGY RECEIVABLES.  AND THAT'S THE INFORMATION

4    THAT WAS ASKED FOR AND THAT'S WHAT MR. BOYDE

5    SUPPLIED.

6             NOW, HE DIDN'T SUPPLY A SIGNED CONTRACT.

7    HE DIDN'T -- ONE OF THE THINGS I ASKED FOR IS HOW

8    ABOUT A SIGNED CONTRACT.

9             WELL, YOU'LL SEE THE EVIDENCE IS THAT

10   THERE ARE NO SIGNED CREDIT CARD CONTRACTS.  YOU'LL

11   HEAR THAT.  SO HE COULDN'T -- THERE WAS NOTHING FOR

12   HIM TO SUPPLY, BUT HE DID SUPPLY ALL OF THE OTHER

13   INFORMATION THAT WAS ASKED FOR.

14            NOW, THERE'S ANOTHER LETTER JUST LIKE

15   THIS EXHIBIT 142.  I WON'T SHOW IT TO YOU BUT IT'S

16   A COUPLE MONTHS LATER AND -- BUT YOU'LL SEE IT

17   LATER.  EXHIBIT 142 WAS SENT BY BRETT BOYDE AS

18   WELL.  AND THAT'S IT.  THAT'S ALL HE DID.

19            LISTEN CLOSELY TO THE EVIDENCE.  DO YOU

20   HEAR ANY OTHER CONNECTION BETWEEN BRETT BOYDE AND

21   THE FAUSTOS OTHER THAN THIS LETTER AND ONE VERY

22   SIMILAR TO IT?  YOU'RE NOT GOING TO HEAR IT, BUT HE

23   GOT SUED.  WHO ELSE GOT SUED?

24            WELL, LUIS NUNES GOT SUED AS WELL.  NOW,

25   MR. NUNES WORKS AND LIVES IN SAO PAULO, BRAZIL AND

140

1    HE WORKED FOR CREDIGY.  HE'S A CUSTOMER

2    REPRESENTATIVE.  HE'S AN ACCOUNT REPRESENTATIVE.

3    HE CALLS PEOPLE AND HE TRIES TO GET IN TOUCH WITH

4    THEM.  HE TRIES TO SEE IF HE CAN NEGOTIATE A

5    PAYMENT ARRANGEMENT, AND THAT'S HIS JOB AND HE'LL

6    TELL YOU HOW HE WAS HIRED AND HOW HE WAS TRAINED IN

7    THE COLLECTION PROCESS.

8              YOU'LL HEAR HIM TALK ABOUT ALL OF THE

9    TRAINING HE GOT ON HOW TO COMPLY WITH THE LAWS THAT

10   BRING US HERE TODAY.

11             NOW, WHY WAS HE SUED?  WELL, HE NEVER

12   TALKED TO MR. FAUSTO.  NOT ONCE.  HE NEVER WROTE A

13   LETTER TO ANYONE.  HE DOESN'T WRITE LETTERS.

14             BUT HE WILL TELL YOU ABOUT CONVERSATIONS

15   THAT HE HAD, HE WILL TELL YOU ABOUT FOUR

16   CONVERSATIONS HE HAD WITH MRS. FAUSTO, AND YOU'LL

17   HEAR HIS TESTIMONY ABOUT THAT.

18             OKAY.  IN THE FIRST THREE OF THOSE,

19   MRS. FAUSTO TOLD HIM SHE HAD A LAWYER THAT SHE WAS

20   WORKING WITH ON THIS ACCOUNT AND THAT LAWYER WAS

21   GOING TO CALL CREDIGY.

22             ONE OF THE CALLS SHE TOLD HIM, HE'S GOING

23   TO NEGOTIATE THE ACCOUNT.  BUT SHE DIDN'T SAY WHO

24   THE LAWYER'S NAME WAS AND DIDN'T SUPPLY ANY CONTACT

25   INFORMATION.  AND MR. NUNES HAD NO WAY TO GET IN

1    TOUCH WITH WHOEVER THIS LAWYER IS.  AND SO HE DID

2    HIS JOB AND TRIED TO CALL HER BACK.  TRIED TO CALL

3    HER BACK.

4              AND THEN THERE WAS THE FOURTH CALL.  THE

5    FOURTH CALL SHE CHANGED HER STORY.  THE FOURTH CALL

6    SHE SAID, "I ALREADY PAID OFF THIS DEBT.  I PAID IT

7    OFF."  SO HE'LL TELL YOU ABOUT THAT.

8              AND MRS. FAUSTO IS GOING TO TESTIFY AND

9    MY EXPECTATION IS THAT SHE'S GOING TO HAVE A VERY

10   DIFFERENT RECOLLECTION OF WHAT THE TWO OF THEM SAID

11   ON THE PHONE, AND THAT'S GOING TO BE YOUR JOB.

12   YOU'RE GOING TO HAVE TO LISTEN TO BOTH OF THEM AND

13   DECIDE WHAT WAS REALLY SAID ON THOSE CALLS.

14             I WILL TELL YOU THAT MR. NUNES IS GOING

15   TO FLATLY DENY THAT HE SAID ANYTHING IMPROPER TO

16   HER BECAUSE HE ALREADY HAS AND HE WILL AGAIN.

17             NOW, LET'S TALK ABOUT THE CREDIGY

18   COMPANIES BECAUSE THEY GOT SUED, TOO.  THE CREDIGY

19   COMPANIES ARE IN THE CREDIT MANAGEMENT BUSINESS,

20   AND THE FIRST ONE THAT GOT SUED WAS CREDIGY

21   RECEIVABLES, INC.

22             NOW, CREDIGY RECEIVABLES BUYS THESE

23   ACCOUNTS AND BOUGHT MR. FAUSTO'S ACCOUNT AND THEY

24   BUY WHOLE PORTFOLIOS OF THESE ACCOUNTS.

25             WHEN OTHER COMPANIES CAN'T COLLECT THEM,

                                                    142

1      THEN CREDIGY RECEIVABLES IS ONE OF THE COMPANIES

2      THAT SAYS, "WE'LL PURCHASE THEM AND SEE IF WE CAN

3      COLLECT."  THAT'S WHAT CREDIGY RECEIVABLES DOES.

4              THEN CREDIGY SERVICES CORPORATION IS THE

5      REAL COLLECTION COMPANY.  THEY'RE THE COMPANY THAT

6      HIRES FOLKS TO MAKE THE PHONE CALLS.  THEY'RE THE

7      COMPANY THAT HANDLES THE LETTERS AND SENDS THE

8      LETTERS OUT.  AND THEY'RE THE COMPANY THAT FOR THE

9      MOST PART HOUSES ALL OF THE DATA AND KEEPS

10     EVERYTHING IN ORDER.  THAT'S CREDIGY SERVICES

11     CORPORATION.

12             ALSO SUED IN THIS CASE IS CREDIGY

13     SOLUTIONS.  YOU'LL HEAR ABOUT CREDIGY SOLUTIONS.

14     THEY'RE A MANAGEMENT SUPPORT COMPANY, AND THEY

15     PROVIDE PROFESSIONAL SUPPORT TO THE OTHER ENTITIES

16     LIKE ACCOUNTING SUPPORT AND LEGAL SUPPORT AND

17     THINGS OF THAT NATURE.

18             AND I ALSO MENTIONED THE BRAZILIAN

19     AFFILIATE IS CREDIGY SOLUCOES FINANCEIRAS LIMETADA.

20     I'M WORKING ON THAT, AND I'LL GET IT SOON.

21             SO THAT'S THE CREDIGY COMPANIES, AND

22     YOU'RE GOING TO MEET A LOT OF FOLKS THAT WORK

23     THERE.

24             NOW, MR. WALLACE, MR. HUMPHREYS HAVE COME

25     A LONG WAY TO SAY NASTY THINGS ABOUT CREDIGY

                                                    143

1    COMPANIES.  THEY CAME ALL OF THE WAY FROM OKLAHOMA.

2         I HEARD MR. WALLACE SAY THAT HE WAS GOING

3    TO SHOW YOU FRAUD, DECEIT, AND WRONGFUL PRACTICES.

4    AND I WANT TO TELL YOU, MY CLIENTS TAKE THIS VERY

5    SERIOUSLY, VERY SERIOUSLY, THAT KIND OF CHARGE VERY

6    SERIOUSLY.  AND I DON'T THINK AT THE END OF THE DAY

7    WHEN ALL IS SAID AND DONE YOU'RE GOING TO FIND ANY

8    EVIDENCE OF THAT.  OKAY.

9         NOW, HOW DO WE GET HERE?  WHERE DOES THIS

10   ALL START?  WELL, IT STARTED WITH THE DEBT.  IT

11   STARTED IN 1992 WHEN WELLS FARGO GAVE MR. FAUSTO A

12   CREDIT CARD ACCOUNT.  AND HE USED IT FOR A WHILE

13   AND HE GOT STATEMENTS AND AT SOME POINT HE STOPPED

14   PAYING.  HE STOPPED PAYING.

15        AND THAT'S WHERE THE EVIDENCE IS GOING TO

16   DIVERGE, AND ONE OF YOUR JOBS IS GOING TO COME INTO

17   PLAY BECAUSE THE FAUSTOS SAY THAT THEY PAID OFF THE

18   DEBT TO WELLS FARGO.  THEY CLAIM THEY HAD A

19   SETTLEMENT.  THEY CLAIM THAT THEY MET WITH THIS

20   GENTLEMAN NAMED MR. BLANCO, THEY BROUGHT IN THESE

21   MONEY ORDERS TO HIM, AND THAT MR. BLANCO TOOK THE

22   MONEY ORDERS AND FILLED THEM OUT AND WELLS FARGO

23   BANK AND ALL OF THAT GOT PUT IN THE MAIL AND THAT

24   WAS IT.  THAT'S THEIR STORY.

25        BUT WE'RE GOING TO SHOW YOU THAT WELLS

144

1    FARGO CHARGED THIS DEBT OFF AS A BAD DEBT OFF THE

2    BOOKS.  WE'RE GOING TO SHOW YOU EVIDENCE THAT WELLS

3    FARGO SOLD IT TO FIRST SELECT CORPORATION.

4         WE'RE GOING TO SHOW YOU THAT FIRST SELECT

5    CORPORATION THEN TRIED TO COLLECT THIS DEBT AND

6    MAIL STUFF TO THE FAUSTOS AND MADE EFFORTS TO

7    COLLECT AND THEY COULDN'T DO IT.

8         AND THEN WE'RE GOING TO SHOW YOU THAT

9    FIRST SELECT GAVE UP AND SOLD IT TO CREDIGY.

10        SO IT'S GOING TO BE UP TO YOU TO DECIDE

11   WHETHER THERE REALLY WAS A SETTLEMENT.

12        ONE THING I CAN TELL YOU, YOU'RE NOT

13   GOING TO SEE ONE PIECE OF PAPER DOCUMENTING THIS.

14   YOU'RE NOT GOING TO SEE THE MONEY ORDERS.  YOU'RE

15   NOT GOING TO SEE A LETTER FROM WELLS FARGO SAYING

16   "THANK YOU VERY MUCH FOR YOUR PAYMENT."  YOU'RE NOT

17   GOING TO SEE THAT.

18        THERE WON'T BE A SINGLE SHRED OF

19   DOCUMENTARY EVIDENCE TO SHOW.

20        NOW, WHAT DID CREDIGY COMPANIES DO ONCE

21   CREDIGY RECEIVABLES BOUGHT THIS ACCOUNT?

22        THE FIRST THING THEY DO IS THEY USE

23   CREDIGY SERVICES CORPORATION.  AND WHAT DO THEY DO?

24   WELL, ONE THING IT DOES IS WRITES LETTERS.  YOU'RE

25   GOING TO SEE THESE LETTERS.  PRETTY BORING, A LOT

145

1     OF LEGALESE IN IT.

2              BUT WHEN IT BOILS RIGHT DOWN TO IT,

3     YOU'RE GOING TO SEE IN MOST OF THESE LETTERS

4     THEY'RE OFFERING A SUBSTANTIAL DISCOUNT OFF OF WHAT

5     IS DUE.  THEY'RE GOING TO SAY, MR. FAUSTO, WE OWN

6     THE DEBT NOW OR OUR SISTER COMPANY DOES, BUT WE'LL

7     OFFER TO SETTLE THIS FOR 65 PERCENT OF WHAT IS DUE

8     OR LESS.  IT DIDN'T WORK.

9              I TOOK MR. FAUSTO'S DEPOSITION DURING

10    THIS CASE BEFORE WE GOT HERE.  HE SAID HE DIDN'T

11    READ THOSE LETTERS.  YOU KNOW, HE DOESN'T READ

12    ENGLISH BUT HE TOLD ME HE DIDN'T HAVE ANYONE

13    TRANSLATE THEM FOR HIM.  SO THE LETTERS DID NOT

14    WORK.

15             SO WE ALSO MADE PHONE CALLS.  IN

16    MR. WALLACE'S OPENING HE SAID THERE WERE 90 PHONE

17    CALLS.  WELL, THERE WERE A LOT OF PHONE CALLS MADE.

18    USUALLY WE COULD NOT GET THEM ON THE PHONE.  MOST

19    OF THE TIME WE COULDN'T REACH THEM.  WE COULDN'T

20    REACH THEM.

21             SO WE'RE TALKING ABOUT A 16-MONTH PERIOD

22    HERE, A 16-MONTH PERIOD HERE BETWEEN THE FIRST

23    ATTEMPT, THE FIRST CONVERSATION, AND THE TIME THEY

24    SUED US.

25             AND OVER 16 MONTHS WE TRIED TO REACH THEM

                                                    146

1    BUT HOW MANY TIMES DID WE ACTUALLY TALK TO SOMEONE

2    AT THE FAUSTO'S HOME?  HOW MANY TIMES OVER A

3    16-MONTH PERIOD DID WE HAVE A CONVERSATION WITH

4    THESE PEOPLE?

5              WELL, OUR RECORDS SHOW 10 TIMES, 10 TIMES

6    OVER 16 MONTHS.

7              AND I PUT TOGETHER A CHART TO SHOW YOU A

8    LITTLE BIT MORE ABOUT THOSE CONVERSATIONS.  SO

9    BETWEEN AUGUST 22ND, 2006 AND NOVEMBER 7, 2007,

10   WHICH WAS WHEN THEY SUED US, THERE WERE TEN

11   CONVERSATIONS WITH THE FAUSTOS.

12             SO LET'S LOOK AT WHEN THE FIRST ONE WAS

13   AUGUST 2006.  THE RECORDS SHOW AUGUST 22, 2006

14   THERE WAS A CONVERSATION WITH THE FAUSTOS LASTING

15   JUST UNDER EIGHT MINUTES.  THAT'S THE ONLY TIME

16   THAT WE TALKED TO THEM IN THE ENTIRE MONTH.  WE GOT

17   THEM ONCE ON THE PHONE, BUT THERE WAS ONE CALL THAT

18   RESULTED IN A CONVERSATION.

19             NOW LET'S TAKE A LOOK AT SEPTEMBER.

20   SEPTEMBER?  ZERO.  WE NEVER REACHED THEM.  WE COULD

21   NOT GET ANYONE TO PICK UP THE PHONE DURING THE

22   ENTIRE MONTH OF SEPTEMBER 2006, BUT WE DO HAVE THAT

23   DAY THE 12TH THERE.  THAT'S THE DAY OF ABOUT THREE

24   WEEKS AFTER THAT FIRST CONVERSATION THAT THEY WENT

25   INTO THE WATSONVILLE LAW CENTER TO FIND OUT WHAT

                                              147

1    THEY COULD DO.  SO NO CONVERSATIONS IN SEPTEMBER.

2              LET'S LOOK AT OCTOBER.  IN OCTOBER WE

3    REACHED THEM ONCE ON OCTOBER 10TH AND TALKED TO

4    THEM FOR LESS THAN TWO MINUTES.  COULDN'T REACH

5    THEM FOR THE REST OF THE ENTIRE MONTH.

6              WHAT ABOUT NOVEMBER OF 2006?  NOTHING.

7    COULDN'T REACH THEM.

8              HOW ABOUT DECEMBER?  YUP.  DECEMBER 21ST,

9    WE REACHED THEM ON THE PHONE.

10             NOW, MR. NUNES IS GOING TO TALK ABOUT

11   THAT CONVERSATION.  AND THAT'S THE ONE WHERE HE

12   REACHED MRS. FAUSTO AND SHE SAID SHE HAD AN

13   ATTORNEY WORKING ON IT.  BUT THAT WAS THE ONLY TIME

14   THAT WE REACHED THEM AND HAD A CONVERSATION.

15             HOW ABOUT JANUARY?  DIDN'T REACH THEM IN

16   JANUARY.

17             HOW ABOUT FEBRUARY?  WE GOT THEM ONCE.

18   WE GOT THEM ON THE PHONE ON THE 16TH OF FEBRUARY

19   2007.  AGAIN, THAT CALL LASTED FOUR MINUTES, SIX

20   SECONDS, ACCORDING TO OUR PHONE RECORDS, AND THAT'S

21   ANOTHER ONE MR. NUNES WILL TELL YOU WHERE -- AND

22   OUR RECORDS WILL SHOW WHERE MRS. FAUSTO SAID, "HEY,

23   I GOT A LAWYER AND THE LAWYER IS GOING TO CALL

24   YOU."  BUT NO ONE DID.

25             HOW ABOUT MARCH?  FIVE CONVERSATIONS.  IT

                                                  148

1    SEEMS LIKE WE HAVE SOME KIND OF A DIALOGUE.  SO

2    HERE WE HAVE FIVE CONVERSATIONS THAT HAPPEN IN

3    MARCH OF 2007.  IN TWO OF THOSE, THE 16TH AND THE

4    23RD, MR. NUNES WILL TELL YOU ABOUT THOSE AND OUR

5    RECORDS WILL REFLECT, AGAIN, "I'VE GOT A LAWYER AND

6    THE LAWYER IS ABOUT TO CALL YOU."  BUT NO LAWYER

7    CALLED AND NO LAWYER WROTE.

8              SO WHAT HAPPENED IN APRIL?  APRIL 2007 --

9    OH, THERE'S ONE.  WE TALKED TO THEM FOR A MINUTE

10   AND A HALF ON APRIL 13TH.  AND THAT'S THE LAST TIME

11   THAT WE WERE EVER ABLE TO REACH THE FAUSTOS ON THE

12   PHONE.

13             LET'S LOOK IN MAY?  DIDN'T REACH THEM.

14             JUNE?  JULY?  AUGUST?  SEPTEMBER?

15   OCTOBER?  NOVEMBER?  DIDN'T REACH THEM.  DIDN'T

16   REACH THEM BEFORE THEY SUED US ON THE 7TH.  THAT'S

17   THE DAY THAT THEY SUED US.  ALL OF THOSE MONTHS

18   WENT BY AND WE NEVER REACHED THEM ON THE PHONE.

19   ALL OF THOSE MONTHS WENT BY.

20             SO THE NEXT SLIDE IS A SUMMARY OF ALL OF

21   THE STUFF I JUST PUT UP THERE.

22             SO HOW MANY TIMES DID WE TALK TO THEM ON

23   THE PHONE BEFORE THEY SUED US?  TEN TIMES IN

24   SIXTEEN MONTHS.

25             HOW MANY SECONDS DO WE HAVE ON THE PHONE

149

1    BEFORE THEY SUED US?  ALMOST 46 MINUTES OF TALK

2    TIME SPREAD OUT OVER THIS 16-MONTH TIME PERIOD.

3    YOU JUST SAW THE DATES AND THE TIMES.  THERE WERE

4    TEN OF THOSE MONTHS WHERE WE WERE NEVER ABLE TO

5    REACH THEM ON THE MONTH.  THE ENTIRE MONTHS WENT

6    BY.

7            IN FACT, THE LAST SEVEN MONTHS BEFORE

8    THEY SUED US, WE WERE NEVER ABLE TO REACH THEM.  WE

9    NEVER HAD A CALL.

10           AND HOW LONG DID WE TALK TO THEM BEFORE

11   THEY WENT TO A LAWYER?  IT WAS 7 MINUTES AND 54

12   SECONDS.

13           SO THAT'S THE PHONE CALLS.

14           NOW, THERE WAS A MISTAKE.  MR. WALLACE

15   TOLD YOU ABOUT IT.  THERE WAS A MISTAKE IN THE WAY

16   THIS ACCOUNT WAS HANDLED IN THE COLLECTION PROCESS.

17           MR. FAUSTO HAD A LETTER, AND IT WAS

18   WRITTEN FOR HIM BY THE WATSONVILLE LAW CENTER.

19   I'LL SHOW IT TO YOU IN A MINUTE.  AND IN THE LETTER

20   IT SAYS, "I WANT YOU TO CEASE AND DESIST, STOP

21   CALLING ME."

22           AND MR. WALLACE IS RIGHT, WE DON'T

23   DISPUTE.  WE ARE OBLIGATED TO STOP.

24           WHEN THAT LETTER COMES IN AND LANDS AT

25   CREDIGY SERVICES CORPORATION, WE GET IT, WE'RE

                                                    150

1    OBLIGATED TO STOP FURTHER PHONE CALLS AND STOP THE

2    LETTERS.  AND WE DIDN'T.  WE DIDN'T.  WE DIDN'T

3    STOP.

4             THE QUESTION IS WHY?  WHY DIDN'T WE STOP?

5    IF WE KNEW WE WERE SUPPOSED TO STOP, WHY DIDN'T WE?

6             WELL, THE EVIDENCE WE'RE GOING TO SHOW

7    YOU IS CREDIGY KNEW IT WAS SUPPOSED TO STOP.  AND

8    IT HAS AN ELABORATE PROCEDURE, AND YOU'RE GOING TO

9    SEE THE WHOLE THING, AND A VERY ELABORATE PROCESS

10   FOR THESE ACCOUNTS.

11            AND THE MOMENT THAT HAPPENS THEY GET

12   TAKEN OUT OF THE CUE AND NO MORE LETTERS GO OUT AND

13   NO PHONE CALLS AND THEY HAVE A WHOLE CEASE AND

14   DESIST PROCESS THAT RUNS THROUGH THEIR MANAGEMENT.

15   THEY KNOW WHAT THEIR OBLIGATIONS ARE.  YOU'LL SEE

16   THAT AND HEAR THE TESTIMONY.

17            BUT WHAT THE PROBLEM IS, IS THAT LIKE

18   EVERY SYSTEM, IT RELIES ON HUMANS AND HUMANS

19   SOMETIMES MAKES MISTAKES.  AND KIM ERVIN, WHO HAD

20   BEEN WORKING THERE AND WHO HAD BEEN TRAINED AND

21   DONE THIS MANY TIMES BEFORE, SHE MADE A MISTAKE.

22   SHE DIDN'T CODE THIS ACCOUNT CORRECTLY.

23            IF SHE HAD CODED IT AS A CEASE AND DESIST

24   ACCOUNT AND FLAGGED IT CORRECTLY, THERE IS A WHOLE

25   PROCESS THAT WOULD HAVE BEEN TRIGGERED, AND IT

                                                    151

1    WOULD HAVE STOPPED.  NO MORE CALLS.  NO MORE

2    LETTERS.  GAME OVER.  BUT SHE DIDN'T DO IT.  SHE

3    MADE A MISTAKE.

4          NOW, THE FAUSTOS ARE ASKING FOR EMOTIONAL

5    DISTRESS DAMAGES IN THIS CASE.  THEY'RE GOING TO

6    TAKE THE POSITION IN THIS CASE THAT MY CLIENT'S

7    CONDUCT WAS SO EGREGIOUS THAT YOU SHOULD AWARD THEM

8    MONEY FOR THEIR MENTAL DISTRESS AND SUFFERING.

9    THAT'S WHAT THEY'RE GOING TO SAY.

10         NOW, IS THERE GOING TO BE A DOCTOR THAT

11   IS GOING TO COME IN AND TESTIFY THAT MY CLIENT

12   CAUSED THEM MENTAL STRESS?  NO.  NO.

13         IN FACT, YOU WILL HEAR FROM THEIR DOCTOR,

14   THEIR FAMILY DOCTOR THAT THEY HAVE BEEN SEEING FOR

15   YEARS.  YOU'LL HEAR FROM THEM.  AND WE TOOK HER

16   DEPOSITION BEFORE THIS CASE STARTED.  WE HAD HER

17   PULL EVERY SINGLE FILE THAT SHE HAD ON MR. FAUSTO

18   AND MRS. FAUSTO AND WE TOOK HER TESTIMONY AND

19   YOU'RE GOING TO HEAR IT.

20         AND THEY NEVER SAID ANYTHING ABOUT

21   CREDIGY WHEN THEY WENT TO SEE HER.  THEY NEVER SAID

22   ANYTHING ABOUT ANY COLLECTION PHONE CALLS AT ALL.

23         BUT THEY DID HAVE A VERY BAD YEAR IN

24   2007.  A TERRIBLE YEAR.  THE EVIDENCE IS GOING TO

25   SHOW THIS.

                                              152

1          A LOT OF TERRIBLE THINGS HAPPENED THAT

2     YEAR THAT HAD NOTHING TO DO WITH MY CLIENTS.

3     NOTHING TO DO WITH MY CLIENTS.

4          THEY STARTED OUT 2007 BY TAKING ON AN

5     ENORMOUS MORTGAGE.  NOT JUST ANY MORTGAGE.  THIS

6     YOU WILL SEE WAS A LOT.  A HALF A MILLION DOLLAR

7     MORTGAGE THE FAUSTO FAMILY TOOK OUT ON THEIR HOUSE.

8     HALF A MILLION DOLLARS.

9          AND THE EVIDENCE IS GOING TO SHOW THAT

10    THEY HAD TO KNOW THEY COULDN'T KEEP PAYING THAT

11    BECAUSE THE MONTHLY PAYMENT ON THE MORTGAGE WAS

12    MORE THAN MR. FAUSTO EARNED EVERY MONTH.

13         SO YOU WILL SEE THAT THAT MORTGAGE AND

14    TRYING TO MAKE THOSE PAYMENTS CAUSED HIM A LOT OF

15    STRESS.  YOU'RE GOING TO SEE THAT.

16         YOU'RE ALSO GOING TO SEE AN EVENT THAT

17    WAS INCREDIBLY UPSETTING TO MRS. FAUSTO.  SHE TOLD

18    ME ABOUT IT WHEN I TOOK HER DEPOSITION.

19         MRS. FAUSTO ON MAY 3RD, 2007 IS DRIVING

20    THROUGH GONZALES.  SHE IS DRIVING IN A BLACK CHEVY

21    SUBURBAN WITHOUT A LICENSE.

22         AND AS SHE'S DRIVING A SMALL GIRL ON A

23    BICYCLE COMES OUT AND SHE HITS HER.  THE GIRL GOES

24    TO THE HOSPITAL AND MRS. FAUSTO, IT WAS SO

25    UPSETTING TO HER, MRS. FAUSTO HAS TO GO AND GET

153

1    MEDICAL ATTENTION THAT DAY.  SHE TOLD ME ABOUT IT.

2    SHE TOLD ME THAT SHE HAD AN ANXIETY ATTACK.  AND

3    YOU'LL HEAR FROM DR. PONZIO ABOUT THAT, TOO.

4            IN FACT, SIX WEEKS LATER IN JUNE OF THAT

5    SAME YEAR SHE WENT BACK TO DR. PONZIO SAYING SHE

6    STILL COULDN'T GET OVER THIS INCIDENT, STILL

7    COULDN'T GET OVER IT.

8            SO YOU'LL HEAR ABOUT THIS AND A LOT OF

9    OTHER THINGS THAT WERE GOING ON DURING THIS YEAR AS

10   WELL AS THE EVIDENCE COMES IN.

11           AND IT'S GOING TO BE UP TO YOU TO DECIDE

12   WHETHER THE FEW MINUTES THAT THE FAUSTOS SPENT ON

13   THE PHONE WITH MY CLIENT HAVE CAUSED ANY REAL HARM

14   TO THEM.

15           I'D ALSO LIKE YOU TO PAY SPECIAL

16   ATTENTION WHEN YOU'RE THINKING ABOUT STRESS AND

17   DAMAGES TO THE TIME LINE OF WHEN THE FAUSTOS WERE

18   REPRESENTED IN THIS CASE.

19           WE KNOW -- WE HAVE EVIDENCE ALREADY AND

20   WE'RE GOING TO SHOW TO YOU THE DATES THAT THEY

21   CONSULTED ATTORNEYS AND WHERE -- WE KNOW THAT THEY

22   WERE TELLING US THAT THEY WERE REPRESENTED

23   THROUGHOUT.

24           LET'S TAKE A LOOK AT EXHIBIT 137.  THIS

25   IS THE SEPTEMBER 12TH LETTER.  THIS IS THE LETTER

                                                    154

1    THAT MR. FAUSTO FIRST WROTE.  THAT WAS WRITTEN ON

2    THE DAY THAT MR. AND MRS. FAUSTO WENT TO THE

3    WATSONVILLE LAW CENTER.

4         IN FACT, THEY TESTIFIED THAT THE LAW

5    CENTER WROTE IT FOR THEM.  THEY WROTE IT FOR THEM.

6         SO THAT'S THE LETTER THAT WAS SENT THAT

7    MR. BOYDE RESPONDED TO.  SO THAT WAS SEPTEMBER

8    12TH, 2006 WHEN THEY'RE GETTING HELP FROM THE

9    WATSONVILLE LAW CENTER.

10        NOW, MR. BOYDE RESPONDS.  YOU ALREADY SAW

11   THAT LETTER.  THEN THEY GO BACK, THE FAUSTOS GO

12   BACK TO THE WATSONVILLE LAW CENTER AND THEY GET

13   THAT LETTER AND THE CENTER WRITES THEM ANOTHER

14   LETTER.  AND LET'S LOOK AT EXHIBIT 141.  THAT'S

15   NOVEMBER 7, 2006.  THIS LETTER WAS DRAFTED BY THE

16   WATSONVILLE LAW CENTER FOR MR. FAUSTO TO SIGN.  HE

17   TOLD ME THAT.

18        IN FACT, IF YOU LOOK IN THERE IT SAYS

19   RIGHT IN THERE "MY ATTORNEY HELPED ME DRAFT THIS

20   LETTER."

21        SO THAT LETTER WAS SENT -- PREPARED FOR

22   THEM BY THE WATSONVILLE LAW CENTER AND SENT TO US.

23        AND THEN, AS I TOLD YOU BEFORE, THE

24   RECORDS SHOW AND THAT MRS. FAUSTO TOLD MR. NUNES

25   THREE TIMES AND TOLD ANOTHER COLLECTION

1    REPRESENTATIVE A FOURTH TIME THAT SHE HAD A LAWYER

2    THAT WAS GOING TO CALL.  SHE HAD A LAWYER THAT WAS

3    GOING TO CALL.

4           I THINK WE HAVE ONE MORE SLIDE AND IT

5    SORT OF SUMMARIZES ALL OF THIS.  THESE ARE THE

6    DATES HERE.  THESE ARE THE TWO DATES THAT THEY WENT

7    TO THE WATSONVILLE LAW CENTER.  THEY BOTH TESTIFIED

8    THAT AT SOME POINT IN TIME, IT'S NOT CLEAR WHEN,

9    BUT AT SOME POINT IN TIME THEY MET BALAM LETONA

10   WHILE THEY WERE AT THE WATSONVILLE LAW CENTER.

11          MR. LETONA IS WITH US HERE TODAY.  HE'S

12   ONE OF THEIR LITIGATION COUNSEL.  BUT THEY BOTH

13   TESTIFIED THAT'S THE PLACE WHERE THEY MET HIM.

14          AND THEN IF WE PULL IN THE OTHER DATES,

15   THIS IS THE -- THESE ARE ACTUAL CLOSE FROM PORTIONS

16   OF OUR RECORDS THAT YOU'LL SEE ON "DECEMBER 21ST,

17   SAID THAT THEY TALKED TO A LAWYER AND SHE'S GONNA

18   GIVE OUR TOLL FREE NUMBER TO CONTACT US ASAP."

19          "FEBRUARY 16, LAWYER IS TAKING CARE OF

20   THE ACCOUNT.  SHE WILL CALL ME BACK TOMORROW 17

21   FEBRUARY TO GIVE LAWYER'S NAME SO I CAN GIVE HIM A

22   CALL ON MONDAY."

23          NO NAME OR NUMBER GIVEN.

24          "MARCH 16TH, SAID HER ATTORNEY IS ABOUT

25   TO CALL US IN ORDER TO NEGOTIATE THIS ACCOUNT.  NO

156

1      CONTACT."

2                AND THEN ON "MARCH 23RD, SHE SAID HER

3      ATTORNEY IS GONNA CALL US FOR SURE TODAY."

4                BUT THEN NO CALLS AND THEN THE LAWSUIT

5      GETS FILED ON NOVEMBER 7.

6                NOW, THERE IS A COUNTERCLAIM IN THIS CASE

7      AND MR. WALLACE TOLD YOU A LITTLE BIT.  BECAUSE THE

8      LAWSUIT WAS FILED ON NOVEMBER 7TH, THEY DIDN'T TELL

9      US ABOUT IT, THEY DIDN'T SERVE US AND THEY JUST

10     FILED US.

11               WHAT HAPPENED AFTER NOVEMBER 7TH, AFTER

12     THEY HAD ALREADY FILED THIS LAWSUIT WAS THAT

13     MR. LETONA MAILED A TAPE RECORDER TO MRS. FAUSTO.

14     SHE ALREADY TOLD ME ABOUT THIS IN HER DEPOSITION.

15     SHE GOT IT IN THE MAIL AND OPENED UP THE MAIL AND

16     HERE'S THE TAPE RECORDER.

17               AND MRS. FAUSTO MADE A SECRET TAPE OF TWO

18     OF THE COLLECTORS.  SHE TOLD ME WHY.  SHE TOLD ME

19     WHY IN HER DEPOSITION.  SHE SAID "I WANTED TO HAVE

20     MORE PROOF.  I WANTED TO HAVE MORE PROOF."

21               BUT SHE DIDN'T TELL THE COLLECTORS THAT

22     SHE WAS RECORDING THIS CALL.  AND CREDIGY SOLUTIONS

23     TAKES THIS VERY SERIOUSLY AND VERY SERIOUSLY THE

24     SECRET TAPING BUSINESS.

25               AND HIS HONOR WILL GIVE YOU THE

                                                      157

1    INSTRUCTIONS ON THE LAW AT THE END OF THE CASE.

2    I'M NOT GOING TO TELL YOU WHAT THE LAW IS.  THAT IS

3    HIS HONOR'S PROVINCE.  HE'S ALREADY TELLING YOU HE

4    WILL DO THAT.

5           BUT ONCE YOU GET THE LAW, IT WILL BE UP

6    TO YOU TO FIGURE OUT THE REQUIREMENTS AND THE LAW

7    THAT AS HIS HONOR GIVES TO YOU AND DECIDE WHETHER

8    OR NOT MRS. FAUSTO DID ANYTHING WRONG WHEN SHE MADE

9    THAT TAPE.  THAT WILL BE UP TO YOU.

10           SO WHEN ALL OF THE EVIDENCE IS IN YOU

11    WILL ALL MEET, YOU'LL GET TOGETHER, YOU'LL TALK IN

12    THE JURY ROOM.  YOU WILL DECIDE THE FACTS.  YOU ARE

13    GOING TO HAVE TO DECIDE IN THIS CASE DID MY CLIENTS

14    REALLY INTEND TO HARM THE FAUSTOS?  DID THEY REALLY

15    INTEND TO HARM THEM, OR WERE THEY JUST TRYING TO

16    COLLECT SOME MONEY THAT THEY THOUGHT WAS DUE?

17           YOU'LL HAVE TO MAKE THAT DECISION.

18           DID MY CLIENTS DELIBERATELY IGNORE A

19    CEASE AND DESIST REQUEST?  DID THEY JUST SAY FORGET

20    ABOUT IT AND IGNORE THAT?  I SEE THAT RIGHT THERE,

21    BUT I'M GOING TO DELIBERATELY IGNORE IT?  IS THAT

22    WHAT HAPPENED IN THIS CASE, OR WAS THERE AN HONEST

23    MISTAKE MADE?  WAS THERE AN HONEST MISTAKE MADE?

24    YOU'LL HAVE TO DECIDE.

25           AND THEN YOU'LL HAVE TO DECIDE WERE THE

158

1    FAUSTOS REALLY HARMED HERE?  WERE THEY REALLY

2    HARMED BY THIS CONDUCT OR WERE THEY JUST HERE IN

3    COURT ASKING ME TO GIVE THEM SOME MONEY BECAUSE OF

4    A MISTAKE THAT HAPPENED A LONG TIME AGO?

5              THANK YOU VERY MUCH.

6              AND THANK YOU, YOUR HONOR.

7              THE COURT:  DO YOU NEED TO RECONFIGURE

8    THE COURTROOM AT ALL TO CALL YOUR FIRST WITNESS

9    BECAUSE IF NOT THEN WE'LL GO PROBABLY UNTIL 3:00

10   O'CLOCK BEFORE WE TAKE A BREAK.

11             MR. HUMPHREYS:  WE DON'T NEED ANYTHING,

12   YOUR HONOR.

13             THE COURT:  ALL RIGHT.  CALL YOUR FIRST

14   WITNESS.

15             MR. HUMPHREYS:  THE PLAINTIFFS WILL CALL

16   CORPORATE REPRESENTATIVE JASON WILLIAMS.

17             THE COURT:  IT'S PERMISSIBLE FOR ONE

18   PARTY TO CALL A PARTY FROM THE OTHER CASE IN A CASE

19   AND THAT'S APPARENTLY WHAT HAS HAPPENED.

20             MR. HUMPHREYS:  YOUR HONOR, WITHOUT

21   TAKING A DELAY, MAY MRS. FAUSTO USE THE RESTROOM?

22             THE COURT:  OH, CERTAINLY.  ANY OF YOU

23   ARE FREE TO GO.  I'M NOT HOLDING YOU HERE.

24             MRS. FAUSTO:  THANK YOU.

25             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

159

1                    **JASON SEAN WILLIAMS,**

2    BEING CALLED AS AN ADVERSE WITNESS ON BEHALF OF THE

3    PLAINTIFFS, HAVING BEEN FIRST DULY SWORN, WAS

4    EXAMINED AND TESTIFIED AS FOLLOWS:

5              THE WITNESS:  I DO.

6              THE CLERK:  PLEASE BE SEATED.  WOULD YOU

7    PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

8    NAME FOR THE RECORD.

9              THE WITNESS:  JASON SEAN WILLIAMS.

10   W-I-L-L-I-A-M-S.

11                  **AS-ON CROSS-EXAMINATION**

12   BY MR. HUMPHREYS:

13   Q    MR. WILLIAMS, WHO DO YOU WORK FOR?

14   A    CREDIGY SOLUTIONS, INCORPORATED.

15   Q    AND HOW LONG HAVE YOU WORKED FOR CREDIGY

16   SOLUTIONS?

17   A    ABOUT SEVEN YEARS.

18   Q    AND SINCE MARCH OF 2002?

19   A    CORRECT.

20   Q    AND WHAT IS YOUR JOB TITLE?

21   A    I'M THE VICE PRESIDENT OF STRATEGIC

22   DEVELOPMENT.

23   Q    AND YOU'RE A LAWYER?

24   A    CORRECT.

25   Q    AND YOU'RE LICENSED TO PRACTICE LAW IN THE

                                                    160

1    STATE OF GEORGIA?

2    A    YES.

3    Q    AND NO OTHER STATES?

4    A    THAT'S CORRECT.

5    Q    AND YOU'VE BEEN LICENSED IN GEORGIA SINCE

6    APRIL 30TH, 1999?

7    A    CORRECT.

8    Q    AND IN 2002 ONE OF THE FOUNDERS OF CREDIGY

9    CONTACTED YOU ABOUT COMING TO WORK WITH HIM?

10   A    YES.

11   Q    AND SO YOU WERE PRETTY MUCH FRESH OUT OF LAW

12   SCHOOL?  ABOUT THREE YEARS OUT OF SCHOOL?

13   A    ABOUT THREE YEARS OUT OF LAW SCHOOL, CORRECT.

14   Q    OKAY.  AND THE FOUNDER OF CREDIGY WHO BROUGHT

15   YOU ON BOARD, THAT WAS STEVE STEWART?

16   A    YES.

17   Q    AND BRETT SAMSKY, HE'S ANOTHER ONE OF THE

18   FOUNDERS OF CREDIGY?

19   A    YES.

20   Q    AND THOSE ARE THE TWO PRINCIPAL FOUNDERS?

21   A    THOSE ARE THE TWO PRINCIPAL FOUNDERS.

22   Q    OKAY.  JUST TO CLARIFY THINGS, LET'S TAKE A

23   LOOK AT A CHART HERE AND PUT IT UP.  WE HAVE A

24   LITTLE BIT OF INTERFERENCE THERE BUT BASICALLY TO

25   MAKE THINGS CLEAR HERE, YOU WORK FOR THE COMPANY

161

1    CALLED CREDIGY SOLUTIONS WHICH WAS ON THE RIGHT OF

2    THE SCREEN WHEN IT WAS UP?

3               THE COURT:  IT WILL BE UP IN A MOMENT.

4               THE WITNESS:  YES, I WORK FOR CREDIGY

5    SOLUTIONS, THAT'S RIGHT.

6    BY MR. HUMPHREYS:

7    Q    OKAY.  AND CREDIGY SOLUTIONS HAS CONTRACTS TO

8    DO SERVICES FOR CREDIGY SERVICES; IS THAT RIGHT?

9               AND THERE'S ANOTHER MEMBER OF THE FAMILY

10   OR YOUR LAWYER MENTIONED CALLED CREDIGY

11   RECEIVABLES; IS THAT RIGHT?

12   A    THAT'S RIGHT.

13   Q    AND YOU'RE A MEMBER OF CREDIGY RECEIVABLES?

14   A    YES.

15   Q    AND YOU'RE AN OFFICER OF CREDIGY SERVICES?

16   A    I'M THE VICE PRESIDENT OF STRATEGIC

17   DEVELOPMENT FOR CREDIGY SOLUTIONS.  I'M NOT AN

18   OFFICER OF CREDIGY SERVICES, JUST CREDIGY

19   RECEIVABLES.

20   Q    NOW, THIS ISN'T YOUR FIRST TIME TESTIFYING IN

21   A COURTROOM AS A COMPANY REPRESENTATIVE?

22   A    NO, IT IS NOT THE FIRST TIME.

23   Q    IN FACT, THAT'S SOMETHING THAT YOU HAVE

24   TRAVELLED ALL OVER THE COUNTRY TO DO THAT; RIGHT?

25   A    YES, I HAVE TESTIFIED IN A NUMBER OF DIFFERENT

162

1    STATES, THAT'S CORRECT.

2    Q    FIFTY TO SEVENTY-FIVE TIMES YOU HAVE APPEARED

3    IN COURT AND ACTED AS A COMPANY REPRESENTATIVE?

4    A    YES.

5    Q    AND LET'S GO BACK.  WE WERE LOOKING AT THIS

6    EARLIER ABOUT SOLUTION, SERVICES, AND RECEIVABLES.

7    THEY ARE ALL AFFILIATED AND UNDER SOME COMMON

8    OWNERSHIP OF SOME HOLDING COMPANIES; IS THAT RIGHT?

9    A    YES.

10   Q    AND DOES THAT INCLUDE CREDIGY LIMITED?

11   A    YES, I THINK THE ULTIMATE PARENT COMPANY IS

12   CREDIGY LIMITED, THAT'S RIGHT.

13   Q    OKAY.  IS THERE ALSO A COMPANY CALLED CREDIGY

14   GLOBAL?

15   A    I THINK THAT'S CORRECT, YES.

16   Q    OKAY.  AND YOU KNOW A LITTLE BIT ABOUT CREDIGY

17   GLOBAL, DON'T YOU?  YOU HAVE HEARD OF IT?

18   A    I HAVE HEARD OF IT.  I'M MOST FAMILIAR WITH

19   CREDIGY SERVICES CORP, CREDIGY RECEIVABLES, CREDIGY

20   SOLUTIONS, AND CREDIGY SOLUCOES FINANCEIRAS

21   LIMETADA.

22   Q    OKAY.  CREDIGY GLOBAL, THOUGH, YOU HAVE HEARD

23   OF IT; RIGHT?

24   A    YES.

25   Q    AND, IN FACT, YOU OWN 50,000 SHARES IN CREDIGY

163

1    GLOBAL?

2              MR. GILLESPIE:  OBJECTION, IRRELEVANT.

3              THE COURT:  IT MAY HAVE TO DO WITH BIAS,

4    BUT IT DOES SEEM TO ME GOING TOO FAR INTO HIS

5    FINANCIAL AFFAIRS MIGHT DRAW AN OBJECTION, BUT I'LL

6    OVERRULE IT FOR NOW.

7              THE WITNESS:  I DO HAVE AN OWNERSHIP

8    INTEREST IN THE ULTIMATE PARENT.  IT'S A VERY SMALL

9    OWNERSHIP INTEREST.

10   BY MR. HUMPHREYS:

11   Q    OKAY, SIR.  THE QUESTION WAS YOU OWN 50,000

12   SHARES OF CREDIGY GLOBAL, THE COMPANY YOU SAID THAT

13   YOU HAD HEARD OF?

14   A    A VERY SMALL PERCENTAGE, THAT'S CORRECT.

15   Q    AND BUT YOU, YOU WOULD ADMIT, YES OR NO,

16   50,000 SHARES?

17   A    YES, I THINK IT'S 50,000 SHARES.  I'M NOT EVEN

18   SURE OF THE EXACT NUMBER.

19   Q    WELL, HAVE YOU TESTIFIED PREVIOUSLY HOW MANY

20   SHARES IN OTHER CASES?

21   A    I THINK I HAVE 50,000.

22   Q    OKAY.  NOW, THESE TIMES THAT HAVE TESTIFIED IN

23   COURT, THE 50 TO 75 TIMES YOU HAVE TOLD US ABOUT,

24   YOU GENERALLY TESTIFY FOR CREDIGY RECEIVABLES; IS

25   THAT RIGHT?

                                                    164

1    A    YES.

2    Q    AND IN THIS CASE WE ASKED FOR TESTIMONY OF THE

3    CORPORATION CREDIGY SERVICES LAST APRIL.  DO YOU

4    REMEMBER THAT?

5    A    YES.

6    Q    AND OF ALL OF THE PEOPLE AT THE CREDIGY

7    FAMILY, YOU WERE THE ONE THAT THE COMPANY PUT

8    FORWARD AS THE REPRESENTATIVE FOR CREDIGY SERVICES

9    TO GIVE TESTIMONY FOR THE CORPORATION; RIGHT?

10   A    I THINK IT WAS FOR CREDIGY SERVICES, CREDIGY

11   RECEIVABLES.

12   Q    FOR ALL THREE?

13   A    AS I REMEMBER.

14   Q    OKAY.  BUT IN ANY EVENT, YOU DID APPEAR AS A

15   REPRESENTATIVE FOR ONE OR MORE OF THE CREDIGY

16   COMPANIES IN THIS VERY CASE AS THE COMPANY'S

17   REPRESENTATIVE?

18   A    CORRECT.

19   Q    AND IN THAT YOU WERE THE PERSON THAT THE

20   CORPORATION DESIGNATED TO TESTIFY ON ALL

21   COMMUNICATIONS RELATING TO THE FAUSTOS?  THAT WAS

22   ONE OF YOUR TOPICS; RIGHT?

23   A    YES.

24   Q    ANOTHER TOPIC WAS ALL COLLECTION NOTES AND/OR

25   COLLECTION LOGS RELATING TO THE FAUSTOS?

165

1    A    CORRECT.

2    Q    CREDIGY COLLECTION PRACTICES AND PROCEDURES

3    WAS ANOTHER AREA THAT YOU WERE DESIGNATED TO

4    TESTIFY ON; IS THAT RIGHT?

5    A    YES.

6    Q    AND THE MODERATING AND REPORTING OF PHONE

7    CALLS WAS ANOTHER AREA; RIGHT?

8    A    YES.

9    Q    AND I THINK YOU TALKED ABOUT THE MANAGEMENT,

10   SUPERVISION OR DISCIPLINE OF THE COLLECTION

11   EMPLOYEES RELATED TO THIS DISPUTE WAS ANOTHER

12   TOPIC; RIGHT?

13   A    I BELIEVE THAT'S CORRECT.

14   Q    NOW, IS CREDIGY RECEIVABLES, ARE THEY A DEBT

15   COLLECTOR?

16   A    CREDIGY RECEIVABLES JUST OWNS ACCOUNTS.  IT

17   DOESN'T ENGAGE IN ANY COLLECTION ACTIVITY DIRECTLY.

18   Q    OKAY.  AND SO YOUR POSITION HERE IS THAT

19   CREDIGY RECEIVABLES IS NOT A DEBT COLLECTOR, AND,

20   THEREFORE, THEY COULD NOT HAVE VIOLATED THE FAIR

21   DEBT COLLECTION PRACTICES ACT; IS THAT RIGHT?

22            MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

23   A LEGAL CONCLUSION.

24            THE COURT:  SUSTAINED.

25   BY MR. HUMPHREYS:

                                                    166

1      Q    SIR, I JUST WANT TO BE CLEAR ARE YOU

2    CONTENDING THAT CREDIGY RECEIVABLES IS NOT A DEBT

3    COLLECTOR?

4              MR. GILLESPIE:  AGAIN, OBJECTION AS TO IT

5    CALLS FOR A LEGAL CONCLUSION.

6              THE COURT:  SUSTAINED.

7    BY MR. HUMPHREYS:

8      Q    HAVE YOU EVER SAID, SIR, THAT CREDIGY

9    RECEIVABLES IS NOT A DEBT COLLECTOR?

10             MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

11   A LEGAL CONCLUSION.

12             THE COURT:  OVERRULED.  YOU CAN TELL US

13   WHETHER YOU MADE THAT STATEMENT BEFORE ONE WAY OR

14   ANOTHER?

15             THE WITNESS:  CAN YOU REPEAT THE

16   QUESTION.

17   BY MR. HUMPHREYS:

18     Q    HAVE YOU EVER SAID THAT CREDIGY RECEIVABLES

19   ISN'T A DEBT COLLECTOR?

20     A    YOU KNOW, I DON'T KNOW IF I HAVE EVER MADE

21   THAT STATEMENT OR NOT.  AGAIN, CREDIGY RECEIVABLES

22   DOESN'T COLLECT ANY DEBTS DIRECTLY.  IT OWNS

23   ACCOUNTS.  THAT'S WHAT IT DOES.

24     Q    OKAY.  EVEN THOUGH YOU HAVE TESTIFIED IN COURT

25   IN LAWSUITS ABOUT CREDIGY RECEIVABLES, YOU'RE

                                              167

1    TELLING THIS JURY THAT IT'S NOT A DEBT COLLECTOR?

2              THE COURT:  WELL, NO.  THE COURT HAS

3    SUSTAINED OBJECTIONS TO THAT.  HE'S DESCRIBED ITS

4    OWNERSHIP ACCOUNTS.

5              IT COULD BE, LADIES AND GENTLEMEN OF THE

6    JURY, THAT I AM GOING TO DEFINE THAT AS A TERM

7    BECAUSE THE LAW DOES REGULATE CERTAIN ENTITIES AND

8    IT COULD BE THAT THIS IS AN IMPORTANT ISSUE BECAUSE

9    OF THOSE REGULATIONS, BUT THAT'S A MATTER FOR ME TO

10   DECIDE.

11             I'LL ASK YOU TO STICK TO THE FACTS OF

12   WHAT IT DOES, WHAT IT OWNS, ITS PROPERTY, HOW IT

13   DIRECTS ITSELF AND IF THERE'S A LEGAL CONCLUSION TO

14   BE DRAWN FROM THOSE FACTUAL MATTERS.

15   BY MR. HUMPHREYS:

16   Q    SIR, WOULD YOU ADMIT THAT CREDIGY RECEIVABLES

17   FILES DEBT COLLECTION LAWSUITS AGAINST CONSUMERS

18   THROUGHOUT THE COUNTRY?

19   A    CREDIGY RECEIVABLES MAY HAVE ATTORNEYS THAT

20   FILE COLLECTION LAWSUITS ON ITS BEHALF, BUT IT

21   DOESN'T DIRECTLY FILE LAWSUITS.

22   Q    OKAY.  WELL, THE LAWYER BRINGS THE CASE DOWN

23   TO THE COURTHOUSE; RIGHT?  OR THEIR STAFF DOES IS

24   THAT WHAT YOU'RE SAYING.

25   A    I'M SAYING CREDIGY RECEIVABLES HAS BEEN A

168

1    PLAINTIFF IN LAWSUITS AND BEEN REPRESENTED BY

2    LAWYERS THAT REPRESENT THEM.  IT DOESN'T DO THAT

3    DIRECTLY.

4    Q    WELL, IT HIRES LAWYERS TO DO ITS DEBT

5    COLLECTION BUSINESS?

6              MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

7    A LEGAL CONCLUSION.

8              THE COURT:  SUSTAINED.

9    BY MR. HUMPHREYS:

10   Q    ALL RIGHT.  NOTWITHSTANDING THE FACT THAT

11   CREDIGY RECEIVABLES HIRES LAWYERS, DO YOU ADMIT

12   THAT CREDIGY RECEIVABLES IS NAMED AS A PARTY, THE

13   PLAINTIFF, FILING LAWSUITS TO COLLECT DEBTS ALL

14   OVER THE COUNTRY AGAINST CONSUMERS?

15   A    YES.

16   Q    IN FACT, THAT -- THEY FILE THOSE LAWSUITS

17   RIGHT HERE IN SANTA CLARA COUNTY; RIGHT?

18   A    YOU MEAN THEY WHO --

19   Q    CREDIGY RECEIVABLES.  THANK YOU.

20   A    AGAIN, AS YOU STATED, CREDIGY RECEIVABLES HAS

21   FILED LAWSUITS ALL OVER THE COUNTRY.  THAT'S

22   CORRECT.

23   Q    OKAY.  AND IS IT TRUE THAT CREDIGY RECEIVABLES

24   WAS SET UP TO BUY A NUMBER OF DEFAULTED ACCOUNTS?

25   A    CREDIGY RECEIVABLES WAS SET UP TO BUY ONE

169

1    SPECIFIC GROUP OF ACCOUNTS OR PORTFOLIO OF

2    ACCOUNTS.

3    Q    AND THAT WAS ABOUT 900,000 ACCOUNTS?

4    A    IT'S 901,639 ACCOUNTS, THAT'S RIGHT.

5    Q    OKAY.  AND IT BASICALLY BOUGHT ALL OF THOSE

6    ACCOUNTS AT ONE TIME?

7    A    CREDIGY RECEIVABLES DID, THAT'S RIGHT.

8    Q    AND THAT WAS IN DECEMBER OF 2002?

9    A    DECEMBER 27TH OF 2002.

10   Q    YOU WERE INVOLVED IN THAT, RIGHT, IN THAT

11   TRANSACTION?

12   A    YES.

13   Q    OKAY.  AND ALL OF THOSE ACCOUNTS WERE --

14   STRIKE THAT.  WERE ANY OF THOSE ACCOUNTS CURRENT

15   WHEN CREDIGY RECEIVABLES BOUGHT THE PORTFOLIO?

16   A    WHAT DO YOU MEAN BY "CURRENT"?

17   Q    NOT DEFAULTED.  NOT PAST DUE.

18   A    TO MY KNOWLEDGE AND RECOLLECTION, EVERY SINGLE

19   ACCOUNT AND IN THE ENTIRE PORTFOLIO WAS PAST DUE

20   AND DEFAULTED, ALTHOUGH THERE WERE AN ELECT NUMBER

21   OF ACCOUNTS THAT WERE MAKING PAYMENTS.

22   Q    OKAY.  AND IS THE FAUSTO ACCOUNT

23   REPRESENTATIVE OF THE TYPE OF ACCOUNTS THAT YOU

24   BOUGHT IN THIS 2002 TRANSACTION AT CREDIGY

25   RECEIVABLES?

170

1    A    WHAT DO YOU MEAN "REPRESENTATIVE"?  YES, THEY

2    WERE ALL CREDIT CARD ACCOUNTS IF THAT'S WHAT YOU

3    MEAN.

4    Q    YES.

5    A    YES, THAT'S CORRECT, THEY WERE ALL CREDIT CARD

6    ACCOUNTS.

7    Q    OKAY.  AND ACCORDING TO CREDIGY'S RECORDS

8    THERE HADN'T BEEN A PAYMENT ON THAT ACCOUNT FROM

9    JULY OF 1999; IS THAT RIGHT?

10   A    OUR RECORDS WERE THAT THE LAST PAYMENT WAS FOR

11   $59 ON JULY 28TH OF 1999, THAT'S CORRECT.

12   Q    OKAY.  AND SO AT THE TIME THAT THE ACCOUNT WAS

13   BOUGHT IN DECEMBER OF 2002, IT WAS ABOUT TWO AND A

14   HALF YEARS FROM ANY PAYMENT HAVING BEEN MADE ON THE

15   ACCOUNT?

16   A    YEAH, IT WAS --

17   Q    THREE AND A HALF YEARS?

18   A    THREE AND A HALF YEARS.

19   Q    I'M SORRY.  THANK YOU.  AND THE CHARGE-OFF

20   BALANCE WAS ABOUT $3200; IS THAT RIGHT?

21   A    I THINK IT WAS LIKE 3332 OR 3232, OR SOMETHING

22   LIKE THAT.

23   Q    BUT IN THE RANGE OF 3200?

24   A    I WOULD HAVE TO LOOK AT THE RECORDS TO GET THE

25   EXACT BALANCE BUT RIGHT AROUND $3200.

171

1    Q    AND WHEN DID CREDIGY FIRST CONTACT THE FAUSTOS

2    ON THIS ACCOUNT THAT HADN'T HAD A PAYMENT ON IT

3    SINCE 1999?

4    A    WHEN YOU SAY, "CREDIGY," AGAIN, WHO ARE YOU

5    REFERRING TO?

6    Q    WELL, WHO IS THE FIRST CREDIGY COMPANY THAT

7    EVER MADE CONTACT FIRST WITH THE FAUSTOS?

8    A    ACCORDING TO OUR RECORDS IT'S CREDIGY SERVICES

9    CORP.

10   Q    AND WHEN DID CREDIGY SERVICES CORP FIRST MADE

11   CONTACT WITH THE FAUSTOS?

12   A    AGAIN, I THINK THERE WAS A LETTER THAT WAS

13   MAILED IN AUGUST OF 2006, I BELIEVE.

14   Q    OKAY.  LET'S GO AHEAD AND PUT UP EXHIBIT 57

15   WHICH I THINK IS SOMETHING THAT YOUR LAWYER

16   REFERENCED IN THE OPENING STATEMENT.

17        THE COURT:  MAYBE WE SHOULD TAKE A BREAK

18   SO WE CAN CHECK ON THE TECHNICAL PROBLEM BECAUSE IT

19   SHOULD NOT DO THAT, AND PERHAPS WE'LL TRY A

20   DIFFERENT PROJECTOR TO SEE IF THAT SOLVES THE

21   PROBLEM.

22        IT'S RATHER DISCONCERTING TO HAVE OUR

23   ATTENTION DRAWN TO IT AND THEN GO OFF.  IT'S ABOUT

24   FIVE -- WELL, IT DEPENDS ON WHICH CLOCK WE LOOK AT.

25   IT'S ABOUT TEN TO THE HOUR, AND LET'S COME BACK AT

172

1    ABOUT 3:05.

2              THE WITNESS:  YOUR HONOR, MAY I STEP

3    DOWN?

4              THE COURT:  YES, PLEASE.

5              THE WITNESS:  THANK YOU.

6              (WHEREUPON, A RECESS WAS TAKEN.)

7              THE COURT:  PLEASE BE SEATED.  VERY WELL.

8    CAN WE HAVE OUR WITNESS BACK.

9              YOU MAY RESUME YOUR EXAMINATION.

10             MR. HUMPHREYS:  THANK YOU.

11   Q    WHEN WE GOT STARTED EARLIER TODAY WE WERE

12   TALKING ABOUT THIS CHART, AND I'M GOING TO RUN JUST

13   ONE OR TWO THINGS ON THAT VERY QUICKLY.

14             THE CHART THAT YOU HAVE BEFORE YOU THERE,

15   DO YOU SEE THAT IT REFERENCES CREDIGY SOLUCOES

16   FINANCEIRAS LIMETADA, IF I'VE SAID THAT ANYWHERE

17   NEAR CLOSE?

18   A    YEAH, THAT'S RIGHT.  THAT'S PRETTY GOOD.

19   Q    AND THAT'S A BRAZILIAN AFFILIATE OF CREDIGY?

20   A    YES, IT'S A BRAZILIAN AFFILIATE OF CREDIGY.

21   Q    OKAY.  AND THERE WAS A TIME PERIOD WHEN THE

22   COLLECTORS THAT WORKED AT CREDIGY SERVICES WERE LET

23   GO AND THAT WORK WAS PICKED UP BY THE BRAZILIAN

24   AFFILIATE FOR COLLECTION?

25   A    AND WE ALSO OUTSOURCED FROM CREDIGY SOLUCOES

173

1   FINANCEIRAS LIMETADA.

2   Q     AND THAT WAS IN THE COLLECTION?

3   A     YES.

4   Q     AND WAS THAT IN THE RANGE OF 40 COLLECTORS AT

5   THE TIME OF THE TRANSACTION?

6   A     FORTY COLLECTORS WHERE?

7   Q     THAT WERE LET GO IN ATLANTA AND THOSE JOBS

8   WERE REPLACED IN THE BRAZILIAN AFFILIATE?

9   A     I DON'T KNOW THE EXACT NUMBER, BUT IT SOUNDS

10   ABOUT RIGHT.

11   Q     ALSO WE WERE DESIGNATING THE TOPICS THAT YOU

12   WERE TO GIVE TESTIMONY ON LAST YEAR, BUT I WANT TO

13   CONFIRM THAT YOU WERE THE COMPANY REPRESENTATIVE

14   FOR THE PURPOSE OF GIVING TESTIMONY ON THE METHODS

15   AND PRACTICES USED IN TRAINING COLLECTORS?

16   A     RIGHT.

17   Q     AND RIGHT BEFORE WE HAD THE BREAK, WE WERE

18   TAKING A LOOK AT EXHIBIT 57 WHICH IS THE LETTER

19   THAT I BELIEVE YOU TESTIFIED THAT EXHIBIT 57 IS A

20   LETTER THAT WAS SENT BY CREDIGY SERVICES TO MANUEL

21   FAUSTO, AND THAT WAS SENT ON AUGUST 16TH OF 2006.

22            AND THAT WAS THE FIRST CONTACT BY CREDIGY

23   SERVICES CORPORATION WITH THE FAUSTOS ABOUT THIS

24   ALLEGED DEBT; IS THAT RIGHT?

25   A     CORRECT.

1    Q    AND THIS WOULD HAVE BEEN AUGUST 2006.  LET'S

2    SEE, ONE, TWO, THREE, FOUR, FIVE, SIX -- ABOUT

3    SEVEN YEARS AFTER YOUR RECORDS SHOW A FINAL

4    PAYMENT?

5    A    THAT'S CORRECT.

6    Q    OKAY.  AND NOW HOW MUCH MONEY IS CREDIGY

7    SERVICES SEEKING IN THIS LETTER OF AUGUST 2006?

8    A    IT'S KIND OF HARD FOR ME TO READ.  I DON'T

9    KNOW IF YOU HAVE A PAPER COPY OF IT, BUT I THINK IT

10   SAYS AROUND, YEAH, 16,689.  THERE WE GO.

11   Q    SO ABOUT $16,000, $17,000 RANGE?

12   A    CORRECT.

13   Q    OKAY.  NOW, IF YOU RECEIVED A LETTER LIKE THIS

14   IN THE MAIL SEEKING ALMOST $17,000 FROM YOU, WOULD

15   THAT BE SOMETHING THAT YOU WOULD BELIEVE TO BE

16   RECKLESS TO PAY?

17           MR. GILLESPIE:  OBJECTION.

18           THE COURT:  SUSTAINED.

19   BY MR. HUMPHREYS:

20   Q    DO YOU BELIEVE IT WOULD BE RECKLESS TO PAY

21   THAT AMOUNT OF MONEY $16,000, $17,000 WORTH OF

22   MONEY WITHOUT MORE INVESTIGATION?

23           MR. GILLESPIE:  OBJECTION.  RELEVANCY.

24           THE COURT:  SUSTAINED.

25   BY MR. HUMPHREYS:

                                                175

1    Q    HAVE YOU RECEIVED AN E-MAIL SUPPOSEDLY FROM

2    YOUR BANK OR A CREDIT UNION OR SUPPOSEDLY ABOUT

3    YOUR PAY PAL ACCOUNT THAT WAS FISHING, SEEKING THE

4    INFORMATION ABOUT YOUR PERSONAL FINANCIAL

5    INFORMATION?

6              MR. GILLESPIE:  OBJECTION.  RELEVANCY.

7    BY MR. HUMPHREYS:

8    Q    NOW, YOU DO ADMIT THAT THE FAUSTOS NEVER HAD A

9    CONTRACT WITH CREDIGY?

10   A    NEVER HAD A CONTRACT WITH CREDIGY?

11   Q    THAT'S RIGHT.

12   A    NO, THAT'S INCORRECT.

13   Q    WELL, THE FAUSTOS NEVER, EVER ENTERED INTO A

14   CONTRACT WITH CREDIGY?

15   A    FAUSTOS -- THE CREDIGY'S PREDECESSOR IN

16   INTEREST AND BY CREDIGY I MEAN CREDIGY RECEIVABLES.

17   Q    OKAY.  SO THE STATEMENT THAT THE FAUSTOS NEVER

18   ENTERED INTO A CONTRACT WITH CREDIGY RECEIVABLES OR

19   ANY OTHER CREDIGY AFFILIATE, THAT'S A TRUE

20   STATEMENT; RIGHT?

21             MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

22   A LEGAL CONCLUSION, YOUR HONOR.

23             THE COURT:  WELL, I'M NOT SURE IT CALLS

24   FOR A LEGAL CONCLUSION, BUT IT DOES HAVE SOME

25   VAGUENESS IN IT.  PERHAPS IF YOU ADDED TO HIS

                                                  176

1    KNOWLEDGE IF THERE WAS ANY WRITTEN ACCOUNT BETWEEN

2    THEM, THAT WOULD BE SOMETHING HE OBSERVED AND KNOW

3    ABOUT BASED UPON HIS OWN KNOWLEDGE, BUT IT COULD BE

4    THAT BY AN ASSIGNMENT OR SOME OTHER LEGAL MECHANISM

5    THERE IS A CONTRACTUAL RELATIONSHIP.

6              SO YOU SHOULD NARROW YOUR INQUIRY TO SEE

7    WHETHER OR NOT YOU CAN OVERCOME THE OBJECTIONS.

8    BY MR. HUMPHREYS:

9    Q    THE FAUSTOS NEVER ENTERED INTO A BARGAINING TO

10   BORROW MONEY FROM CREDIGY; IS THAT TRUE?

11   A    THAT'S CORRECT.

12   Q    OKAY.  AND TO YOUR KNOWLEDGE HAD THE FAUTOS

13   EVER HEARD OF THIS CREDIGY RECEIVABLES CORPORATION

14   THAT SENT THEM A LETTER SEEKING ALMOST $17,000 IN

15   2006?

16             MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

17   SPECULATION.

18             THE COURT:  SUSTAINED.

19   BY MR. HUMPHREYS:

20   Q    DO YOU HAVE ANY KNOWLEDGE, SIR, ABOUT ANY

21   CONTACT THAT CREDIGY EVER MADE WITH THE FAUSTOS

22   BEFORE AUGUST OF 2006?  ANY CREDIGY AFFILIATE?

23   A    CREDIGY DIRECTLY HAD NOT MADE ANY CONTACT.

24   Q    SO YOU HAVE NO KNOWLEDGE OF THE FAUSTOS EVER

25   HAVING ANY DEALINGS OR KNOWLEDGE OF CREDIGY PRIOR

177

1    TO THIS LETTER?

2              MR. GILLESPIE:  OBJECTION.  ASKED AND

3    ANSWERED, YOUR HONOR.

4              THE COURT:  SUSTAINED.  AND YOU PUT IN

5    KNOWLEDGE AND DEALING, AND I ALREADY SUSTAINED IT

6    AS TO THEIR KNOWLEDGE BUT DEALINGS IT HAS BEEN

7    ASKED AND ANSWERED.

8              BUT MOVE ON TO OTHER AREAS.

9              MR. HUMPHREYS:  I WILL, YOUR HONOR.

10   Q    DO YOU KNOW WHEN LOOKING AT THE CREDIT LOG

11   WHEN CREDIGY MADE THEIR FIRST PHONE CALL TO THE

12   FAUSTOS?

13   A    CREDIGY SERVICES AND CREDIGY SOLUCOES MADE A

14   PHONE CALL I BELIEVE IT WAS IN AUGUST OF 2006.

15   Q    LET'S TAKE A LOOK AT THIS.

16             MR. GILLESPIE:  OBJECTION, YOUR HONOR.  I

17   BELIEVE THIS IS AN EXHIBIT THAT WE HAVE NOT

18   STIPULATED INTO EVIDENCE YET.

19             THE COURT:  VERY WELL.  SO YOU SHOULD NOT

20   DISPLAY IT TO THE JURY UNTIL IT'S BEEN RECEIVED BY

21   THE COURT, BUT YOU CAN USE IT WITH THE WITNESS.

22             MR. HUMPHREYS:  YES, YOUR HONOR.

23             THE COURT:  DO YOU HAVE A METHOD OF DOING

24   THAT OUTSIDE OF THE ELECTRONICS?

25             MR. HUMPHREYS:  YES, YOUR HONOR.  MAY I

178

1      APPROACH THE WITNESS, YOUR HONOR?

2              THE COURT:  SURE.

3      BY MR. HUMPHREYS:

4      Q    LET ME HAND YOU WHAT WE'LL MARK AS PLAINTIFFS'

5      EXHIBIT 2.  AND WOULD YOU READ THE -- DO YOU SEE IN

6      THE BOTTOM RIGHT-HAND CORNER THERE'S A STAMP FA

7      WITH NUMBERS ON IT?

8              MR. GILLESPIE:  YOUR HONOR, I'M GOING TO

9      OBJECT TO HIM READING ANY DOCUMENT.

10             THE COURT:  HE REPHRASED HIS QUESTION AS

11     TO WHETHER HE SAW THAT DESIGNATION.  THAT'S AN

12     APPROPRIATE QUESTION.

13             THE WITNESS:  COULD YOU REPEAT THAT?  I'M

14     SORRY.

15     BY MR. HUMPHREYS:

16     Q    DO YOU SEE IN THE BOTTOM RIGHT-HAND CORNER A

17     STAMP THAT SAYS FA WITH A SERIES OF NUMBERS

18     FOLLOWING THE FA?

19     A    YES.

20     Q    AND DO YOU RECOGNIZE THAT TO BE DOCUMENTS THAT

21     WERE PRODUCED BY CREDIGY IN THIS LAWSUIT?  THAT'S

22     THE DOCUMENT CONTROL STAMP?

23     A    YES, I BELIEVE THIS IS OR MAYBE PART OF THE

24     DOCUMENT THAT WAS PRODUCED BY CREDIGY.

25     Q    AND WHAT IS THE DOCUMENT RANGE ON THAT?

                                                    179

1    A    THE RANGE ON WHAT YOU HAVE IS FIVE PAGES.

2    Q    AND WOULD YOU READ THE NUMBERS FOR US FROM THE

3    BEGINNING AND END NUMBERS?

4    A    SURE.  FA 0001048.

5    Q    OKAY.

6          THE COURT:  YOU CAN LEAVE OFF THE

7    BEGINNING ZEROS.

8          THE WITNESS:  ALL RIGHT.  AND THE ENDING

9    NUMBER FA 1052.

10   BY MR. HUMPHREYS:

11   Q    OKAY.  AND WHAT IS THE -- NOW, IS THAT

12   DOCUMENT THAT YOU HAVE BEFORE YOU A PRINTOUT OF A

13   COMPUTER SCREEN OF RECORDS THAT ARE MAINTAINED AT

14   CREDIGY SERVICES?

15   A    YES.

16   Q    AND DOES THAT REFLECT COLLECTION ACTIVITY BY

17   THE BRAZILIAN AFFILIATE CREDIGY SOLUCOES

18   FINANCEIRAS LIMETADA IN BRAZIL REGARDING CONTACTS

19   THAT THEY MADE ON THE FAUSTO ACCOUNT?

20   A    I BELIEVE IT DOES.

21   Q    OKAY.  AND WHAT IS THE VERY FIRST ENTRY BY

22   DATE IN THAT RECORD THAT YOU HAVE BEFORE YOU,

23   EXHIBIT 2?

24   A    THE VERY FIRST DATE IS NOVEMBER 4, 2004.

25   Q    OKAY.

                                                    180

1    A    AGAIN, I THINK THIS IS AN INCOMPLETE RECORD.

2    THERE ARE MORE NOTES BUT THAT'S THE FIRST ONE ON

3    THIS RECORD.

4    Q    AND WHEN DID CREDIGY BUY THIS SELECTION OF

5    ACCOUNTS, THIS 900 SOME THOUSAND ACCOUNTS THAT YOU

6    TOLD US ABOUT?

7            MR. GILLESPIE:  OBJECTION.  ASKED AND

8    ANSWERED.

9    BY MR. HUMPHREYS:

10   Q    WOULD YOU CONFIRM FOR ME -- I'M SORRY, JUDGE.

11           DO YOU WANT TO MAKE A RULING?

12           THE COURT:  THIS IS SOMETHING BEING TAKEN

13   FROM THE DOCUMENT NOW?

14           MR. HUMPHREYS:  I'M ASKING HIM TO CONFIRM

15   THAT ON DECEMBER OF 2002.

16           THE WITNESS:  DECEMBER 27TH, 2002 CREDIGY

17   SERVICES, INCORPORATED, ACQUIRED THIS ACCOUNT AND

18   SOME OTHERS.

19           THE COURT:  THAT HAS BEEN COVERED.

20   BY MR. HUMPHREYS:

21   Q    WELL, MY QUESTION IS DOES THAT CONTAIN ALL OF

22   THE ENTRIES THAT CREDIGY MADE IN THE DOCUMENT?

23   A    ALL OF THE ENTRIES THAT CREDIGY MADE AND THE

24   NOTES?

25   Q    RIGHT.

                                                  181

1    A    I WOULD HAVE TO LOOK AT A COMPLETE SET OF

2    NOTES TO CONFIRM THAT.

3    Q    OKAY.  DO YOU HAVE ANY KNOWLEDGE THAT WERE

4    THERE ANY ENTRIES THAT WERE MADE BY CREDIGY

5    SERVICES THAT ARE NOT CONTAINED IN THE EXHIBIT 2

6    THAT YOU HAVE BEFORE YOU, SIR?

7    A    AGAIN, I WOULD HAVE TO REVIEW THE COMPLETE SET

8    OF RECORDS TO ANSWER THAT QUESTION.

9    Q    THAT WASN'T MY QUESTION.  MY QUESTION WAS DO

10   YOU HAVE PERSONAL KNOWLEDGE THAT THERE IS ANYTHING

11   MISSING FROM THERE THAT CREDIGY PUT IN THAT LOG

12   THAT YOU TOLD US IS A CREDIGY RECORD?

13   A    YEAH, FROM, YOU KNOW, A QUICK REVIEW, LET ME

14   JUST LOOK HERE.  THE FIRST NOTE IN 2004 WAS

15   PROBABLY THE FIRST NOTE ENTERED BY CREDIGY SERVICES

16   CORP, CORRECT.

17   Q    AND JUST TO MAKE SURE I UNDERSTAND HERE, WE

18   HAVE FOLKS IN BRAZIL WORKING FOR THE AFFILIATE THAT

19   ARE PUTTING NOTES INTO THE CREDIGY SYSTEM; IS THAT

20   WHAT IS HAPPENING?

21   A    AT WHAT POINT IN TIME?

22   Q    AT ANY POINT IN TIME?

23   A    WELL, AT SOME POINTS IN TIME, YES, AND AT SOME

24   POINT IN TIME, NO.

25   Q    WELL, ARE THERE RECORDS KEPT IN BRAZIL THAT

                                                    182

1    HAVE NOT BEEN TURNED OVER?

2    A    NO, THERE'S ONLY ONE SET OF RECORDS.

3    Q    AND THEY'RE KEPT BY CREDIGY SERVICES?

4    A    CORRECT.

5    Q    AND YOU HAVE THEM THERE BEFORE YOU?

6    A    WELL, AGAIN, THIS IS A PART OF THE RECORDS

7    KEPT BY CREDIGY SERVICES.

8    Q    YOU ALREADY TOLD US THAT IT'S PROBABLE THAT

9    IT'S FROM CREDIGY SERVICES CORP THAT THEY CREATED

10   RELATED TO THE FAUSTO ACCOUNT.  DIDN'T YOU JUST SAY

11   THAT?

12            MR. GILLESPIE:  OBJECTION.  IT MISSTATES

13   PRIOR TESTIMONY.

14            THE COURT:  OVERRULED.

15            THE WITNESS:  NO, THEY ARE, FOR EXAMPLE,

16   THERE'S ANOTHER SCREEN SHOT I KNOW THAT I HAVE SEEN

17   THAT HAS THE BASIC INFORMATION ABOUT THIS ACCOUNT

18   THAT YOU HAVEN'T PRESENTED TO ME HERE.

19   BY MR. HUMPHREYS:

20   Q    OKAY.  THAT -- BUT AS FAR AS THE COLLECTION

21   LOG, THAT'S IT; RIGHT?

22   A    AS FAR AS THE COLLECTION LOG, AGAIN, IT LOOKS

23   LIKE THAT US THE FIRST NOTE HERE NOVEMBER 4TH,

24   2004, YES, THIS IS THE FIRST NOTE THAT WAS ENTERED

25   BY CREDIGY SERVICES CORP ON THE COLLECTION LOG,

183

1    THAT'S CORRECT.

2    Q    AND WHEN YOU SAY THERE ARE OTHER RECORDS,

3    YOU'RE TALKING ABOUT SOMEONE ELSE'S RECORDS THAT

4    ARE NOT IN THERE; RIGHT?

5    A    NO.  I'M TALKING ABOUT THE BUSINESS RECORDS.

6    Q    YOU'RE TALKING ABOUT THE FIRST SELECT RECORDS

7    THAT THEY GAVE YOU; TRUE?

8    A    I'M TALKING ABOUT RECORDS THAT THAT WAS

9    FIRSTHAND BY WELLS FARGO THAT BECAME PART OF OUR

10   RECORDS.

11   Q    BUT TO ANSWER MY QUESTION, THAT CONTAINS ALL

12   OF THE RECORDS THAT CREDIGY CREATED; RIGHT?

13   A    IN THE COLLECTION LOG, BUT AGAIN, THERE ARE

14   SOME OTHER ENTRIES ON THE REST OF THE DOCUMENTS.

15            FOR EXAMPLE, I KNOW ONE OF THE DOCUMENTS

16   WE PRODUCED IDENTIFIES THE DATE.

17            MR. HUMPHREYS:  I DON'T THINK YOU'RE

18   ANSWERING MY QUESTION.

19            I'M GOING TO STRIKE AND TO MOVE AS

20   NONRESPONSIVE.

21            THE COURT:  YES, I'M SATISFIED THAT YOU

22   HAVE GIVEN HIM RECORDS, WHICH MAY NOT BE ALL OF THE

23   RECORDS, ARE RECORDS OF A PRINTOUT FROM FILES OF

24   THE CREDIGY LOG OF ACTIVITY.

25            AND SO EXHIBIT 2, IF THAT'S HOW YOU HAVE

184

1    MARKED IT ELECTRONICALLY, I'M PREPARED TO ACCEPT

2    INTO EVIDENCE.

3              MR. HUMPHREYS:  YOUR HONOR?

4              MR. GILLESPIE:  I'D LIKE TO MOVE UNDER

5    THE RULE OF COMPLETENESS EXHIBIT 157, WHICH IS THE

6    COMPLETE SET OF BUSINESS RECORDS FOR CREDIGY WHICH

7    INCLUDES WHAT IS BEING ADMITTED IN EXHIBIT 2 BE

8    ADMITTED AT THIS TIME.

9              THE COURT:  WELL, THAT'S A HELPFUL

10   SUGGESTION.

11             IS THERE ANY REASON WHY WE SHOULDN'T

12   ALLOW 157 IN EVIDENCE EVEN THOUGH IF -- YOU CAN USE

13   EXHIBIT 2 IF YOU HAVE CUED UP YOUR SYSTEM TO JUST

14   USE A PORTION OF IT AS LONG AS IT'S CLEAR TO THE

15   JURY THAT BOTH DOCUMENTS CONTAIN THE SAME

16   INFORMATION.

17             MR. HUMPHREYS:  WELL, IT'S MORE

18   INFORMATION, YOUR HONOR, AND IT'S INFORMATION THAT

19   WE THINK THERE'S NO FOUNDATION FOR.

20             THE COURT:  OH, ALL RIGHT.

21             MR. HUMPHREYS:  THEY'RE ACTUALLY SOMEONE

22   ELSE'S RECORDS.

23             THE COURT:  WELL, I'LL WAIT UNTIL YOU

24   OFFER THROUGH ANOTHER WITNESS ANOTHER EXHIBIT.

25             MR. GILLESPIE:  MAY I BE HEARD BRIEFLY ON

185

1    THAT, YOUR HONOR?

2            THE COURT:  CERTAINLY.

3            MR. GILLESPIE:  SOME OF THE INFORMATION

4    THAT IS CONTAINED ON EXHIBIT 2 ALSO WAS NOT

5    GENERATED BY CREDIGY.  IT WAS ACQUIRED FROM THESE

6    PRIOR OWNERS.

7            SO EVEN IN THE DOCUMENT THAT HE SEEKS TO

8    BE ADMITTED NOW, SOME OF THE INFORMATION IN THERE

9    WAS ACQUIRED BY CREDIGY FROM EITHER FIRST SELECT OR

10   WELLS FARGO.

11           THE COURT:  VERY WELL.  SO PERHAPS WE'RE

12   LOOKING AT MORE THAN THE LOG IN EXHIBIT 2.  I

13   THOUGHT THAT THE FOUNDATION HAD BEEN LAID THAT

14   EXHIBIT 2 IS A LOG OF ACTIVITY.

15           SO I'LL WITHHOLD ALLOWING IT UNTIL YOU

16   LAY A FOUNDATION AS TO WHAT ELSE MIGHT BE ON

17   EXHIBIT 2.

18           MR. HUMPHREYS:  YOUR HONOR, I WOULD

19   SUBMIT RESPECTFULLY THAT MR. GILLESPIE'S TESTIMONY,

20   IF THAT'S WHAT IT IS, IS DIFFERENT FROM THE

21   WITNESS'S.  HE SAID IT WAS CREATED BY CREDIGY.

22   IT'S THEIR INFORMATION.

23           THE COURT:  CAN I SEE EXHIBIT 2?

24           MR. GILLESPIE:  IF I COULD SPECIFICALLY

25   POINT TO WHAT I'M TALKING ABOUT IF YOU CARE.

                                                    186

1          THE COURT:  I DON'T WANT TO DELAY US, BUT

2    IT DOES APPEAR TO BE, LOOKING AT THE SUBSTANCE OF

3    THE DOCUMENT, TO BE A LOG OF ACTIVITY.  AS I LOOK

4    AT THE DOCUMENT ITSELF IT APPEARS TO BE WITH A LOGO

5    THAT CONTAINS THE WORD "CREDIGY TECHNOLOGIES,

6    INCORPORATED."

7          IF WITHIN THE LOG ITSELF THERE IS SOME

8    INFORMATION THAT YOU WOULD LIKE TO HAVE REDACTED

9    BECAUSE IT WAS NOT RECORDED IN THE REGULAR COURSE

10   OF EVENTS BY WHOEVER MADE THESE ENTRIES, WE CAN

11   COME BACK TO THAT, BUT I'M SATISFIED TO ALLOW

12   EXHIBIT 2 INTO EVIDENCE.

13          MR. GILLESPIE:  OKAY.  THANK YOU, YOUR

14   HONOR.

15          THE WITNESS:  THANK YOU.

16          THE COURT:  YOU MAY PROCEED.

17          (WHEREUPON, PLAINTIFFS' EXHIBIT NUMBER 2,

18          HAVING BEEN PREVIOUSLY MARKED FOR

19          IDENTIFICATION, WAS ADMITTED INTO

20          EVIDENCE.)

21   BY MR. HUMPHREYS:

22   Q    LET'S JUST DEAL WITH THIS STRAIGHT UP, SIR.

23   IS THIS JURY -- ARE THESE FOLKS GOING TO SEE

24   SOMEONE FROM WELLS FARGO WITH AN EMPLOYEE BADGE

25   FROM WELLS FARGO COME INTO THIS COURT AND SIT IN

                                                    187

1    THAT CHAIR RIGHT THERE AND SAY, "YES, THESE ARE

2    LEGITIMATE," AND ARE WE GOING TO SEE THAT KIND OF

3    TESTIMONY FROM YOUR COMPANY?

4              MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

5    A LEGAL CONCLUSION.

6              THE COURT:  THAT'S ARGUMENTATIVE.

7    SUSTAINED.

8    BY MR. HUMPHREYS:

9    Q    LET ME ASK THIS:  ARE YOU GOING TO PUT SOMEONE

10   ON THE STAND FROM WELLS FARGO?

11             THE COURT:  HE'S NOT CALLING WITNESSES,

12   COUNSEL.  IT'S ARGUMENTATIVE IN FORM.

13   BY MR. HUMPHREYS:

14   Q    DO YOU KNOW IF CREDIGY IS GOING TO BRING A

15   WITNESS FROM WELLS FARGO TO SAY, "YES, THESE ARE

16   OUR RECORDS AND THESE ARE ACCURATE"?

17             MR. GILLESPIE:  OBJECTION, YOUR HONOR.

18             THE COURT:  SUSTAINED.

19   BY MR. HUMPHREYS:

20   Q    THE EXHIBIT 2 THAT YOU HAVE BEFORE YOU THERE,

21   IS THERE SOMETHING IN THERE THAT CREDIGY CREATED

22   THAT THIS JURY DOESN'T HAVE THAT YOU THINK THEY

23   NEED TO HAVE?

24             THAT EXHIBIT 2 THAT WE JUST SUBMITTED

25   INTO EVIDENCE, IS THERE SOMETHING THAT WE NEED TO

188

1    SEE OR THIS JURY NEEDS TO SEE THAT CREDIGY MADE OR

2    A RECORD?

3    A    I THINK THERE ARE A NUMBER OF RECORDS IN

4    EXHIBIT 157.

5    Q    IS THERE A RECORD THAT CREDIGY CREATED THAT IS

6    NOT ON EXHIBIT 2?

7    A    YES.

8    Q    WHAT?

9    A    IN EXHIBIT 157 THE ACCOUNT, FOR EXAMPLE,

10   THERE'S A LIST OF PORTFOLIOS THE ACCOUNT WAS

11   ASSIGNED TO AT DIFFERENT TIMES IN EXHIBIT 157.

12   THERE'S A LIST OF DIFFERENT STRATEGIES THE ACCOUNT

13   WAS ASSIGNED TO IN EXHIBIT 157.

14   Q    ARE THERE ANY CONTACTS WITH THE FAUSTOS ACTUAL

15   OR ATTEMPTED THAT ARE NOT CONTAINED IN THIS EXHIBIT

16   2 THAT CREDIGY ACTUALLY MADE?

17          IS THAT WHAT YOU'RE SAYING, THAT THERE

18   ARE SOME KIND OF CONTACTS THAT YOU MADE THAT YOU

19   WANT TO SHARE WITH THE JURY THAT ARE NOT IN HERE?

20          MR. GILLESPIE:  YOUR HONOR, I THINK THE

21   WITNESS SHOULD BE ALLOWED TO SEE THE EXHIBIT THAT

22   WE'RE TALKING ABOUT SO HE CAN ANSWER THE QUESTION.

23          THE COURT:  WELL, THAT'S UP TO HIM TO SAY

24   THAT.  I CAN'T SAY WITHOUT SEEING THE WITNESS --

25   YOU CAN -- IF THE QUESTION IS ASKED AS TO WHETHER

189

1    OR NOT THERE ARE CONTACTS IN THIS OTHER DOCUMENT,

2    THAT'S AN APPROPRIATE QUESTION.

3           BUT YOU SHOULD UNDERSTAND, SIR, THAT IF

4    YOU'RE ASKED ABOUT THE CONTENTS OF THE DOCUMENT AND

5    YOU HAVE IT IN MIND, YOU COULD TELL US.

6           BUT IF YOU DON'T HAVE IT IN MIND, YOU

7    SHOULD SAY, "I CAN'T TELL YOU."  BUT WE DON'T KNOW

8    WHAT YOUR STATE OF MEMORY IS SO YOU CAN TELL US ONE

9    WAY OR THE OTHER.

10          THE WITNESS:  OKAY.  WELL, I DON'T KNOW

11   IN EXHIBIT 157.  I'LL HAVE TO REVIEW IT WHETHER

12   THERE ARE ANY ADDITIONAL CONTACTS LISTED THERE, BUT

13   I BELIEVE THAT THERE ARE SOME CONTACTS THAT ARE NOT

14   LISTED IN THIS EXHIBIT 2 OR MADE BY CREDIGY.

15   BY MR. HUMPHREYS:

16   Q    WITH THE FAUSTOS?

17   A    YES, CREDIGY.

18   Q    WELL, WE'RE GOING TO TAKE A BREAK HERE WHEN

19   THE COURT SAYS SO AND WE'LL COME BACK TOMORROW AND

20   WE'LL TALK ABOUT THAT, OKAY?  WE'LL GIVE YOU A

21   CHANCE TO LOOK AT THAT OVERNIGHT, OKAY?

22   A    LOOK AT WHAT?

23   Q    WHATEVER CONTACTS THAT YOU THINK CREDIGY

24   SOLUTIONS MADE THAT YOU DON'T HAVE BEFORE YOU.

25   A    ALL RIGHT.

                                              190

1    Q    NOW, BEFORE WE GOT OFF TRACK THERE WE WERE

2    TAKING -- YOU TOLD ME THAT AUGUST 16TH WAS THE

3    FIRST LETTER OF 2006.

4         AND IF WE CAN PUT EXHIBIT 2 UP.  YOU TOLD

5    US I BELIEVE THAT THE FIRST PHONE CALL HAPPENED ON

6    AUGUST 22ND.

7    A    I SAID IT WAS IN AUGUST, BUT IT LOOKS LIKE

8    AUGUST 22ND, THAT'S CORRECT.

9    Q    OKAY. LET'S SEE IF WE CAN HIGHLIGHT THAT

10   PARTICULAR ENTRY.

11        MY EYES ARE NOT TOO GOOD, BUT CAN YOU

12   TELL US WHAT THE AUGUST 22ND, 2006 ENTRY FROM

13   CREDIGY SAYS?

14   A    YES.  IT SAYS, "AUGUST 22ND 2006 AT 12:43:17

15   TALKED TO DEBTOR KRAMOS.  SCHEDULED FOR 25-08-2006,

16   12:39 SD SAID WILL DISPUTE THE ACCOUNT."

17   Q    OKAY.  IS IT FAIR TO SAY THAT THE ONLY

18   INFORMATION ABOUT THAT CONTENT OF THE COMMUNICATION

19   WITH THE DEBTOR, WHOEVER WAS SPOKEN TO THERE SAID

20   "WILL DISPUTE THE ACCOUNT"?

21   A    OTHER THAN THE DATE AND TIME THAT WAS ON THE

22   CALL, YES.

23   Q    WHAT DOES IT MEAN SCHEDULED -- IS THAT AUGUST

24   25TH, 2006?

25   A    YES.

191

1    Q    AND WHAT DOES IT MEAN WHEN IT'S SCHEDULED FOR

2    AUGUST 25TH, THREE DAYS LATER?

3    A    IT MEANS THAT THE ACCOUNT WAS SCHEDULED FOR

4    CALLBACK ON THAT DAY.

5    Q    OKAY.  IS THAT SOMETHING THAT THE PERSON PUT

6    IN MANUALLY?

7    A    I BELIEVE THAT'S CORRECT.

8    Q    OKAY.  SO ALL WE KNOW IS THAT A CONVERSATION

9    TOOK PLACE ON THAT DATE AND "WILL DISPUTE THE

10   ACCOUNT."

11        HOW LONG DID THAT PHONE CALL TAKE?

12   A    I CAN'T TELL FROM THIS PARTICULAR RECORD.

13   Q    WHAT WOULD YOU LOOK AT?

14   A    I WOULD HAVE TO LOOK AT THE PHONE BILL.

15   Q    OKAY.  LET'S TAKE A LOOK AT EXHIBIT 185,

16   DOCUMENT 2944.

17   A    DO YOU HAVE A PAPER COPY OF THAT, SIR?  IT'S

18   HARD TO READ.

19        THE COURT:  I KNOW THIS SYSTEM HAS AN

20   ABILITY TO BLOW THIS THING UP.  SO IF YOU WANT US

21   TO APPRECIATE THIS INFORMATION.  THERE YOU GO.

22   BY MR. HUMPHREYS:

23   Q    AND THIS IS A CALL TO THEIR HOME IN GONZALES?

24   A    YOU'RE TALKING ABOUT GONZALES RIGHT HERE

25   (INDICATING)?

                                              192

1    Q     RIGHT.

2    A     I THINK THAT'S CORRECT.  THE PHONE NUMBER FOR

3    THE ACCOUNT I BELIEVE IT'S ON 157, BUT THAT'S

4    CORRECT, THAT'S THE PHONE NUMBER RIGHT THERE.

5    Q     OKAY.  WELL, THE PHONE NUMBER IS IN EXHIBIT 2,

6    ISN'T IT?  THEY HAVE IT LISTED AFTER MANY OF THE

7    PHONE CALLS, DO THEY NOT?

8    A     I THINK IT IS LISTED AFTER THE NUMBER OF PHONE

9    CALLS, THAT'S CORRECT.

10   Q     OKAY.  SO THIS IS ALMOST AN EIGHT-MINUTE PHONE

11   CALL THAT TAKES PLACE HERE AND YOUR RECORDS SAY

12   "WILL DISPUTE ACCOUNT," RIGHT?

13   A     YES.

14   Q     SO CAN YOU ADMIT THAT THERE WAS SOMETHING MORE

15   DISCUSSED THAN THE FOUR WORDS "WILL DISPUTE THE

16   ACCOUNT"?

17   A     I HAVE NO IDEA WHAT WAS SAID ON THE

18   CONVERSATION OTHER THAN THE PERSON STATED THAT THEY

19   WILL DISPUTE THE ACCOUNT.

20   Q     OKAY.  DO YOU KNOW IF YOUR COLLECTORS WILL

21   TELL THEM THE FAUSTOS THAT THEY WERE CALLING WITH

22   PORTUGUESE ACCENTS, THAT THEY WERE SUPPOSEDLY

23   CALLING FROM ATLANTA?

24         MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

25   SPECULATION.

                                                        193

1            THE COURT:  I'LL SUSTAIN IT AS VAGUE AT

2    THIS POINT BECAUSE I'M NOT SURE I UNDERSTAND.

3            ARE YOU ASKING IF THERE WAS A CUSTOM IN

4    THE COMPANY TO HAVE EMPLOYEES SPEAK WITH AN ACCENT

5    OR ANY PARTICULAR TONE?

6    BY MR. HUMPHREYS:

7    Q    WELL, THE QUESTION IS DO YOU KNOW IF YOUR

8    COLLECTORS AT CREDIGY SERVICES OR SOLUCOES ARE

9    TELLING CUSTOMERS THAT THEY'RE CALLING FROM RIGHT

10   HERE IN ATLANTA WHEN THEY'RE REALLY CALLING FROM

11   BRAZIL?

12   A    YOU KNOW, I THINK IT'S PROBABLY THE CASE THAT

13   THE CREDIGY SOLUCOES FINANCEIRAS LIMETADA CREDITORS

14   STATED THAT THEY WERE CALLING ON BEHALF OF CREDIGY

15   SOLUTIONS CORP IN ATLANTA AND THAT'S PROBABLY WHAT

16   WAS STATED.

17   Q    AND THESE PEOPLE WHO ARE DOING THE COLLECTION

18   CALLS ARE BRAZILIAN NATIVE; RIGHT?

19   A    HERE THE COLLECTION CALL THAT WE'RE TALKING

20   ABOUT IN AUGUST OF '06, YES.

21   Q    AND THE ONES YOU HAVE SPOKEN TO, THEY HAVE A

22   BRAZILIAN ACCENT OR PORTUGUESE ACCENT; RIGHT?

23            MR. GILLESPIE:  OBJECTION AS TO

24   RELEVANCE.

25            THE COURT:  OVERRULED.

                                                      194

1          THE WITNESS:  WELL, I HAVE SPOKEN WITH

2    MANY BRAZILIANS, AND I THINK THE ENGLISH IS VERY

3    GOOD.

4    BY MR. HUMPHREYS:

5    Q    I'M SIMPLY NOT CRITICIZING THEIR LANGUAGE

6    SKILLS AT ALL, BUT I'M SIMPLY SUGGESTING THAT THEY

7    HAVE AN ACCENT THAT MOST PEOPLE WOULDN'T ASSOCIATE

8    WITH ATLANTA, GEORGIA.  IS THAT FAIR?

9    A    I THINK THAT'S FAIR.

10   Q    AND THE FAUSTOS DID NOT IGNORE CREDIGY'S

11   LETTER OR THEIR PHONE CALL; RIGHT?

12          MR. GILLESPIE:  OBJECTION.  FOUNDATION.

13          THE COURT:  IT DOES APPEAR THAT YOU ARE

14   ASKING FOR A CONCLUSION FROM THE WITNESS.  SO I'LL

15   SUSTAIN THE OBJECTION.

16   BY MR. HUMPHREYS:

17   Q    OKAY.  DID THE FAUSTOS RESPOND TO CREDIGY'S

18   PHONE CALL AND INITIAL LETTER?

19          MR. GILLESPIE:  SAME OBJECTION.

20          THE COURT:  OVERRULED.

21          THE WITNESS:  YES.

22   BY MR. HUMPHREYS:

23   Q    ALL RIGHT.  LET'S GO TO EXHIBIT 109.  IS THAT

24   A LETTER SEPTEMBER 12TH, 2006?

25   A    YES.  I SAW IT UP THERE.  IT'S A LETTER FROM

                                                   195

1    MANUEL FAUSTO DATED SEPTEMBER 12, 2006.

2    Q    OKAY.  AND IN THAT LETTER DOES HE -- DOES IT

3    SAY THAT "I DISPUTE THE DEBT"?

4    A    YES.

5    Q    AND DOES HE ALSO SAY THAT "I DO NOT BELIEVE

6    THAT I CURRENTLY OWE MONEY TO WELLS FARGO"?

7    A    YES, IT SAYS IT RIGHT THERE IN THE LETTER,

8    YES.

9    Q    DOES HE ALSO SAY PLEASE --

10           THE COURT:  YOU DON'T NEED TO CONFIRM

11   WITH THIS WITNESS.  YOU CAN READ IT SO WE CAN ALL

12   SEE THE WORDS AND THEN IF YOU HAVE FURTHER

13   QUESTIONS ABOUT IT.

14           MR. HUMPHREYS:  YES, YOUR HONOR.

15   Q    DO YOU UNDERSTAND THIS TO BE A REQUEST FOR

16   CREDIGY TO DO AN INVESTIGATION AND TO SEND COPIES

17   OF RELEVANT DOCUMENTS, OF ANY RELEVANT DOCUMENTS,

18   INCLUDING SIGNED AGREEMENTS?

19   A    YES, I UNDERSTAND IT TO BE A REQUEST FOR

20   VALIDATION OF THE DEBT.

21   Q    OKAY.  IT'S FAIR TO SAY THAT HE SQUARELY PUT

22   HIS DISPUTE IN FRONT OF CREDIGY AND SAID, "I DON'T

23   THINK I OWE THIS"?

24   A    YES.

25   Q    AND DO YOU IN THE DEBT COLLECTION INDUSTRY

196

1    UNDERSTAND THAT WHEN SOMEONE SAYS THEY WANT COPIES

2    OF ANY RELEVANT DOCUMENTS, THAT MIGHT BE SOMETHING

3    LIKE AN APPLICATION, A MONTHLY STATEMENT, A HISTORY

4    OF WHATEVER CHARGES AND PAYMENTS THAT THEY

5    SUPPOSEDLY MADE OR MAYBE EVEN A LETTER FROM WELLS

6    FARGO SAYING, YOU KNOW, "YOU OWE THIS MONEY.  WE

7    NEVER GOT ANY PAYMENTS"?

8              MR. GILLESPIE:  OBJECTION AS TO

9    FOUNDATION, YOUR HONOR.

10             THE COURT:  OVERRULED.

11   BY MR. HUMPHREYS:

12   Q    IS THAT SOMETHING THAT YOU UNDERSTAND IN THE

13   INDUSTRY WHEN PEOPLE SAY THAT THEY WANT DOCUMENTS?

14   A    WELL, PEOPLE MAY SEND LETTERS SUCH AS THIS ONE

15   REQUESTING DOCUMENTS OR OTHER INFORMATION ABOUT THE

16   ACCOUNT.  I THINK THAT'S CORRECT.

17   Q    OKAY.  AND CREDIGY RESPONDED TO THAT REQUEST

18   FOR INFORMATION, THAT'S RIGHT, ISN'T IT?

19   A    YES, THAT'S CORRECT.

20   Q    ALL RIGHT.  LET'S MOVE TO EXHIBIT 110.  THAT'S

21   A SEPTEMBER 28, 2006 LETTER THAT HAS BEEN SUBJECT

22   TO AN AGREEMENT.

23             THIS IS CREDIGY'S RESPONSE HERE; RIGHT?

24   A    YES, I THINK THIS IS THE RESPONSE THAT WE SENT

25   ABOUT TEN DAYS AFTER GETTING MR. FAUSTO'S LETTER.

197

1    Q    WELL, WE KNOW THE LETTER IS DATED TEN DAYS

2    AFTER; RIGHT?

3    A    YES, WE KNOW THE LETTER IS DATED, THAT'S

4    RIGHT.

5    Q    DO YOU HAVE PERSONAL KNOWLEDGE AS TO WHAT DAY

6    THAT LETTER WAS ACTUALLY MAILED?

7    A    TO WHAT, MR. FAUSTO'S LETTER WAS MAILED?

8    Q    NO.  YOUR LETTER THAT YOU SAY CAME TEN DAYS

9    LATER?

10   A    OH, I JUST HAVE OUR RECORDS.

11   Q    AND HAVE YOU AS A COMPANY REPRESENTATIVE GONE

12   AND LOOKED AT THE TESTIMONY THAT HAS BEEN GIVEN IN

13   THIS CASE OF MS. ERVIN AND MS. POSTON WHO WORKED IN

14   THE DEPARTMENT THAT PUT THESE LETTERS OUT?  HAVE

15   YOU LOOKED AT ANY OF THAT?

16   A    I HAVE NOT REVIEWED THEIR TESTIMONY.

17   Q    HAVE YOU GONE AND SPOKEN TO THEM ABOUT WHETHER

18   OR NOT THERE WERE BUCKETS OF THESE LETTERS SITTING

19   AROUND THAT HAD TO BE RESPONDED TO?

20   A    I HAVEN'T SPOKEN TO THEM.

21   Q    AND SO YOU DON'T KNOW HOW LONG IT TOOK TO GET

22   THIS LETTER BACK OUT TO THE FAUSTOS?

23   A    I JUST KNOW WHAT IS IN OUR RECORDS.

24   Q    RIGHT.  AND WE AGREE THIS IS A COVER LETTER

25   THAT DIRECTS THEM TO THE ACCOUNT INFORMATION THAT

198

1    HAS CREDIGY'S RESPONSE TO THE REQUEST FOR AN

2    INVESTIGATION AND REQUEST FOR MORE RECORDS?

3    A    CORRECT, I BELIEVE THIS IS A COVER PAGE AND

4    THE ACCOUNT INFORMATION THE SECOND PAGE OF THIS

5    LETTER.

6    Q    OKAY.  LET'S TAKE A LOOK AT THAT.  LET'S LOOK

7    AT IT FROM THE ACCOUNT HISTORY.  AND THIS WAS

8    SOMETHING THAT WAS PRINTED OFF ON A SINGLE SHEET OF

9    PAPER AT CREDIGY'S DISPUTE RESOLUTION TEAM IN

10   ATLANTA; IS THAT RIGHT?

11   A    AT CREDIGY -- YES, AT CREDIGY SERVICES CORP IN

12   ATLANTA, THAT'S CORRECT.

13   Q    OKAY.  AND THIS ISN'T ANY -- WELL, LET ME ASK

14   THIS:  CREDIGY DID NOT PROVIDE ANY LETTER FROM

15   WELLS FARGO SAYING THAT, HEY, YOU OWE US -- YOU

16   OWED MONEY TO US AND WE SOLD THE DEBT OFF?

17             THERE WAS NOTHING LIKE THAT CONTAINED

18   WITH EXHIBIT 110, THE RESPONSE, RIGHT?

19   A    THAT'S CORRECT.

20   Q    THERE WASN'T ANY MONTHLY STATEMENTS FROM WELLS

21   FARGO INCLUDED; RIGHT?

22   A    AGAIN, TO MY KNOWLEDGE THE LETTER, THE 28TH OF

23   SEPTEMBER LETTER JUST CONTAINED THESE TWO PAGES.

24   Q    OKAY.  THERE WASN'T ANY CANCELLED CHECKS OR

25   ANYTHING FROM THE FAUSTOS THAT THEY HAD SENT TO

199

1    WELLS FARGO?

2    A    RIGHT.  TO MY KNOWLEDGE, AGAIN, IT WAS JUST A

3    TWO-PAGE LETTER.

4    Q    THERE WASN'T ANY TYPE OF APPLICATION THAT THEY

5    SUBMITTED TO WELLS FARGO?

6    A    AGAIN, IT WAS A TWO-PAGE LETTER THAT WAS.

7    Q    AND YOUR LETTER ON THE BOTTOM OR CREDIGY'S

8    LETTER ON THE BOTTOM SAID THE CURRENT BALANCE IS

9    $17,031; RIGHT?

10   A    YES.

11   Q    AND SO THE FIRST LETTER THAT CAME OUT IN

12   AUGUST IT WAS $16,600; RIGHT?

13   A    RIGHT.

14   Q    AND THE BALANCE ON THE ACCOUNT WENT UP TO OVER

15   $17,000 AT THE TIME THAT THIS LETTER WAS PRINTED?

16   A    YES.

17   Q    AND THE LETTER SAYS THAT "THE ABOVE AMOUNT

18   REPRESENTS GOODS AND/OR SERVICES PURCHASED VIA A

19   CREDIT ACCOUNT EXTENDED TO THE ACCOUNT HOLDER BY

20   THE ORIGINAL CREDITOR."  THAT WOULD BE WELLS FARGO;

21   RIGHT?

22   A    YES, ORIGINAL CREDITOR WOULD BE WELLS FARGO.

23   Q    COULD YOU TELL THE JURY WHAT GOODS OR SERVICES

24   WAS EVER PROVIDED THAT REPRESENTS ANY PART OF THIS

25   $17,000 BALANCE THAT YOU'RE SEEKING?

200

1    A    WELL, I CAN'T TELL YOU EXACTLY WHAT WAS

2    PURCHASED, NO.

3    Q    AND HOW ABOUT GENERALLY LIKE MAYBE THE

4    MERCHANT, CAN YOU TELL US THAT?

5    A    NO, I CAN'T TELL YOU THE NAME OF THE MERCHANT.

6    Q    CAN YOU TELL US IF IT WAS A CASH ADVANCE?

7    A    NO, I CAN'T TELL YOU WHAT PART OF THE

8    CHARGE-OFF BALANCE WAS A CASH ADVANCE AND THEN FOR

9    A PURCHASE OF GOODS AND SERVICES.

10   Q    OR, IN FACT, WHAT GOODS OR SERVICES WAS

11   ALLEGEDLY BOUGHT?  YOU DON'T HAVE ANY KNOWLEDGE AT

12   CREDIGY ABOUT WHAT THAT MIGHT BE?

13   A    YEAH, I DON'T KNOW WHAT GOODS AND SERVICES

14   WERE BOUGHT PRIOR TO THE ACCOUNT BEING CHARGED OFF,

15   NO.

16   Q    OKAY.  YOU TOLD US THAT CREDIGY DID NOT

17   PROVIDE ANY OF THE PAPERWORK FROM WELLS FARGO.

18        DID YOU HAVE PAPERWORK FROM WELLS FARGO

19   AND YOU JUST DIDN'T GIVE IT TO THEM OR DID YOU NOT

20   HAVE PAPERWORK TO SEND THEM --

21   A    LET ME --

22   Q    -- THE MONTHLY STATEMENTS?  THE TRANSACTION

23   HISTORY?

24   A    COULD YOU BREAK THAT INTO TWO QUESTIONS.

25   Q    SURE.  DID CREDIGY HAVE MONTHLY STATEMENTS

201

1        FROM WELLS FARGO, AN ACCOUNT APPLICATION FROM WELLS

2        FARGO, A TRANSACTION HISTORY FROM WELLS FARGO,

3        THE -- A LIST OF GOODS AND SERVICES THAT WERE

4        SUPPOSEDLY PURCHASED?  DID IT HAVE ANY OF THAT SORT

5        OF INFORMATION IN ITS FILES AT CREDIGY WHEN IT WAS

6        WRITTEN?

7                MR. GILLESPIE:  OBJECTION.  COMPOUND

8        QUESTION.

9                THE COURT:  OVERRULED.

10               THE WITNESS:  THE ITEMS THAT YOU

11       MENTIONED, NO, WE DIDN'T HAVE THOSE.

12       BY MR. HUMPHREYS:

13       Q    OKAY.  DID CREDIGY GO TO WELLS FARGO AND ASK

14       FOR ANY OF THE INFORMATION THAT MR. FAUSTO SAID HE

15       WOULD LIKE TO HAVE?

16       A    I'M SORRY.  WHEN?

17       Q    WHEN THIS -- AT THE TIME THIS LETTER WAS

18       RESPONDED TO?

19       A    NOT TO MY KNOWLEDGE, NO.

20       Q    OKAY.

21       A    CREDIGY SERVICES DID NOT.

22       Q    OKAY.  HOW ABOUT AS OF TODAY, HAVE YOU EVER

23       GONE BACK TO WELLS FARGO AND SAID, "SHOW US THE

24       RECORDS OF THIS TYPE TO PROVE THAT, YOU KNOW, THAT

25       THERE REALLY IS SOME MONEY OWED HERE OR THAT YOU

                                                        202

1    DID BUY SOMETHING AND THE ACCOUNT HAS NOT BEEN PAID

2    OFF IN FULL"?

3    A    AS OF THE CREDIGY GOING TO WELLS FARGO AS OF

4    TODAY?

5    Q    YES.

6    A    I HAVE NO IDEA DURING THE COURSE OF THIS CASE

7    IF WE HAVE TALKED TO WELLS FARGO OR NOT.  I REALLY

8    HAVE NOT.

9    Q    YOU DON'T KNOW IF THEY ISSUED A SUBPOENA TO

10   WELLS FARGO?

11   A    I DO NOT.

12   Q    OKAY.  AND SO CREDIGY NEVER OBTAINED ANYTHING

13   FROM WELLS FARGO WHEN IT ACQUIRED THIS ACCOUNT WITH

14   MR. FAUSTO'S SIGNATURE ON IT; IS THAT TRUE?

15         MR. GILLESPIE:  OBJECTION TO THE FORM OF

16   THE QUESTION.

17         THE COURT:  OVERRULED.

18         THE WITNESS:  WHEN YOU MEAN THIS LETTER?

19   BY MR. HUMPHREYS:

20   Q    NO.

21   A    YOU SAID THIS ACCOUNT WITH MR. FAUSTO'S

22   SIGNATURE.  SORRY.  COULD YOU REPEAT THAT?

23   Q    OKAY.  YOU TOLD US ABOUT 900 ODD THOUSAND, AND

24   I'M SURE YOU CAN TELL US EXACTLY HOW MANY, BUT FOR

25   PURPOSES OF MY QUESTION 900,000 WOULD BE FINE.  BUT

203

1    YOU TOLD US THAT HAPPENED IN DECEMBER OF '02.  AT

2    THAT TIME PERIOD WHEN YOU MADE THE TRANSACTION AND

3    BOUGHT THESE 900,000 ACCOUNTS, DID YOU RECEIVE

4    ANY -- EXCUSE ME -- DID YOU RECEIVE ANYTHING WITH

5    MR. FAUSTO'S SIGNATURE ON IT AT THAT TIME?

6    A    NO, WE DON'T HAVE ANY RECORDS WITH

7    MR. FAUSTO'S SIGNATURE.

8    Q    OKAY.  AND YOU WERE PART OF THE TEAM THAT MADE

9    THIS DEAL TO BUY THESE ACCOUNTS FROM FIRST SELECT;

10   RIGHT?

11   A    I DID WORK ON A TEAM, YES.

12   Q    AND WERE YOU INVOLVED IN THE DUE DILIGENCE?

13   A    I WAS.

14   Q    AND WITHOUT GOING INTO THE DETAILS OF DUE

15   DILIGENCE, IS IT FAIR TO SAY THAT PART OF WHAT YOU

16   DO IS THAT YOU GO IN AND LOOK AT THE BALANCES OF

17   THE ACCOUNTS, THE LENGTH OF TIME SINCE THE LAST

18   PAYMENT AND THE TYPE OF INFORMATION THAT IS

19   AVAILABLE TO SUPPORT THE CHARGES?

20   A    YES, WE RUN A LOT OF TESTS AND ANALYSIS TO

21   CHECK THE INTEGRITY OF THE DATA THAT IS PROVIDED

22   AND ANY OTHER SUPPORTING INFORMATION THAT IS

23   PROVIDED.

24   Q    OKAY.  AND YOU KNEW THAT THESE ACCOUNTS WERE

25   BEING BOUGHT THIRDHAND OR -- STRIKE THAT.  YOU

                                                    204

1    BOUGHT THESE FROM FIRST SELECT, INC.; RIGHT?

2    A    YES.

3    Q    AND SOME OF THESE ACCOUNTS WERE, WERE -- HAD

4    PREVIOUSLY BEEN OWNED BY FIRST SELECT CORPORATION

5    AND SOME HAD BEEN OWNED BY FIRST SELECT, INC.;

6    RIGHT?

7    A    FIRST SELECT CORPORATION WAS THE PREDECESSOR

8    FOR SELECT, INCORPORATED.

9    Q    OKAY.

10   A    AND, YOU KNOW, ESSENTIALLY FIRST SELECT IS ALL

11   OWNED BY THE SAME COMPANY PROVIDIAN NATIONAL BANK

12   AND THEY WERE OUR PREDECESSOR IN INTEREST, CREDIGY

13   RECEIVABLES, INC., PREDECESSOR IN INTEREST.

14   Q    AND THEY DIDN'T -- FIRST SELECT, INC., OR

15   FIRST SELECT CORPORATION, NEITHER ONE OF THEM

16   ORIGINATED THESE ACCOUNTS?

17   A    ARE YOU TALKING ABOUT THE ACCOUNTS THAT

18   CREDIGY RECEIVABLES ACQUIRED?

19   Q    YES.

20   A    FIRST SELECT DID NOT ORIGINATE THOSE ACCOUNTS,

21   THAT'S CORRECT.

22   Q    AND THEY BOUGHT THEM AS BAD DEBT?

23   A    THAT'S CORRECT, THEY BOUGHT THEM AS BAD DEBT

24   AND IN A SMALL NUMBER OF CASES I GUESS THEY WERE

25   ASSIGNED FROM PROVIDIAN NATIONAL BANK TO FIRST

205

1    SELECT.

2    Q    SO WHEN CREDIGY BOUGHT THESE DEBTS FROM

3    ANOTHER BAD DEBT BUYER, YOU KNEW WHAT INFORMATION

4    YOU WERE GETTING AND YOU FACTORED THAT INTO THE

5    PRICE THAT YOU WERE TO PAY FOR THESE BAD ACCOUNTS?

6    A    YOU KNOW, CERTAINLY THE INFORMATION THAT WAS

7    AVAILABLE AND OUR CONFIDENCE IN THE INFORMATION

8    AFTER REVIEWING IT WAS A FACTOR IN OUR ANALYSIS OF

9    THE TRANSACTION, THAT'S CORRECT.

10   Q    AND THE PRICE YOU PAID WAS BASED UPON YOUR

11   BELIEF AS TO THE VALUE OF WHAT YOU WERE BUYING?

12   A    SURE.

13   Q    OKAY.  AND ISN'T IT TRUE THAT THERE WERE

14   SERIOUS QUESTIONS ABOUT THE AVAILABILITY OF

15   INFORMATION ON THESE ACCOUNTS?

16            MR. GILLESPIE:  OBJECTION TO THE FORM OF

17   THE QUESTION, YOUR HONOR.

18            THE COURT:  YEAH, IT DOESN'T -- I CAN'T

19   TELL FROM YOUR QUESTION WHERE THAT SERIOUSNESS WAS

20   COMING FROM OR WHO HAD IT.

21   BY MR. HUMPHREYS:

22   Q    OKAY.  DID CREDIGY HAVE ANY SERIOUS QUESTIONS

23   ABOUT THE AVAILABILITY OF INFORMATION ON THE

24   ACCOUNTS IT WAS BUYING?

25   A    SURE.  CREDIGY WAS VERY CONCERNED THAT THE

1    INFORMATION THAT IT WAS BUYING WAS CREDIBLE,

2    ACCURATE, AND THAT WE COULD TRACE THE INFORMATION

3    BACK TO, IN THIS CASE, WELLS FARGO AND WITH A HIGH

4    DEGREE OF CONFIDENCE.

5    Q    OKAY.  AND DID YOU HAVE ANY CONCERNS ABOUT THE

6    ACCURACY OF THE INFORMATION?

7    A    SURE.  AND THAT'S WHY IN THE DILIGENCE PROCESS

8    WE HAD TESTED THE DATA EXTENSIVELY.  ABSOLUTELY.

9    Q    OKAY.  AND THERE WERE A LIMITED -- STRIKE

10   THAT.

11        OTHER THAN VERY SPECIFIC REPRESENTATIONS

12   THAT WERE MADE BY FIRST SELECT, THE ACCOUNTS WERE

13   SOLD AS IS AND WITH ALL FAULTS, WITHOUT ANY

14   REPRESENTATION OR WARRANTY ABOUT THE ACCOUNTS?

15   A    THE REPRESENTATIONS AND WARRANTIES THAT WERE

16   MADE ABOUT WELLS FARGO AND FIRST SELECT WERE

17   ACTUALLY PRETTY EXTENSIVE ON THE ACCOUNT LEVEL AND

18   GENERALLY, AND WE COULD LOOK AT THE CONTRACTS IF

19   YOU WOULD LIKE TO DISCUSS THOSE.

20   Q    I WOULD LIKE TO DO THAT, IF YOU NEED TO, BUT I

21   GUESS GENERALLY, EXCEPT FOR WHATEVER

22   REPRESENTATIONS WERE SPECIFICALLY MADE, THE

23   ACCOUNTS -- THE CONTRACT SAID THAT THEY WERE SOLD

24   AS IS WITH ALL FAULTS, WITHOUT ANY REPRESENTATION

25   OR WARRANTY.  DIDN'T IT SAY THAT?

207

1    A    YES, THERE WAS A GENERAL DISCLAIMER, THAT'S

2    CORRECT.

3    Q    OKAY.  AND THAT THE SELLER, AND THE SELLER

4    WOULD BE FIRST SELECT, THEY SPECIFICALLY DISCLAIMED

5    ANY WARRANTY OR REPRESENTATION CONCERNING THE

6    COLLECTABILITY OF THE ACCOUNTS, DIDN'T THEY SAY

7    THAT?

8    A    I BELIEVE THAT'S CORRECT.

9    Q    AND THEY ALSO DISCLAIMED ANY WARRANTY OR

10   REPRESENTATION ABOUT THE SUFFICIENCY OF INFORMATION

11   THAT THEY FURNISHED TO YOU?

12   A    YES, BUT THEY DID STATE THAT I BELIEVE THAT

13   THE INFORMATION WAS ACCURATE THAT THEY PROVIDED US.

14   Q    WELL, THE ACCOUNTS WERE SOLD WITHOUT RECOURSE;

15   CORRECT?

16   A    INCORRECT.

17   Q    WELL, EXCEPT FOR PREIMPOSED --

18   A    WELL, THERE WERE PREIMPOSED BY FIRST SELECT

19   AND THERE WERE OBLIGATIONS AND RIGHTS ARISING OUT

20   OF THE REPRESENTATIONS AND WARRANTIES THAT WERE

21   MADE BY FIRST SELECT AND GUARANTEED BY PROVIDIAN

22   NATIONAL BANK.

23   Q    AND WHAT KIND OF PROMISES DID WELLS FARGO MAKE

24   ABOUT THE ACCURACY OF THE INFORMATION THAT FIRST

25   SELECT WAS SELLING?

1    A    WELLS FARGO ENTERED INTO AN AGREEMENT WITH

2    FIRST SELECT.

3    Q    WHAT KIND OF PROMISES DID WELLS FARGO MAKE TO

4    CREDIGY IN THIS TRANSACTION?

5    A    WELLS FARGO DID NOT MAKE ANY DIRECT PROMISES

6    TO CREDIGY RECEIVABLES.  CREDIGY RECEIVABLES WAS

7    SIMPLY THE PREDECESSOR IN INTEREST TO FIRST SELECT.

8    Q    AND DID YOU SAY THAT THE ACCOUNTS -- THAT

9    THERE WERE PROMISES MADE BY FIRST SELECT ABOUT THE

10   ACCURACY OF THE ACCOUNTING INFORMATION?

11   A    REPRESENTATIONS AND WARRANTIES WERE MADE,

12   THAT'S CORRECT.

13   Q    OKAY.  WELL, WEREN'T THEY LIMITED TO -- DIDN'T

14   THEY SAY THAT THEY WEREN'T REPRESENTING THE

15   CHARGE-OFF BALANCE THAT WAS ON THE ACCOUNTS?  THEY

16   WEREN'T REPRESENTING THAT?

17   A    ACTUALLY, I BELIEVE THEY REPRESENTED THAT ALL

18   OF THE FIELDS THAT WERE REPRESENTED ON SCHEDULE --

19   I CAN'T REMEMBER THE EXACT SCHEDULE -- 7.1 --

20   Q    UH-HUH.

21   A    -- WERE ACCURATE.  AND SO THOSE WERE ALL OF

22   THE FIELDS THAT WERE ON THE MASTER FILE DATA

23   PROVIDED BY FIRST SELECT.

24        SO I BELIEVE THAT IF I WERE TO READ THE

25   CONTRACT RIGHT NOW THAT FIRST SELECT GUARANTEED

209

1    PROVIDIAN REPRESENTED THAT INFORMATION PROVIDED IN

2    THOSE FIELDS WAS TRUE AND ACCURATE.

3    Q    EXCEPT THAT THE INFORMATION ABOUT THE

4    CHARGE-OFF BALANCE WAS OBTAINED, THAT'S WHAT THEY

5    OBTAINED FROM SOMEBODY ELSE; RIGHT?  THEY DIDN'T

6    WARRANT THAT?

7    A    AGAIN, I WOULD HAVE TO LOOK AT THE ACCOUNT --

8    Q    OKAY.

9    A    -- AND REVIEW IT TO ANSWER THAT QUESTION

10   BECAUSE, AGAIN, I THINK IT WAS TO ALL OF THE DATA

11   FIELDS ON SCHEDULE 7.10.  IT'S BEEN SEVERAL YEARS,

12   BUT I WOULD HAVE TO TAKE A LOOK AT THE CONTRACT.

13   Q    OKAY.  LET'S TAKE A LOOK AT EXHIBIT 160.  AND

14   TAKE A LOOK AT WHAT HAS BEEN MARKED WITH LITIGATION

15   CONTROL NUMBER AS 1139.  IT'S ON PAGE 1139 OF

16   EXHIBIT 160.

17          MR. GILLESPIE:  YOUR HONOR, MAY I ASK IF

18   COUNSEL IS GOING TO OFFER THIS EXHIBIT INTO

19   EVIDENCE?

20          THE COURT:  WELL, AT THIS POINT HE'S

21   SIMPLY SHOWING IT TO THE WITNESS TO FRAME THE

22   QUESTION.

23          THE WITNESS:  I'M SORRY.  YOU SAID

24   EXHIBIT 160?

25          MR. HUMPHREYS:  YES.

                                              210

1          THE WITNESS:  I DON'T SEE THAT IT'S IN

2    THIS NOTEBOOK, SIR.

3    BY MR. HUMPHREYS:

4    Q    OKAY.  IT WOULD BE ON THE BOTTOM RIGHT-HAND

5    CORNER, AND IT WOULD BE MARKED AS PAGE 1139.

6    A    YOU WANT ME TO LOOK AT PAGE 1139?

7    Q    YES.  IF YOU LOOK AT THE PAGE NUMBERS 1139 ON

8    EXHIBIT 160, IT'S PARAGRAPH L.

9    A    OKAY.

10   Q    OKAY.  DOESN'T IT SAY THAT THE REPRESENTATION

11   ABOUT THE ACCURACY OF THE INFORMATION THAT THE

12   CHARGE-OFF BALANCE FROM VENDOR IS WHATEVER THEY

13   RECEIVE FROM SOMEBODY ELSE, THE ORIGINAL SELLER.

14   ISN'T THAT WHAT IT SAYS?

15   A    YES.  IT STATES THAT "THE DATA FIELD

16   DESIGNATED CO BALANCE FROM VENDOR ON THE MASTER

17   DISK ACCURATELY AND COMPLETELY SETS FORTH THE

18   INFORMATION IN THAT REGARD OBTAINED FROM THE

19   ORIGINAL SELLER."

20   Q    SO FIRST SELECT IS SAYING THAT EVERYTHING

21   WE'RE GIVING YOU ABOUT THE ACCOUNT IS TRUE EXCEPT

22   WHATEVER IS THE CHARGE-OFF BALANCE IS, WE'RE NOT

23   PROMISING THAT'S TRUTHFUL?  YOU'RE GOING TO HAVE TO

24   RELY UPON SOMEBODY ELSE, SOMETHING WE GOT FROM

25   SOMEONE ELSE?

                                            211

1          MR. GILLESPIE:  OBJECTION.  THE DOCUMENT

2     SPEAKS FOR ITSELF.

3          THE WITNESS:  WELL, I DON'T KNOW IF

4     THAT'S TRUE AT ALL BECAUSE WHAT THE SENTENCE SAYS

5     IS THAT THE INFORMATION CONTAINED ON 7.1 L IS TRUE,

6     ACCURATE, AND COMPLETE IN ALL MATERIAL RESPECTS AND

7     THAT THE DATA FIELD DESIGNATED CHARGE-OFF BALANCE

8     FROM VENDOR ACCURATELY AND COMPLETELY SETS FORTH

9     INFORMATION IN THAT REGARD RETAINED FROM THE

10    ORIGINAL SELLER.

11    BY MR. HUMPHREYS:

12    Q    IT ACTUALLY DOESN'T SAY AND PROVIDED THAT THE

13    DATA FIELD DESIGNATED CO ARE ACCURATE?

14    A    BUT IT'S NOT A REPRESENTATION AS TO ALL OF THE

15    DATA FIELDS AS BEING SET OUT IN THE BEGINNING OF

16    THE SENTENCE.  I DON'T KNOW.  IT'S OPEN TO

17    INTERPRETATION, BUT I UNDERSTAND YOUR POINT.

18    Q    SO ANYWAY, WITH THIS INTERPRETATION HERE,

19    CREDIGY NEVER WENT BACK TO WELLS FARGO TO TRY TO

20    CONFIRM WHAT THEIR RECORDS SAID?

21    A    WELL, WE LOOKED AT THE CONTRACT BETWEEN FIRST

22    SELECT AND WELLS FARGO AND TALKED TO THE PERSONNEL

23    OF FIRST SELECT THAT WERE INVOLVED IN THE

24    ACQUISITION OF THE DATA FROM WELLS FARGO, BUT WE

25    DID NOT SPEAK DIRECTLY WITH WELLS FARGO.

212

1          THE COURT:  I THINK THAT HAS BEEN COVERED

2     SUFFICIENTLY.

3          MR. HUMPHREYS:  OKAY, YOUR HONOR.  I'LL

4     MOVE ALONG HERE, SIR.

5     Q    SIR, ISN'T IT TRUE THAT THIS AGREEMENT WITH

6     FIRST SELECT LIMITED ANY PROMISES ABOUT THE

7     VALIDITY OF THE ACCOUNTS IN THE CASES OF A

8     SETTLEMENT AGREEMENT OR A PAYMENT PLAN THAT HAD

9     BEEN MADE?

10    A    WHAT SECTION ARE YOU REFERRING TO IN THE

11    AGREEMENT?  I'M SORRY.

12    Q    THAT WOULD BE 7.1 G, WHICH I THINK YOU'LL FIND

13    ON 1138.

14    A    SORRY.  IT'S BEEN A WHILE SINCE I HAVE LOOKED

15    AT THIS CONTRACT.  HOLD ON ONE SECOND IF YOU DON'T

16    MIND.  I JUST WANT TO --

17         THE COURT:  WELL, WE'RE GOING TO GIVE YOU

18    OVERNIGHT TO LOOK AT IT BECAUSE IT'S NOW 4:00

19    O'CLOCK AND THAT'S THE END OF OUR BUSINESS DAY.

20         TIME DOES MOVE AND WE HAVE HAD A COUPLE

21    OF FITS AND STARTS HERE HAVING TO DO WITH THE

22    TECHNOLOGY, BUT I WANT TO KEEP TO THE SCHEDULE THAT

23    WE HAVE.

24         SO MEMBERS OF THE JURY, WE'LL COME BACK

25    TO THIS MATTER TOMORROW AT 1:00 O'CLOCK.  WE'LL

                                                      213

1    STAND IN RECESS.

2              (WHEREUPON, THE PROCEEDINGS IN THIS

3    MATTER WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4              THE COURT:  VERY WELL.  WE'RE MEETING OUT

5    OF THE PRESENCE OF THE JURY.  I JUST WANTED TO GIVE

6    YOU A MOMENT TO SEE IF THERE ARE ANY MATTERS THAT

7    YOU WANTED TO BRING UP TO THE ATTENTION OF THE

8    COURT.

9              THE WITNESS:  YOUR HONOR, MAY I STEP

10   DOWN?

11             THE COURT:  YES.

12             THE WITNESS:  WHAT DO I DO WITH THESE?

13   SORRY.

14             THE COURT:  LEAVE THAT.

15             THE WITNESS:  LEAVE THAT?

16             MR. WALLACE:  IT'S POSSIBLE THAT WE WOULD

17   GET FAR ENOUGH ALONG THAT WE WOULD LIKE TO PLAY

18   SOME VIDEOS AND THERE'S SOME ISSUES WITH REGARD TO

19   THE VIDEOS.

20             WE HAVE TENDERED TO THE COURT AND LODGED

21   A BIG DOCUMENT, AND IT HAS THE DEPOSITION TESTIMONY

22   AND SPECIFICALLY I WOULD JUST DIRECT THE COURT TO

23   WITNESS NUMBER 4, LETICIA POSTON, AND WITNESS

24   NUMBER 5, KIMBERLY ERVIN, IN THAT DOCUMENT AND

25   THOSE DEPOSITION ISSUES.

1              THE COURT:  WHERE HAVE YOU TENDERED THAT?

2              MR. NARITA:  IT'S BEEN LODGED WITH THE

3    CLERK I BELIEVE THIS MORNING.

4              MR. WALLACE:  IT'S BEEN LODGED YESTERDAY

5    AND THERE WAS AN UPDATE MADE.

6              THE COURT:  AND WHAT IS THE ISSUE?

7              MR. WALLACE:  WE HAVE DESIGNATED WHAT WE

8    WOULD LIKE TO PLAY, AND THEY OBJECTED TO PART OF

9    IT.  AND THEY LISTED THEIR OBJECTION, AND WE LISTED

10   OUR RESPONSE.

11             THE COURT:  WHO ARE THESE WITNESSES?

12             MR. WALLACE:  THESE ARE EMPLOYEES AND

13   WERE EMPLOYEES OF THE RESOLUTION DISPUTE DEPARTMENT

14   AND WHICH IS THE DEPARTMENT THAT HANDLED THE CEASE

15   AND DESIST AND THE DISPUTE LETTERS AT ISSUE.

16             THE COURT:  AND WHAT IS THE NATURE OF THE

17   OBJECTION?

18             MR. GILLESPIE:  MANY OF THE ANSWERS ARE

19   NONRESPONSIVE, YOUR HONOR, AND GO INTO MATTERS AND

20   THEN QUESTIONS THAT FOLLOWED ON THE NONRESPONSIVE

21   ANSWERS ARE WITHOUT ANY FOUNDATION WHATSOEVER.

22             MANY OF THE QUESTIONS ARE NOT SPECIFIC AS

23   TO TIME AND PLACE, BUT THAT'S MOST OF THE

24   OBJECTIONS.

25             AND I WOULD ALSO POINT OUT THAT THERE

                                                    215

1    HAVE BEEN SOME COUNTER-DESIGNATIONS MADE BY

2    DEFENDANTS IN THE -- FOR BOTH OF THESE DEPOSITIONS

3    AND SOME OF THESE HAVE NOT BEEN OBJECTED TO BY

4    PLAINTIFFS AND SOME HAVE.

5              THE COURT:  WELL, I'LL SEE WHAT I CAN

6    FIND WHAT IT IS THAT YOU WANT ME TO RULE ON.  IT IS

7    SOMETIMES VERY DIFFICULT IN THE COURSE OF TRIAL TO

8    GIVE YOU RULINGS, ESPECIALLY IF YOU CUED UP THESE

9    MATERIALS TO BE PLAYED.

10             MR. GILLESPIE:  WE HAVE AN EXTRA COPY IF

11   YOU WOULD LIKE ME TO HAND IT UP TO YOU.

12             THE COURT:  HAND IT UP.  LET ME TAKE A

13   LOOK AT WHAT YOU WOULD LIKE ME TO LOOK AT.

14             MR. GILLESPIE:  REFER HIM TO THE PAGES.

15             MR. WALLACE:  PAGE 7 OF THAT, IF MY COPY

16   IS THE SAME.  I BELIEVE IT IS.

17             THE COURT:  7?

18             MR. WALLACE:  IT STARTS THE LETICIA

19   POSTON AND 7 IS THE KIMBERLY ERVIN TESTIMONY.

20             THE COURT:  NOW, I WOULD HAVE TO, IN

21   OTHER WORDS, THIS FORM THAT YOU'RE USING REQUIRES

22   THAT I HAVE THE DEPOSITION AND INFORMATION IN FRONT

23   OF ME IN ORDER TO RULE ON THIS LIST.  THIS DOESN'T

24   INCLUDE THE ACTUAL TESTIMONY I TAKE IT?

25             MR. WALLACE:  THAT WAS LODGED YESTERDAY,

1    YOUR HONOR.

2              THE COURT:  SO WHAT YOU HAVE GIVEN ME IS

3    THE PAPER TRANSCRIPT?

4              MR. WALLACE:  YES, YOUR HONOR, AND I

5    BELIEVE THEY'RE MARKED.

6              MR. NARITA:  YES.  THEY'RE ALREADY

7    DESIGNATED.

8              THE COURT:  WHEN YOU SAY THEY WERE

9    LODGED, YOU GAVE THEM DOWNSTAIRS TO THE CLERK'S

10   OFFICE?

11             MR. NARITA:  YES, YOUR HONOR.  AND MAYBE

12   THEY'LL NEVER COME BACK.

13             MR. WALLACE:  YOUR HONOR, I HAVE MY COPY

14   HERE THAT HAS NOT BEEN MARKED ON AT ALL AND IT'S

15   BEEN GIVEN TO THE OTHER SIDE AND I'M HAPPY TO LET

16   YOU HAVE MY COPY SO YOU CAN LOOK AT IT.

17             THE COURT:  AND SO WHAT I'M BEING ASKED

18   TO DEAL WITH IS LETICIA POSTON AND WHO ELSE?

19             MR. WALLACE:  KIMBERLY ERVIN.

20             MR. GILLESPIE:  KIMBERLY ERVIN.

21             MR. WALLACE:  AND THOSE TWO EMPLOYEES

22   WERE ACTUALLY INVOLVED IN THIS DISPUTE LETTER

23   PROCESS.

24             THE COURT:  KIMBERLY ERVIN?

25             MR. GILLESPIE:  ERVIN, E-R-V-I-N.

                                              217

1          THE COURT:  THAT'S THE OTHER PERSON?

2          MR. GILLESPIE:  YES.

3          THE COURT:  WELL, I'LL TELL YOU, AS I

4    KIND OF THUMB THROUGH THESE AND NOW UP TO SOME OVER

5    30 PAGES AND ON EACH PAGE ARE CHARTS WHICH CONTAIN

6    IN MANY INSTANCES MULTIPLE PAGES AND OBJECTIONS TO

7    WHETHER THE TESTIMONY IS RELEVANT OR IRRELEVANT, IT

8    WOULD TAKE ME A CONSIDERABLE AMOUNT OF TIME, MORE

9    THAN I CAN DEVOTE BETWEEN NOW AND THE NEXT DAY THAT

10   I SEE YOU, TO READ THROUGH PAGES 69, 19, 75, 76,

11   24, 78.

12          I MEAN, THIS IS A FORM -- MAYBE MY

13   PRETRIAL ORDER PERMITS YOU IN THE MIDDLE OF TRIAL

14   TO ASK YOU TO DO THIS, BUT THIS IS NOT THE KIND OF

15   SUBMISSION THAT I'M USED TO.

16          AND I DOUBT WHETHER OR NOT I CAN RESPOND

17   TO THE VOLUME OF MATERIAL THAT YOU'LL ASK ME TO DO.

18          NOW, WHAT I WILL DO IS SEE IF I CAN GET A

19   FLAVOR FOR WHAT IS GOING ON HERE.  IF THESE ARE

20   EMPLOYEES OF THE COMPANY, AND I TAKE IT THESE ARE

21   OBJECTIONS THAT WERE STATED AT THE TIME?

22          MR. GILLESPIE:  YES, YOUR HONOR.

23          MR. WALLACE:  WELL, SOME OF THEM.

24          MR. GILLESPIE:  EXCEPT AS TO RELEVANCY,

25   YOUR HONOR.  CERTAINLY ALL OF THE OBJECTIONS

                                                      218

1    REGARDING NONRESPONSIVENESS WERE MADE AT THE TIME.

2         THE COURT:  IT SEEMS TO ME THAT IN

3    PRETRIAL PROCEEDINGS TO COMPEL FURTHER TESTIMONY

4    AND TO OVERCOME THOSE OBJECTIONS THAT WOULD HAVE

5    BEEN THE APPROPRIATE TIME TO DEAL WITH IT RATHER

6    THAN LEAVING THIS TO THE POINT OF TRIAL.

7         I TAKE IT THESE ARE NOT WITNESSES WHO ARE

8    AVAILABLE TO US?

9         MR. WALLACE:  THAT'S CORRECT.  THEY'RE IN

10   ATLANTA AND IN THE PRETRIAL ORDER THAT WE FILED

11   WITH THE COURT BACK IN JANUARY, I BELIEVE IT IS, I

12   DESIGNATED IN THE PRETRIAL ORDER THE EXACT

13   TESTIMONY WE'RE TALKING ABOUT.  I LET THEM HAVE

14   THAT.

15        THEY GAVE ME THEIR RESPONSES MORE

16   RECENTLY, AND IT HAS AN ACCUMULATION SO THE COURT

17   COULD RULE ON IT.  BUT I DID GIVE THEM THE

18   DESIGNATIONS WAY BACK.  SO IT'S NOT SOMETHING THAT

19   WE HAVE BEEN SITTING ON.

20        MR. NARITA:  IT'S BEEN A CONTINUING

21   PROCESS THOUGH, YOUR HONOR.  THERE'S A LOT OF

22   DEPOSITION WITNESSES AND I'VE HAD MY STAFF

23   RESPONDING TO UPDATES TO MR. WALLACE'S CHANGES.

24        THE COURT:  HOW ARE YOU PLANNING TO

25   PRESENT THIS?  THIS IS IN VIDEO?

                                              219

1          MR. WALLACE:  IT'S A VIDEO, YOUR HONOR.

2          THE COURT:  AND YOU'VE SET UP YOUR

3    TECHNOLOGY SO IF I SAY YES TO LINES 22 TO 13 BUT NO

4    TO LINES 14 TO 17 YOU CAN TAKE IT OUT?

5          MR. WALLACE:  YES, WE BOUGHT THE SOFTWARE

6    AFTER THE LAST HEARING.

7          THE COURT:  BUT WHEN WOULD YOU NEED MY

8    RULINGS TO DO THAT?

9          MR. WALLACE:  YOU KNOW, I WOULD PROBABLY

10   NEED IT NOW.

11         MR. CATALANO:  DEPENDING ON HOW MUCH YOU

12   TOOK OUT, PROBABLY AN HOUR.

13         MR. WALLACE:  AND REALISTICALLY WE'RE NOT

14   GOING TO GET TO BOTH OF THESE WITNESSES TOMORROW

15   AND THERE'S A CHANCE IT WOULD MORE LIKELY BE FRIDAY

16   BY THE TIME WE GET TO THESE WITNESSES.

17         THE COURT:  WELL, I APPRECIATE THAT I MAY

18   HAVE MORE TIME OVERNIGHT AND THROUGH THE MORNING.

19         YOU'RE LUCKY THAT I ENDED UP SETTLING MY

20   CRIMINAL CASE BECAUSE I WOULD HAVE NO TIME TO DO

21   THIS AT ALL.

22         AS I SAID, WHAT I WILL DO IS TAKE A LOOK

23   AT THIS TO GET A TENURE OF THE FLAVOR OF WHAT

24   YOU'RE PRESENTING SO I CAN GIVE YOU SOME

25   GUIDELINES.  I DOUBT SERIOUSLY THAT I'M GOING TO BE

                                                       220

1   ABLE TO COMPLETE THE TASK THAT YOU'RE GIVING ME IN

2   A FASHION THAT WOULD ALLOW ME TO RULE ON ALL OF

3   THESE.

4            BUT I'LL GIVE YOU -- I'LL GIVE IT A TRY

5   AND I'LL SEE WHAT IT IS ONCE I TAKE A LOOK AT THE

6   DEPOSITION ITSELF.  AND I TAKE IT THE DEPOSITION IS

7   HIGHLIGHTED SO I CAN FIND IT?

8            MR. WALLACE:  YES, IT IS.

9            THE COURT:  SO THAT PORTION HAS THE

10  HIGHLIGHTING FOR THE PARTS THAT ARE IN ISSUE HERE,

11  AND THERE ARE PORTIONS THAT ARE NOT AT ISSUE THAT

12  YOU'RE AVAILABLE WITHOUT OBJECTION?

13           MR. HUMPHREYS:  YES, YOUR HONOR.

14           THE COURT:  WELL, MAYBE IF I HAD YOUR

15  COPY, THAT WOULD SPEED UP THE PROCESS.

16           ARE THE COPIES THAT YOU LODGED WITH THE

17  COURT, DO THEY ALSO HAVE HIGHLIGHTS ON THEM?

18           MR. WALLACE:  THE COPIES I HAVE RIGHT

19  HERE ARE WHAT THE DEFENDANTS GAVE ME, BUT THEY'RE

20  HIGHLIGHTED AND IT HAS THE TESTIMONY.

21           I DO HAVE ANOTHER VERSION THAT MY OFFICE

22  PREPARED AND OUR VERSION AND THEIR COUNTER AND THE

23  OBJECTED TO SECTIONS ARE HIGHLIGHTED SO YOU CAN

24  ZERO IN ON THAT.

25           THE COURT:  WHERE IS THAT?

221

1       MR. WALLACE:  I'VE GOT IT RIGHT HERE.

2       MR. LUCAS:  JUDGE, WE HAVE SEVERAL

3  POTENTIAL 20 VIDEOS, 15 OR SO THAT WERE VIDEOTAPED,

4  AND THIS MIGHT OCCUR AT SOME OTHER TIME DURING THE

5  TRIAL.

6       WHAT IS YOUR STANDARD PROCEDURE ON

7  DEALING WITH OBJECTIONS MADE DURING VIDEOTAPED

8  DEPOSITIONS?

9       THE COURT:  WELL, WHAT I WOULD ENCOURAGE

10  THE PARTIES TO DO IS TO COME TO A STIPULATION,

11  QUITE FRANKLY, AS TO WHAT YOU WILL PLAY.

12       NOW, IF THERE ARE PARTS THAT THE

13  PLAINTIFF FEELS ARE IMPORTANT TO THEIR CASE, AND

14  THE DEFENDANT IS OBJECTING TO THOSE, THEN IT SEEMS

15  TO ME THAT THERE'S NO WAY OTHER THAN TO TENDER TO

16  THE COURT THAT TESTIMONY BECAUSE DEPOSITION

17  TESTIMONY IS THE SAME AS TESTIMONY IN COURT.

18       AND IF A QUESTION IS ASKED TO WHICH AN

19  OBJECTION IS MADE AT THE DEPOSITION, AND RATHER

20  THAN TRY AND OVERCOME THE OBJECTION, THE WITNESS IS

21  INSTRUCTED TO GO AHEAD AND ANSWER IT, AND LATER ON

22  IN TRIAL THE OBJECTION IS RENEWED, IT SEEMS TO ME

23  THAT THE RULES OF EVIDENCE REQUIRE ME TO RULE ON

24  IT.

25       I WILL NOT BE CONTENT, HOWEVER, TO TRY TO

222

1    NOW RULE ON OBJECTIONS WHICH WERE NOT INTERPOSED AT

2    THE TIME OF THE DEPOSITION.

3              BOTH PARTIES, IT SEEMS TO ME, RUN THE

4    RISK THAT IF THEY DON'T OBJECT DURING THE COURSE OF

5    THE DEPOSITION, THAT THE ANSWER WILL BE ALLOWED TO

6    STAND AND READ TO THE JURY.

7              GIVEN THE NATURE OF WHO THESE PEOPLE ARE,

8    IT SURPRISES ME TO HAVE THE VOLUME OF OBJECTIONS IF

9    WHAT THEY'RE BEING ASKED TO DO IS TO DESCRIBE THEIR

10   CUSTOM AND PRACTICES.

11             BUT UNTIL I READ IT, I WON'T BE ABLE TO

12   SAY.

13             SO I'LL DEVELOP, AS I READ IT, AND YOU

14   TELL ME THIS IS GOING TO BE ENDEMIC WITH THE

15   DEPOSITION TESTIMONY IN THIS CASE, I'LL TRY AND

16   DEVELOP THE PROCESS TO HELP YOU UNDERSTAND WHAT

17   DIRECTION THE COURT IS GOING TO GO SO YOU CAN SIT

18   DOWN OR HAVE SOME OF YOUR ASSOCIATES SIT DOWN AND

19   WORK OUT THESE PROBLEMS.

20             BECAUSE I CAN TELL YOU NOW, I'M BUSY

21   ENOUGH THAT I CAN'T SPEND MY TIME READING

22   DEPOSITIONS BETWEEN SESSIONS.

23             MR. WALLACE:  YOUR HONOR, IF YOU'LL

24   ACCEPT IT, I HAVE THE ONE FROM MS. ERVIN AND SHE

25   WOULD BE THE NEXT WITNESS AND THAT WOULD BE BY

                                                      223

1    VIDEO.

2              AND THE PINK IS THE OBJECTIONABLE PART

3    THAT IS CODED.

4              THE COURT:  BEFORE I LET YOU GO AND LET

5    ME JUST LOOK.

6              MR. HUMPHREYS:  YELLOW IDENTIFIES THE

7    PLAINTIFFS' OBJECTIONS AND PINK IDENTIFIES --

8              THE COURT:  WELL, THERE ARE YELLOW AND

9    PINK.

10             MR. WALLACE:  ON THE FRONT PAGE YELLOW IS

11   OURS.  ANYTHING THAT THEY OBJECTED TO HAS BEEN

12   HIGHLIGHTED AS PINK.

13             THE COURT:  AH.

14             MR. GILLESPIE:  AND ARE OUR

15   COUNTER-DESIGNATIONS ON THERE, TOO?

16             MR. WALLACE:  YES, THEY'RE BLUE.

17             MR. GILLESPIE:  OKAY.

18             THE COURT:  NOW, IN THIS CASE THERE'S A

19   PINK SECTION, THE ONE I JUST TURNED TO ON PAGE 17

20   AND THERE IS NO OBJECTION, THE QUESTION IS:  "WHY

21   DID YOU AGREE TO MEET WITH A COMPANY, WITH A

22   REPRESENTATIVE OF THE COMPANY, YOU KNOW, IT'S WHAT

23   YOU KNOW.  I'M BEING APPRECIATED FOR THE JOB THAT

24   I'M DOING, FULLY APPRECIATED."

25             MR. WALLACE:  YOUR HONOR, LIKE I SAID A

                                                          224

1    MINUTE AGO, THERE'S VERY FEW OBJECTIONS THAT THEY

2    MADE AT THE TIME OF THE DEPOSITION.  ALMOST NONE.

3                BUT WHAT WE HAVE DONE IN THAT REGARD IS

4    THAT THEY HAVE GIVEN US NOTICE RIGHT BEFORE THE

5    TRIAL STARTED THAT THESE ARE THE PAGES AND THE

6    LINES THAT THEY OBJECTED TO, THE DESIGNATION THAT

7    THEY MADE.

8                SO OUT OF PROFESSIONAL COURTESY TO THEM

9    WE HAVE GONE AND DESIGNATED EVERYTHING BY PINK

10   EVERYTHING THEY OBJECTED TO EVEN THOUGH THEY DIDN'T

11   OBJECT TO AT THE TIME.  WE AGREED THAT IF THEY

12   OBJECTED TO AT THE TIME, WE WAIVED IT.

13               MR. HUMPHREYS:  YOUR HONOR --

14               MR. GILLESPIE:  MR. HUMPHREYS CAN GO

15   FIRST.

16               MR. HUMPHREYS:  YOUR HONOR, IF YOUR ORDER

17   IS THAT ANY OBJECTION THAT IS NOT MADE HAS NOT BEEN

18   PRESERVED, WE WILL GO BACK AND REDESIGNATE THESE

19   FOR BOTH OF US, AND I UNDERSTAND THAT WILL APPLY TO

20   US AS WELL IF THAT'S YOUR RULING AND WE CAN HAVE

21   THOSE TO YOU IN THE MORNING.

22               THE COURT:  WELL, YOU KNOW, THERE'S A

23   STANDARD PROTOCOL THAT SOMETIMES LAWYERS DEVELOP TO

24   RESERVE OBJECTIONS IF IT'S HEARSAY OR SOME KIND OF

25   INFORMATION BECAUSE IN DEPOSITIONS YOU'RE ABLE TO

1    ASK FOR INFORMATION THAT IS OTHERWISE NOT

2    ADMISSIBLE UNDER THE VARIOUS EVIDENTIARY RULES

3    BECAUSE IT COULD LEAD TO THE DISCOVERY OF

4    ADMISSIBLE INFORMATION.

5         BUT IF IT'S AS TO THE FORM OF THE

6    QUESTION, THAT IS, IT CALLS THE WITNESS TO

7    SPECULATE OR IT'S A QUESTION THAT IS CONFUSING OR

8    VAGUE, IF THE WITNESS ANSWERS IT AND THERE'S NO

9    OBJECTION TO IT, THE WITNESS MAY UNDERSTAND THE

10   QUESTION.

11        IT'S HARD FOR ME IN THE CONTEXT OF A

12   TRIAL TO GO BACK AND SEE WHETHER OR NOT I CAN

13   FERRET OUT WHETHER OR NOT THERE'S A REASON TO NOT

14   ALLOW A QUESTION AND AN ANSWER BECAUSE THERE'S NO

15   NOTICE AT THE TIME THAT THE DEPOSITION IS CLOSED.

16   THERE'S PLENTY OF TIME AFTER THE DEPOSITION TO

17   STRIKE PARTS OF IT FOR A WITNESS TO SAY THAT I

18   DIDN'T MEAN TO SAY THAT.  IT'S JUST VERY DIFFICULT

19   FOR THE COURT TO GO BACK AND LOOK AT THAT.

20        SO AS I START THIS PROCESS, THE FIRST

21   THING I WILL DO IS PAY ATTENTION, IF THERE WAS NO

22   OBJECTION AT THE TIME OF THE DEPOSITION; THE SECOND

23   THING I WILL LOOK TO IS TO SEE WHETHER OR NOT THE

24   OBJECTION IS AS TO A MATTER THAT IS A VIOLATION OF

25   THE RULES HAVING TO DO WITH HEARSAY OR RELEVANCE

226

1    AND RELEVANCE IS WHAT I SEE THROUGHOUT THIS.

2             AND SO IF I GET A FLAVOR THAT I'M BEING

3    ASKED TO RULE ON MATTERS THAT ARE CLEARLY RELEVANT

4    GIVEN THE INDICATION, I'M GOING TO STOP AND INVITE

5    THE PARTIES TO GO BACK TO THE TABLE AND SEE WHETHER

6    OR NOT THEY CAN DO A BETTER JOB OF NARROWING

7    THEIR -- WHAT THEY'RE ASKING THE COURT TO DO.

8             IT DOES SEEM TO ME THAT ONCE A FOUNDATION

9    IS LAID AS TO WHO THE PERSON IS AND WHAT THEIR JOB

10   IS, THE QUESTIONS OF AND PERTAINING TO THEIR WORK

11   AND THEIR CONDUCT WITH RESPECT TO THIS MATTER, OR

12   IF THEY DON'T HAVE A RECOLLECTION WITH RESPECT TO

13   THIS MATTER, JUST THE GENERAL CUSTOM AND PRACTICE

14   ARE MATTERS THAT I WOULD ALLOW THE DEPOSITION TO GO

15   FORWARD ON.

16            I CAN SEE IN MY QUICK READING OF

17   MS. ERVIN'S DEPOSITION THAT THERE WERE

18   CIRCUMSTANCES HAVING TO DO WITH HER TERMINATION AND

19   LEAVING THE COMPANY, AND IT'S HARD FOR ME TO KNOW

20   WITHOUT READING THIS WHY IT WOULD BE IMPORTANT FOR

21   THIS JURY TO KNOW WITHOUT KNOWING THE

22   CIRCUMSTANCES.  IT COULD BE IT WAS BIAS OR

23   PREJUDICE OR ANIMOSITY THAT WOULD COLOR WHY SHE

24   WOULD TESTIFY, AND THAT'S FAIR AND IT'S APPROPRIATE

25   TO PULL THOSE THINGS OUT.

1          BUT, QUITE FRANKLY, YOU COULD DO A BETTER

2     JOB OF THAT THAN I COULD.

3          I GUESS THE OTHER THING I COULD DO IS TO

4     HAVE YOU DESIGNATE SOMEONE FROM YOUR OFFICES, AND I

5     CAN HAVE ONE OF MY LAW CLERKS SIT DOWN WITH YOU AND

6     GO THROUGH THIS AND SEE HOW FAR YOU CAN GET IN THAT

7     PROCESS AND THAT CAN GO ON EVEN AS THE TRIAL IS

8     GOING ON IF YOU HAVE A VOLUMINOUS SET OF MATERIALS

9     LIKE THAT AND TREAT MY LAW CLERK'S RECOMMENDATIONS

10    AS SOMETHING I WOULD LOOK AT AND ADOPT IF I FOUND

11    THEM TO BE SOUND OR YOU COULD STIPULATE BASED UPON

12    THAT PROCESS TO HAVE PUT IN THE RECORD THOSE THINGS

13    THAT YOU CONVINCE MY LAW CLERK TO ALLOW TO GO

14    FORWARD.  THEREFORE, YOU COULD THEN SHAPE UP YOUR

15    VIDEOS BECAUSE IT JUST SEEMS TO ME THAT HAVING

16    DEVOTED ENERGY INTO PUTTING THESE INTO VIDEOS, IT'S

17    GOING TO BE A MESS TO TRY AND EDIT THOSE UNLESS YOU

18    HAVE EARLY NOTICE OF WHAT THINGS YOU CAN USE AND

19    CAN'T USE.

20         SO THAT'S ANOTHER SUGGESTION I'LL MAKE,

21    BUT I WON'T DO ANYTHING UNTIL I HAVE GOTTEN A

22    FLAVOR OF WHAT YOU'RE DOING HERE.  SO I'LL COME

23    BACK TO IT.

24         MR. WALLACE:  THANK YOU, YOUR HONOR.

25         THE COURT:  THANK YOU ALL.

                                                    228

1            MR. LUCAS:  JUDGE, YOU MENTIONED YOU

2   WOULD LIKE TO HAVE ANY KIND OF MATTERS HANDLED IN

3   THE MORNING SCHEDULED AHEAD OF TIME.  WOULD IT

4   BE --

5            THE COURT:  YOU NEED TO CALL MS. GARCIA.

6   THERE ARE THINGS THAT I HAVE TO DO.  MY MORNING

7   TRIAL WENT AWAY SO I HAVE A FREE MORNING.  WE DON'T

8   START UNTIL 1:00.  I'M USUALLY HERE HAVING LUNCH

9   WITH MY STAFF AT NOON.  SO I CAN STOP EARLY,

10  QUARTER TILL, EVEN 12:30 BUT I EXPECT YOU TO WORK

11  OUT A LOT OF THIS.  DON'T COME TO ME WITH MATTERS

12  THAT YOU CAN'T RESOLVE.

13           MR. LUCAS:  WE'LL DO OUR BEST BUT PERHAPS

14  IF WE COULD KNOW YOUR HONOR'S IDEAS ON THIS

15  PARTICULAR TOPIC AT SOME POINT TOMORROW MORNING.

16           THE COURT:  I'LL LET YOU KNOW AS QUICKLY

17  AS I CAN.

18           MR. LUCAS:  THANK YOU, JUDGE.

19           (WHEREUPON, THE PROCEEDINGS IN THIS MATTER

20  WERE CONCLUDED.)

21

22

23

24

25