1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5    MANUEL G. FAUSTO, ET      )  C-07-0568-JW
     AL.,                      )
6                             )  MARCH 20, 2009
              PLAINTIFFS,      )
7                             )  VOLUME 4
              V.               )
8                             )  PAGES 375 - 509
     CREDIGY SERVICES, ET      )
9    AL.,                      )
                              )
10            DEFENDANTS.      )
     _____ )
11

12

13         THE PROCEEDINGS WERE HELD BEFORE

14        THE HONORABLE UNITED STATES DISTRICT

15                JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFFS: HUMPHREYS, WALLACE & HUMPHREYS
                         BY:  DAVID HUMPHREYS
18                            LUKE WALLACE
                             PAUL CATALANO
19                       9202 SOUTH TOLEDO AVENUE
                         TULSA, OKLAHOMA 74137
20
                         THE LAW OFFICE OF RONALD WILCOX
21                       BY:  RONALD WILCOX
                         2160 THE ALAMEDA
22                       FIRST FLOOR
                         SAN JOSE, CALIFORNIA 95126
23
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
24

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074

                                                    375

```
1

2
                A P P E A R A N C E S:  (CONT'D)
3

4    FOR THE PLAINTIFFS:      THE LAW OFFICE OF BALAM O.
                              LETONA
5                             BY:  BALAM O. LETONA
                              1337 PACIFIC AVENUE
6                             SUITE 203
                              SANTA CRUZ, CALIFORNIA 95060
7

8
     FOR THE DEFENDANTS:      SIMMONDS & NARITA
9                             BY:  TOMIO NARITA
                              44 MONTGOMERY STREET
10                            SUITE 3010
                              SAN FRANCISCO, CALIFORNIA
11                            94104

12
                              STEWART & ASSOCIATES
13                            BY:  JEFFREY B. LUCAS
                                   JOHN E. GILLESPIE
14                            3950 JOHNS CREEK COURT
                              SUITE 100
15                            SUWANEE, GEORGIA 30024

16
     ALSO PRESENT:            STEPHANIE SCHMITT
17                            KATY THORESEN

18

19

20

21

22

23

24

25


                                                        376
```

1
                        INDEX OF PROCEEDINGS
2

3      FOR THE PLAINTIFFS'

4
       **JASON SEAN WILLIAMS**        AS-ON CROSS-EXAM P. 387
5                                     (RESUMED)
                                      AS-ON DIRECT EXAM P. 445
6                                     AS-ON RECROSS-EXAM P. 487

7

8

9                        INDEX OF EXHIBITS

10
                                MARKED          ADMITTED
11
       DEFENDANTS':
12

13     157                                      459
       160                                      470
14     159                                      472
       162                                      472
15     161                                      473
       155                                      478
16     209                                      481
       201 (SUBJECT TO LIMITATION)              486
17     203 (SUBJECT TO LIMITATION)              487

18

19

20

21

22

23

24

25

                                                        377


                        U.S. COURT REPORTERS

1    SAN JOSE, CALIFORNIA                 MARCH 20, 2009

2
                        P R O C E E D I N G S
3

4              (WHEREUPON, THE PROCEEDINGS IN THIS

5    MATTER WERE HELD OUT OF THE PRESENCE OF THE JURY:)

6              THE COURT:  GOOD AFTERNOON.  MS. GARCIA

7    SAID THAT YOU HAD SOME MATTERS THAT YOU WANTED TO

8    BRING UP BEFORE WE STARTED.

9              MR. HUMPHREYS:  THE PLAINTIFF HAS

10   NOTHING, YOUR HONOR.

11             MR. GILLESPIE:  YOUR HONOR, AFTER

12   MR. HUMPHREYS FINISHED WITH HIS CROSS-EXAMINATION

13   OF MR. WILLIAMS, I INTEND TO TAKE HIM AND EXAMINE

14   HIM AND ASK SOME QUESTIONS OF HIM.

15             I'M MINDFUL OF THE COURT'S CONCERN

16   YESTERDAY ABOUT THE AREAS THAT HE WAS GETTING INTO

17   AND THE LENGTH OF THE QUESTIONING.  I JUST WANTED

18   TO POINT OUT TO THE COURT THAT I'M GOING TO ATTEMPT

19   TO LAY A FOUNDATION FOR THIS DISPUTED EXHIBIT 157

20   UNDER NINTH CIRCUIT CASE LAW.  I'LL PROVIDE YOU A

21   COPY OF THAT AND COUNSEL ON THE OTHER SIDE.  WE'RE

22   GETTING A ONE PAGE PHOTOCOPIED, BUT THAT'S MY

23   INTENTION NOT TO UNDULY PROLONG THE TRIAL.

24             THE COURT:  WELL, THAT MIGHT BE A MATTER

25   THAT WE CAN HANDLE WITH JUST A LIMITING INSTRUCTION

                                                      378

1    WITH RESPECT TO THE IMPORTANCE THAT THE JURY SHOULD

2    ATTACH TO A QUESTION ABOUT WHETHER OR NOT THE

3    PRESENCE OR ABSENCE OF WELLS FARGO RECORDS IS

4    DISPOSITIVE OF ANY ISSUE WITH RESPECT TO THE

5    COLLECTION PROCESS WHICH I TRIED TO DO INFORMALLY

6    YESTERDAY SO.

7          IT JUST SEEMS TO ME THAT I DIDN'T WANT US

8    SPENDING TIME IN THE TRIAL TRYING TO PROVE TO A

9    DEGREE OF CERTAINTY THAT, ONE, THE EVIDENCE

10   WOULDN'T TAKE US BECAUSE IT DOESN'T EXIST TO A

11   CERTAIN LEVEL; AND ALSO IT DIDN'T APPEAR TO ME TO

12   BE AS IMPORTANT TO THE CASE AS THE TIME THAT WE

13   WERE DEVOTING IT SUGGESTED.

14         MR. GILLESPIE:  AND AGAIN, MY RESPONSE TO

15   THAT, YOUR HONOR, IS THAT IN OPENING STATEMENT AND

16   IN COMMENTS AND IN QUESTIONS MADE SINCE THEN

17   PLAINTIFFS HAVE STRESSED THEIR THEORY THAT BECAUSE

18   THIS ACCOUNT WHERE HE COULDN'T PROVE THE VALIDITY

19   OF THIS, THAT SOMEHOW IMPACTS EITHER THE NATURE OF

20   OUR VIOLATION OR THE SEVERITY OF OUR VIOLATION.

21         THEY INDICATED THAT THEY INTENDED TO PUT

22   ON ORAL TESTIMONY THAT THE ACCOUNT WAS RESOLVED A

23   LONG TIME AGO.

24         THE RECORDS THAT I'M TRYING TO GET INTO

25   EVIDENCE ARE COMPETENT AND COMPELLING EVIDENCE THAT

379

1    CONTRADICTS THEIR ORAL TESTIMONY, AND I THINK THE

2    JURY SHOULD HAVE AN OPPORTUNITY TO REVIEW IT TO,

3    WEIGH IT AGAINST THE TESTIMONY OF THE FAUSTOS.

4         THE COURT:  AND I HAVEN'T RULED THAT IT'S

5    NOT THERE.  THE ONLY THING THAT I DID WAS RESERVE

6    ON THAT ISSUE LEAVING THE PLAINTIFF TO PUT IN THEIR

7    PORTION OF IT AS AN EXHIBIT TO USE RESERVING UNTIL

8    LATER.

9         AND ALTHOUGH I HAVE SEEN SOME PARTS AS

10   YOU GUYS PRESUME AS YOU HAVE GONE THROUGH THIS 157,

11   YOU MAY ATTEMPT TO LAY A FOUNDATION FOR 157.

12        MR. GILLESPIE:  THANK YOU, YOUR HONOR.

13        THE COURT:  IS THAT IT?

14        MR. LUCAS:  JUST QUICKLY THE VINHNEE

15   CASE, WHICH IS THE NINTH CIRCUIT CASE WE WANT TO

16   GIVE YOU, OUTLINES THE EXACT REQUIREMENTS TO LAY

17   THE FOUNDATION FOR ELECTRONIC RECORDS WHICH IS WHAT

18   WE BELIEVE WE CAN DO.

19        THE COURT:  OKAY.  SO I'LL COME BACK IN

20   FIVE MINUTES.

21        (WHEREUPON, A RECESS WAS TAKEN.)

22        MR. HUMPHREYS:  YOUR HONOR, MAY I HAVE A

23   MOMENT OR TWO TO ADDRESS THE JURY ABOUT THE

24   INTERPRETER, JUST VERY BRIEFLY.

25        THE COURT:  OH, SURE.  SUMMON THE JURY.

                                                    380

1              (WHEREUPON, THE FOLLOWING PROCEEDINGS

2    WERE HELD IN THE PRESENCE OF THE JURY:)

3              THE COURT:  PLEASE BE SEATED.  MEMBERS OF

4    THE JURY, ONE OF THE THINGS THAT I ALLOW AS A WAY OF

5    HELPING YOU TO UNDERSTAND THE DISPUTE THAT THE

6    PARTIES ARE HAVING AND TO DECIDE THE CASE IS WHAT I

7    CALL INTERIM COMMENTARY.

8              ORDINARILY IN A TRIAL THE PARTIES PUT ON

9    ALL OF THEIR EVIDENCE.  BEFORE THEY'RE ABLE TO

10   COMMENT TO YOU OR ADDRESS YOU, THAT CLOSING ARGUMENT

11   IS USUALLY HELD AT THE END OF THE TRIAL.

12             BUT OVER THE YEARS I HAVE FOUND IT HELPFUL

13   TO ALLOW THE PARTIES, IF THEY WISH, TO ADDRESS THE

14   JURY AFTER EACH WITNESS IS EXCUSED.  AND I GIVE IT TO

15   BOTH OF THE PARTIES.  SO I ALLOW THE COMMENTARY TO BE

16   OPENED BY THE PARTY WHO CALLED THE WITNESS AND TO BE

17   CLOSED BY THE OPPOSING SIDE.

18             THEY EACH HAVE TO SPEND NO MORE THAN FIVE

19   MINUTES IN COMMENTARY AND THE PLAINTIFFS' COUNSEL HAS

20   INDICATED THAT HE WISHES TO COMMENT ON THE TESTIMONY

21   AND THE EVIDENCE PRESENTED THROUGH THE INTERPRETER.

22             A PARTY IS NOT REQUIRED TO DO COMMENTARY.

23   IF THEY DECLINE, THEY'LL SAY I'LL WAIT UNTIL LATER,

24   BUT ARGUMENT OF THIS KIND IS NOT EVIDENCE.

25             WHAT YOU HEAR FROM THE WITNESS STAND OR

                                                        381

1    DOCUMENTS IS THE TESTIMONY, BUT I PERMIT THE

2    ATTORNEYS TO COMMENT ON IT TO HELP YOU UNDERSTAND

3    WHAT SIGNIFICANCE THEY BELIEVE IT HAS IN THE CASE SO

4    YOU CAN EVALUATE IT.  BUT IT'S UP TO YOU WHETHER TO

5    AGREE WITH THEM OR NOT WITH RESPECT TO THEIR

6    EVALUATION.

7          COUNSEL.

8          MR. HUMPHREYS:  WE THINK THIS EVIDENCE IS

9    IMPORTANT BECAUSE IT'S EVIDENCE OF A NUMBER OF

10   FALSE STATEMENTS.  THE STATEMENTS BY CREDIGY WERE

11   RIDDLED WITH LIES AND DECEPTION, AND WE'LL GO TO

12   EXACTLY WHAT THOSE ARE LATER BUT IT'S MORE THAN

13   JUST THE BIG ONE THAT "WE'LL REPORT THIS ON YOUR

14   CREDIT FOREVER."

15         CREDIGY HAS SUGGESTED TO YOU THAT YOU

16   CAN'T RELY ON THE TRANSLATOR.  SHE'S NOT A RELIABLE

17   WITNESS.

18         SHE'S BEEN CERTIFIED IN FEDERAL COURTS,

19   INCLUDING THIS COURT, AND YOU CAN JUDGE FOR

20   YOURSELF THAT SHE'S CREDIBLE.  I WILL POINT OUT

21   THAT CREDIGY DID NOT HIRE SOMEONE TO COUNTER HER,

22   AN EXPERT TO SAY THAT SHE'S DONE A POOR JOB IN

23   TRANSLATING THIS PAPERWORK.

24         AND I'LL TELL YOU WHY YOU CAN RELY ON HER

25   TRANSCRIPTION ABOUT WHETHER OR NOT CREDIGY SAID

                                                    382

1    THAT THEY WERE GOING TO REPORT THIS FOREVER ON

2    MR. FAUSTO'S CREDIT RECORD.

3              AND IF YOU TAKE A LOOK AT THE TRANSCRIPT

4    WHEN YOU HAVE IT AND IF YOU TAKE A LOOK AT PAGE 8

5    WHERE IT BEGINS IT SAYS THE VERY LAST TWO WORDS ON

6    THE VERY BOTTOM OF PAGE 8 ON LINE 29.

7              "BECAUSE THIS ACCOUNT IS NOT GOING TO

8    DISAPPEAR.  IT'S GOING TO ALWAYS BE ON YOUR

9    HUSBAND'S CREDIT REPORT."  IT DOESN'T MAKE ANY

10   SENSE BECAUSE THIS ACCOUNT IS NOT GOING TO

11   DISAPPEAR IF HE DIDN'T SAY IT'S GOING TO BE ON YOUR

12   HUSBAND'S REPORT FOREVER.

13             ALSO IF YOU LOOK AT THE VERY END OF THE

14   TRANSCRIPT, THE LAST THING THAT WAS SAID BY THE

15   SUPERVISOR, MR. MOTELI, IT STARTS ON THE BOTTOM OF

16   PAGE 10 AT LINE 28 -- 20, 29, AT THE VERY BOTTOM

17   THERE.  "THE COLLECTION ACTIVITY OF COLLECTING WILL

18   CONTINUE.  ONE DAY WHEN YOU NEED TO GET CREDIT TO

19   BUY A HOUSE OR SOMETHING LIKE THAT, THEN YOU WILL

20   BE SHOWN YOU HAVE THIS DEBT AND YOU WILL FIND A WAY

21   TO PAY THIS DEBT."

22             SO HE'S SUGGESTING ONE DAY IN THE FUTURE,

23   LIKE FOREVER YOU'RE GOING TO NEED YOUR CREDIT AND

24   THIS IS GOING TO BE THERE.  THAT'S VERY CONSISTENT

25   WITH THE STATEMENT THAT THIS IS GOING TO BE ON YOUR

                                                   383

1    CREDIT FOREVER.  THAT'S WHAT THEY DID, THEY

2    THREATENED THIS LADY TO PUT THIS ON HERE.  AND IF

3    YOU LOOK AT THE TRANSCRIPT AS A WHOLE WITH WHAT YOU

4    SAID MADE SENSE AND CREDIGY'S EXPLANATION, WE

5    SUBMIT TO YOU, THAT YOUR HUSBAND'S, "IT WILL BE ON

6    YOUR HUSBAND'S CREDIT FOREVER," IS ABSURD.

7          THANK YOU.

8          THE COURT:  DO YOU WISH TO COMMENT?

9          MR. NARITA:  YES, YOUR HONOR.

10          THANK YOU, YOUR HONOR.

11          WE THINK THIS TRANSCRIPT IS PRETTY

12    SIGNIFICANT EVIDENCE, TOO.  THE FIRST THING THAT

13    STRUCK US, AND WE WOULD LIKE YOU TO CONSIDER IS

14    THAT AS YOU CONSIDER IT IS HOW IT WAS PREPARED.

15          IF YOU REMEMBER, WE DIDN'T HEAR FROM

16    MR. HUMPHREYS THE EXACT METHOD OF PREPARATION, BUT

17    WHEN I ASKED MS. KLIMKOVA HOW IT GOT PUT TOGETHER,

18    WE LEARNED THAT THERE WERE SEVERAL DRAFTS PASSED

19    BACK AND FORTH THAT YOU DIDN'T HAVE AN OPPORTUNITY

20    TO SEE.

21          AND THOSE DRAFTS WERE EDITED ON AND

22    COMMENTED ON BY MR. LETONA, ONE OF THE ATTORNEYS IN

23    THIS CASE.  SO THAT'S SIGNIFICANT FOR YOU TO

24    CONSIDER.

25          IN FACT, I THINK TOWARDS THE END THE LAST

384

1   THING THEY SAID SHE GAVE TO MR. LETONA WAS A WORD

2   DOCUMENT, THAT SHE DIDN'T CREATE A FINAL PDF

3   DOCUMENT.  SO THAT'S SOMETHING THAT WE WOULD LIKE

4   YOU TO CONSIDER.

5          IF THE FAUSTOS AND THEIR ATTORNEY WENT TO

6   THE TROUBLE OF HIRING A CERTIFIED EXPERT COURT

7   APPROVED TRANSLATOR, WHY SO MANY DRAFTS?  WHY DID

8   IT TAKE SO LONG TO GET IT JUST RIGHT?

9          SO WE THINK THE CIRCUMSTANCES OF ITS

10  PREPARATION, YOU KNOW, IS SOMETHING THAT YOU SHOULD

11  CONSIDER WHEN YOU CONSIDER WHETHER ITS TRUSTWORTHY

12  OR NOT.

13         ALSO, CONSIDER WHETHER SOMEBODY WOULD PUT

14  THE LETTERS SIC OR THE INDICATION SIC, S-I-C, NEXT

15  TO THEIR OWN TYPOGRAPHICAL ERRORS.  THAT DOESN'T

16  SEEM QUITE RIGHT.

17         IF SOMEBODY ELSE MAKES A TYPOGRAPHICAL

18  ERROR AND THEN QUOTING IT YOU'RE GOING TO PUT SIC.

19  BUT IF YOU'RE GOING TO MAKE A TYPOGRAPHICAL ERROR

20  THEN YOU JUST CORRECT IT, YOU DON'T SAY, WHOOPS, I

21  MADE AN ERROR.  SO CONSIDER IT WHETHER THAT PART OF

22  THE TESTIMONY WAS BELIEVABLE OR RELIABLE, TOO.

23         AND THE LAST THING WE WOULD LIKE YOU TO

24  CONSIDER ABOUT THIS EVIDENCE IS WHEN THE CALL

25  OCCURRED.

385

1              I THINK WE HEARD THAT THIS WAS THE CALL

2     THAT WAS TAPED, THE ONE CALL THAT WAS TAPED AFTER

3     THIS LAWSUIT WAS FILED, AFTER THIS LAWSUIT WAS

4     FILED.

5              SO CONSIDER THE CIRCUMSTANCES SURROUNDING

6     THE PREPARATION OF THIS TAPE AND WHY IT WAS MADE

7     AND THEN THE CIRCUMSTANCES OF HOW IT WAS TRANSLATED

8     INTO ENGLISH AND PRESENTED TO YOU WHEN YOU CONSIDER

9     THIS EVIDENCE.

10             THAT'S ALL, YOUR HONOR.

11             THE COURT:  VERY WELL.  MEMBERS OF THE

12    JURY, I ACTUALLY DON'T RECALL THE TESTIMONY WHEN

13    THE CALL WAS MADE AND SO PERHAPS THAT WOULD BE

14    SOMETHING THAT WOULD BE IMPORTANT PERHAPS TO YOU

15    AND SO TO THE EXTENT THAT THE PARTIES ARE ABLE TO

16    STIPULATE OR OTHERWISE CLARIFY THAT FOR US, THE

17    COURT WOULD APPRECIATE THAT.

18             MAY WE HAVE MR. WILLIAMS BACK IF THAT'S

19    YOUR INTENT?

20             MR. HUMPHREYS:  YES, YOUR HONOR.

21             THE COURT:  MR. WILLIAMS.

22                    **JASON SEAN WILLIAMS,**

23    BEING RECALLED AS AN ADVERSE WITNESS ON BEHALF OF THE

24    PLAINTIFFS, HAVING BEEN FIRST DULY SWORN, WAS

25    EXAMINED AND TESTIFIED AS FOLLOWS:

                                                    386

1          THE COURT:  YOU MAY INQUIRE.

2          MR. HUMPHREYS:  THANK YOU, YOUR HONOR.

3          **AS-ON CROSS-EXAMINATION** (RESUMED)

4     BY MR. HUMPHREYS:

5     Q    MR. WILLIAMS, THE PHONE CALL THAT WAS

6     TRANSCRIBED YESTERDAY, DO YOU BELIEVE IT WAS --

7     THAT THAT CALL TOOK PLACE ON NOVEMBER 23RD OF 2007;

8     IS THAT TRUE?

9     A    I THINK THAT'S WHEN THE RECORDS REFLECT THAT

10    THE PHONE CALL WAS MADE.

11    Q    AND THAT PHONE CALL WAS OBVIOUSLY MADE TO

12    COLLECT A DEBT.  THERE'S NO DISPUTE ABOUT THAT?

13    A    I THINK ON THAT PHONE CALL I'M NOT SURE

14    WHETHER MRS. FAUSTO CALLED CREDIGY OR CREDIGY -- I

15    THINK MRS. FAUSTO CALLED CREDIGY ACTUALLY.

16    Q    OKAY.  WELL, WE'LL GET TO THAT IN A LITTLE

17    BIT.  WE'LL SEE.

18          OKAY.  DO YOU NOT LOG IN YOUR NOTES WHICH

19    WAY IF A CALL GOES IN AND OUT?

20    A    YEAH.  LET ME LOOK AT THE NOTES AND SEE.  I

21    THINK THAT THIS WAS -- IT JUST INDICATES, YOU KNOW,

22    THAT TALKED TO THE DEBTOR, AND WHAT WE ACTUALLY

23    HAVE THE PHONE CALL OF RECORD FROM GLOBAL CROSSING,

24    WHICH IS THE LONG DISTANCE CARRIER WHICH REFLECTS

25    WHETHER IT'S AN INBOUND OR OUTBOUND TELEPHONE CALL.

                                                    387

1    Q    AND IF IT WAS AN OUTBOUND CALL THAT WOULD BE A

2    CHARGE THEN TO CREDIGY.  IS THAT WHAT YOU'RE

3    SAYING?

4    A    I THINK THEY BOTH SHOW UP ON THE GLOBAL

5    CROSSING REFERENCE.

6    Q    OKAY.

7    A    I'M JUST NOT SURE WHETHER IT WAS INBOUND OR

8    OUTBOUND THERE.

9    Q    OKAY.  NOW, THE STATEMENT YOU CAN LOOK AT THE

10   CREDIT AGENCY CREDIT BUREAU, YOU CAN SEE THIS IS A

11   LEGITIMATE DEBT.  IS THAT A TRUE STATEMENT, THAT BY

12   LOOKING AT A CREDIT BUREAU IT MAKES A DEBT

13   LEGITIMATE?

14   A    WELL, I GUESS IF YOU LOOK AT A CREDITOR REPORT

15   IT WOULD JUST BE EVIDENCE THAT A DEBT WAS RECORDED

16   TO A CREDIT BUREAU.

17   Q    OKAY.  THE FACT THAT CREDIGY REPORTED THIS

18   ACCOUNT TO A CREDIT BUREAU WOULD NOT MAKE IT A

19   LEGITIMATE DEBT; IS THAT RIGHT?

20   A    IT'S JUST A RECORD OF AN ACCOUNT THAT REPORTED

21   TO A CREDIT REPORTING AGENCY.

22   Q    SO THE ANSWER TO MY QUESTION IS, YES, WHEN I

23   SAID IT WAS TRUE?

24   A    WELL, CREDIGY WOULD NOT REPORT A DEBT TO A

25   CREDIT REPORTING AGENCY UNLESS IT WAS LEGITIMATE.

1    Q    OKAY.  THE FACT OF REPORTING A DEBT TO A

2    CREDIT REPORTING AGENCY DOES NOT MAKE IT A DEBT?

3    A    IT'S A DEBT BUT IN AND OF ITSELF IT DOES NOT

4    MAKE IT LEGITIMATE.

5    Q    OKAY.  AND THERE'S NO DISPUTE HERE THAT

6    MR. MOTELI, THE SUPERVISOR, WAS CALLING FROM

7    BRAZIL?

8    A    YES, THE CREDIGY SOLUCOES EMPLOYEE WAS IN

9    BRAZIL, THAT'S RIGHT.  THAT'S MY UNDERSTANDING.

10   Q    AND THE STATEMENT, "I'M CALLING FROM CREDIGY

11   HERE IN ATLANTA, GEORGIA IS NOT A TRUE STATEMENT"?

12   A    WELL, I THINK HE WAS TALKING ABOUT CREDIGY'S

13   MAIN CORP OFFICE IN ATLANTA, BUT HE HIMSELF WAS

14   ACTUALLY IN BRAZIL, THAT'S CORRECT.

15   Q    SO DO YOU THINK IT'S A TRUE STATEMENT, "I'M

16   CALLING FROM CREDIGY HERE IN ATLANTA"?

17   A    WELL, I THINK HE WAS REFERRING TO CREDIGY

18   SERVICES CORP WHICH HAS A MAIN OFFICE IN ATLANTA

19   WHO HE IS CALLING ON BEHALF OF IT.

20   Q    SO YOUR ANSWER IS, YES, YOU BELIEVE IT'S A

21   TRUE STATEMENT?

22   A    MY ANSWER IS THAT I DON'T THINK HE WAS TRYING

23   TO MISLEAD ANYONE BY SAYING THAT.

24   Q    OKAY.  HAVE YOU GONE BACK AND TALKED TO HIM

25   ABOUT WHAT HIS INTENT WAS?

389

1    A    NO.

2    Q    SO YOU'RE GOING TO HAVE TO SPECULATE TO THIS

3    JURY ABOUT WHAT HE WAS THINKING WHEN HE SAID THAT;

4    RIGHT?

5    A    YEAH, I DON'T KNOW WHAT HE WAS THINKING.  I'M

6    JUST TELLING YOU WHAT MY INTERPRETATION IS.

7    Q    OKAY.  AND THE STATEMENT, "YOU SENT US A

8    DISPUTE LETTER SO WE DO A REVIEW OF THE ACCOUNT.

9    OUR LEGAL DEPARTMENT SENT YOU THE ANSWER TELLING

10   YOU THAT, YES, THIS ACCOUNT WAS YOURS AND ALSO YOUR

11   HUSBAND'S."

12          IS THE STATEMENT THAT THIS ACCOUNT WAS --

13   THAT IT WAS REVIEWED AND AN ANSWER WAS SENT BY THE

14   LEGAL DEPARTMENT, IS THAT A TRUE STATEMENT?

15   A    ACTUALLY I THINK IT WAS SENT BY THE DISPUTE

16   RESOLUTION TEAM.

17   Q    OKAY.

18   A    SO I DON'T THINK THAT WAS ACTUALLY CORRECT.

19   BUT THE DISPUTE RESOLUTION TEAM IS UNDER THE

20   SUPERVISION OF AN ATTORNEY SO.

21   Q    OKAY.  AND THE STATEMENT THAT "YES, THIS

22   ACCOUNT WAS YOURS AND ALSO YOUR HUSBAND'S," IS

23   THAT A TRUE STATEMENT?

24   A    I THINK THE ACCOUNT WAS MR. FAUSTO'S ACCOUNT.

25   Q    OKAY.  SO YOU HAVE GONE BACK AND LOOKED AT

                                                    390

1    YOUR RECORDS AND YOU CAN CONFIRM?

2    A    I ACTUALLY DID LOOK BACK, AND I THINK THAT THE

3    RECORDS REFLECT THAT MRS. FAUSTO WAS AN AUTHORIZED

4    USER.

5    Q    OKAY.  SO WHEN YOU SAID YESTERDAY THAT SHE WAS

6    A COSIGNER, THAT WASN'T TRUE?

7    A    YEAH, I WENT BACK AND LOOKED AT THE RECORDS

8    AND VERIFIED THAT I THINK SHE WAS AN AUTHORIZED

9    USER.

10   Q    AND, IN FACT, YOU SUBMITTED AN AFFIDAVIT TO

11   THIS COURT PREVIOUSLY INDICATING THAT THIS WAS

12   SOLELY THE ACCOUNT OF MANUEL FAUSTO; ISN'T THAT

13   TRUE?

14   A    AGAIN, I WENT BACK TO VERIFY THE RECORDS.

15   Q    OKAY.  THIS AFFIDAVIT THAT YOU SWORE OUT

16   SAYING THAT IT WAS JUST MR. FAUSTO'S ACCOUNT THAT

17   WAS SOMETHING THAT YOU DID IN 2008, ALMOST A YEAR

18   AGO?

19   A    RIGHT.

20   Q    AND THE REASON WHY -- DO YOU REMEMBER WHEN I

21   ASKED YOU THAT QUESTION ABOUT WHOSE ACCOUNT IT WAS,

22   YOU SAID IT WAS MRS. FAUSTO'S ALSO, THAT'S WHEN WE

23   WERE LOOKING AT THE RECORDS FROM FIRST SELECT THAT

24   SHOWED THAT MRS. FAUSTO WAS ALSO GETTING THE

25   MONTHLY STATEMENT?

391

1    A    YES, SHE APPEARED ON THE STATEMENT FROM FIRST

2    SELECT.

3    Q    BUT SHE DIDN'T HAVE ANY RESPONSIBILITY TO PAY

4    FOR THE ACCOUNT TO YOUR KNOWLEDGE?

5    A    RIGHT.  I WENT BACK AND VERIFIED THE ORIGINAL

6    RECORDS AND FROM MY RECORDS IT APPEARED THAT SHE

7    WAS ONLY AN AUTHORIZED USER, NOT A COSIGNER.

8    Q    OKAY.  SO THE STATEMENT, "EVEN IF YOU PROVE TO

9    US THAT YOU HAVE MADE PAYMENTS ON THIS ACCOUNT,

10   THIS IS STILL DAMAGING YOUR CREDIT," THAT

11   STATEMENT TO MRS. FAUSTO WAS FALSE; RIGHT?

12   A    SORRY.  "EVEN IF YOU PROVE TO US THAT YOU MADE

13   PAYMENTS, IT'S STILL DAMAGING TO YOUR CREDIT"?

14   Q    THIS IS SPEAKING TO HER.

15   A    WELL, A LOT OF TIMES MARRIED PEOPLE HAVE A

16   JOINT CREDIT REPORT AND A LOT OF TIMES THEY'RE ON

17   THE SAME CREDIT REPORT.

18   Q    OKAY.  AND THE STATEMENT "AND OUR COMPANY HERE

19   SENT YOU THE ANSWER OF WHAT HAPPENED TO THIS

20   ACCOUNT.  YES, IT IS YOURS AND YOUR HUSBAND'S."  IS

21   THAT STATEMENT THAT IT'S YOURS AND YOUR HUSBAND'S

22   ACCOUNT A TRUE ONE?

23   A    WELL, AGAIN, SHE WAS ONLY AN AUTHORIZED USER,

24   ACCORDING TO OUR RECORDS.

25   Q    OKAY.  AND THE STATEMENT THAT THIS ACCOUNT IS

392

1    NOT GOING TO DISAPPEAR, IT IS GOING TO ALWAYS BE ON

2    YOUR HUSBAND'S CREDIT REPORT, MR. MANUEL'S," IS

3    THAT A TRUE STATEMENT?

4    A    WELL, THERE ARE LIMITATIONS ABOUT HOW LONG AN

5    ACCOUNT CAN APPEAR ON A CREDIT REPORT.

6    Q    SO IT ISN'T TRUE THAT IT CAN ALWAYS BE ON

7    THEIR ACCOUNT OR MR. FAUSTO'S ACCOUNT, IS IT?

8    A    IT CAN IN CERTAIN CIRCUMSTANCES.

9    Q    YOU'RE SAYING THAT -- HAVEN'T WE COVERED THIS

10   ALREADY?  DIDN'T YOU ALREADY TELL US THAT YOU CAN

11   REPORT AN ACCOUNT SEVEN YEARS AFTER CHARGE-OFF?

12   A    RIGHT.  BUT AN ACCOUNT FOR CERTAIN

13   TRANSACTIONS UNDER THE FAIR CREDIT REPORTING ACT

14   FOR A TRANSACTION IN EXCESS OF $150,000 OR FOR AN

15   INQUIRY RELATED TO AN EMPLOYMENT, A CREDIT

16   REPORTING AGENCY ACTUALLY CAN REPORT ACCOUNTS THAT

17   ARE OLDER THAN SEVEN YEARS.  THOSE ARE EXCLUDED

18   UNDER THE FAIR CREDIT REPORTING ACT UNDER A

19   SEVEN-YEAR LIMITATION.

20   Q    SO DO YOU THINK MR. MOTELI THOUGHT THAT MAYBE

21   MR. FAUSTO WAS MAYBE APPLYING FOR A JOB WITH

22   CREDIGY?

23   A    NO, I WAS JUST TELLING YOU THE LIMITATIONS OF

24   THE FAIR CREDIT REPORTING ACT.

25   Q    AND HE KNEW HOW MUCH THE ACCOUNT WAS FOR

393

1    $28,000; RIGHT?

2    A    YES, I ASSUME HE KNEW THE CURRENT BALANCE WHEN

3    HE WAS TALKING TO HER.

4    Q    NO, HE TOLD HER WHAT IT WAS.

5    A    I WOULD HAVE TO LOOK AT THE TRANSCRIPT.  I

6    BELIEVE THAT'S CORRECT.

7    Q    OKAY.  SO BOTTOM LINE IS A BAD DEBT ROLES OFF

8    OF THE ACCOUNT AFTER SEVEN YEARS, THAT'S HOW IT

9    WORKS; RIGHT?

10   A    IT ROLLS OFF ACCEPT FOR OTHER PURPOSES.

11   Q    IT DOESN'T HAVE ANYTHING TO DO WITH WHAT WE

12   HAVE TO DO WITH HERE.  THOSE EXCEPTIONS THAT YOU

13   WANT TO TALK ABOUT HAVE NOTHING TO DO WITH THE

14   FAUSTOS OR THEIR ACCOUNT; TRUE?

15   A    WELL, IF SOMEONE WAS TO APPLY FOR A HOME LOAN

16   OVER $150,000, POSSIBLY THE ACCOUNT WOULD BE

17   REPORTED TO THE LENDER.

18   Q    YOU'RE SAYING THAT THIS ACCOUNT COULD HAVE

19   BEEN ON HERE OVER SEVEN YEARS NOW, IS THAT WHAT

20   YOUR TESTIMONY IS?

21   A    I THINK THERE'S AN EXCEPTION UNDER THE CRA FOR

22   CERTAIN TYPES OF TRANSACTIONS THAT ITEMS ACTUALLY

23   STAY ON A CREDIT REPORT LONGER THAN SEVEN YEARS.

24   Q    WELL, I WANT --

25   A    BUT FOR MOST CREDIT REPORTS THEY WOULDN'T BE.

1    Q    WELL, I WON'T ARGUE WITH YOU ABOUT THE LAW.

2    WE'LL HAVE THE JUDGE INSTRUCT AT THE END OF THE

3    CASE WHAT THE LAW IS ON THAT.

4              SO WHEN MR. OR MRS. FAUSTO WAS TOLD THAT

5    SOME DAY WHEN YOU GO -- WHEN YOU NEED TO GET CREDIT

6    TO BUY A HOUSE OR SOMETHING LIKE THAT YOU WILL BE

7    SHOWN TO HAVE THIS DEBT AND YOU WILL FIND A WAY TO

8    PAY THIS DEBT, THAT WAS AN ATTEMPT TO COMPEL THE

9    FAUSTOS TO PAY THIS DEBT OR THEIR CREDIT -- IT

10   WOULD BE ON THEIR CREDIT?

11             MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

12   SPECULATION.

13             THE COURT:  OVERRULED.

14   BY MR. HUMPHREYS:

15   Q    IS THAT RIGHT?

16   A    YEAH, I CERTAINLY THINK HE WAS NEGOTIATING IN

17   AN ATTEMPT TO GET HIM TO MAKE A PAYMENT ON THE

18   ACCOUNT, CORRECT.

19   Q    THAT'S A TECHNIQUE THAT YOU USE TO THREATEN

20   SOMEBODY'S CREDIT AND IF THEY DON'T PAY; RIGHT?

21             MR. GILLESPIE:  OBJECTION TO THE FORM OF

22   THE QUESTION AND THE CHARACTERIZATION.

23   ARGUMENTATIVE.

24             THE COURT:  OVERRULED.

25             THE WITNESS:  IT SEEMS TO BE THE

395

1    TECHNIQUE THAT WAS USED HERE THAT THERE WAS A

2    STATEMENT MADE ABOUT THE CREDIT REPORT AS HE WAS

3    TALKING TO MRS. FAUSTO.

4    BY MR. HUMPHREYS:

5    Q    OKAY.  NOW, CREDIGY'S LAWYER SAID IN OPENING

6    STATEMENT THAT THERE WAS NO FRAUD, NO DECEPTION,

7    AND NO ABUSE HERE.

8              DO YOU AS CREDIGY'S CORPORATE

9    REPRESENTATIVE STILL STAND BY THAT?

10   A    YES.

11   Q    WHAT WE READ ON THE TRANSCRIPT, IS THAT THE

12   SORT OF COLLECTION ACTIVITIES THAT CREDIGY EXPECTS

13   OF ITS COLLECTORS?

14   A    YOU KNOW, WE EXPECT OUR COLLECTORS TO FOLLOW

15   THE TRAINING THAT WE RECEIVE AND TO COMPLY WITH THE

16   LAW.

17   Q    OKAY.  WERE ANY CREDIGY COLLECTORS DISCIPLINED

18   AS A RESULT OF THEIR HANDLING OF THE FAUSTO

19   ACCOUNT?

20   A    I DON'T BELIEVE THAT THERE WERE ANY

21   DISCIPLINARY ACTIONS TO MY KNOWLEDGE.

22   Q    AND WAS ANYBODY REPRIMANDED OR FIRED?

23   A    SPECIFICALLY OUT OF THE FAUSTO ACCOUNT?  NOT

24   TO MY KNOWLEDGE.

25   Q    OKAY.  HASN'T CREDIGY ADMITTED IN THE COURT

                                              396

1    PAPERS THAT THAT'S THE CASE, THAT NO ONE HAS BEEN

2    REPRIMANDED, DISCIPLINED OR FIRED?

3    A    AGAIN, I BELIEVE THAT'S CORRECT, YEAH.

4    Q    OKAY.  LET ME HAND YOU WHAT HAS BEEN MARKED AS

5    EXHIBIT 51 AND STAMPED AS FA 20 THROUGH FA 42.

6              THAT'S A STIPULATED EXHIBIT, YOUR HONOR.

7              YOU HAVE IN FRONT OF YOU THE TRAINING

8    MANUAL FOR CREDIGY; IS THAT RIGHT?

9    A    THIS IS THE TRAINING MANUAL THAT BRIAN SILER,

10   WHO IS RESPONSIBLE FOR TRAINING USED FOR SOME CPA

11   TRAINING, CORRECT.

12   Q    YOU HAVE BEFORE YOU THE TRAINING MANUAL FOR

13   CREDIGY; IS THAT RIGHT?

14   A    WELL, ACTUALLY THERE'S MORE TRAINING MATERIAL,

15   I BELIEVE, THAN JUST THIS.

16   Q    IS THAT THE TRAINING MANUAL FOR COLLECTORS?

17   IS THAT RIGHT?  WHAT YOU HAVE BEFORE YOU, IS THAT

18   THE TRAINING MANUAL FOR COLLECTORS, YES OR NO?

19   A    IT'S MORE TRAINING MATERIAL.

20   Q    OKAY.  DO YOU REMEMBER BEING ASKED THE

21   QUESTION ON PAGE 43?

22   A    YES, I REMEMBER BEING ASKED ABOUT THIS WHEN

23   YOU TOOK MY -- MR. WILCOX TOOK MY DEPOSITION.

24   Q    OKAY.  AT THAT TIME WHEN THE QUESTION WAS

25   ASKED YOU HAVE IN FRONT YOU THE TRAINING MANUAL

                                                    397

1    THERE FOR CREDIGY; IS THAT RIGHT?  YOUR ANSWER WAS

2    YES?

3    A    AT THAT TIME THAT'S WHAT I SAID, YES.

4    Q    OKAY.  AND YOUR LAWYER SAID, YEAH, THAT'S THE

5    MANUAL THAT WAS PRODUCED BY CREDIGY IN INITIAL

6    DISCLOSURES AND IN RESPONSE FOR REQUESTS TO

7    PRODUCE.

8              ISN'T THAT WHAT YOUR LAWYER SAID?

9    A    YES.

10   Q    OKAY.  AND WHERE DID THOSE -- WHERE DID YOU

11   GET THOSE RECORDS, THE TRAINING MANUAL YOU HAVE

12   BEFORE YOU IS EXHIBIT 151?

13   A    THIS TRAINING MATERIAL WAS PROVIDED I THINK BY

14   BRIAN SILER AT CREDIGY SERVICES CORP RIGHT BEFORE

15   THE DEPOSITION YOU'RE REFERENCING IN APRIL LAST

16   YEAR.

17   Q    OKAY.  THAT WAS PROVIDED BY YOUR TRAINING

18   DEPARTMENT TO YOU; RIGHT?

19   A    RIGHT.

20   Q    SO YOU COULD GIVE TESTIMONY AS A

21   REPRESENTATIVE OF CREDIGY ON THE TOPIC OF -- EXCUSE

22   ME -- ON THE TOPIC OF COLLECTION TRAINING, AMONG

23   OTHER TOPICS; IS THAT TRUE?

24   A    YES.

25   Q    ALL RIGHT.  AND IS THAT -- DIDN'T YOU SAY AT

398

1    THAT TIME THAT THAT WAS THE TRAINING MATERIALS THAT

2    WAS PROVIDED TO DEBT COLLECTORS IN BRAZIL?

3    A    I SAID THAT, YEAH, THIS WAS IN PART OF THE

4    TRAINING MATERIAL THAT WAS PROVIDED TO COLLECTORS

5    IN BRAZIL, YES.

6    Q    AND DIDN'T YOU SAY THAT THAT WAS THE TRAINING

7    MATERIALS THAT WERE PRODUCED NOT --

8    A    I BELIEVE I DID SAY THAT.

9    Q    YOU DIDN'T SAY ANYTHING ABOUT ANY OTHER

10   COLLECTION MANUALS, DID YOU?

11   A    I THINK THE ONLY OTHER TRAINING MATERIAL I

12   MENTIONED IN MY DEPOSITION WAS THE DISPUTE

13   RESOLUTION PROCESS.

14   Q    WHICH HAS NOTHING TO DO WITH TRAINING THE

15   COLLECTORS ON HOW TO COLLECT?

16   A    CORRECT.

17   Q    ALL RIGHT.  AND DID YOU TELL -- DID YOU SAY

18   UNDER OATH, DID YOU GIVE TESTIMONY HOW YOU KNEW

19   THAT THAT WAS THE TRAINING MANUAL THAT WAS USED IN

20   BRAZIL?

21   A    I THINK I DID SPEAK ABOUT MY KNOWLEDGE OF THE

22   TRAINING MANUAL, YEAH.

23   Q    AND YOU SAID THAT YOU HAD BEEN TO BRAZIL AND

24   SEEN THE TRAINING SESSIONS GOING ON THERE AND THAT

25   THE DOCUMENT WAS PRODUCED BY YOUR TRAINING

1    DEPARTMENT AS THE TRAINING MATERIAL.  WEREN'T THOSE

2    YOUR WORDS?

3    A    YES.

4    Q    OKAY.  AND AT THAT TIME, YOU DIDN'T MAKE ANY

5    MENTION OF -- YOU WERE TALKING ABOUT A 20-PAGE

6    STACK; RIGHT?

7    A    YEAH, I WAS TALKING ABOUT THIS RIGHT HERE

8    (INDICATING).

9    Q    THERE WASN'T ANY MENTION OF WHAT HAS NOW BEEN

10   MARKED AS EXHIBIT 152, WHICH IS A LITTLE BIT LARGER

11   STACK; RIGHT?

12   A    I DIDN'T MENTION THAT IN MY DEPOSITION, NO.  I

13   WASN'T AWARE OF THAT AT THE TIME.

14   Q    OKAY.  AND THE DIRECTOR OF TRAINING,

15   MR. SILER, WHO GAVE YOU THAT -- THE STACK, THE

16   MANUAL THAT YOU TESTIFIED ABOUT, HE DIDN'T TELL YOU

17   ABOUT THIS?

18   A    NO.  THE ONLY THING I WAS PROVIDED AS PART OF

19   THE TRAINING MATERIAL THAT WAS THEN USED WAS RIGHT

20   HERE (INDICATING).

21   Q    AND WHAT YOU HAVE THERE IN FRONT OF YOU WAS

22   PROVIDED TO YOU BY THE TRAINING DEPARTMENT BEFORE

23   YOU GAVE YOUR TESTIMONY UNDER OATH?

24   A    CORRECT.

25             THE COURT:  I'M CONFUSED NOW WITH THE

                                                      400

1    EXHIBIT THAT WE'RE DEALING WITH.  IS THAT THE

2    SEPARATE EXHIBITS?

3              MR. HUMPHREYS:  YES, YOUR HONOR.  151 IS

4    THE TWO-PAGE MANUAL THAT IS USED IN THE DEPOSITION.

5    AND EXHIBIT NUMBER 152 HAS A DOCUMENT RANGE OF FA

6    1843 THROUGH FA 1887.

7              THE COURT:  SO YOU USED THE SAME NUMBER.

8    SO EXHIBIT 151 IS FA 20 THROUGH 42?

9              MR. HUMPHREYS:  YES, YOUR HONOR.

10             THE COURT:  WHAT IS THAT NUMBER?

11             MR. HUMPHREYS:  THIS IS 152, YOUR HONOR.

12             THE COURT:  152.  ALL RIGHT.

13             MR. HUMPHREYS:  I APOLOGIZE.

14             THE COURT:  SO WHEN YOU SAY YOU MADE

15   REFERENCE, I JUST WANT OUR RECORD TO BE CLEAR THE

16   THICKER MATERIALS THAT WERE NOT PROVIDED TO THE

17   DEPOSITION YOU WERE REFERRING TO 152?

18             MR. HUMPHREYS:  YES, YOUR HONOR.

19             THE COURT:  AND IS 152 IN EVIDENCE?

20             MR. HUMPHREYS:  NO, YOUR HONOR.

21             THE COURT:  VERY WELL.

22   BY MR. HUMPHREYS:

23   Q    WHEN WAS EXHIBIT 15, THE BIG STACK HERE, WHEN

24   WAS THAT PRODUCED?

25   A    TO MY KNOWLEDGE WHEN PAULA PERES OR ANOTHER

                                                      401

1    ONE OF THE PERSONNEL FROM CREDIGY SOLUCOES GAVE

2    THEIR DEPOSITION THAT ADDITIONAL TRAINING MATERIAL

3    WAS PRODUCED.

4    Q    OKAY.  THIS IS IN AUGUST -- ACTUALLY ON AUGUST

5    12TH IN THE EVENING; RIGHT?

6    A    I'M NOT SURE OF THE EXACT DATE, BUT I'LL TAKE

7    YOUR WORD FOR IT.

8    Q    OKAY.  WELL, DO YOU SEE THE E-MAIL THERE

9    BEFORE YOU WITH PRODUCING THAT MATERIAL?

10   A    I DON'T HAVE AN E-MAIL IN FRONT OF ME, SIR.

11   YEAH, I SEE THE E-MAIL?

12   Q    AND THIS IS 6-30, THE NIGHT BEFORE MR. PERES'S

13   DEPOSITION IN ATLANTA, THESE -- THIS STACK HERE

14   GETS E-MAILED AND THE CLAIM IS THAT, OH, WE'RE

15   ACTUALLY USING THESE DOWN IN BRAZIL NOW, THAT'S THE

16   FIRST TIME THAT THAT CLAIM IS MADE; RIGHT?

17   A    AGAIN, I THINK THAT THE FIRST TIME THAT THE

18   ADDITIONAL TRAINING MATERIAL CAME UP WAS HERE WHERE

19   YOU SAID IT WAS ON AUGUST 12TH.

20   Q    THE FIRST TIME THAT THE CLAIM WAS MADE THAT

21   THESE WERE ADDITIONAL COLLECTION MATERIALS THAT

22   WERE ACTUALLY USED IN BRAZIL WAS THE DAY BEFORE

23   MR. PERES'S DEPOSITION; RIGHT?

24   A    I THINK THAT'S WHAT YOU SAID ON THE 12TH OF

25   AUGUST.

402

1              THE COURT:  WHAT YEAR?

2              THE WITNESS:  OF 2008.

3              MR. HUMPHREYS:  I APOLOGIZE.  THANK YOU,

4    YOUR HONOR.

5    Q    WOULD YOU AGREE WITH ME, SIR, THAT THE 22

6    PAGES OF TRAINING MATERIAL THAT YOU HAVE, THAT YOU

7    SAID THAT YOU TESTIFIED WAS THE TRAINING MATERIAL

8    THAT THE COMPANY USED --

9              MR. GILLESPIE:  OBJECTION, ASKED AND

10   ANSWERED, YOUR HONOR.

11             THE COURT:  WELL, WE HAVEN'T HEARD THE

12   QUESTION.

13   BY MR. HUMPHREYS:

14   Q    -- IS A POWER POINT PRESENTATION?

15   A    YEAH, IT APPEARS TO ME TO BE A POWER POINT

16   PRESENTATION, YES.

17   Q    AND IT HAS PHOTOS AND VERY LITTLE DETAIL IN

18   THERE ON EACH PAGE?

19             MR. GILLESPIE:  OBJECTION TO THE

20   CHARACTERIZATION OF THE DOCUMENT, YOUR HONOR.

21             THE COURT:  OVERRULED.

22             THE WITNESS:  I THINK, YOU KNOW, IT

23   COVERS THE FAIR DEBT COLLECTION PRACTICES ACT AND

24   IT WAS INTENDED TO BE USED KIND OF IN A CLASSROOM

25   SCENARIO, AND THAT'S WHAT I OBSERVED IN BRAZIL IN

                                                    403

1    THE PAST.

2    BY MR. HUMPHREYS:

3    Q    AND IS IT SUFFICIENT TO MAKE SURE THAT YOUR

4    COLLECTORS IN BRAZIL UNDERSTAND THE OBLIGATIONS

5    UNDER THE FEDERAL LAW, THE EXHIBIT THAT YOU HAVE

6    BEFORE YOU EXHIBIT 151?

7              MR. GILLESPIE:  CALLS FOR A LEGAL

8    CONCLUSION, YOUR HONOR.

9              THE COURT:  SUSTAINED.

10   BY MR. HUMPHREYS:

11   Q    DOES THE EXHIBIT THAT YOU HAVE BEFORE YOU

12   THERE, DOES IT HAVE ANY REFERENCE TO THE

13   PROHIBITION ON USING LANGUAGE THAT ABUSES THE

14   HEARER OR READER?  DOES IT SPECIFICALLY HAVE ANY

15   MENTION OF THAT?

16   A    I'LL HAVE TO LOOK REAL QUICK THROUGH IT IF YOU

17   WANT ME TO.  DO YOU WANT ME TO DO THAT?

18   Q    YEAH, IF YOU DON'T MIND, PLEASE.

19             THE COURT:  WELL, GIVEN 20 PAGES, I WON'T

20   BURDEN THE JURY BY HAVING THEM SIT HERE WHILE HE

21   GOES THROUGH IT.  IT'S IN EVIDENCE, AND YOU CAN

22   ARGUE ABOUT WHAT IT CONTAINS OR DOESN'T CONTAIN

23   LATER ON.

24             LET'S MOVE ON.

25   BY MR. HUMPHREYS:

404

1       Q    DID CREDIGY CONDUCT TESTS ON ITS COLLECTORS IN

2       BRAZIL ON THE FAIR DEBT AND COLLECTION PRACTICES

3       ACT THAT IT PROVIDED?

4       A    TO MY KNOWLEDGE, YES.

5       Q    THAT'S PRETTY STANDARD TO TEST THE COLLECTORS;

6       RIGHT?

7       A    YES.

8       Q    AND CREDIGY DIDN'T DO ANY TESTING UNTIL AFTER

9       THIS LAWSUIT WAS FILED IN 2008; ISN'T THAT RIGHT?

10      A    I DON'T THINK THAT'S CORRECT.  I THINK THERE

11      HAS ALWAYS BEEN TESTING DONE AT CREDIGY SOLUCOES IN

12      BRAZIL AND AT CREDIGY SERVICES IN ATLANTA.

13      Q    OKAY.  LET ME HAND YOU THE EXHIBIT BINDER

14      HERE.  ARE YOU AWARE OF THE TESTIMONY OF MR. NUNES

15      THE -- ONE OF THE COLLECTORS WHO GOES BY THE ALIAS

16      OF RYAN MILLER, THAT HE WAS TESTED ONE TIME?

17      A    I'M NOT FAMILIAR WITH IT SPECIFICALLY, BUT

18      I'LL TAKE YOUR WORD FOR IT.

19      Q    OKAY.  WELL, IF YOU'LL TAKE A LOOK AT EXHIBIT

20      65, WHICH IS STIPULATED.  DO YOU SEE A REFERENCE TO

21      A DATE OF JANUARY 24TH, 2008 ON THE TOP LINE?

22      A    ARE YOU TALKING ABOUT PAGE 2021; CORRECT?

23      Q    YES.

24      A    OKAY.

25      Q    AND YOU GO TO BRAZIL OFTEN ENOUGH AND YOU'RE

405

1    FAMILIAR WITH THAT, THAT THAT DATE RIGHT THERE IS

2    WHAT WE WOULD CALL JANUARY 24TH, 2008; TRUE?

3    A    YES.

4    Q    AND IF YOU LOOK DOWN THERE A LITTLE FURTHER,

5    YOU'LL SEE A TEST SCORE FOR MR. NUNES?

6    A    YES.

7    Q    AND HIS TEST SCORE IS 27.  ACCORDING TO THIS

8    HE MISSED 3 OUT OF THE POSSIBLE SCORE OF 30?

9    A    YES.

10   Q    AND ARE YOU -- AND THIS AGAIN WAS IN JANUARY

11   OF '08.  ARE YOU AWARE OF ANY TEST RESULTS THAT

12   EXIST FOR MR. NUNES OR ANY OF THE COLLECTORS IN

13   BRAZIL BEFORE THIS 2008 DATE?

14   A    YOU KNOW, I'M NOT FAMILIAR WITH ANY OF, YOU

15   KNOW, THE TEST RESULTS, NO.

16   Q    OKAY.  WELL, YOU DID -- YOU HAVE SAID

17   PREVIOUSLY THAT YOU KNOW THAT TEST RESULTS ARE

18   STORED AT CREDIGY; RIGHT?

19   A    AGAIN, I THINK THAT THIS EXHIBIT THAT YOU JUST

20   REFERENCED THERE'S A TEST RESULT THAT IS STORED.

21   Q    RIGHT.  AND YOU'RE FAMILIAR THAT CREDIGY DOES

22   STORE ITS TEST RESULTS; RIGHT?

23   A    I THINK THAT'S WHAT I SAID IN MY DEPOSITION.

24   Q    OKAY.  AND ARE YOU AWARE OF WHETHER LETICIA

25   POSTON AND KIMBERLY ERVIN HAVE GIVEN SWORN

                                                    406

1    STATEMENTS IN THIS CASE SAYING THAT THEY NEVER

2    RECEIVED ANY TRAINING UNTIL 2008?

3         MR. GILLESPIE:  OBJECTION, YOUR HONOR.

4    HE'S NOT LAID A FOUNDATION THAT IT'S RELATED TO THE

5    QUESTIONS THAT HE'S ASKING THIS WITNESS ABOUT

6    TRAINING COLLECTORS.

7         THE COURT:  WELL, THAT IS TRUE.  I

8    HAVEN'T HEARD A FOUNDATION LAID THAT HE'S FAMILIAR.

9         THIS IS KIND OF FOUNDATIONAL, BUT YOU'RE

10   INCLUDING THE SUBSTANCE OF WHAT YOU ARE WISHING TO

11   KNOW IN YOUR FOUNDATIONAL QUESTION.

12        SO I'LL SUSTAIN THE OBJECTION.  YOU CAN

13   ASK WHETHER HE'S FAMILIAR WITH THE DEPOSITION AND

14   READ THEM AND SUFFICIENT TO TESTIFY ABOUT THE

15   CONDUCT.

16   BY MR. HUMPHREYS:

17   Q    DO YOU UNDERSTAND THERE'S A DISPUTE RESOLUTION

18   TEAM THAT WORKS IN ATLANTA THAT RESPONDS TO THESE

19   LETTERS THAT WE HAVE BEEN WORKING ON THESE LAST FEW

20   DAYS?

21   A    YES.

22   Q    AND THAT KIMBERLY ERVIN AND LETICIA POSTON

23   WERE INVOLVED IN PROCESSING THE DISPUTE RAISED BY

24   THE FAUSTOS?

25   A    YES.

                                                    407

1    Q    AND ARE YOU AWARE THAT THEY HAD GIVEN PRETRIAL

2    TESTIMONY IN ATLANTA?

3    A    I UNDERSTAND THAT THEIR -- THEY GAVE

4    DEPOSITION TESTIMONY, YES.

5    Q    OKAY.  ARE YOU AWARE OF WHETHER OR NOT THEY

6    TESTIFIED THAT THEY WERE NOT GIVEN ANY TESTS

7    REGARDING THE FAIR DEBT COLLECTION PRACTICES ACT

8    UNTIL JANUARY 2008?

9    A    I HAVEN'T LOOKED AT THEIR DEPOSITIONS OR --

10   Q    SO AS A REPRESENTATIVE FOR CREDIGY ON THE

11   SUBJECT OF TRAINING AND COLLECTION, YOU JUST DON'T

12   KNOW, YOU KNOW, WHO IS BEING GIVEN TESTS?

13          WELL, LET ME JUST SAY THIS, CAN YOU

14   HONESTLY TELL THIS JURY THAT THIS -- THESE

15   COLLECTORS AND THE DRT PEOPLE WERE GIVEN TESTS,

16   WRITTEN TESTS IN 2008?

17   A    WELL, AGAIN, I THINK I WAS -- MY DEPOSITION I

18   WAS TALKING ABOUT THE COLLECTORS.  ON THE DISPUTE

19   RESOLUTION TEAM, I THINK THERE IS ABSOLUTE

20   TRAINING, AND WE WENT OVER THE DISPUTE RESOLUTION

21   PROCESS IN MY DEPOSITION.  AND, YOU KNOW, AS TO

22   WHETHER OR NOT THERE WERE TESTS GIVEN TO THE

23   DISPUTE RESOLUTION TEAM, I'M NOT SURE ABOUT THAT.

24   I DON'T KNOW THAT.

25   Q    SO IF THERE WAS TESTING OF COLLECTORS, YOU

408

1    WOULD EXPECT THERE -- OR YOU WOULD BELIEVE THERE TO

2    BE A RECORD OF THAT AT CREDIGY?

3              MR. GILLESPIE:  OBJECTION.  ASKED AND

4    ANSWERED, YOUR HONOR.

5              THE COURT:  OVERRULED.

6              THE WITNESS:  WELL, I THINK THAT -- I

7    DON'T KNOW WHEN THE RECORDS, HISTORICAL RECORDS OF

8    TESTING WERE STARTING TO BE MAINTAINED.

9              AGAIN, MY KNOWLEDGE IS THAT THERE HAS

10   ALWAYS BEEN TESTING.  I DON'T KNOW EXACTLY WHEN

11   RECORDS OF THE TESTING WAS STARTED TO BE KEPT

12   HISTORICALLY.

13   BY MR. HUMPHREYS:

14   Q    IN YOUR PREVIOUS DEPOSITION TESTIMONY AT PAGE

15   53, LINE 16 WERE YOU ASKED, "SO IF A COLLECTOR

16   WORKING FOR CREDIGY IS TAKING A NUMBER OF THESE

17   TESTS, THERE SHOULD BE A RECORD OF THAT?"

18              DO YOU REMEMBER THAT QUESTION?

19   A    YEAH.

20   Q    AND DO YOU REMEMBER ONCE IT WAS CLARIFIED THAT

21   THE QUESTION WAS DIRECTED TO CREDIGY SERVICES

22   CORPORATION, YOUR ANSWER WAS, "YES, THERE SHOULD BE

23   A RECORD OF THE TESTS OF SOME SORT."  THAT WAS YOUR

24   ANSWER?

25   A    I THINK THAT'S RIGHT, YES.

                                                    409

1    Q    OKAY.  CREDIGY, ALONG WITH LIVEVOX, YOUR AUTO

2    DEALER SERVICE, MADE AT LEAST 90 PHONE CALLS TO THE

3    FAUSTO'S HOME; ISN'T THAT TRUE?

4    A    I WENT THROUGH AND COUNTED THE PHONE CALLS AND

5    I COUNTED ABOUT 90 OVER 16 MONTHS, SOMETHING LIKE

6    THAT.

7    Q    OKAY.  AND WHEN DID THE FIRST PHONE CALL

8    START?

9    A    AGAIN, I THINK IT WAS IN AUGUST OF 2006 WAS

10   THE FIRST PHONE CALL.

11   Q    AND THE PHONE CALLS ENDED ON JANUARY 10TH, TWO

12   DAYS AFTER THE COUNTERCLAIM FLAG WAS RAISED

13   INDICATING THAT CREDIGY KNEW IT HAD BEEN SUED;

14   RIGHT?

15   A    I THINK THAT THAT WAS THE LAST CALL, ATTEMPT.

16   YOU KNOW, THERE WERE ABOUT 88, 90 CALL ATTEMPTS.

17   Q    OKAY.  YOU HAVE BEFORE YOU EXHIBIT 2.  MAYBE

18   YOU DON'T.

19         I THINK IT'S IN THE BINDER.

20   A    EXHIBIT 2 YOU SAID?

21   Q    YES.  AND I THINK YOU BROUGHT UP THE EXHIBIT.

22   A    I'VE GOT IT RIGHT HERE.

23   Q    YOU ALSO HAVE YOUR EXHIBIT 157 OR 152 ALSO IN

24   FRONT OF YOU?

25   A    YES.

                                                        410

1    Q    AND I SAW YOU BRING THAT UP.

2    A    RIGHT.

3    Q    AND WHY DON'T YOU TAKE A LOOK AT BOTH OF THOSE

4    AND TELL ME HOW MANY CALLS -- DO YOU KNOW HOW MANY

5    CALLS ARE RECORDED IN YOUR COLLECTION LOG?

6    A    I WOULD HAVE TO GO THROUGH AND COUNT, BUT

7    AGAIN, AS I TOLD YOU YESTERDAY, YOU KNOW, I'M AWARE

8    THAT THERE ARE A NUMBER OF CALL ATTEMPTS THAT ARE

9    NOT IN THE CALL LOG, NOT REFLECTED IN THE CALL LOG.

10   Q    LET ME HAND YOU WHAT HAS BEEN MARKED AS

11   EXHIBIT 127, A STIPULATED EXHIBIT.  IS THAT A

12   RECORD OF PHONE CALLS THAT WERE MADE BY THE AUTO

13   DEALER SERVICE LIVEVOX?

14   A    I ASSUME IT IS.  I HAVEN'T SEEN THIS

15   PARTICULAR EXHIBIT BEFORE, BUT IT LOOKS LIKE A

16   SUMMARY OF PHONE CALLS.  IT'S MARKED AS 127.

17   Q    OKAY.  WELL, IT SAYS ON THE TOP "CALLS TO

18   MANUEL FAUSTO"; RIGHT?

19   A    RIGHT.  IT DOESN'T SPECIFICALLY REFERENCE

20   LIVEVOX, BUT I ASSUME THAT'S WHAT IT IS.

21   Q    OKAY.  WELL, DO YOU RECOGNIZE THE NAME MR. --

22   IF YOU LOOK ON THE RIGHT-HAND COLUMN WE NUMBERED

23   THEM, WE SHOW THEM TO BE 41.  DO YOU AGREE WITH

24   YOUR NUMBER THAT THERE ARE 41 OF THESE CALLS THAT

25   WERE MADE?

411

1    A    IT LOOKS LIKE THERE ARE 41 ATTEMPTS HERE, YES.

2    Q    OKAY.  AND HOW MANY OF THOSE 41 CALLS ARE

3    REPORTED IN EITHER EXHIBIT 2, THE CREDIGY

4    COLLECTION LOG, OR IN EXHIBIT I BELIEVE IT'S 152,

5    THE OTHER VERSION OF THE COLLECTION LOG?

6              HOW MANY OF THESE CREDIGY CALLS ARE IN

7    YOUR LOG?

8              MR. GILLESPIE:  OBJECTION, FOUNDATION.

9              MR. HUMPHREYS:  EXCUSE ME.  STRIKE THAT.

10   Q    HOW MANY OF THE LIVEVOX CALLS ARE REFLECTED IN

11   CREDIGY'S CREDIT LOG?

12             MR. GILLESPIE:  OBJECTION.  FOUNDATION.

13             THE COURT:  SUSTAINED.

14   BY MR. HUMPHREYS:

15   Q    WELL, CAN YOU COMPARE THE TWO, SIR, AND TELL

16   US IF ANY OF THESE PHONE CALLS ARE --

17             THE COURT:  ACTUALLY, COUNSEL, IF YOU

18   MADE THAT COMPARISON, YOU CAN REPRESENT THAT TO THE

19   RECORD AND IF SOMEONE ELSE WANTS TO CHALLENGE THAT,

20   THEY CAN.  WE DON'T NEED TO BURDEN THE JURY WITH

21   SOMETHING THAT SOMEONE HAS DONE BECAUSE IT'S SIMPLY

22   A MATTER OF COMPARING ONE DOCUMENT WITH ANOTHER.

23             MR. HUMPHREYS:  YES, YOUR HONOR.

24   Q    SIR, I'LL REPRESENT TO YOU THAT I HAVE LOOKED,

25   AND I DON'T SEE A SINGLE ONE OF THESE LIVEVOX CALLS

                                              412

1    THAT EXIST IN CREDIGY'S COLLECTION.

2              DO YOU KNOW IF THAT'S TRUE OR NOT?

3    A    I -- AGAIN, I HAVE LOOKED AT THIS.  THERE ARE

4    SOME LIVEVOX CALLS THAT ARE REFLECTED IN THE CALL

5    LOGS, AND I ASSUME THAT THESE 41 ATTEMPTS THAT YOU

6    HAVE HERE ARE THE ONES THAT WERE NOT IMPORTED TO

7    THE CALL LOGS ON THE SIMPLECT.

8    Q    AND WE DIDN'T GET ANY INFORMATION ABOUT THE

9    FULL NUMBER OF LIVEVOX CALLS UNTIL WE ISSUED A

10   SUBPOENA ON LIVEVOX; RIGHT?

11             MR. GILLESPIE:  OBJECTION, FOUNDATION?

12             THE COURT:  SUSTAINED.

13   BY MR. HUMPHREYS:

14   Q    DO YOU KNOW, DO YOU KNOW IF THIS INFORMATION

15   WAS EVER PRODUCED BY CREDIGY, THE LIVEVOX CALLS?

16   A    I -- AGAIN, I ASSUME THAT WE GAVE YOU THE

17   RECORDS THAT WE HAD FROM SIMPLECT WHICH WOULD

18   REFLECT SOME LIVEVOX CALLS, BUT MY UNDERSTANDING IS

19   THAT THESE CALLS HERE WERE NOT IMPORTED INTO THE

20   LOG.

21   Q    SO IF SOMEONE WERE TO LOOK AT THE LOG THAT

22   CREDIGY PRODUCED OF THE COLLECTION CALLS, WE WOULD

23   MISS A MAJORITY OF THESE LIVEVOX CALLS IF NOT ALL

24   OF THEM; ISN'T THAT RIGHT?  IF YOU DIDN'T GO

25   DIRECTLY TO LIVEVOX.

413

1    A    AGAIN, I THINK THE ONES ON THIS SHEET, THESE

2    CALL ATTEMPTS WERE NOT IMPORTED INTO THE CALL LOG.

3    Q    OKAY.  SO IT'S YOUR BELIEF THAT CREDIGY HAS

4    MERGED ALL OF THE RECORDS FROM WELLS FARGO -- OR

5    EXCUSE ME -- FROM FIRST SELECT AND EVEN FROM WELLS

6    FARGO INTO ITS SYSTEM; RIGHT?

7    A    YES, WE MERGED THE DATA FROM WELLS FARGO AND

8    FROM FIRST SELECT INTO OUR SYSTEM, THAT'S CORRECT.

9    Q    BUT YOU DIDN'T MERGE YOUR OWN COLLECTION CALLS

10   THAT WERE MADE BY YOUR AUTO DEALER SERVICE LIVEVOX?

11   THAT'S NOT MERGED INTO YOUR SYSTEM?

12   A    AGAIN, I THINK I HAVE ANSWERED THIS, BUT THESE

13   CALL -- 41 CALL ATTEMPTS HERE TO MY KNOWLEDGE WERE

14   NOT IMPORTED INTO THE RECORD.

15   Q    OKAY.  AND JUST TO CONFIRM THIS, LIVEVOX IS

16   A -- IT'S AN INDEPENDENT COMPANY THAT CREDIGY HIRED

17   TO USE ITS AUTOMATED SYSTEMS TO MAKE PHONE CALLS

18   FOR CREDIGY TO THE FAUSTOS AND TO OTHER CONSUMERS;

19   RIGHT?  THAT'S WHAT LIVEVOX DOES?

20   A    YES.

21   Q    AND TO YOUR KNOWLEDGE THERE'S NO LIMIT ON THE

22   NUMBER OF PHONE CALLS THAT LIVEVOX CAN MAKE FOR

23   CREDIGY; ISN'T THAT TRUE?

24   A    WELL, I DON'T THINK THAT THAT'S TRUE, NO.

25   Q    IS THERE ANY LIMIT IN THE AGREEMENT BETWEEN

                                                    414

1    LIVEVOX AND IN THAT AGREEMENT THAT CALLS CAN BE

2    MADE?

3    A    I THINK THE MOST THAT MAYBE WERE MADE IN ONE

4    DAY, THERE WERE THREE ATTEMPT CALLS MADE IN ONE

5    DAY.

6              THE COURT:  NO.  HE'S ASKING WHETHER

7    THERE WAS IN THE CONTRACT?

8              THE WITNESS:  IN THE CONTRACT ITSELF WITH

9    LIVEVOX, I DON'T KNOW.  I DON'T BELIEVE THAT THERE

10   IS A STATED LIMIT, NO.

11   BY MR. HUMPHREYS:

12   Q    OKAY.  AND YOU HAVE SEEN THIS SERVICE

13   AGREEMENT BETWEEN LIVEVOX AND CREDIGY?

14   A    I HAVE NOT REVIEWED THAT AGREEMENT.

15   Q    OKAY.  BUT YOU'RE AWARE THAT IT DOESN'T HAVE

16   ANY LIMIT ON THE MAXIMUM NUMBER OF PHONE CALLS THAT

17   COULD BE MADE?

18   A    I WAS KIND OF TAKING YOUR WORD ON IT.

19   Q    OKAY.  LET ME ASK YOU WHAT WAS BEEN MARKED AS

20   EXHIBIT 125.  TAKE A LOOK AT THE BACK OF THAT.

21              IS THERE A MINIMUM NUMBER OF PHONE CALLS

22   THAT HAS TO BE MADE UNDER THAT AGREEMENT?

23   A    WHEN YOU MEAN THE BACK SIDE, ARE YOU TALKING

24   ABOUT THE BACK OF EXHIBIT 125?

25   Q    THERE'S AN ATTACHMENT A TO IT, TO THE SERVICE

415

1    AGREEMENT.

2    A    ARE YOU TALKING ABOUT 1008?

3    Q    YES.

4    A    THERE'S A MINIMUM VOLUME STATED THAT PER MONTH

5    OF 50,000 MINUTES PER MONTH.

6    Q    OKAY.  SO THE ONLY LIMIT IS A MINIMUM OF

7    50,000 MINUTES OF PHONE CALLS PER MONTH THAT HAS TO

8    BE MADE ON THESE ACCOUNTS BY LIVEVOX BY THEIR AUTO

9    DEALERS?

10   A    WELL, AS A PRACTICAL MATTER OPERATIONALLY MY

11   UNDERSTANDING IS THAT THERE'S A LIMIT ABOUT THE

12   MAXIMUM THAT COULD HAPPEN ANY DAY IS THREE.

13   Q    OKAY.

14   A    BECAUSE THE CALL HAS TO BE CYCLED AND THE

15   MAXIMUM THAT COULD HAPPEN IS ABOUT THREE IN ANY

16   DAY.

17   Q    WOULD YOU AGREE WITH ME THAT THIS CONTRACT

18   THAT YOU HAVE BEFORE YOU HAS NO SUCH LIMIT, THAT

19   LIVEVOX HAS NO SUCH LIMITATION IN IT?

20   A    AGAIN, I DON'T BELIEVE IT DOES.  I CAN REVIEW

21   THE CONTRACT IF YOU WANT ME TO.

22   Q    CAN YOU POINT US TO A PROVISION THAT LIMITS?

23   A    YEAH, I CAN'T POINT YOU.

24   Q    OKAY.  LET'S TAKE A LOOK.  THIS AGREEMENT WAS

25   REACHED ON JULY 24TH, 2006 BETWEEN LIVEVOX AND

                                                         416

1    CREDIGY SOLUTIONS; RIGHT?

2    A    YES.

3    Q    AND CREDIGY SOLUTIONS, ARE THEY A DEBT

4    COLLECTOR?

5    A    NO.

6    Q    OKAY.  WHY DON'T YOU TAKE A LOOK AT PARAGRAPH

7    6, THE VERY LAST SENTENCE AND BEFORE YOU -- WELL,

8    LET'S NOT -- OKAY.  IF YOU DON'T MIND WHILE WE'RE

9    WAITING FOR THAT TO BOOT UP -- HERE WE GO.

10         IF YOU LOOK AT THE VERY LAST SENTENCE

11   WHERE IT STARTS WITH THE CAPITAL LIVEVOX IN CAPS.

12   IT'S ABOUT FOUR LINES FROM THE BOTTOM.  "LIVEVOX

13   EXPRESSLY ACKNOWLEDGES THAT CLIENT PERFORMS

14   COLLECTION ACTIVITIES."

15         THAT'S WHAT YOUR AGREEMENT WITH LIVEVOX

16   SAYS; RIGHT?

17   A    YES, THAT'S WHAT IT SAYS.

18   Q    AND LET'S GO TO THE SIGNATURE BOX HERE, AND

19   AGAIN, SEE WHO THE PARTIES TO THIS COLLECTION

20   ACTIVITY AGREEMENT IS.

21         CAN YOU ADMIT, SIR, THAT CREDIGY

22   SOLUTIONS IS THE CLIENT WHO PERFORMS COLLECTION

23   ACTIVITIES UNDER THIS AGREEMENT?

24   A    NO.  AGAIN, CREDIGY SOLUTIONS DOESN'T PERFORM

25   ANY COLLECTION ACTIVITIES.  I THINK THE PROVISION

1    AT THE END OF PARAGRAPH 6 IS KIND OF A PROVISION IN

2    FAVOR OF THE COUNTER PARTY TO THE AGREEMENT TO

3    GOVERN THE CONDUCT OF LIVEVOX AS IT CARRIES OUT

4    SERVICES UNDER THE AGREEMENT.

5    Q    OKAY.  SO THIS SAYS THAT "I'M LEGALLY

6    AUTHORIZED TO SIGN AND ENTER INTO THIS CONTRACTUAL

7    AGREEMENT.  I HAVE READ AND AGREE WITH THE TERMS

8    AND CONDITIONS AS STATED IN THE ABOVE AGREEMENT."

9         THAT'S WHAT IT SAYS; RIGHT?

10   A    THAT'S WHAT IT SAYS, YES.

11   Q    AND WHO IS THE CLIENT THERE?

12   A    CREDIGY SOLUTIONS.

13   Q    AND WHOSE SIGNATURE IS THAT?

14   A    BRETT SAMSKY.

15   Q    AND IT SAYS THAT HE'S THE CHIEF EXECUTIVE

16   OFFICER OF CREDIGY SOLUTIONS; RIGHT?

17   A    CORRECT.

18   Q    AND YOU TOLD US BEFORE HE'S ONE OF THE TWO

19   FOUNDERS OF THE CREDIGY FAMILY?

20   A    YES.

21   Q    AND HE'S ALSO THE CEO OF CREDIGY RECEIVABLES?

22   A    YES.

23   Q    AND CREDIGY SERVICES?

24   A    YES.

25   Q    AND CREDIGY GLOBAL THAT YOU OWN 50 PERCENT OF

                                                    418

1    SHARES IN?

2    A    YES.

3    Q    AND CREDIGY LIMITED?

4    A    I BELIEVE SO, CORRECT.

5    Q    BUT YOU'RE GOING TO TELL THIS JURY THAT --

6              THE COURT:  NO, NO, THAT'S ARGUMENTATIVE.

7              MR. HUMPHREYS:  I APOLOGIZE, YOUR HONOR.

8    Q    LET'S MOVE ON TO STIPULATED EXHIBIT 126.

9    LIVEVOX WAS HIRED TO MAKE THESE AUTOMATED PHONE

10   CALLS WITH ITS COMPUTER SYSTEM AND TO -- IF IT

11   COULDN'T GET A PERSON LIVE, IT WOULD LEAVE A

12   MESSAGE; IS THAT RIGHT?

13   A    IN SOME CASES I BELIEVE THERE WAS AN AUTOMATED

14   MESSAGE, CORRECT.

15   Q    AND IF THEY WERE ABLE TO GET AHOLD OF

16   SOMEBODY, THEN THEY TRANSFERRED THE CALL TO BRAZIL

17   TO BE HANDLED BY A COLLECTOR THERE; RIGHT?

18   A    THAT'S MY UNDERSTANDING, YES.

19   Q    OKAY.  AND THIS TEXT OF A MESSAGE HERE, THIS

20   IS SOMETHING THAT CREDIGY AUTHORED?  THEY WROTE

21   THIS AND THEY SENT IT TO LIVEVOX FOR THEM TO PLAY

22   ON THE PHONE CALL, ON THE MESSAGE TO THE CONSUMER;

23   RIGHT?

24   A    I ASSUME THAT, YEAH, THIS WAS A MESSAGE SCRIPT

25   THAT CREDIGY SERVICES CORP DEVELOPED WITH LIVEVOX

419

1    TO PLAY ON AUTOMATED PHONE CALLS, YES.

2    Q    AND SO CREDIGY SERVICES HAS AUTHORIZED LIVEVOX

3    TO BE CALLING PEOPLE'S HOMES UP, INCLUDING THE

4    FAUSTOS, AND TELL THEM "THIS IS NOT A SALES CALL.

5    YOU HAVE AN URGENT MATTER WITH OUR COMPANY THAT

6    DESERVES YOUR IMMEDIATE ATTENTION."

7              RIGHT?  AND THAT'S BEING SAID REPEATEDLY?

8    A    YES, IT LOOKS LIKE IT IS SAID TWICE.

9    Q    AND THAT'S THE SCRIPT THAT CREDIGY SERVICES

10   CREATED AND SENT OVER TO LIVEVOX FOR LIVEVOX TO

11   LEAVE A MESSAGE?

12   A    I BELIEVE SO, YES.

13   Q    AND BY THIS CREDIGY IS TRYING TO FRIGHTEN

14   PEOPLE WITH AN URGENT BUSINESS CALL; RIGHT?

15              MR. GILLESPIE:  OBJECTION.

16              THE COURT:  SUSTAINED.

17   BY MR. HUMPHREYS:

18   Q    AND IS THERE A REASON WHY CREDIGY WAITED FOUR

19   YEARS TO CONTACT THE FAUSTOS AND THEN THEY'RE

20   CALLING THEM UP AND TELLING THEM THEY HAVE AN

21   IMPORTANT CALL AND IT'S AN URGENT MATTER?

22   A    AGAIN, AS I SAID YESTERDAY, THE FAUSTOS

23   ACCOUNT, THERE HAD BEEN A LAWSUIT FILED BY HUNT &

24   ENRIQUES AGAINST THE FAUSTOS BACK IN 2000 AND THAT

25   LAWSUIT WAS NEVER SERVED IN -- I THINK IN OCTOBER

                                                    420

1    OF 2000 THE LAWSUIT WAS ACTUALLY DISMISSED FOR NOT

2    GETTING SERVICE AND THAT THE ACCOUNT AND IN OUR

3    RECORDS WAS STILL AT HUNT & ENRIQUES UNTIL IT WAS

4    RECALLED.  AND AFTER THAT TIME WAS WHEN CREDIGY

5    SERVICES CORP AND THEN CREDIT CREDIGY SOLUCOES

6    FINANCEIRAS LIMETADA STARTED TO TRY TO COLLECT THE

7    ACCOUNT.

8    Q    SO THERE WAS A MISTAKE, BUT IT WAS THE LAW

9    FIRM'S FAULT, IS THAT WHAT YOU'RE TELLING US?

10              MR. GILLESPIE:  OBJECTION.

11   ARGUMENTATIVE.

12              THE COURT:  SUSTAINED.

13   BY MR. HUMPHREYS:

14   Q    SIR, THIS IS NOT TRUTHFUL, THIS MESSAGE HERE

15   ABOUT BEING AN URGENT MATTER AND IT REQUIRES -- IT

16   DESERVES IMMEDIATE ATTENTION; RIGHT?

17              MR. GILLESPIE:  OBJECTION.

18   ARGUMENTATIVE.

19              THE COURT:  OVERRULED.

20              THE WITNESS:  I THINK -- I MEAN, I THINK

21   IT IS A TRUTHFUL MESSAGE, YES.

22   BY MR. HUMPHREYS:

23   Q    WELL, THERE'S NOTHING URGENT ABOUT IT.

24   THERE'S NOTHING THAT YOU CAN DO TO THE FAUSTOS THAT

25   THEY IGNORE YOU, BECAUSE YOU CAN'T SUE THEM

                                        421

1    ANYMORE; RIGHT?

2    A    WELL, I MEAN, IN THE FAUSTOS' CASE I BELIEVE

3    AT THE POINT IN TIME THAT THIS MESSAGE WAS PLAYED

4    TO THE FAUSTOS THE STATUTE OF LIMITATIONS HAD RUN

5    ON THE ACCOUNT.

6    Q    OKAY.

7    A    YES.

8    Q    AND SO THERE WAS NOTHING URGENT ABOUT IT, WAS

9    THERE?

10   A    NO, I DISAGREE.  IT WAS AN UNPAID DEBT THAT

11   WAS OWED BY THE FAUSTOS.

12   Q    THAT DOESN'T MAKE IT URGENT.  THERE'S NO

13   REASON TO TELL THEM THAT IT'S URGENT?

14            MR. GILLESPIE:  OBJECTION.

15   ARGUMENTATIVE.

16            THE COURT:  SUSTAINED.

17   BY MR. HUMPHREYS:

18   Q    DID -- TO YOUR KNOWLEDGE AS A CORPORATE

19   REPRESENTATIVE OF CREDIGY, DID CREDIGY COLLECTORS

20   THREATEN TO TAKE THE FAUSTOS' HOME?

21   A    NO, I DON'T BELIEVE THERE WAS EVER A THREAT TO

22   TAKE THE FAUSTOS' HOME, NO.

23   Q    AND DID CREDIGY EVER THREATEN TO GARNISH

24   MR. FAUSTO'S WAGES?

25   A    NO, NOT TO MY KNOWLEDGE.

                                              422

1    Q    AND THOSE WOULD BE FALSE STATEMENTS IF THOSE

2    WERE MADE FROM -- IN 2006 OR AFTER; RIGHT?

3    A    IF THAT STATEMENT WAS MADE, YEAH, THAT WOULD

4    BE A FALSE STATEMENT.

5    Q    OR AFTER?

6    A    OR AFTER, SURE.

7    Q    AND TO YOUR KNOWLEDGE DID CREDIGY DO ANY

8    INVESTIGATION TO FIND OUT IF THOSE SORTS OF THINGS

9    WERE EVER SAID TO THE FAUSTOS?

10        MR. GILLESPIE:  OBJECTION, YOUR HONOR.

11   THIS WITNESS WAS NEVER DESIGNATED AS ANYONE WHO HAD

12   ANY KNOWLEDGE OF ANY INVESTIGATION IN CONNECTION

13   WITH THE CASE.

14        THE COURT:  WELL, HE DIDN'T ASK WHETHER

15   HE DID IT, BUT THE QUESTION WAS WHETHER HE HAD

16   KNOWLEDGE OF ANY INVESTIGATION.

17        MR. GILLESPIE:  AND AGAIN, TO THE EXTENT

18   THAT IT INVOLVES ATTORNEY-CLIENT PRIVILEGE I WOULD

19   RAISE THAT, TOO.

20        THE COURT:  WELL, ALL OF THESE ANSWERS

21   ARE TO BE ANSWERED WITHOUT REVEALING ANY

22   CONFIDENTIAL COMMUNICATION FROM COUNSEL, BUT THIS

23   IS AN APPROPRIATE QUESTION, WHETHER YOU KNOW OF ANY

24   INVESTIGATION.

25        SO THE OBJECTION IS OVERRULED.

423

1              THE WITNESS:  SO, SIR, COULD YOU REPEAT

2      THE QUESTION?

3      BY MR. HUMPHREYS:

4      Q    WELL, I'M NOT ASKING WHAT YOUR LAWYERS DID TO

5      PREPARE FOR THIS LAWSUIT AND THIS JURY TRIAL.

6              I'M SAYING YOU'RE THE SENIOR VICE

7      PRESIDENT OR SENIOR VICE EXECUTIVE OF ONE OF THE

8      CREDIGY COMPANIES, DO YOU KNOW OF ANY INVESTIGATION

9      THAT WAS DONE TO FIND OUT IF THESE TYPES OF THINGS

10     WERE SAID TO THE FAUSTOS?

11     A    AGAIN, IN THIS CASE THERE WAS A DISPUTE LETTER

12     THAT WAS RECEIVED I THINK WE TALKED ABOUT YESTERDAY

13     OR THE DAY BEFORE AND THE ACCOUNT RECORDS WERE

14     REVIEWED AT THAT TIME AND THERE WAS A SUBSEQUENT

15     LETTER THAT WAS RECEIVED AS WELL.

16             AND THERE WERE A NUMBER OF COLLECTION

17     CALLS MADE AT CREDIGY SOLUCOES UNTIL, AS YOU JUST

18     SAID A MOMENT AGO, I THINK JANUARY 10TH OR

19     SOMETHING LIKE THAT OF 2008.

20     Q    I'M NOT SURE WHAT QUESTION YOU'RE ANSWERING,

21     BUT I'LL TRY THIS ONE AGAIN.

22             WHAT INVESTIGATION WAS DONE BY CREDIGY TO

23     FIND OUT IF YOUR COLLECTORS WERE THREATENING THESE

24     TWO PEOPLE?

25             MR. GILLESPIE:  OBJECTION.  RELEVANCY.

424

1          THE COURT:  OVERRULED.

2          THE WITNESS:  WELL, I DON'T, YOU KNOW, I

3    DON'T THINK THAT THERE WAS AN INVESTIGATION DONE

4    OTHER THAN AT THE TIME THE DISPUTE LETTERS WERE

5    RECEIVED ON THIS ACCOUNT.

6    Q    OKAY.  SO THE INVESTIGATION THAT YOU'RE

7    TALKING ABOUT IS WHATEVER THE DISPUTE RESOLUTION

8    TEAM DID, MS. POSTON AND MS. ERVIN, THOSE FOLKS;

9    RIGHT?

10   A    CORRECT.

11   Q    AND YOU AS PART OWNER OF ONE OF THE CREDIGY

12   FAMILIES AND AS A SENIOR EXECUTIVE OF THE COMPANY,

13   HAVE YOU EVER GONE AND STARTED TALKING TO THESE

14   COLLECTORS IN BRAZIL AND FIND OUT WHAT THEY'RE

15   SAYING TO PEOPLE?

16          MR. GILLESPIE:  OBJECTION.  RELEVANCY,

17   YOUR HONOR.

18          THE COURT:  SUSTAINED.

19   BY MR. HUMPHREYS:

20   Q    DOES CREDIGY TRAIN ITS COLLECTORS TO TELL

21   CONSUMERS THAT THEY HAVE TO PROVE THAT THEY DON'T

22   OWN THE DEBT?

23   A    CREDIGY TRAINS ITS COLLECTORS TO ATTEMPT TO

24   COLLECT DEBTS IN COMPLIANCE WITH THE APPLICABLE

25   LAW.

                                                    425

1               YOU KNOW, I THINK THAT IN THE CONTEXT OF

2      THE DISPUTE IT'S POSSIBLE, BUT A DEBTOR OR CUSTOMER

3      MAY BE ASKED TO PROVIDE, IF THEY HAVE SOME EVIDENCE

4      THAT A DEBT WAS PAID OR SATISFIED, ASKED TO PROVIDE

5      THAT, SURE.

6      Q    OKAY.  SO DOES CREDIGY TRAIN ITS COLLECTORS TO

7      TELL CONSUMERS THAT IT'S THEIR JOB TO PROVE THAT

8      THEY DON'T OWE MONEY TO CREDIGY?

9      A    NOT TO MY KNOWLEDGE, NO.

10     Q    OKAY.  LET'S TAKE A LOOK AT LOG 2.  THIS IS A

11     PHONE CALL OF MARCH 30TH, 2007.  LET ME TRY THIS

12     AGAIN HERE.  "TOLD DEBTOR SHE MUST SEND ANY PROOF

13     THAT THIS ACCOUNT WAS ALREADY PAID OFF OR WE GONNA

14     CONTINUE TO COLLECT."

15               IS THAT AN APPROPRIATE STATEMENT OF

16     CREDIGY?

17     A    I THINK IT'S A FINE STATEMENT.  I DON'T KNOW

18     WHAT THE EXACT CONVERSATION WAS THERE, BUT IT LOOKS

19     LIKE SOMEONE SAID THAT THIS DEBT HAS ALREADY BEEN

20     PAID.  AND THE COLLECTOR SAID, GREAT.  CAN YOU SEND

21     ME SOME PROOF THAT THE DEBT WAS PAID.  AND THAT'S

22     WHAT WAS ASKED FOR IN AN ATTEMPT TO RESOLVE THE

23     ACCOUNT IF THAT WAS, IN FACT, THE CASE TO MAKE SURE

24     NO MORE COLLECTION ACTIVITY WAS DONE IF THAT WAS

25     THE CASE.

                                                      426

1    Q    AND THIS PHONE CALL HAPPENED SIX MONTHS AFTER

2    THE CEASE AND DESIST LETTER WAS IGNORED BY CREDIGY

3    ON MARCH 30TH?

4    A    WELL, I DON'T KNOW IF IT'S SIX MONTHS BUT

5    IT'S --

6              MR. GILLESPIE:  YOUR HONOR, IT'S

7    ARGUMENTATIVE.

8              THE WITNESS:  IT'S AFTER THE CEASE AND

9    DESIST LETTER --

10             THE COURT:  JUST A MINUTE.  YOU NEED TO

11   HOLD OFF IF THERE'S AN OBJECTION.  THE QUESTION WAS

12   MORE THAN THE DATE.  IT DID HAVE OTHER ELEMENTS.

13   IT'S SUSTAINED, BUT YOU CAN INQUIRE ABOUT THE DATE.

14             MR. HUMPHREYS:  YES, YOUR HONOR.

15   Q    WOULD YOU AGREE THAT THIS PHONE CALL WHERE

16   MRS. FAUSTO WAS TOLD TO SEND IN PROOF TOOK PLACE

17   SIX OR -- FIVE OR SIX MONTHS AFTER SHE ASKED

18   CREDIGY TO NEVER CONTACT HER AGAIN, OR MR. FAUSTO

19   DID?

20             MR. GILLESPIE:  OBJECTION TO THE FORM OF

21   THE QUESTION.  IT ASSUMES FACTS NOT IN EVIDENCE.

22             THE COURT:  OVERRULED.

23             THE WITNESS:  AGAIN, I THINK I SAID IT

24   LOOKS LIKE TO ME IT TOOK PLACE AFTER THE CEASE AND

25   DESIST LETTER; CORRECT.

                                              427

1        MR. HUMPHREYS:  OKAY.

2        THE COURT:  IT SEEMS WE HAVE GONE FULL

3   CIRCLE.  IS THERE NEW MATERIAL THERE?

4        MR. HUMPHREYS:  YES, YOUR HONOR, VERY

5   BRIEFLY.

6   Q    NOW, WOULD YOU AGREE THAT CREDIGY DID NOT

7   TREAT THE FAUSTOS ANY DIFFERENT THAN THEY TREAT

8   PEOPLE, OTHER PEOPLE THAT THEY ARE COLLECTING MONEY

9   FROM?

10        MR. GILLESPIE:  OBJECTION.

11   ARGUMENTATIVE.  NO FOUNDATION.

12        THE COURT:  I'M NOT SURE THAT'S RELEVANT

13   SINCE THIS IS NOT A CLASS ACTION.  SO IT DOES SEEM

14   TO ME THAT THE OBJECTION CAN BE SUSTAINED ON A

15   NUMBER OF GROUNDS.  AND SO THE OBJECTION IS

16   SUSTAINED.

17   BY MR. HUMPHREYS:

18   Q    YOU TOLD US CREDIGY MADE OVER 90 PHONE CALLS

19   TO THE FAUSTOS AND WE SAW ONE OF THE VERY FIRST

20   ENTRIES THAT MRS. FAUSTO SAID THAT SHE WAS GOING TO

21   DISPUTE THIS ACCOUNT AND THEY DID SEND A DISPUTE

22   LETTER BACK IN SEPTEMBER OF 2006.

23        COULD YOU TELL THE JURY WHY YOU CALL 90

24   TIMES ON AN ACCOUNT THAT YOU COULDN'T SUE ON AFTER

25   THEY TOLD YOU THAT THEY WEREN'T GOING TO PAY IT?

428

1          MR. GILLESPIE:  OBJECTION.

2    ARGUMENTATIVE.

3          THE COURT:  OVERRULED.

4          THE WITNESS:  SURE.  IT'S I THINK SIMPLE.

5    THERE WAS A MISTAKE MADE WHEN THE CEASE AND DESIST

6    LETTER WAS RECEIVED FROM MRS. FAUSTO.  IT'S SIMPLY

7    A MISTAKE WAS MADE.

8    BY MR. HUMPHREYS:

9    Q    OKAY.  LET'S TAKE OUT THE CEASE AND DESIST.

10   YOU MEANT TO CALL 90 TIMES; RIGHT?  YOU KNOW, LET'S

11   JUST IGNORE THE CEASE AND DESIST.  I'M NOT ASKING

12   YOU ABOUT THAT.

13          IT WAS INTENDED FOR CREDIGY TO CALL THEM

14   90 TIMES DURING THIS PERIOD FROM AUGUST OF '06 TO

15   JANUARY OF '08?

16   A    IGNORING THE CEASE AND DESIST, YEAH, THERE WAS

17   ABOUT SIX CALLS A MONTH OVER A SIX-MONTH PERIOD.

18   Q    OKAY.  WHY WOULD YOU CALL SOMEBODY 90 TIMES

19   AFTER THEY TOLD YOU THEY'RE GOING TO DISPUTE THE

20   DEBT AND THEY'RE NOT GOING TO PAY IT?

21   A    WELL, AGAIN, CREDIGY SOLUCOES WAS ATTEMPTING

22   TO COLLECT THE DEBT OWED BY MR. FAUSTO.

23   Q    WELL, THEY TOLD YOU THAT THEY WEREN'T GOING TO

24   PAY IT.  WERE YOU TRYING TO CALL THEM SO MANY TIMES

25   THAT THEY WOULD JUST GIVE UP AND PAY SOMETHING?

429

1              MR. GILLESPIE:  OBJECTION, YOUR HONOR.

2      THAT FACT IS NOT IN EVIDENCE, AND IT MISSTATES

3      PRIOR TESTIMONY.

4              THE COURT:  OVERRULED.

5              THE WITNESS:  CREDIGY SOLUCOES WAS SIMPLY

6      TRYING TO REACH AN ARRANGEMENT WITH THE FAUSTOS AT

7      SOME POINT.  PEOPLE'S CIRCUMSTANCES CHANGE AND ONE

8      DAY THEY MAY NOT BE ABLE TO PAY A DEBT AND THE NEXT

9      DAY THEY MAY.

10     BY MR. HUMPHREYS:

11     Q   OKAY.  AND ACCORDING TO YOUR OWN RECORDS THIS

12     ACCOUNT HAD AN END DATE FOR COLLECTION OF 2020;

13     RIGHT?

14             MR. GILLESPIE:  OBJECTION.  ASKED AND

15     ANSWERED.

16             THE COURT:  SUSTAINED.

17     BY MR. HUMPHREYS:

18     Q   WAS IT CREDIGY'S INTENT TO CALL SO MANY TIMES

19     THAT THEY WOULD BE ANNOYED INTO SUBMISSION OR

20     HARASSED INTO SUBMISSION?

21             MR. GILLESPIE:  OBJECTION.

22     ARGUMENTATIVE.

23             THE COURT:  OVERRULED.

24             THE WITNESS:  NO.

25     BY MR. HUMPHREYS:

                                              430

1    Q    ISN'T IT TRUE THAT THE BUSINESS MODEL AT

2    CREDIGY WAS TO FIND A LOW COST WAY TO CALL PEOPLE

3    REPEATEDLY TO MAKE THEIR LIFE MISERABLE SO THAT

4    THEY WOULD JUST PAY YOU SOMETHING?

5              MR. GILLESPIE:  OBJECTION, ARGUMENTATIVE.

6              THE COURT:  OVERRULED.

7              THE WITNESS:  NO, NO IT WASN'T.

8    BY MR. HUMPHREYS:

9    Q    WELL, CREDIGY HIRED LIVEVOX TO MAKE NO COST

10   AUTOMATED PHONE CALLS; RIGHT?

11   A    YES, CORRECT.

12   Q    AND THEY CAN MAKE AUTOMATED PHONE CALLS AT

13   LIVEVOX CHEAPER THAN YOU CAN DO IT YOURSELF SO YOU

14   HIRED THEM; RIGHT?

15   A    THAT WAS, YEAH, ONE OF THE REASONS, THE COST

16   OF THE SERVICE, I BELIEVE THAT'S CORRECT.

17   Q    AND THESE JOBS, THESE COLLECTION JOBS WERE

18   SENT TO BRAZIL, RIGHT, SO THAT WHEN YOU WERE GOING

19   TO TALK TO SOMEBODY, YOU WOULD HAVE ONE OF THE

20   BRAZILIAN COLLECTORS -- TRY TO COLLECT THE DEBT;

21   RIGHT?

22              MR. GILLESPIE:  OBJECTION.

23   ARGUMENTATIVE, ASSUMES FACTS NOT IN EVIDENCE.  NO

24   FOUNDATION.

25              THE COURT:  OVERRULED.

                                              431

1              THE WITNESS:  IN THIS CASE AND THE

2       FAUSTOS' CASE, YES, PEOPLE AT CREDIGY SOLUCOES IN

3       SAO PAULO.

4       BY MR. HUMPHREYS:

5       Q    AND THESE COLLECTORS ARE BEING PAID THE

6       EQUIVALENT OF $400 A MONTH TO DO THIS; RIGHT?

7                MR. GILLESPIE:  OBJECTION.

8                THE COURT:  OVERRULED.

9                THE WITNESS:  I'M NOT SURE OF THE EXACT

10      SALARY, BUT YOU KNOW, THAT MAY BE IN THE RANGE.

11      BY MR. HUMPHREYS:

12      Q    IT'S 750 REAL, BRAZILIAN REAL; TRUE?

13      A    AGAIN, THAT SOUNDS -- IT MAY BE CORRECT, BUT

14      I'M NOT SURE OF THE EXACT AMOUNT.

15      Q    AND WHEN YOU SAY CREDIGY SOLUCOES, THOSE

16      PEOPLE ARE UNDER CONTRACT TO DO THE SERVICES FOR

17      CREDIT SERVICES?

18      A    RIGHT.

19      Q    AND IT'S CREDIGY SERVICES ACTUALLY IN AMERICA

20      THAT ACTUALLY HAS THE LICENSE FOR THEM TO DO THE

21      COLLECTIONS; RIGHT?

22      A    WELL, I DON'T THINK THERE'S ANY LICENSE

23      REQUIRED IN CALIFORNIA, BUT I MAY BE WRONG.

24      Q    THAT WASN'T MY QUESTION.  THERE ARE LICENSES

25      IN MANY STATES; RIGHT?

                                                    432

1    A    THERE ARE LICENSES AND IN SOME STATES,

2    CORRECT.

3    Q    AND FOR WHATEVER STATES REQUIRE A LICENSE,

4    CREDIGY SERVICES OBTAINS A LICENSE FOR THEM FOR THE

5    EMPLOYEES THAT ARE WORKING UNDER CONTRACT FOR

6    SOLUCOES; RIGHT?

7            MR. GILLESPIE:  OBJECTION, RELEVANCE.

8            THE COURT:  SUSTAINED.

9    BY MR. HUMPHREYS:

10   Q    YOU'RE NOT DENYING, SIR, THAT THE EMPLOYEES OF

11   CREDIGY SOLUCOES WERE ACTING FOR CREDIGY SERVICES,

12   ARE YOU?

13   A    NO.  AGAIN, AS YOU STATED, CREDIGY SOLUCOES

14   WERE UNDER CONTRACT TO CREDIGY SERVICES CORP.

15   Q    AND LET'S MOVE TO EXHIBIT 64 WHICH IS A

16   STIPULATED EXHIBIT.  THE DATE OF THIS IS NOVEMBER

17   OF 2007.

18           YOU CAN AGREE WITH ME, SIR, THAT THIS

19   LETTER WAS SENT BY CREDIGY AFTER THE FAUSTOS HAD

20   RESPONDED IN WRITING TWICE SAYING THAT THEY

21   DISPUTED THE DEBT; RIGHT?

22   A    YES.

23   Q    OKAY.  AND IF WE LOOK AT YOUR LETTER HERE IN

24   BOLD, OR EXCUSE ME, IN CAPITAL LETTERS, CREDIGY IS

25   SAYING, "UNLESS YOU NOTIFY THIS OFFICE WITHIN 30

433

1    DAYS AFTER RECEIVING THIS NOTICE, OR YOU DISPUTE

2    THE VALIDITY OF THE DEBT OR ANY PORTION THEREOF,

3    THIS OFFICE WILL ASSUME THIS DEBT IS VALID."  THIS

4    IS A YEAR AFTER THEY DISPUTED IT TWICE; RIGHT?

5    A    YES, THIS IS ABOUT A YEAR AFTER THAT.

6    Q    AND THE PRACTICE AT CREDIGY IS TO SEND LETTERS

7    TELLING PEOPLE THAT AFTER THEY HAVE DISPUTED THE

8    DEBT, THAT THEY HAVE TO DISPUTE IT IN WRITING OR

9    YOU'RE GOING TO CONSIDER IT VALID; RIGHT?

10   A    WELL, THE PRACTICE AT CREDIGY IS TO COMPLY

11   WITH F.D.C.P.A. AND THE REQUIREMENTS OF THE

12   STATEMENTS OF F.D.C.P.A.

13   Q    ONLY THE FIRST COMMUNICATIONS REQUIRED TO HAVE

14   THE MAIN NOTICE.  AFTER THAT YOU COULD GIVE A MINI

15   MIRANDA, WHAT IS CALLED A MINI MIRANDA IN YOUR

16   BUSINESS; RIGHT?

17   A    CORRECT.

18   Q    AND SO YOU'RE NOT REQUIRED TO SAY THAT BY

19   FEDERAL LAW.  YOU JUST, AFTER THE FIRST ATTEMPT,

20   YOU'RE NOT REQUIRED TO SAY THAT AGAIN?

21   A    CORRECT.

22   Q    ALL RIGHT.  AND DID YOU SIGN A CONFIDENTIALITY

23   AGREEMENT WHEN YOU WENT TO WORK FOR THE COMPANY?

24   A    YES.

25   Q    CAN YOU AGREE THAT THE CONFIDENTIALITY STATES

434

1    THAT "CREDIGY SERVICES CORPORATION IS AND WILL

2    BECOME AFFILIATED WITH STEWART & ASSOCIATES PC AND

3    ITS CLIENTS FROM TIME TO TIME INCLUDING WITHOUT

4    LIMITATION ALL ENTITIES OWNED AND CONTROLLED BY

5    CREDIGY LIMITED"?

6              MR. GILLESPIE:  OBJECTION.  RELEVANCY.

7              THE COURT:  I KNOW PERHAPS THE

8    ASSOCIATION OF THE AGENCY IS RELEVANT, BUT I'M

9    CONFUSED WHY IT'S COMING BY THROUGH HIS

10   CONFIDENTIALITY.

11             MR. HUMPHREYS:  THAT'S WHERE THE

12   REPRESENTATION IS MADE THAT THE ENTITIES ARE OWNED

13   AND CONTROLLED BY CREDIGY LIMITED AND OUR THEORY IS

14   AGENCY, YOUR HONOR.

15             THE COURT:  I UNDERSTAND THE THEORY OF

16   AGENCY CAN COME IN.

17             IS THAT THE ONLY BASIS FOR AGENCY IS

18   THROUGH AN EMPLOYMENT DOCUMENT?

19             MR. HUMPHREYS:  NO, YOUR HONOR.  WE

20   HAVE --

21             THE COURT:  WELL, THAT'S WHY I'M CONFUSED

22   ABOUT WHY YOU PREFACE THE QUESTION WITH HIS

23   CONFIDENTIALITY AGREEMENT.  YOU CAN GO DIRECTLY TO

24   A DESCRIPTION AND SEE IF IT DRAWS AN OBJECTION TO

25   THE RELATIONSHIP BETWEEN THE COMPANIES WITHOUT

                                                    435

1    GOING INTO HIS PERSONNEL FILE AND HIS

2    CONFIDENTIALITY AGREEMENT.

3              MR. HUMPHREYS:  YES, I APOLOGIZE, YOUR

4    HONOR.  I UNDERSTAND.

5    Q    ISN'T IT TRUE THAT IN FORMER LEGAL PAPERS THAT

6    THE CREDIGY FAMILY SAYS THAT ITS AFFILIATES, THAT

7    THE ONES THAT WE'RE TALKING ABOUT HERE, ARE OWNED

8    AND CONTROLLED BY CREDIGY LIMITED?

9              MR. GILLESPIE:  OBJECTION, FORM.  I

10   DIDN'T UNDERSTAND THE QUESTION, YOUR HONOR.

11             THE COURT:  WELL, HE WAS TRYING TO

12   OVERCOME THE PROBLEM BY SAYING "LEGAL PAPERS."

13             BUT IT IS CONFUSING TO WHAT YOU'RE

14   REFERRING TO.

15             AM I TO UNDERSTAND THAT THAT IS THE ONLY

16   SOURCE OF THE DESCRIPTION OF THE RELATIONSHIP IS IN

17   THE EMPLOYEE CONFIDENTIALITY AGREEMENTS?

18             MR. HUMPHREYS:  NO, YOUR HONOR.  BUT

19   THERE IS A REPRESENTATION THERE THAT THE AFFILIATES

20   ARE OWNED AND CONTROLLED BY CREDIGY LIMITED, AND

21   I'D LIKE TO USE THAT REPRESENTATION.

22             THE DOCUMENT IS ACTUALLY THE ONE I'M

23   LOOKING AT IS ANOTHER EMPLOYEE'S PERSONNEL FILE,

24   BUT IT'S IN A STIPULATED EXHIBIT.  IT'S EXHIBIT 3.

25             THE COURT:  WELL, WHY DON'T YOU GO TO THE

                                                    436

1    LANGUAGE OF THE EXHIBIT AND ASK THIS WITNESS IF

2    IT'S NECESSARY TO GET HIS KNOWLEDGE ABOUT IT AS TO

3    ASK HIM ANY QUESTION THAT GOES TO HIS KNOWLEDGE

4    ABOUT IT.

5         IT DOESN'T SEEM TO ME THAT YOU'RE GOING

6    TO ADVANCE THE BALL ANY IF YOU HAVE A STIPULATED

7    EXHIBIT BY ASKING HIM QUESTIONS ABOUT IT UNLESS

8    YOU'RE INQUIRING FURTHER ABOUT HIS KNOWLEDGE.

9         MR. HUMPHREYS:  YES, YOUR HONOR.

10   Q    SIR, ISN'T IT TRUE THAT THE DEFENDANTS IN THIS

11   CASE AND OTHER CREDIGY AFFILIATES, INCLUDING

12   STEWART & ASSOCIATES, ARE OWNED AND CONTROLLED BY

13   CREDIGY LIMITED?

14   A    STEWART & ASSOCIATES IS NOT BUT WHEN YOU'RE

15   TALKING ABOUT CREDIGY SERVICES CORP, CREDIGY

16   RECEIVABLES, AND CREDIGY SOLUTIONS, THAT'S CORRECT.

17   Q    OKAY.  LET ME HAND YOU EXHIBIT 163, WHICH IS

18   FA 450 TO 451.

19         IS THAT AN EMPLOYEE -- A MEMO TO AN

20   EMPLOYEE AND WHO IS THE EMPLOYEE THAT THAT MEMO IS

21   TO?

22   A    KIMBERLY ERVIN.

23   Q    OKAY.  AND WHAT IS THE LETTERHEAD THAT THAT

24   MEMO WAS WRITTEN ON?

25   A    STEWART & ASSOCIATES.

437

1    Q    OKAY.  SO STEWART & ASSOCIATES HAS THE ABILITY

2    TO ISSUE MEMOS TO EMPLOYEES OF -- IN THE DISPUTE

3    RESOLUTION TEAM; RIGHT?

4    A    AGAIN, I THINK THAT MIRANDA HEWITT, WHO WAS

5    THE ATTORNEY RESPONSIBLE FOR THE DISPUTE RESOLUTION

6    TEAM WAS EMPLOYED BY STEWART & ASSOCIATES.

7    Q    OKAY.  EMPLOYED BY STEWART & ASSOCIATES IS THE

8    PERSON WHO MANAGES THE DISPUTE RESOLUTION TEAM WITH

9    CREDIGY SERVICES; IS THAT RIGHT?

10   A    WELL, AS I SAID, I THINK THE DISPUTE

11   RESOLUTION TEAM IS UNDER THE SUPERVISION OF AN

12   ATTORNEY, IN THIS CASE IT WAS MIRANDA, AND SHE'S AN

13   ATTORNEY FROM STEWART & ASSOCIATES.

14   Q    HER EMPLOYER IS STEWART & ASSOCIATES?

15   A    I BELIEVE THAT'S CORRECT, YES.

16   Q    AND WITHOUT GETTING INTO THE DETAILS OF THAT

17   MEMO, WE'LL SEE THAT LATER, THAT IS BASICALLY

18   REPRIMANDING THE EMPLOYEES; RIGHT?

19   A    IT LOOKS LIKE A RECORD OF A DISCUSSION THAT

20   TOOK PLACE ON MARCH 6TH REGARDING JOB PERFORMANCE.

21   Q    OKAY.  WHAT YEAR?

22   A    2006.

23   Q    OKAY.  LOOK AT THE LAST PAGE OF THAT.  WHAT IS

24   THE DATE THAT IT WAS SIGNED?

25   A    IT IS ACTUALLY SIGNED AS OF 2008.  IT LOOKS

438

1    LIKE THERE'S A TYPO ON PAGE 1.

2    Q    OKAY.  AND THE OTHER POSSIBILITY IS THAT THAT

3    DOCUMENT HAS BEEN MANUFACTURED?

4    A    WELL, I DON'T THINK THAT'S POSSIBLE.

5    Q    WELL, AREN'T THERE TWO PARAGRAPHS IN THE

6    LETTER THAT SAY 2006?

7    A    I SEE A REFERENCE TO '06 ON PAGE 1 AND IN THE

8    FIRST PARAGRAPH IT SAYS 2006, RIGHT.

9    Q    OKAY.  NOW, THERE WAS SOME MENTION OF

10   MR. PAULO PERES AND WHY HE'S IN THIS LAWSUIT.

11            IS IT TRUE THAT YOU SAW THE LETTER THAT

12   LISTED MR. PERES AS A COLLECTION MANAGER FOR

13   CREDIGY SERVICES?

14            YOU SAW THAT LETTER, RIGHT?  I WON'T --

15   A    YEAH.

16   Q    OKAY.  AND IS IT YOUR UNDERSTANDING THAT HE'S

17   NOT A COLLECTION MANAGER AND HAS NEVER WORKED FOR

18   CREDIGY SERVICES?

19   A    MY UNDERSTANDING WAS THAT AT THE TIME THAT

20   THAT LETTER WENT OUT IT WAS AN AUTOMATED LETTER

21   TEMPLATE AND HIS NAME WAS ON THERE INCORRECTLY.

22   Q    ARE YOU AWARE OF THE TESTIMONY FROM MR. NUNES

23   WHO GOES BY THE ALIAS OF RYAN MILLER THAT HE WAS

24   DIRECTLY SUPERVISED BY MR. PERES?

25            MR. GILLESPIE:  OBJECTION, FORM OF THE

439

```
 1    QUESTION.  NOT SPECIFIC AS TO TIME.

 2              THE COURT:  WELL, HE'S ASKING IF HE'S

 3    AWARE OF A LETTER AND SO THE OBJECTION IS

 4    OVERRULED.

 5              THE WITNESS:  AGAIN, I HAVEN'T LISTENED

 6    TO OR READ MR. NUNES'S DEPOSITION TESTIMONY.

 7              MR. HUMPHREYS:  OKAY.

 8    Q   SO IF YOU WOULD PLEASE TAKE A LOOK AT EXHIBIT

 9    185 AND 2975.  CAN YOU FIND THE NOVEMBER 23RD PHONE

10    CALL, THE ONE THAT WE HAVE TALKED ABOUT THAT WAS

11    RECORDED?

12              MR. GILLESPIE:  WHAT PAGE DID YOU

13    REFERENCE, COUNSEL?

14              THE WITNESS:  I SEE A PHONE CALL ON

15    NOVEMBER 23RD THAT WAS PLACED WITH HER PLACE IT

16    LOOKS LIKE IN GONZALES, CALIFORNIA.

17              MR. HUMPHREYS:  2975.

18    Q   AND THAT WAS A CALL THAT CREDIGY PLACED, TRUE?

19    OR LIVEVOX I SHOULD SAY?

20    A   THE RECORD YOU HAVE HERE IS PAGE 393 OF 985

21    PAGES OF CALL RECORDS, AND I THINK AT SOME POINT

22    THERE'S ANOTHER PIECE OF THIS RECORD THAT SAYS

23    INBOUND OR OUTBOUND OR SOMETHING.  SO IN LOOKING AT

24    THIS PARTICULAR PIECE OF THE RECORD IT'S KIND OF

25    HARD FOR ME TO TELL YOU.
```

440

1    Q    LET ME HAND YOU THE REST OF EXHIBIT 185.  CAN

2    YOU SEE FROM LOOKING AT THE REST OF IT -- AND YOU

3    AGREE THAT THE DOCUMENT CONTROL NUMBER IS SOMETHING

4    ON THE BOTTOM THAT THAT'S SOMETHING THAT CREDIGY

5    PRODUCED?

6    A    YES, IT LOOKS LIKE THIS IS THE GLOBAL CROSSING

7    REPORT OR PHONE BILL.

8    Q    THAT WAS PRODUCED BY CREDIGY?

9    A    YES.

10   Q    ALL RIGHT.  AND FROM LOOKING AT THAT WHOLE

11   EXHIBIT THERE, CAN YOU TELL US -- CAN YOU CONFIRM

12   THAT THIS WAS A CALL THAT WAS INITIATED BY CREDIGY?

13   A    LET ME LOOK AGAIN.  I THINK THERE'S A BREAK IN

14   HERE THAT SAYS INBOUND OR OUTBOUND OR SOMETHING.

15   LET ME SEE IF I CAN FIND IT.

16        YOU KNOW, I DON'T SEE AN INDICATION FROM

17   THE SURROUNDING PAGES OF WHETHER OR NOT IT WAS AN

18   INBOUND OR OUTBOUND CALL.

19   Q    WOULDN'T YOU AGREE THAT THE RECORDING, THE

20   TRANSCRIPT OF THE RECORDING IS HELPFUL IN

21   UNDERSTANDING WHAT YOUR COLLECTORS IN BRAZIL ARE

22   SAYING TO CUSTOMERS HERE?

23   A    WHAT THE -- I'M SORRY.  THE TRANSCRIPT THAT WE

24   SAW TODAY?

25   Q    YEAH, THAT WE SAW.  WASN'T THE TRANSCRIPT

441

1    ITSELF HELPFUL TO UNDERSTAND WHAT IS BEING SAID BY

2    YOUR COLLECTORS?

3    A    WELL, AGAIN, I THINK THAT THE NOTES ARE THE

4    MOST HELPFUL THING TO UNDERSTAND.  AND THE

5    TRANSCRIPT FOR THAT PARTICULAR CALL IS HELPFUL

6    MAYBE.

7    Q    OKAY.  AND BASED UPON THAT RECORDING OF WHAT

8    IS HAPPENING THERE, THERE HASN'T BEEN ANY

9    DISCIPLINE OF ANY EMPLOYEES IN BRAZIL?

10   A    TO MY KNOWLEDGE, YOU KNOW, I DON'T KNOW OF ANY

11   DISCIPLINARY ACTIVITY RELATED TO THE TRANSCRIPT

12   THAT YOU'RE TALKING ABOUT.

13   Q    OKAY.  AND INSTEAD OF DISCIPLINING EMPLOYEES

14   FROM WHAT WAS BEING SAID TO MRS. FAUSTO, CREDIGY'S

15   ONLY RESPONSE TO THAT RECORDED PHONE CALL WAS TO

16   SUE MRS. FAUSTO, TRUE?

17            MR. GILLESPIE:  OBJECTION.  MISSTATES

18   FACTS.

19            THE COURT:  SUSTAINED.

20   BY MR. HUMPHREYS:

21   Q    WELL, YOU SUED HER BECAUSE SHE RECORDED THE

22   PHONE CALL; RIGHT?

23            MR. GILLESPIE:  OBJECTION.  IT MISSTATES

24   FACTS.

25            THE COURT:  OVERRULED.

                                                    442

1          THE WITNESS:  I BELIEVE THAT'S CORRECT.

2     BY MR. HUMPHREYS:

3     Q    AND YOU'RE AWARE THAT PEOPLE HAVE A RIGHT TO

4     RECORD PHONE CALLS IF THEY'RE NOT CONFIDENTIAL;

5     RIGHT?

6     A    I'M NOT SURE OF THE EXACT LAW IN CALIFORNIA

7     OTHER THAN IT REQUIRES A TWO-PARTY CONSENT, I DON'T

8     THINK.  I'M NOT SURE OF THE EXACT LAW.

9     Q    WELL, ARE YOU AWARE OF WHETHER PEOPLE HAVE A

10    RIGHT TO RECORD A PHONE CALL TO TRAP SOMEONE WHO IS

11    EXTORTING THEM?

12          MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

13    A LEGAL CONCLUSION.

14          THE COURT:  SUSTAINED.

15    BY MR. HUMPHREYS:

16    Q    ARE YOU AWARE OF WHETHER -- ARE YOU AWARE OF

17    WHETHER PEOPLE HAVE A RIGHT TO RECORD A PHONE CALL

18    TO OBTAIN EVIDENCE THAT THEY'RE BEING HARASSED?

19          MR. GILLESPIE:  OBJECTION.  IT CALLS FOR

20    A LEGAL CONCLUSION.

21          THE COURT:  SUSTAINED.

22    BY MR. HUMPHREYS:

23    Q    ARE YOU THE ONE THAT MADE THE DECISION TO SUE

24    THIS LADY (INDICATING)?

25    A    NO.

                                                      443

```
1     Q    WHO DID?

2     A    I'M NOT SURE.

3     Q    YOU'RE THE VICE PRESIDENT OF THE COMPANY.  DO

4     YOU SUPPOSE THIS IS SOMETHING THAT YOU WOULD

5     DISCUSS WITH MR. SAMSKY OR MR. STEWART?

6     A    NO.

7     Q    AS THE COMPANY REPRESENTATIVE YOU DON'T KNOW

8     WHO MADE THE DECISION TO SUE MRS. FAUSTO?

9                MR. GILLESPIE:  OBJECTION.  THIS IS

10    ATTORNEY-CLIENT PRIVILEGE.

11               THE COURT:  SUSTAINED.  AND THIS IS

12    NOT -- THE MERITS MAY BE DECIDED BY THE JURY, BUT

13    THE DECISION IS NOT RELEVANT.

14               MR. HUMPHREYS:  NOTHING FURTHER, YOUR

15    HONOR.

16               THE COURT:  VERY WELL.  YOU'RE READY TO

17    EXAMINE THE WITNESS?

18               WHY DON'T WE -- WE HAVE BEEN GOING ABOUT

19    AN HOUR AND A HALF OR SO.  SO IT'S ABOUT 2:25.  SO

20    WE'LL COME BACK AT ABOUT 2:35.

21               MR. GILLESPIE:  THANK YOU, YOUR HONOR.

22               (WHEREUPON, A RECESS WAS TAKEN.)

23               THE COURT:  PLEASE BE SEATED.

24               MR. GILLESPIE:  MAY I PROCEED, YOUR

25    HONOR?
```

                                                    444

1          THE COURT:  YES, YOU MAY.

2              **AS-ON DIRECT EXAMINATION**

3    BY MR. GILLESPIE:

4    Q    MR. WILLIAMS, HOW WAS CREDIGY FORMED?

5    A    CREDIGY WAS ACTUALLY STARTED IN 2001 IN

6    SAO PAULO, BRAZIL AND THEN IN 2002 CREDIGY IN THE

7    U.S. WAS STARTED.

8    Q    WHEN WERE YOU APPROACHED BY CREDIGY TO JOIN?

9    A    AGAIN, BEGINNING 2002 WAS WHEN I JOINED

10   CREDIGY.

11   Q    DID YOU GET INVOLVED WITH CREDIGY TO BUY THE

12   FIRST SELECT PORTFOLIO?

13   A    YES.

14   Q    AND WHEN DID THAT OCCUR?

15   A    MID TO LATE SUMMER 2002.

16   Q    AND HOW WERE YOU INVOLVED IN THE FIRST SELECT

17   PORTFOLIO TRANSACTION?

18   A    PRINCIPALLY INVOLVED IN THE DUE DILIGENCE AND

19   REVIEW OF THE ASSETS TO BE ACQUIRED AND REVIEWING

20   THE OPERATIONS, PRACTICES AND PROCEDURES OF FIRST

21   SELECT AND THE COMPUTER DATA SYSTEMS THAT THEY

22   USED.

23   Q    WERE YOU RESPONSIBLE FOR ENSURING THE QUALITY

24   OF ACCOUNT DATA FOR THE FIRST SELECT PORTFOLIO?

25   A    YES.  ONE OF MY JOBS ON THE DUE DILIGENCE TEAM

445

1    ALONG WITH OTHER PEOPLE WAS TO ENSURE THE QUALITY

2    AND INTEGRITY, ACCURACY OF THE INFORMATION OBTAINED

3    BECAUSE THAT'S WHAT WE WERE BUYING ESSENTIALLY.

4    Q    WHAT WAS DONE TO ADDRESS THOSE CONCERNS?

5    A    WELL, WE REVIEWED THE ELECTRONIC DATA THAT WE

6    RECEIVED.  WE REVIEWED THE COMPUTER SYSTEM

7    MAINTAINED BY FIRST SELECT, AND WE ALSO REVIEWED

8    POLICIES AND PROCEDURES OF FIRST SELECT AND ITS

9    OPERATIONAL PRACTICES.

10          ALL OF THOSE THINGS WERE RELATED TO

11   ENSURING AND VERIFYING INTEGRITY OF THE

12   INFORMATION.

13   Q    WERE YOU RESPONSIBLE FOR ENSURING THE -- OR

14   CONFIRMING THE EVIDENCE OF CHAIN OF TITLE FOR THE

15   ACCOUNTS IN THE FIRST SELECT PORTFOLIO?

16   A    YES.  AGAIN, THAT WAS ANOTHER THING THAT WE

17   DID DURING THE DUE DILIGENCE PROCESS, AND WE LOOKED

18   AT BOTH THE ELECTRONIC RECORDS PROVIDED AS WELL AS

19   THE PURCHASE AND SALE AGREEMENTS BETWEEN FIRST

20   SELECT AND ITS PREDECESSOR IN INTEREST IN THIS CASE

21   WELLS FARGO.

22          THERE WERE A NUMBER OF OTHER BANKS THAT

23   FIRST SELECT HAD CONTRACTS WITH AS WELL.

24   Q    AND SPECIFICALLY WHAT DID YOU LOOK AT TO

25   ADDRESS THOSE CONCERNS ABOUT CHAIN OF TITLE?

446

1      A     WELL, UM --

2            MR. HUMPHREYS:  AGAIN, YOUR HONOR, THE

3      CONTRACT SPEAKS FOR THEMSELVES.  THEY'RE

4      CONTRACTUAL RELATIONSHIPS.  THE DOCUMENTS NEED TO

5      BE TENDERED.

6            THE COURT:  OVERRULED.

7            THE WITNESS:  WELL, FOR EXAMPLE, WE

8      LOOKED AT THE CONTRACT TO UNDERSTAND WHAT PERIOD OF

9      TIME IT ADDRESSED.  AND THEN FOR THE ACCOUNTS THAT

10     WERE PROVIDED ON THE MASTER DISK BY FIRST SELECT,

11     WE TIED EVERY ACCOUNT OUT TO A PARTICULAR PURCHASE

12     AND SALE AGREEMENT BETWEEN FIRST SELECT AND ITS

13     PREDECESSOR IN INTEREST BY USING THE DATE THAT IT

14     WAS ACQUIRED BY FIRST SELECT AND LOADED TO THE

15     FIRST SELECT DATA SYSTEM TSYS AND THE NAME OF THE

16     ORIGINAL ISSUER.

17            SO THAT WAS, FOR EXAMPLE, ONE OF THE WAYS

18     WE IDENTIFIED PURCHASE OF TITLE AND THE RELATION OF

19     THE FIRST SALE AGREEMENTS FROM FIRST SELECT AND THE

20     ORIGINAL ISSUERS LIKE WELLS FARGO.

21     Q    I'M SORRY.

22     A    SORRY.

23     Q    DID YOU SPECIFICALLY LOOK AT THE QUALITY OF

24     THE ACCOUNT DATA FOR THE WELLS FARGO ACCOUNTS THAT

25     WERE IN THE FIRST SELECT PORTFOLIO?

1    A    SURE.  WE LOOKED AT THE QUALITY OF THE DATA

2    FOR THE WELLS FARGO ACCOUNTS ALONG WITH THE DATA

3    FOR ALL OF THE OTHER ACCOUNTS THAT WERE ACQUIRED IN

4    2002 AND REVIEWED THAT TO DETERMINE WHETHER OR NOT

5    WE THOUGHT THE INFORMATION WAS ACCURATE AND

6    TRUSTWORTHY.

7    Q    AND ALSO DID YOU SPECIFICALLY CONFIRM THE

8    EVIDENCE OF THE CHAIN OF TITLE FOR THE WELLS FARGO

9    ACCOUNTS IN THAT PORTFOLIO?

10            MR. HUMPHREYS:  OBJECTION.  THE DOCUMENT

11   SPEAKS FOR ITSELF AS FAR AS OWNERSHIP OF THE

12   ACCOUNT.  THE CONTRACTS NEED TO BE IN EVIDENCE AS

13   THE BEST EVIDENCE.

14            MR. GILLESPIE:  YOUR HONOR, I'M ASKING

15   ABOUT THE PROCESS THAT WAS USED IN THE DUE

16   DILIGENCE.

17            THE COURT:  THE OBJECTION IS OVERRULED.

18            IT DOES SEEM TO ME THAT THE PROCESS CAN

19   BE DESCRIBED.  HE'S NOT -- UNLESS HE'S BEING ASKED

20   TO TELL US WHAT IS IN A DOCUMENT, AND MAYBE I'VE

21   LOST THE SENSE OF THE QUESTION, BUT IF HE'S BEING

22   ASKED TO DESCRIBE A PROCESS THAT HE PARTICIPATED

23   IN, HE CAN DESCRIBE THE PROCESS.

24            MR. GILLESPIE:  WELL, I'M HAPPY TO ADMIT

25   INTO EVIDENCE, YOUR HONOR, THE EXHIBIT THAT HAS

                                                    448

1    BEEN MARKED 159, WHICH IS THE CONTRACT BETWEEN

2    WELLS FARGO AND THE FIRST SELECT ENTITIES, BUT IT'S

3    BEEN MY UNDERSTANDING THAT IT'S BEEN OBJECTED TO BY

4    THE OTHER SIDE AND I'M TRYING TO LAY A FOUNDATION,

5    UNLESS THEY WANT TO WITHDRAW THEIR OBJECTION?

6              THE COURT:  NO.  I'VE OVERRULED THE

7    OBJECTION.  CONTINUE YOUR EXAMINATION OF THE

8    WITNESS UNTIL ANOTHER OBJECTION COMES.

9    BY MR. GILLESPIE:

10   Q    WHEN WAS DOUG FULLER BROUGHT ON BOARD?

11   A    WE STARTED WORKING WITH DOUG FULLER WHEN WE

12   STARTED THE DUE DILIGENCE ON THE FIRST SELECT

13   PORTFOLIO.

14   Q    AND WHO WAS MR. FULLER?

15   A    MR. FULLER IS A PH.D.  I BELIEVE HIS DEGREE IS

16   IN QUANTITATIVE METHODS.  HE WAS FOR A NUMBER OF

17   YEARS EMPLOYED AT FIRST SELECT AND WHERE HIS FIRST

18   RESPONSIBILITY WAS ENSURING THE DATA ACQUIRED BY

19   FIRST SELECT BY THIRD PARTIES SUCH AS WELLS FARGO.

20   Q    AND WHAT WAS HIS ROLE IN THE DUE DILIGENCE

21   PROCESS?

22   A    THE REASON WE BROUGHT HIM ON BOARD WAS IN

23   ORDER FOR HIM TO EXPLAIN TO US AND HELP US

24   UNDERSTAND WHAT WERE THE PROCESS AND PROCEDURES

25   THAT FIRST SELECT USED AS IT OBTAINED DATA FOR

449

1    WELLS FARGO OR ANY OTHER BANK, THE COMPUTER SYSTEMS

2    THAT WERE UTILIZED BY FIRST SELECT IN THE ORIGINAL

3    ISSUER SUCH AS WELLS FARGO, HOW DATA WAS INSERTED

4    INTO THE COMPUTER SYSTEMS AND MAINTAINED AND

5    UPDATED AND WHAT PROCESSES, PROCEDURES THAT WERE IN

6    PLACE TO ENSURE THE INTEGRITY OF THE INFORMATION.

7         THAT'S WHY WE BROUGHT MR. FULLER ON BOARD

8    BECAUSE HE WAS EXTREMELY FAMILIAR AND RUN THE

9    PROCESS WITH FIRST SELECT IN ACQUIRING DATA AND

10   LOADING IT INTO THEIR SYSTEMS RECORD.

11   Q    AND WHAT SPECIFICALLY DID THE TWO OF YOU DO IN

12   THE DUE DILIGENCE PROCESS?

13   A    WELL, AGAIN, WE STARTED THE DUE DILIGENCE

14   PROCESS BY RECEIVING AN ELECTRONIC FILE THAT

15   CONTAINED A LARGE NUMBER OF DATA FIELDS WITH

16   DEMOGRAPHIC INFORMATION, INFORMATION ABOUT ACCOUNT

17   BALANCE, WHO THE ISSUER WAS, THE ACCOUNT STATUS OF

18   THE ACCOUNT.

19        WE ALSO RECEIVED A COMPLETE TRANSACTIONS

20   HISTORY OR HISTORY OF PAYMENTS AND OTHER EXPENSES

21   OR CHARGES SUCH AS THE COSTS OCCURRED ON EACH AND

22   EVERY ACCOUNT AND IN THE PORTFOLIO SINCE THE

23   ACCOUNT WAS CHARGED OFF.

24        AND WE RECEIVED ALL OF THE TEXTUAL NOTES

25   THAT ARE RECORDED BY FIRST SELECT AND IN ITS SYSTEM

450

1    ALONG WITH THE NOTES RECORDED BY ANY ORIGINAL

2    ISSUER SUCH AS WELLS FARGO.

3              SO THE FIRST THING WE DID IS WE EXAMINED

4    THE INTEGRITY OF THAT DATA USING A VARIETY OF THOSE

5    METHODS.  SOME OF THOSE METHODS ARE QUITE BASIC.

6              FOR EXAMPLE, A CREDIT CARD NUMBER SUCH AS

7    A WELLS FARGO ACCOUNT NUMBER IS A 16 DIGIT ACCOUNT

8    NUMBER.  IT'S BUILT WITH A CHECK DIGIT IN IT USING

9    SOMETHING CALLED THE ONE ALGORITHM.

10             SO USING THAT ALGORITHM YOU CAN ACTUALLY

11   DETERMINE WHETHER OR NOT A PARTICULAR CREDIT CARD

12   NUMBER IS VALID.

13             YOU CAN DO THE SAME THING WITH A SOCIAL

14   SECURITY NUMBER.

15             THE SOCIAL SECURITY ADMINISTRATION HAS A

16   DEFINED ALGORITHM FOR THE GENERATION OF SOCIAL

17   SECURITY NUMBERS AND WHICH NUMBERS HAVE BEEN ISSUED

18   AND USED AND AUTHORIZED TO DATE.

19             SO YOU CAN DO THE SAME THING THERE.

20             OTHER THINGS THAT WE DID, WE LOOKED AT

21   THE BALANCES OF THE ACCOUNT AND THE TRANSACTION

22   HISTORY, FOR EXAMPLE, THAT WE RECEIVED FROM FIRST

23   SELECT TO DETERMINE, COULD WE TIE THE BALANCE BACK

24   TO THE BALANCE AT CHARGE-OFF?  AND A LOT OF BASIC

25   TESTS LIKE THAT.

451

1           WHAT WAS THE OPEN DATE OF A PARTICULAR

2    ACCOUNT PRIOR TO THE DATE IT WAS CHARGED-OFF?

3           WAS THE DATE OF LAST PAYMENT WITHIN THE

4    EXPECTED RANGE OF THE CHARGE-OFF DATE BASED ON OUR

5    UNDERSTANDING OF WHAT THE CHARGE-OFF POLICIES WERE

6    AND WHAT LEGAL REQUIREMENTS THERE WERE?

7           SO WE CARRIED OUT A LOT OF TESTS WITH

8    REGARD TO THE DATA THAT WAS RECEIVED.

9           AND THE NEXT PART OF THE DUE DILIGENCE

10   WAS TO VERIFY, OKAY, HOW WAS THAT DATA PRODUCED?

11   HOW WAS IT MAINTAINED?  AND ARE WE SATISFIED THAT

12   THE SYSTEM'S METHODS AND PROCEDURES USED TO PRODUCE

13   THAT DATA TO US AND MAINTAIN IT WERE CREDIBLE?

14   TRUSTWORTHY?

15          SO IN THAT PROCESS ON THREE OCCASIONS I

16   TOOK A TEAM OF PEOPLE TO LOUISVILLE, KENTUCKY WHICH

17   WAS THE FIRST SELECT SERVICING CENTER WHERE WE

18   INTERVIEWED ALL OF THE OPERATIONAL PERSONNEL AND

19   MANAGEMENT AND TO UNDERSTAND THEIR DAY-TO-DAY

20   SYSTEMS AND RESPONSIBILITIES AND THE SERVICES THAT

21   THEY USED TO MAINTAIN DATA IN THE COMPUTER SYSTEM

22   AND EXTRACT DATA FROM THAT SYSTEM, WHAT PROCEDURES

23   THEY USED TO ENSURE THAT THE DATA WAS ACCURATE.

24          I ALSO VISITED THE FIRST SELECT FACILITY

25   IN PLEASANTON, CALIFORNIA AND INTERVIEWED PERSONNEL

                                                    452

1    AT PROVIDIAN NATIONAL BANK, WHICH WAS THE PARENT

2    CORPORATION OF FIRST SELECT AND ON THREE OCCASIONS

3    I ACTUALLY WENT TO COLUMBUS, GEORGIA AND VISITED

4    WITH TOTAL SYSTEMS.

5          TOTAL SYSTEMS IS A THIRD PARTY THAT

6    OPERATES TSYS.  TSYS IS THE SECOND BIGGEST CREDIT

7    CARD DATA SYSTEM OUT THERE.  CREDIT CARD COMPANIES

8    LIKE WELLS FARGO OR CITIBANK OR OTHER COMPANIES

9    WILL CONTRACT WITH TSYS OR ANOTHER COMPANY CALLED

10   FIRST DATA AND ON THOSE TWO SYSTEMS ABOUT 90, YOU

11   KNOW, 95 PERCENT OF ALL CREDIT CARD TRANSACTIONS IN

12   THE WORLD ARE PROCESSED ON THE FIRST DATA OR THE

13   TSYS DATA SYSTEM.

14         SO I SPENT THREE TRIPS IN COLUMBUS

15   UNDERSTANDING HOW THE TSYS DATA SYSTEM WORKED

16   BECAUSE THAT WAS THE DATA SYSTEM THAT FIRST SELECT

17   WAS USING TO MAINTAIN ITS INFORMATION AND THAT WAS

18   THE SYSTEM THAT WE USED AS WELL AFTER WE ACQUIRED

19   THE FIRST SELECT CREDIGY RECEIVABLES.

20   Q    SO JUST TO BE CLEAR, A COMPUTER WAS BEING USED

21   BY FIRST SELECT TO STORE ITS ACCOUNT DATA?

22   A    YES, THE FIRST SELECT DATA WAS STORED ON THE

23   TSYS COMPUTER SYSTEM IN COLUMBUS, GEORGIA AND

24   THAT'S WHERE THE DATA WAS MAINTAINED.

25   Q    AND DID YOU INVESTIGATE THE RELIABILITY OF

453

1    THIS COMPUTER?

2    A    YES, I ACTUALLY VISITED THE CAMPUS WHERE --

3             THE COURT:  I'M SORRY TO INTERRUPT THIS,

4    BUT I DON'T FIND THIS TO BE AS HELPFUL.

5             AS I HAVE SAID BEFORE, THE -- I'M

6    SATISFIED THAT THERE IS EVIDENCE THAT THIS COMPANY

7    PURCHASED THE RECORDS AND THOSE -- AND THE ACCOUNTS

8    FROM ANOTHER COMPANY.

9             AND IF THIS WERE A CASE WHERE THE ACCOUNT

10   WAS ONGOING AND THERE WERE CHARGES BEING MADE WHILE

11   FIRST SELECT HAD IT, WHICH I DON'T UNDERSTAND THAT

12   THERE'S BEEN EVIDENCE THAT IT WAS, THEN THE

13   RELIABILITY OF THE RECORDING OF THE TRANSACTIONS

14   WOULD BE IMPORTANT.

15            BUT MY UNDERSTANDING IS THAT THE ACCOUNT

16   WAS DORMANT AT THE TIME FIRST SELECT ACQUIRED IT

17   AND THAT THE ONLY RECORD THAT FIRST SELECT

18   MAINTAINED WAS THE BALANCE THAT WAS ACQUIRED AND

19   THE INTEREST THAT WAS ACCRUING ON IT.

20            IF THERE IS EVIDENCE THAT DURING FIRST

21   SELECT'S TIME IT OWNED THE ACCOUNT THERE WAS AN

22   ACCOUNT ACTIVITY, NAMELY, THE ACCOUNT WAS BEING

23   USED, FIRST SELECT WAS SERVICING THAT, PEOPLE WERE

24   CHARGING THINGS, PEOPLE WERE PAYING THINGS, THEN

25   THIS WOULD BE IMPORTANT.

1          BUT IF YOU PUT A NUMBER INTO A SYSTEM AND

2     YOU HAVE NOT VERIFIED THAT IT GOES IN THE ACCOUNT

3     THAT IS KEPT IS NOT GOING TO HELP US.

4          AND ALSO I HAVE SAID THAT IT'S NOT

5     IMPORTANT IN THIS CASE HAD FIRST SELECT MADE SURE

6     THAT THE NUMBER THAT IT HAD ACQUIRED FROM WELLS

7     FARGO AND PASSED THAT BALANCE ON TO THIS COMPANY.

8          THOSE MATTERS, IF WE SPENT A GREAT DEAL

9     OF TIME HEARING THIS WITNESS DESCRIBE THE EFFORTS

10    MADE TO VERIFY THAT THE FIRST SELECT RECORDS WERE

11    KEPT IN THE ORDINARY COURSE OF BUSINESS, IS NOT

12    GOING TO GET US ANY CLOSER TO THE QUESTION THAT THE

13    JURY HAS TO ANSWER IN THIS CASE.

14         SO I'M INTERRUPTING YOU.  IF YOU HAVE

15    EVIDENCE THAT YOU WISH TO SOLICIT FROM THIS WITNESS

16    OF ACCOUNT ACTIVITY WHICH WOULD HELP US UNDERSTAND

17    AS TO WHETHER THE FAUSTOS WERE MAINTAINING THE

18    ACCOUNT AND MANAGING IT AND IT WAS AN ACTIVE

19    ACCOUNT, THAT MIGHT MARGINALLY BE RELEVANT BECAUSE

20    I UNDERSTAND BOTH SIDES WISH THIS JURY TO

21    UNDERSTAND WHETHER IT STARTED OUT AS A LEGITIMATE

22    ACCOUNT.

23         BUT IT COULD BE THAT THE FAUSTOS PAID IT

24    OFF AND DIDN'T RECOGNIZE IT AND DIDN'T RECOGNIZE IT

25    AS THEIR ACCOUNT WHEN REPORTED BY CREDIGY AS SOME

1    $17,000 WHEN THE ACCOUNT THAT THEY HAVE REMEMBERED

2    AS BEING INVOLVED IN WAS $3,000 OR $4,000.  IT MAY

3    NOT BE RECOGNIZED AS THE SAME ACCOUNT.  THERE COULD

4    BE ALL KINDS OF POSSIBILITIES.  THAT'S NOT WHAT

5    OCCUPIES US HERE TODAY.

6                MR. GILLESPIE:  LET ME TRY THIS, YOUR

7    HONOR -- I'LL GO AHEAD AND ASK TO MOVE INTO

8    EVIDENCE EXHIBIT 157 AND LET ME WITHDRAW THAT AND

9    JUST HAVE MR. WILLIAMS IDENTIFY IT FOR THE RECORD.

10   Q    DO YOU HAVE A COPY OF EXHIBIT 157 UP THERE,

11   JASON?

12   A    YES, I DO RIGHT HERE (INDICATING).

13   Q    WHAT IS EXHIBIT 157?

14   A    157 IS THE RECORDS, CREDIGY'S RECORDS AND THE

15   RECORDS WE RECEIVED FROM FIRST SELECT ON THEIR

16   COLLECTION ACTIVITY REPORTS IN THE LOG AND THE

17   RECORDS THAT WERE RECEIVED FROM WELLS FARGO JUST

18   THE ELECTRONIC DATA.  THAT'S WHAT 157 IS.

19   Q    AND THESE ARE BUSINESS RECORDS OF CREDIGY?

20   A    YES.

21               MR. GILLESPIE:  I'LL MOVE TO ADMIT

22   EXHIBIT 157, YOUR HONOR.

23               MR. HUMPHREYS:  I OBJECT.  IT'S DOUBLE

24   HEARSAY AND MULTIPLE HEARSAY.

25               MAY I VOIR DIRE THE WITNESS?

                                                    456

1          THE COURT:  YOU ALREADY HAD AN

2    OPPORTUNITY TO EXAM THE WITNESS, BUT IT WAS NOT

3    NECESSARILY WITH RESPECT TO EXHIBIT 157.

4          THE ONLY PART OF THIS THAT I PAUSE ON IS

5    THE WITNESS DESCRIBED THIS AS A DOCUMENT WHICH

6    CONTAINS RECORDS THAT WE RECEIVED FROM WELLS FARGO

7    BANK.

8          DO I UNDERSTAND THAT INCLUDED IN THAT

9    DOCUMENT ARE DOCUMENTS SOLICITED BY CREDIGY FROM

10   WELLS FARGO AND RECEIVED FROM CREDIGY FROM WELLS

11   FARGO?

12         MR. GILLESPIE:  NO.  THERE ARE ACCOUNT

13   RECORDS FROM FIRST SELECT -- FROM WELLS FARGO THAT

14   WERE OBTAINED BY FIRST SELECT.

15         THE COURT:  ALL RIGHT.  WELL, THAT'S

16   DIFFERENT.

17         IN OTHER WORDS, MEMBERS OF THE JURY, I'M

18   GOING TO ALLOW THIS INTO EVIDENCE, BUT YOU'LL HAVE

19   TO UNDERSTAND THAT THERE WILL BE RECORDS AS, I

20   UNDERSTAND IT, INCLUDED IN HERE WHICH CREDIGY

21   RECEIVED FROM FIRST SELECT AND EVERY RECORD THAT IS

22   THERE WOULD BE RECEIVED FROM FIRST SELECT.

23         THAT WHAT IS BEING REFERRED TO AS WELLS

24   FARGO IS A REPRESENTATION THAT WELLS FARGO HAD

25   SUPPLIED IT TO FIRST SELECT.

457

1          NOW, THERE'S NO ONE HERE FROM FIRST

2     SELECT WHO CAN SAY THAT TO US AND SO WE'RE HAVING

3     TO RELY UPON THE REPRESENTATION THAT FIRST SELECT

4     MADE TO CREDIGY THAT THAT'S WHERE THEY GOT THE

5     RECORD BUT THAT'S -- BUSINESSES OPERATE THAT WAY.

6     THIS IS A NORMAL KIND OF PRACTICE BUT IT COULD, AS

7     I UNDERSTAND IT, GO TO THE WEIGHT THAT YOU GIVE IT.

8          IN OTHER WORDS, IF THERE WAS A MISTAKE

9     MADE BY WELLS FARGO, THEN THAT MISTAKE WOULD HAVE

10    BEEN PASSED ON TO FIRST SELECT AND FIRST SELECT

11    WOULD HAVE PASSED IT ON TO CREDIGY.  THAT'S AS FAR,

12    AS I UNDERSTAND THAT, WE WILL BE ABLE TO GO ON THIS

13    MATTER.

14         BUT IT DOES OCCUR TO ME THAT IF AN

15    ACCOUNT IS STATED IN THE REGULAR BUSINESS ACTIVITY

16    OF FIRST SELECT AND THAT IS PASSED ON TO CREDIGY,

17    CREDIGY RELIED UPON THAT REPRESENTATION WITHOUT

18    ITSELF GOING BACK TO THE SOURCE TO CHECK ON THAT

19    INFORMATION.

20         SO WITHOUT ALLOWING YOU TO VOIR DIRE,

21    I'LL LET YOU CROSS-EXAMINE ON 157.

22         MR. HUMPHREYS:  WELL, BEFORE IT'S

23    ADMITTED, YOUR HONOR, I BELIEVE THAT THERE'S

24    IMPORTANT QUESTIONS HERE ABOUT WHETHER THE RECORD

25    HAS BEEN ALTERED AT CREDIGY BY CREDIGY.

458

1      THE WELLS FARGO RECORDS HAVE BEEN

2  MANIPULATED BY CREDIGY.

3      THE COURT:  WELL, BUT -- THEN WHAT YOU

4  ARE CALLING A WELLS FARGO RECORD IS A FIRST SELECT

5  RECORD.  THERE IS NO RECORD OF WELLS FARGO.

6  THERE'S ONLY A RECORD OF FIRST SELECT.

7      AND YOU MAY CROSS-EXAMINE THE WITNESS

8  WITH RESPECT TO ONCE IT RECEIVED THE RECORDS FROM

9  FIRST SELECT, WHETHER IT DID SOMETHING TO THOSE

10  RECORDS, BUT THAT'S ON CROSS-EXAMINATION.

11      MR. HUMPHREYS:  I WOULD ALSO RENEW MY

12  OBJECTION THEN TO IT BEING DOUBLE HEARSAY.  IT'S

13  INADMISSIBLE.

14      THE COURT:  THE OBJECTION IS OVERRULED.

15  157 MAY BE RECEIVED.

16      (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 157,

17      HAVING BEEN PREVIOUSLY MARKED FOR

18      IDENTIFICATION, WAS ADMITTED INTO

19      EVIDENCE.)

20      MR. GILLESPIE:  YOUR HONOR -- I MEAN, I'M

21  SORRY.

22  Q   MR. WILLIAMS, THERE WAS -- THERE'S BEEN SOME

23  DISCUSSION TODAY THAT YOU HAD IN YOUR QUESTION BY

24  MR. HUMPHREYS ABOUT A LAWSUIT THAT WAS FILED BY THE

25  FAUSTOS IN 200 -- IN 2000 I BELIEVE BY HUNT

459

1    & ENRIQUES?

2    A    YES.

3    Q    AND CAN YOU TELL THE JURY WHAT YOU KNOW ABOUT

4    THAT?

5    A    YES.  I KNOW THAT THERE WAS A LAWSUIT FILED BY

6    HUNT & ENRIQUES FOR TWO REASONS:  NUMBER ONE, I

7    PULLED THE RECORDS FROM MONTEREY COUNTY AND LOOKED

8    AT THE COMPLAINT THAT WAS FILED BY HUNT & ENRIQUES

9    BY MR. AND MRS. FAUSTO.

10        THE COMPLAINT WASN'T SERVED ON THEM

11   PERSONALLY.  IT WASN'T MAILED TO THEIR POST OFFICE

12   BOX.  ULTIMATELY THAT COMPLAINT IS DISMISSED.

13        I ALSO NOTED THAT BECAUSE THE TEXTUAL

14   NOTES THAT WE HAVE RELATED TO THE ACCOUNT INDICATED

15   THAT MR. AND MRS. FAUSTO WERE SENT TO HUNT &

16   ENRIQUES FOR A LAWSUIT TO BE FILED IN THE BEGINNING

17   PART OF 2000.

18   Q    AND SPECIFICALLY WHERE IN THE ACCOUNT RECORDS

19   IS THAT SHOWN ON EXHIBIT 157?

20   A    IF I LOOK ON 157 ON, STARTING ON 1062 AND THEN

21   1061 ON APRIL 3RD OF 2000 THERE WAS A CALL FROM

22   MR. BLANCO WHO TRIED TO NEGOTIATE A SETTLEMENT ON

23   THE ACCOUNT.

24        FIRST SELECT REFUSED TO ACCEPT THE

25   SETTLEMENT.

460

1           AND THEN ON APRIL 10TH, 2000 FIRST SELECT

2    INFORMED HUNT & ENRIQUES TO PROCEED WITH THE

3    LAWSUIT.  AND THAT IS WHEN THE -- AFTER THAT THE

4    LAWSUIT WAS FILED BY HUNT & ENRIQUES.

5    Q    IS THERE ANYTHING IN THE RECORDS INDICATING

6    THAT BEFORE THE CALL CAME IN FROM MR. BLANCO THAT

7    YOU JUST DESCRIBED THAT THE ACCOUNT WAS SENT OUT TO

8    HUNT & ENRIQUES TO TAKE SOME ACTION ON IT, SOME

9    COLLECTION ACTIVITY?

10   A    YES, I BELIEVE IMMEDIATELY BEFORE THE CALL

11   FROM ABC CONSULTING MR. BLANCO, THE LETTER WAS SENT

12   OUT, THE RECORD REFLECTS HERE THAT THE FILE WAS

13   SENT TO HUNT & ENRIQUES ON MARCH 3RD OF 2000.  THEY

14   MAILED A LETTER OUT AND THEN IMMEDIATELY AFTER THAT

15   THERE WAS A PHONE CALL RECEIVED FROM VANESSA

16   CALLING ON BEHALF OF MR. AND MRS. FAUSTO, THEIR

17   DAUGHTER.  AND AFTER THAT MR. BLANCO CALLED AND

18   TRIED TO NEGOTIATE SETTLEMENT.

19           FIRST SELECT REFUSED.

20           AND THEN SUIT WAS FILED BY HUNT &

21   ENRIQUES.  IT WAS JUST NEVER SERVED.

22   Q    AND AGAIN, SO THE JURY, WHEN THEY TAKE A LOOK

23   AT THIS DOCUMENT LATER CAN SEE SPECIFICALLY WHAT

24   YOU'RE TALKING ABOUT.  IN WHAT PAGE AND WHAT DATES

25   OF THESE RECORDS DO THEY NEED TO LOOK AT?

1    A    PAGE 1062.

2    Q    OF EXHIBIT 157?

3    A    OF EXHIBIT 157.  THE MARCH 3RD WAS WHEN THE

4    ACCOUNT WAS SENT TO HUNT & ENRIQUES; MARCH 14TH WAS

5    WHEN MR. FAUSTO'S DAUGHTER, VANESSA, CALLED; AND ON

6    APRIL 3RD, MR. BLANCO CALLED AND TRIED TO NEGOTIATE

7    A SETTLEMENT; AND ON APRIL 10TH, FIRST SELECT

8    INFORMED HUNT & ENRIQUES THAT THEY SHOULD PROCEED

9    WITH THE LAWSUIT BECAUSE THE ACCOUNT WAS NOT

10   SETTLED.

11   Q    DO YOU KNOW ANYTHING ELSE ABOUT THE HUNT &

12   ENRIQUES HANDLING OF THIS ACCOUNT PRIOR TO THE

13   FILING OF THE LAWSUIT?

14   A    JUST THAT THEY SENT A DEMAND LETTER WHEN THEY

15   RECEIVED THE ACCOUNT.

16   Q    AND HAVE YOU SEEN ANYTHING TO CONFIRM THAT

17   OTHER THAN WHAT IS APART FROM THE FIRST SELECT

18   RECORDS?

19   A    WELL, I PERSONALLY VISITED WITH HUNT &

20   ENRIQUES AND THAT IS THEIR PRACTICE.

21         MR. HUMPHREYS:  OBJECTION.  IT'S HEARSAY.

22   WHATEVER THEY MAY OR MAY NOT HAVE SAID IS HEARSAY,

23   YOUR HONOR.

24         THE COURT:  SUSTAINED.  I WAS ALSO

25   STUDYING THE RECORD.  IS THE WORDS YOU STATED

                                          462

1    MR. BLANCO CALLED AND ATTEMPTED TO SETTLE IN THE

2    RECORD OR IS THAT YOUR CHARACTERIZATION OF THE

3    RECORD?

4            BECAUSE IT SEEMS TO ME TO SAY THAT

5    THERE'S A HAD SETTLEMENT SUGGESTED THAT HE

6    ACKNOWLEDGES THAT IT IS HIS DEBT AND HE WISHES TO

7    PAY LESS THAN ALL OF IT.  AND I DIDN'T WANT THE

8    WORD "SETTLEMENT" TO BE ON OUR RECORD UNLESS THERE

9    WAS THAT REPRESENTATION.

10            I KNOW YOU'RE RELYING ON SOMEONE ELSE'S

11    RECORD.  SO I WANT TO MAKE SURE THAT YOU WERE

12    RELYING ON WHAT SOMEONE ELSE TOLD US AS OPPOSED TO

13    WHAT YOUR CONCLUSION WAS HE WAS SAYING.

14            THE WITNESS:  YES, ON 10-62 WHAT THE

15    RECORD INDICATES IS THAT MR. BLANCO CALLED.  HE

16    OFFERED TO SETTLE THE ACCOUNT.

17            THE COURT:  WHERE DO YOU SEE THE WORDS

18    "HE OFFERED TO SETTLE THE ACCOUNT"?

19            MR. GILLESPIE:  LET ME LAY A FOUNDATION

20    FOR THAT, IF I MAY.

21            THE COURT:  CERTAINLY.

22    BY MR. GILLESPIE:

23    Q    ARE YOU FAMILIAR WITH ANY SYMBOLS OR

24    ABBREVIATIONS OR TERMS THAT ARE USED IN THE RECORD?

25            MR. HUMPHREYS:  I'LL HAVE TO OBJECT TO

                                                         463

1    HIM NOW TESTIFYING AS TO WHAT THE CODES WERE

2    INPUTED BY A THIRD PARTY MEAN.

3            THE COURT:  SUSTAINED.

4    BY MR. GILLESPIE:

5    Q    DO YOU KNOW WHAT THESE CODES MEAN?

6    A    YES.

7    Q    AND HOW DO YOU KNOW THAT?

8    A    BECAUSE I INTERVIEWED ALL OF THE OPERATIONAL

9    PERSONAL AND OBSERVED CODES USED.

10           MR. HUMPHREYS:  THAT'S HEARSAY.  MOVE TO

11   STRIKE AS HEARSAY.

12           THE COURT:  SUSTAINED.

13   BY MR. GILLESPIE:

14   Q    ARE YOU ABLE TO TRANSLATE THE ENTRY OF APRIL

15   3RD, 2000?

16           MR. HUMPHREYS:  IT'S HEARSAY, YOUR HONOR.

17           THE COURT:  SUSTAINED.  IT DOESN'T SEEM

18   TO ME -- THAT'S WHY I WAS CONCERNED.

19           I WILL LET HIM READ WHAT IS IN THE

20   RECORD, BUT IF SOME CODE IS USED WHICH WOULD

21   REQUIRE THE PERSON WHO MADE THE CODE TO TRANSLATE

22   IT, THERE'S NO WAY FOR US -- AND HE'S THE ONLY ONE

23   WHO KNOWS THE CODE, THERE'S NOBODY ELSE WHO HERE

24   WHO COULD TESTIFY ABOUT IT, I'M CONCERNED THAT WE

25   ARE AT RISK, UNLESS THE DOCUMENT ITSELF CONTAINS A

1    CODE.

2              IN OTHER WORDS, IF THEY ACQUIRE FROM

3    FIRST SELECT, TT MEANS CALL TO SETTLE, THEN WE CAN

4    RELY UPON THAT CALL, BUT OTHERWISE THERE'S NO WAY

5    TO KNOW WHETHER OR NOT HIS CONCLUSION ABOUT WHAT

6    HAPPENED IS WHAT THE PERSON WHO WROTE THE RECORD IS

7    RECORDING AS HAVING TAKEN PLACE.

8              THE REASON I PERMIT HEARSAY IN THE FORM

9    OF BUSINESS RECORDS IS THAT IT'S RECORDED IN THE

10   REGULAR COURSE OF BUSINESS, AND WHAT WE SEE

11   RECORDED IS SOMEONE IS DOING SOMETHING THAT THEY

12   DON'T THINK ABOUT THE RELIABILITY OR TRUTH OF IT.

13   THEY JUST RECORD WHAT IS GOING ON.

14             SO I WILL PERMIT YOU TO ASK HIM WHAT IS

15   THERE BECAUSE I HAVE ALLOWED THIS IN THE RECORD,

16   BUT I WON'T PERMIT HIM TO STATE ANYTHING BEYOND

17   WHAT IS THERE AT THIS POINT.

18             MR. GILLESPIE:  MAY I TRY ONE MORE TIME

19   TO QUALIFY HIM ON SOME OF THESE?

20             THE COURT:  SURE.

21   BY MR. GILLESPIE:

22   Q    ARE ANY OF THE TERMS THAT ARE USED IN THE

23   FIRST SELECT RECORDS OR THE ABBREVIATIONS OR

24   SYMBOLS COMMONLY USED SYMBOLS, OR ABBREVIATIONS, IN

25   THE COLLECTION ACTIVITY FOR NOTING COLLECTION

                                                    465

1    ACTIVITY?

2              MR. HUMPHREYS:  YOUR HONOR, THERE'S A

3    MOTION IN LIMINE ON EXPERT TESTIMONY.  THEY HAVE

4    NOT DESIGNATED HIM AS AN EXPERT.

5              MR. GILLESPIE:  THIS IS WHY I TRIED TO

6    LAY THE FOUNDATION REGARDING THE EXPERIENCE OF WHAT

7    HE HAS LEARNED IN THE DUE DILIGENCE PROCESS, AND,

8    AGAIN, IT'S NOT EXPERT OPINION TESTIMONY THIRD

9    PARTY.  IT'S HIS TESTIMONY REGARDING --

10             THE COURT:  YES.  BUT, COUNSEL, I'M GOING

11   TO HAVE TO SUSTAIN THE OBJECTION.

12             ONE OF THE MOST IMPORTANT ISSUES IN THIS

13   CASE THAT YOU ALL ARE TRYING IS WHETHER THE FAUSTOS

14   ACKNOWLEDGED THAT THIS WAS THEIR ACCOUNT.

15             I WILL ALLOW YOU, IF THE RECORD SAYS

16   ANYTHING TO THAT EFFECT, TO READ THAT RECORD.  BUT

17   IT SEEMS TO ME FOR HIM TO SAY, "THIS IS NOT THE

18   ACCOUNT," I WON'T ALLOW THAT.

19             MR. GILLESPIE:  IF I LATER BRING IN A

20   WITNESS WHO CAN TRANSLATE WHAT THESE SYMBOLS MEAN

21   WHO WORKED FOR FIRST SELECT AT THE TIME WOULD THAT

22   BE --

23             THE COURT:  I'LL TAKE IT UP LATER.

24   THAT'S AN IMPROPER PROFFER BEFORE THE JURY.  IF

25   YOU'RE ABLE TO CALL ANOTHER WITNESS, I'LL EVALUATE

466

1    THAT WITNESS.

2            I'M JUST SPEAKING WITH RESPECT TO

3    MR. WILLIAMS.

4            MR. GILLESPIE:  ALL RIGHT.

5    Q    WHY DON'T YOU JUST READ THE ENTRY FROM APRIL

6    3RD, 2000 THAT WE HAVE BEEN DISCUSSING?

7    A    SURE.  "TT CI, TT CARLOS BLANCO/ABC

8    CONSULTING.  HE WANTED AN SIF OF 50 PERCENT.  SD NO

9    LOWER THAN 90 PERCENT OF BIF.  TRIED TO BIF,

10   SIF/PPA.  SD CI POSSIBLY MOVING BACK TO MEXICO IF

11   FILE BK.  ADV OF LGL CONSEQUENCES AND RD HARD

12   REFUSAL."

13   Q    NOW, AGAIN, FOR THE JURY'S CONVENIENCE AND IN

14   LOOKING AT THIS EXHIBIT LATER, WHAT PAGES OF

15   EXHIBIT 157 CONTAIN HISTORICAL NOTES THAT WERE

16   OBTAINED FROM FSI?

17   A    PAGE 1061, 1062, 1063, AND 1064.

18   Q    AND AGAIN, FOR THE CONVENIENCE OF THE JURY,

19   CAN YOU DISTINGUISH SPECIFICALLY OUT OF THESE ANY

20   OF THE WELLS FARGO ACCOUNT NOTES WHICH CREDIGY GOT

21   FROM FIRST SELECT?

22   A    YES.

23   Q    AND WHAT ARE THOSE?

24   A    THOSE ARE THE NOTES MARKED ON 1069, AND 1063,

25   AND 1064.

                                              467

1          THE COURT:  DO I UNDERSTAND THAT WHAT

2     YOU'RE TELLING US IS THAT YOU CAN DISCERN FROM THE

3     REPORT ON DECEMBER 1990 THAT A WELLS FARGO EMPLOYEE

4     MADE THE RECORD THAT IS 1063 AND 1064?

5          THE WITNESS:  NO.  WHAT I'M SAYING IS

6     THAT ON DECEMBER 1990 AN EMPLOYEE FROM FIRST SELECT

7     LOADED THE INFORMATION ON THE RIGHT-HAND COLUMN

8     WHICH WAS INFORMATION RECEIVED FROM WELLS FARGO.

9          THE COURT:  OKAY.

10    BY MR. GILLESPIE:

11    Q    AND AGAIN, TO CLARIFY FOR THE BENEFIT OF THE

12    COURT AND JURY, ARE THERE OTHER DATES WHICH THEN

13    ALL OF THOSE ENTRIES OF DECEMBER 30TH WHICH WOULD

14    REFER TO ACCOUNT ACTIVITY DURING THE TIME THE

15    ACCOUNT WAS HELD BY WELLS FARGO?

16    A    YES.

17    Q    OKAY.  COULD YOU GIVE US AN EXAMPLE?

18    A    YES.  ON THE BOTTOM OF PAGE 1063 THERE IS AN

19    ENTRY THAT SAYS, "OLD W/SON, 19990821, 08:52."

20    THAT'S AN EXAMPLE OF A DATE EMBEDDED THERE.

21    Q    AFTER ALL DUE DILIGENCE WAS CONDUCTED AND YOU

22    WERE GOING TO GO THROUGH THE SALE OF THE PORTFOLIO,

23    WERE YOU INVOLVED IN THE NEGOTIATION OF THE

24    PURCHASE AND SALE AGREEMENT BETWEEN THE PARTIES?

25    A    YES.

1    Q    WERE YOU INVOLVED IN THE DRAFTING OF THE

2    PURCHASE AND SALE AGREEMENT?

3    A    I WAS INVOLVED IN THE DRAFTING, YES.

4    Q    SPECIFICALLY WHAT WAS YOUR INVOLVEMENT?

5    A    I ACTUALLY DRAFTED THE SECTION RELATED TO DATA

6    TRANSFER THAT SPECIFICALLY THEN DEFINED THE SERIAL

7    NUMBERS OF THE C'S ON WHICH THE DATA WAS

8    TRANSFERRED AND THE MECHANISM BY WHICH THE DATA WAS

9    TO BE TRANSFERRED IN THE TRANSACTION.

10   Q    WOULD YOU TAKE A LOOK AT EXHIBIT 160, PLEASE.

11   A    LET ME SEE IF I'VE GOT IT HERE.

12   Q    DO YOU HAVE IT, JASON?

13   A    ALL RIGHT.

14   Q    WHAT IS THAT DOCUMENT?

15   A    THIS IS THE PURCHASE AND SALE AGREEMENT DATED

16   DECEMBER 27TH, 2002 BETWEEN FIRST SELECT,

17   INCORPORATED, AND CREDIGY RECEIVABLES,

18   INCORPORATED.

19   Q    AND DO I CORRECTLY RECALL THAT MR. HUMPHREYS

20   ASKED YOU SOME QUESTIONS ABOUT THIS DOCUMENT

21   YESTERDAY?

22   A    YES.

23         MR. GILLESPIE:  AND I MOVE FOR THE

24   ADMISSION OF EVIDENCE OF EXHIBIT 160.

25         MR. HUMPHREYS:  I WOULD OBJECT BECAUSE IT

                                                    469

1    CONTAINS MARKOUTS.  I WOULD LIKE AN ACTUAL COPY OF

2    THE AGREEMENT.  IN ADDITION TO IT THERE ARE

3    SCHEDULES THAT ARE NOT INCORPORATED IN IT SO IT'S

4    AN INCOMPLETE DOCUMENT.

5              IF THEY'RE GOING TO ADMIT IT SO I CAN SEE

6    WHAT IT REALLY IS, NOT A PHOTOCOPY THAT IS NOT --

7              THE COURT:  VERY WELL.  160 IS IN

8    EVIDENCE.  I HAVE ALLOWED YOU TO PUT IN DOCUMENTS

9    THAT HAVE BEEN PHOTOCOPIED AND THERE'S NO REASON

10   NOT TO ALLOW THE DEFENSE.

11             (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 160,

12             HAVING BEEN PREVIOUSLY MARKED FOR

13             IDENTIFICATION, WAS ADMITTED INTO

14             EVIDENCE.)

15   BY MR. GILLESPIE:

16   Q    DOES THIS PURCHASE AND SALE AGREEMENT COVER

17   THE WELLS FARGO ACCOUNTS THAT HAVE BEEN DISCUSSED?

18   A    YES.

19   Q    AND DOES IT SPECIFICALLY COVER THE FAUSTO

20   ACCOUNT?

21   A    YES.

22   Q    COULD YOU PLEASE TAKE A LOOK AT EXHIBIT 159,

23   AND I'LL GIVE YOU MY COPY.  WHAT IS THAT EXHIBIT?

24   A    THIS IS THE PURCHASE AND SALE AGREEMENT DATED

25   OCTOBER 23RD, 1998 BETWEEN WELLS FARGO BANK AND

470

1   FIRST SELECT CORPORATION, AND IT'S ALSO INCLUDING

2   SIX AMENDMENTS TO THAT PURCHASE AND SALE AGREEMENT.

3   Q    HOW DID CREDIGY ACQUIRE A COPY OF THIS

4   ACCOUNT?

5   A    THIS CONTRACT WAS PROVIDED BY FIRST SELECT TO

6   EVIDENCE THE CHAIN OF TITLE RELATED TO THE ASSETS

7   ACQUIRED AND ANY OTHER RIGHTS, RESPONSIBILITIES,

8   REGARDING THE ACCOUNTS THAT WERE ACQUIRED FROM

9   WELLS FARGO.

10  Q    AND WAS THIS EXHIBIT PART OF THE DOCUMENTS

11  THAT WERE INCLUDED IN THE PURCHASE AND SALE

12  AGREEMENT, EXHIBIT 160?

13  A    YES.

14  Q    DOES THE -- DOES EXHIBIT 159 COVER THE

15  FAUSTOS' ACCOUNT IN THE SALE FROM WELLS FARGO TO

16  FIRST SELECT?

17          MR. HUMPHREYS:  OBJECTION, YOUR HONOR.

18  THE DOCUMENT ITSELF IS THE BEST EVIDENCE.

19          THE COURT:  OVERRULED.

20          THE WITNESS:  YES.

21          MR. GILLESPIE:  I MOVE FOR THE ADMISSION

22  INTO EVIDENCE OF EXHIBIT 159.

23          MR. HUMPHREYS:  OBJECT ON THE GROUNDS

24  THAT HE CAN'T LAY A PROPER FOUNDATION, AND HE

25  WASN'T A PARTY TO IT AND HEARSAY.

471

1              THE COURT:  OVERRULED.  159 IS IN

2    EVIDENCE.

3              (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 159,

4              HAVING BEEN PREVIOUSLY MARKED FOR

5              IDENTIFICATION, WAS ADMITTED INTO

6              EVIDENCE.)

7    BY MR. GILLESPIE:

8    Q    I'D LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

9    162.  WHAT IS THAT DOCUMENT, MR. WILLIAMS?

10   A    IT'S AN AMENDED AND RESTATED SERVICING

11   AGREEMENT BETWEEN CREDIGY RECEIVABLES,

12   INCORPORATED, AND CREDIGY SERVICES CORP.

13             MR. GILLESPIE:  MOVE FOR THE ADMISSION OF

14   162.

15             MR. HUMPHREYS:  NO OBJECTION.

16             THE COURT:  162 IS IN EVIDENCE.

17             (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 162,

18             HAVING BEEN PREVIOUSLY MARKED FOR

19             IDENTIFICATION, WAS ADMITTED INTO

20             EVIDENCE.)

21   BY MR. GILLESPIE:

22   Q    AND AGAIN, BECAUSE THIS IS FOR THE JURY, THIS

23   IS A STIPULATED EXHIBIT, WHAT IS EXHIBIT 161?

24             THE COURT:  I'M SORRY, THE NUMBER?

25             MR. GILLESPIE:  161.

                                                    472

1              THE WITNESS:  THIS IS A GENERAL AND

2    ADMINISTRATIVE SERVICES AGREEMENT BETWEEN CREDIGY

3    SOLUCOES FINANCEIRAS LIMETADA AND CREDIGY SERVICES

4    CORP.

5    BY MR. GILLESPIE:

6    Q    DOES EXHIBIT 160 AND 16 -- 159, WOULD THEY

7    COVER THE SERVICING OF THE FAUSTOS' ACCOUNT?

8    A    I'M SORRY?  162 AND --

9    Q    NO.  159 AND 160?

10   A    162 AND 161 COVERED THE SERVICING.

11   Q    OH, I'M SORRY, YOU'RE RIGHT.  I'M GETTING MY

12   NUMBERS CONFUSED.  I APOLOGIZE.

13             SO EXHIBIT 161 AND 162 GOVERN THE

14   SERVICING OF THE ACCOUNT; CORRECT?

15   A    YES.

16             MR. GILLESPIE:  I'LL GO AHEAD AND MOVE

17   FOR THE ADMISSION OF 161 INTO EVIDENCE ALTHOUGH

18   IT'S BEEN STIPULATED INTO EVIDENCE, YOUR HONOR.

19             THE COURT:  161 IS IN EVIDENCE.

20             (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 161,

21             HAVING BEEN PREVIOUSLY MARKED FOR

22             IDENTIFICATION, WAS ADMITTED INTO

23             EVIDENCE.)

24   BY MR. GILLESPIE:

25   Q    AFTER THE FIRST SELECT TRANSACTION WAS

473

1    CONSUMMATED AT CREDIGY, WHAT SORT OF DUTIES WERE

2    YOU ASSIGNED?

3    A    WELL, MANY THINGS BUT IMMEDIATELY AFTER THE

4    TRANSACTION I WAS INVOLVED IN TRANSITION OF

5    SERVICING FROM FIRST SELECT TO CREDIGY SERVICES

6    CORP UNTIL MAY 3RD OF 2003.

7         FIRST SELECT CONTINUED TO SERVICE THE

8    ACCOUNTS THAT WERE ACQUIRED ON DECEMBER 27TH, 2002

9    AND THAT WAS THE DATE THAT SERVICE WAS TRANSFERRED

10   TO CREDIGY SERVICES CORP.

11   Q    AND SPECIFICALLY WHAT DID YOU DO?

12   A    WELL, I WAS INVOLVED IN GETTING OUR COMPUTER

13   DATA SYSTEMS SET UP SO WE CONTINUED TO USE THE TSYS

14   SYSTEM IN COLUMBUS, GEORGIA.

15        AFTER CREDIGY RECEIVABLES BECAME OWNER OF

16   THE ACCOUNT, SO I WAS INVOLVED IN THAT.  AND I WAS

17   INVOLVED IN THE PREPARATION FOR THE SYSTEM OF

18   RECORD TRANSFER THAT TOOK PLACE ON MAY 3RD OF 2003

19   WHEN THE INFORMATION FROM THE TSYS DATA SYSTEM WAS

20   TRANSFERRED TO AN INTERNAL SYSTEM MAINTAINED BY

21   CREDIGY SERVICES CORP CALLED SIMPLECT.

22   Q    OKAY.  AND WERE YOU INVOLVED -- OR WHAT DUTIES

23   DID YOU HAVE IN CONNECTION WITH SIMPLECT?

24   A    WITH RELATION TO SIMPLECT I WAS INVOLVED IN

25   HELPING TO DEFINE A NUMBER OF THE BUSINESS RULES

474

1    AND PROCESSES RELATED TO A COLLECTION OF ACCOUNTS

2    AND WORKING WITH OUR IT DEVELOPMENT TEAMS AT

3    CREDIGY TO IMPLEMENT THOSE BUSINESS RULES AND

4    PROCESSES.

5            FOR EXAMPLE, THE STATUTE OF LIMITATIONS

6    RULE THAT AN ACCOUNT CAN'T BE SUED AFTER THE

7    STATUTE OF LIMITATIONS HAS EXPIRED.  FOR EXAMPLE,

8    THE WORK FLOW OF THE ACCOUNT WOULD GO THROUGH WHAT

9    THE ACCOUNT WAS REFERRED TO AN ATTORNEY OUTSIDE FOR

10   LAWSUIT.

11           SO THESE KIND OF PROCESSES AND PROCEDURES

12   I WORKED ON WITH THE I.T. TEAM.

13   Q    WERE THERE SAFEGUARDS BUILT INTO THE DESIGN OF

14   THE SIMPLECT SYSTEM TO AVOID ERRORS, MISTAKES, THAT

15   TYPE OF THING?

16   A    SURE.  FOR EXAMPLE, THERE'S A CHECK ROUTINE

17   THAT IS RUN EVERY NIGHT WHEN TRANSACTIONS ARE

18   POSTED TO THE SYSTEM.  SO THOSE COULD BE PAYMENT

19   TRANSACTIONS OR LEGAL EXPENSE COSTS OR AN NSF, A

20   NONSUFFICIENT FUNDS CHECK.  AND EVERY NIGHT A CHECK

21   TRANSACTION IS RUN WHEN THOSE TRANSACTIONS ARE

22   POSTED TO TIE THE BALANCE BACK TO THE BALANCE

23   ORIGINALLY ACQUIRED BY CREDIGY.  SO THAT'S THE

24   EXAMPLE OF A CHECK PROCEDURE.

25   Q    ARE YOU FAMILIAR WITH THE METHODS FOR

475

1    EXTRACTING INFORMATION FROM THE SIMPLECT SYSTEM AND

2    PRINTING OUT REPORTS?

3    A    YES, I AM.

4    Q    I WANT TO SHOW YOU WHAT HAS BEEN MARKED AS

5    EXHIBIT 155.  CAN YOU TELL US WHAT THAT DOCUMENT

6    IS?

7    A    YES.  THIS IS THE OUTPUT OF THE QUERY THAT WAS

8    RUN IN THE SEQUEL QUERY ANALYZER ON THE SIMPLECT

9    DATABASE AND THEN THE RESULTS OF THAT QUERY WERE

10   PLACED INTO A SPREADSHEET AND PRINTED OUT HERE.

11   Q    OKAY.  DID YOU PREPARE THIS DOCUMENT?

12   A    THIS DOCUMENT?  NO, I DID NOT PREPARE THIS

13   PARTICULAR DOCUMENT.

14   Q    HAVE YOU REVIEWED THIS DOCUMENT TO DETERMINE

15   ITS ACCURACY?

16   A    I -- ACTUALLY, I HAVE.  I ACTUALLY WROTE AND

17   RAN A QUERY ON THE CEASE AND DESIST FLAG AND RAN IT

18   YESTERDAY.

19   Q    IS THIS AN ACCURATE REPORT BASED UPON THE

20   ACTUAL QUERY THAT YOU RAN?

21   A    IT IS.  I THINK THAT THIS REPORT PROBABLY DOES

22   NOT GO UP TO THE CURRENT TIME, BUT THIS IS THE

23   INFORMATION I EXTRACTED REGARDING THE CEASE AND

24   DESIST FLAG.  I HAD ADDITIONAL INFORMATION.

25   Q    AND BY "ADDITIONAL INFORMATION," DO YOU MEAN

476

1    ADDITIONAL DATES?

2    A    CORRECT.

3         MR. GILLESPIE:  I MOVE FOR ADMISSION

4    EXHIBIT 205.

5         MR. HUMPHREYS:  OBJECTION.  RELEVANCE,

6    YOUR HONOR.  THIS IS A DOCUMENT OF A THOUSAND OF

7    ENTRIES ON THE SAME DAY IN 2006.  IT CAN'T BE

8    ACCURATE.

9         THE COURT:  I'M SORRY.

10         MR. HUMPHREYS:  THIS IS THE DOCUMENT THAT

11   HAS THE THOUSAND ENTRIES IN 2006 ALL ON THE SAME

12   DAY.  SO I'M NOT SURE IT'S RELEVANT TO PROVE WHAT

13   HAPPENED AND WHEN IT HAPPENED BECAUSE IT'S NOT

14   ACCURATE.

15         THE COURT:  I DON'T UNDERSTAND THE LAST

16   PART THAT IT'S NOT ACCURATE.

17         MR. HUMPHREYS:  THEY ACKNOWLEDGED I THINK

18   IN TESTIMONY, MR. WILLIAMS DID EARLIER, THAT IT HAS

19   A NUMBER OF DATES AND IN 2006.  THEY'RE ALL EXACTLY

20   THE SAME DAY.  THOUSANDS OF FLAGS WERE SUPPOSEDLY

21   RAISED ON THAT DATE, AND SO IT CANNOT BE A

22   CONTEMPORANEOUS REPORTING OF EVENTS THAT TRANSPIRED

23   ON SPECIFIC DATES BECAUSE THE DATES ARE NOT

24   ACCURATE AND SO, THEREFORE, I QUESTION ITS

25   RELEVANCE.

477

1          THE COURT:  WELL, MAYBE I DON'T

2     UNDERSTAND IT.  THAT SOUNDS LIKE AN AUTHENTICITY

3     OBJECTION AS OPPOSED TO A RELEVANCY OBJECTION.

4          GIVE ME YOUR PROFFER AGAIN AS TO WHAT 155

5     IS.

6          MR. GILLESPIE:  CAN YOU DESCRIBE IT FOR

7     COUNSEL.

8          THE COURT:  NO, COUNSEL.

9          MR. GILLESPIE:  I'M OFFERING IT -- IT WAS

10    A RUNOFF FROM SIMPLECT TO SHOW THE NUMBER OF TIMES

11    THE CEASE AND DESIST FLAG WAS RAISED SINCE THE FLAG

12    BECAME OPERATIONAL IN THE MIDDLE OF 2006 AND THE

13    PERSONS THAT RAISED THE FLAGS AND THE PERSON THAT

14    LOWERED THE FLAG.

15         THE COURT:  ALL RIGHT.  SO THIS IS A

16    PRINTOUT OF RECORDS THAT WERE KEPT IN THE COMPUTER

17    AND THE PRINTOUT IS -- WAS OF A QUERY THAT SAID

18    SHOW ME ALL OF THE TIMES THE CEASE AND DESIST FLAG

19    WAS RAISED AND LOWERED FOR A PERIOD OF TIME?

20         MR. GILLESPIE:  YES, YOUR HONOR.

21         THE COURT:  SO 155 CAN COME IN AS A

22    REPORT SHOWING THE RESULT OF THAT QUERY.

23              (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 155,

24              HAVING BEEN PREVIOUSLY MARKED FOR

25              IDENTIFICATION, WAS ADMITTED INTO

                                                478

1              EVIDENCE.)

2      BY MR. GILLESPIE:

3      Q    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS

4      255 IN THIS CASE.

5              MR. HUMPHREYS:  I'M GOING TO OBJECT.

6      THIS HAS NOT BEEN CONSISTENT WITH YOUR RULES AND

7      ORDERS.  I HAVE NEVER SEEN THIS DOCUMENT BEFORE.

8              THE COURT:  WELL, ANY DOCUMENT CAN BE

9      SHOWN TO A WITNESS.  MY OBJECTION MIGHT BE TO

10     WHETHER IT COMES IN AND SEEN BY THE JURY.  IT COULD

11     SIMPLY REFRESH HIS MEMORY ON SOMETHING.  SO THE

12     OBJECTION IS PREMATURE.

13     BY MR. GILLESPIE:

14     Q    WHAT IS THIS DOCUMENT?

15     A    THIS DOCUMENT IS A SUMMARY THAT I PREPARED IN

16     MICROSOFT EXCEL USING A TABLE TO SUMMARIZE DATA

17     THAT I EXTRACTED FROM THE SIMPLECT USING A QUERY I

18     WROTE REGARDING THE NUMBER OF TIMES THAT THE CEASE

19     AND DESIST FLAGS HAD BEEN RAISED ON THE SIMPLECT

20     SYSTEM THROUGHOUT ITS HISTORY.

21     Q    AND DOES THIS SHOW THAT THE CEASE AND DESIST

22     FLAG WAS RAISED BY KIMBERLY ERVIN?

23     A    IT DOES.

24     Q    AND DOES IT SHOW HOW MANY TIMES?

25     A    IT SHOWED IT WAS RAISED WAY MS. ERVIN 152

1    TIMES FROM THE THIRD QUARTER OF '06 THROUGH THE

2    FOURTH QUARTER OF 2007.

3    Q    AND DOES IT SHOW THAT THE FLAG WAS RAISED BY

4    LETICIA POSTON?

5    A    IT DOES.

6    Q    AND DOES IT SHOW HOW MANY TIMES?

7    A    IT SHOWS THAT MS. POSTON RAISED THE FLAG 110

8    TIMES.

9         MR. GILLESPIE:  MOVE FOR THE ADMISSION OF

10   205 INTO EVIDENCE, YOUR HONOR.

11        MR. HUMPHREYS:  OBJECTION, YOUR HONOR.

12   IT'S NOT ON THE PRETRIAL.

13        THE COURT:  SUSTAINED.  AND YOU MAY COME

14   BACK TO THIS BECAUSE AS I UNDERSTAND THERE IS

15   DEPOSITION TESTIMONY OR OTHER EVIDENCE FROM OTHER

16   INDIVIDUALS AND IT MIGHT BE IMPEACHING.  I DON'T

17   KNOW AT THIS POINT, BUT I'LL SUSTAIN THE OBJECTION

18   TO 205 COMING INTO EVIDENCE AT THIS POINT.

19        MR. GILLESPIE:  THANK YOU, YOUR HONOR.

20   Q    I'M GOING TO GO BACK TO AN EXHIBIT THAT I

21   ASKED YOU ABOUT PREVIOUSLY.  SHOWING YOU WHAT HAS

22   BEEN MARKED AS EXHIBIT 209.  WHAT IS THE EXHIBIT

23   THAT I JUST HANDED YOU?

24   A    IT'S THE BILL OF SALE FOR THE PURCHASE AND

25   SALE AGREEMENT BETWEEN FIRST SELECT AND CREDIGY

                                              480

1    RECEIVABLES, INC.

2    Q    AND IT'S PART OF THE TRANSACTION WHEREBY THE

3    ACCOUNTS WERE SOLD FROM FIRST SELECT TO CREDIGY?

4    A    YES, IT'S JUST THE ACCOUNT OF A FORMAL OR

5    LEGAL ACKNOWLEDGEMENT OF THE TRANSFER IN ADDITION

6    TO THE PURCHASE AND SALE AGREEMENT.

7              MR. GILLESPIE:  OKAY.  I MOVE FOR THE

8    ADMISSION OF THAT EXHIBIT INTO EVIDENCE, YOUR

9    HONOR.

10             MR. HUMPHREYS:  NO OBJECTION.

11             THE COURT:  209 IS IN EVIDENCE.

12             (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 209,

13             HAVING BEEN PREVIOUSLY MARKED FOR

14             IDENTIFICATION, WAS ADMITTED INTO

15             EVIDENCE.)

16   BY MR. GILLESPIE:

17   Q    LOOKING AT EXHIBIT 155, WHICH WAS ADMITTED

18   INTO EVIDENCE.  CAN YOU TELL FROM THAT DOCUMENT HOW

19   MANY TIMES KIMBERLY ERVIN RAISED THE CEASE AND

20   DESIST LETTER?

21   A    YES, I CAN.  I WOULD HAVE TO GO THROUGH AND

22   COUNT, BUT I BELIEVE IT WOULD BE THE EXACT SAME

23   NUMBER THAT WAS REPORTED ON MY SUMMARY OF I BELIEVE

24   152.

25   Q    WELL, WOULD YOU TAKE A LOOK AT PAGE 2088.

481

1    I'LL WITHDRAW THE QUESTION, YOUR HONOR.

2             LET ME ASK YOU THIS, YOU MENTIONED THAT

3    YOU LOOKED UP A LAWSUIT INVOLVING HUNT & ENRIQUES

4    FILED ON BEHALF OF FIRST SELECT AGAINST MANUEL G.

5    FAUSTO.

6    A    YES.

7    Q    LET ME SHOW YOU WHAT HAS BEEN MARKED AS

8    EXHIBIT 201.  WHAT IS THAT DOCUMENT?

9    A    IT'S A COPY OF THE COMPLAINT FILED AGAINST

10   MR. FAUSTO DATED APRIL 21ST, 2000.

11            MR. GILLESPIE:  I MOVE FOR THE ADMISSION

12   OF EXHIBIT 201 INTO EVIDENCE.

13            MR. HUMPHREYS:  RELEVANCE, YOUR HONOR.

14            THE COURT:  MAY I SEE IT.

15            (PAUSE IN PROCEEDINGS.)

16            THE COURT:  WELL, PART OF MY CONCERN IS

17   THAT THIS IS A COMPLAINT WHICH THE WITNESS SAID WAS

18   NEVER SERVED.

19            IT DOES CONTAIN ALLEGATIONS AS TO

20   OWNERSHIP OF THE ACCOUNT AND THE BALANCE, BUT IT

21   DOESN'T ADD ANYTHING TO WHAT IS THE STATE OF

22   AFFAIRS OTHER THAN WHAT THE LAWYERS WERE ALLEGING.

23            IT DOES SEEM TO ME THAT -- WHAT IS YOUR

24   PURPOSE IN OFFERING THE COMPLAINT?

25            MR. HUMPHREYS:  YOUR HONOR, IF I MIGHT, I

                                              482

1    APOLOGIZE FOR INTERRUPTING.  I DID NOT REALIZE WHAT

2    THAT WAS.  I THOUGHT THAT WAS A COMPLAINT IN THIS

3    ACTION.  THAT WAS NOT LISTED ON THE PRETRIAL, THAT

4    PARTICULAR DOCUMENT.  I WOULD ASSERT THAT OBJECTION

5    AS WELL.

6              THE COURT:  VERY WELL.  WHAT IS YOUR

7    PURPOSE OF OFFERING IT?

8              MR. GILLESPIE:  THE PURPOSE OF OFFERING

9    IT IS THAT THE QUESTION THAT -- OF MR. WILLIAMS IS

10   IT WAS MADE THE ALLEGATION THAT THERE WAS NO

11   ACCOUNT ACTIVITY ON THIS.

12             AFTER THEY SETTLED THE WELLS FARGO

13   ACCOUNT, BACK WHEN WELLS FARGO HAD THE ACCOUNT,

14   THIS IS FURTHER EVIDENCE THAT, IN FACT, THE ACCOUNT

15   WAS NEVER SETTLED BECAUSE IT WAS SENT OUT FOR SUIT,

16   SUIT WAS ACTUALLY FILED, AND TO AVOID ANY PREJUDICE

17   FOR ANY CONFUSION IN FRONT OF THE JURY I WAS GOING

18   TO OFFER THE DOCUMENTS TO SHOW THAT, IN FACT, IT

19   WAS DISMISSED AS MR. WILLIAMS TESTIFIED.

20             THE COURT:  RIGHT.  WELL, MY CONCERN IS

21   THAT THIS IS BEING OFFERED THEN FOR THE TRUTH OF

22   THE ALLEGATIONS IN THE COMPLAINT, NAMELY, THAT

23   THERE WAS SOME CONDUCT WITH RESPECT TO IT.

24             DO I UNDERSTAND THAT YOU'RE ATTEMPTING TO

25   TIE TOGETHER THE TELEPHONE CALL RECORD THAT THE

                                                   483

1    WITNESS HAS READ THE INITIALS ON WHICH YOU EARLIER

2    CHARACTERIZED AS AN ATTEMPT TO SETTLE AS A

3    TELEPHONE CALL THAT CAME OFF THIS COMPLAINT WAS

4    FILED?

5             MR. GILLESPIE:  IT CAME BEFORE THE

6    COMPLAINT WAS FILED AND IT ALSO GOES TO THE ATTACK

7    I'M SURE WE'RE GOING TO GET ON THE VERACITY OF THE

8    FSI AND THE ATTACK ON THE WELLS FARGO RECORDS.

9             THIS IS A CERTIFIED COPY OF A PUBLIC

10   DOCUMENT WHICH ESSENTIALLY CONFIRMS THE ENTRY IN

11   THE FIRST SELECT RECORDS.

12            SO TO THE EXTENT THAT THERE IS AN

13   ARGUMENT BY PLAINTIFFS' COUNSEL THAT YOU KNOW THESE

14   RECORDS WERE FAKED OR THERE'S NOTHING TO SUPPORT

15   THEM, THIS IS CORROBORATING EVIDENCE.

16            THE COURT:  WELL, I WILL ALLOW THEM IN.

17   I WANT TO GIVE YOU INSTRUCTIONS, MEMBER OF THE

18   JURY.  I WILL ALLOW IT IN BECAUSE THIS, IN FACT,

19   APPEARS TO BE A FILED COMPLAINT.  BUT I WON'T ALLOW

20   IT IN TO PROVE THAT IT ALLEGES TO BE TRUE.  I'LL

21   ALLOW IT IN THAT JUST THAT A COMPLAINT WAS FILED.

22            IT COULD BE THAT WHAT WAS SAID HERE WAS

23   OR WAS NOT TRUE.  THESE ARE ALLEGATIONS OF THE

24   COMPLAINT AND THE COMPLAINTS DON'T ALLEGE THE

25   TRUTH.  THEY ALLEGE WHAT SOMEONE BELIEVES TO BE

484

1   TRUE, AND IT'S NEVER PROVED UNTIL THE COMPLAINT

2   COMES TO A TRIAL AND A JURY LIKE YOU OR A JUDGE

3   FINDS WHAT IS ALLEGED TO BE TRUE.

4           SO YOU CAN'T ACCEPT THIS AS TRUE.  BUT

5   YOU CAN ACCEPT THE FACT THAT FOR THE LIMITED

6   PURPOSE THAT THE COMPLAINT WAS FILED AND THAT THE

7   DATE THE COMPLAINT WAS FILED.  HERE IT'S DATED

8   APRIL 21, 2000.

9           THERE IS A DOCUMENT ATTACHED TO IT, A

10  FIRST SELECT ACCOUNT AGREEMENT.

11          IS THAT OTHERWISE ALREADY IN EVIDENCE?

12          MR. GILLESPIE:  I'LL HAVE TO TAKE A LOOK

13  AT IT, YOUR HONOR.  IT'S NOT IN EVIDENCE, YOUR

14  HONOR.

15          MR. NARITA:  IT'S PART OF THE EXHIBIT.

16  IT'S REFERRED TO IN THE COMPLAINT, YOUR HONOR.

17          THE COURT:  WELL, THAT'S WHY I'M

18  CONCERNED ABOUT IT.  IT DOESN'T HAVE A DATE OR AN

19  ADDRESS OR ANYTHING ON IT.  IT SIMPLY IS AN ACCOUNT

20  AND IT PURPORTS TO BE THE PERSON WHO RECEIVED IT,

21  BUT THERE'S NO WAY TO TELL IF THIS IS SENT, THERE'S

22  NO WAY TO KNOW IF THIS IS BEING REPRESENTED AS A

23  CORRESPONDENCE WITH THE FAUSTOS.

24          AND SO EVEN IF I ALLOW THIS, IT SEEMS TO

25  ME THAT I WOULD HAVE TO FURTHER INSTRUCT THE JURY

485

1    TO DISREGARD THIS AS EVIDENCE THAT THAT LETTER WAS

2    SENT AND IT MIGHT BE WELL THAT I WILL ORDER IT

3    REDACTED SO AS TO NOT BE CONFUSED AMONG THE MANY

4    RECORDS TO WHETHER THE FAUSTOS MIGHT HAVE RECEIVED

5    SOMETHING IN WRITING.

6            AND SO I WILL ALLOW YOU TO USE IT TO

7    EXAMINE THE WITNESS, BUT WHAT GOES INTO THE JURY

8    I'LL RESERVE ON.

9            MR. GILLESPIE:  THANK YOU, YOUR HONOR.

10           (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 201,

11           HAVING BEEN PREVIOUSLY MARKED FOR

12           IDENTIFICATION, WAS ADMITTED INTO EVIDENCE

13           SUBJECT TO LIMITATION.)

14   BY MR. GILLESPIE:

15   Q    I'LL SHOW YOU WHAT HAS BEEN MARKED AS 203.

16   WHAT IS THAT DOCUMENT?

17   A    THIS IS A REQUEST FOR DISMISSAL FILED IN THE

18   CASE OF FIRST SELECT AGAINST MANUEL FAUSTO ON

19   OCTOBER 6TH, 2000.

20   Q    AND THAT RELATES TO EXHIBIT 201, THAT WAS JUST

21   RELATED TO THE LAWSUIT?

22   A    YES, THIS IS THE LAWSUIT.

23           MR. GILLESPIE:  AND MOVE FOR THE

24   ADMISSION OF 203 INTO EVIDENCE.

25           MR. HUMPHREYS:  NO OBJECTION.

486

1        THE COURT:  WELL, YOU WANT THE DISMISSAL

2   IN BUT YOU'RE OBJECTING TO THE COMPLAINT COMING IN?

3        MR. HUMPHREYS:  WELL, IF THEY'RE GOING TO

4   SEE PART OF IT, THEY MIGHT AS WELL SEE BOTH OF

5   THEM, YOUR HONOR.

6        THE COURT:  SO 203 IS IN ALSO WITH THE

7   SAME LIMITATION.  BEFORE YOU SEND THEM INTO THE

8   JURY, I WANT TO INSPECT THEM.

9            (WHEREUPON, DEFENDANTS' EXHIBIT NUMBER 203,

10           HAVING BEEN PREVIOUSLY MARKED FOR

11           IDENTIFICATION, WAS ADMITTED INTO EVIDENCE

12           SUBJECT TO LIMITATION.)

13       MR. GILLESPIE:  THANK YOU, YOUR HONOR.

14  I'LL PASS THE WITNESS.

15       THE COURT:  DO YOU HAVE FURTHER QUESTIONS

16  OF THE WITNESS?

17       MR. HUMPHREYS:  BRIEFLY, YOUR HONOR.

18            **AS-ON RECROSS-EXAMINATION**

19  BY MR. HUMPHREYS:

20  Q    SO WHEN I ASKED YOU EARLIER WHY IT WAS A

21  FOUR-YEAR DELAY IN THE COLLECTIONS, YOU TOLD ME IT

22  WAS BECAUSE THERE WAS A LAWSUIT ON FILE THAT WAS

23  BEING HANDLED BY AN OUTSIDE COLLECTION AGENCY, AN

24  OUTSIDE LAW FIRM; IS THAT RIGHT?

25  A    NO, THAT'S NOT WHAT I SAID.

487

1    Q    WELL, THE LAWSUIT WAS DISMISSED IN 2000;

2    RIGHT?

3    A    IT WAS DISMISSED FOR FAILURE TO SERVE THE

4    PERSON MR. FAUSTO, RIGHT.

5    Q    SHOW ME WHERE IT SAYS THAT ON THE FORM?

6    A    IT SAYS IT ON THE -- THERE'S ANOTHER ACTUALLY

7    DOCUMENT THAT THE CASE MANAGEMENT CONFERENCE -- BUT

8    I THINK ON THIS ONE I DON'T KNOW THAT IT SAYS FOR

9    FAILURE TO SERVE BUT AGAIN THAT'S WHY I --

10   Q    SO THE RECORD YOU HAVE BEFORE YOU JUST SAYS IT

11   WAS DISMISSED IN OCTOBER OF 2000 AND CREDIGY DID

12   NOT DO ANYTHING TO CONTACT MR. FAUSTO UNTIL 2006?

13   A    AGAIN, THE RECORD.

14   Q    IT'S A YES OR NO QUESTION.  YOU DIDN'T DO

15   ANYTHING TO CONTACT THE FAUSTOS UNTIL 2006 EVEN

16   THOUGH THIS LAWSUIT WAS DISMISSED IN 2000?

17   A    INCORRECT.

18   Q    WHAT DID YOU DO?  SHOW ME -- WE HAVE YOUR LOG

19   HERE?

20   A    YEAH.

21        THE COURT:  YOU DON'T HAVE TO BE

22   ARGUMENTATIVE.

23   BY MR. HUMPHREYS:

24   Q    WE HAVE YOUR EXHIBIT 157.  COULD YOU SHOW US

25   THE CONTACTS THAT CREDIGY MADE WITH MR. FAUSTO OR

                                                        488

1    MRS. FAUSTO FROM OCTOBER OF 2000 WHEN THE LAWSUIT

2    BY FIRST SELECT WAS DISMISSED?

3    A    WELL, AGAIN, THE ACCOUNT REMAINED OUTSOURCED

4    TO HUNT & HENRIQUES AND CREDIGY ALSO REPORTED THE

5    ACCOUNT TO THE CREDIT BUREAU.

6    Q    MY QUESTION WAS, SHOW US IN YOUR LOGS, 157,

7    WHERE CREDIGY MADE ANY CONTACT WITH THE FAUSTOS

8    FROM OCTOBER 2000 WHEN THE LAWSUIT WAS DISMISSED

9    UNTIL AUGUST OF 2006?  DO YOU HAVE ANYTHING?

10   A    CREDIGY DID NOT DIRECT -- CREDIGY SERVICES

11   CORP DID NOT CONTACT DIRECTLY, NO.

12   Q    AND NOW THAT WE HAVE EXHIBIT 157 BEFORE THE

13   JURY, YOU SAID BEFORE THAT THERE WERE CONTACTS WITH

14   THE FAUSTOS IN EXHIBIT 157 AND I WANT YOU TO TELL

15   THEM WHAT THEY WERE?

16   A    I COULDN'T HEAR THE QUESTION.

17   Q    I'LL ASK IT AGAIN.

18        YOU TOLD THIS JURY THIS WEEK THAT THIS

19   EXHIBIT 157 HAD CONTACTS WITH THE FAUSTOS THAT

20   WEREN'T IN EXHIBIT 2, THE ONE THAT I INTRODUCED.

21        I WANT YOU TO LOOK AT AND TELL THEM WHAT

22   CONTACTS WITH THE FAUSTOS ARE DOCUMENTED IN THIS

23   157 THAT ARE NOT IN EXHIBIT 2 FROM CREDIGY?

24        MR. GILLESPIE:  OBJECTION.  MISSTATES

25   PRIOR TESTIMONY.

489

```
1                THE COURT:  OVERRULED ON THE

2     MISSTATEMENT, BUT IT IS ARGUMENTATIVE IN TONE.

3                THE WITNESS:  WELL, I SAID ACTUALLY THAT

4     THE REST OF 157 REFLECTED OTHER COLLECTION ACTIVITY

5     IS WHAT I SAID.

6     BY MR. HUMPHREYS:

7     Q    OKAY.  SO THE TRUTH IS THAT CREDIGY -- 157

8     DOESN'T HAVE ANY CONTACTS BY CREDIGY BEFORE 152; IS

9     THAT RIGHT?

10    A    WELL, AGAIN, WHAT I SAID THE OTHER DAY --

11    YOU'RE MISCHARACTERIZING WHAT I SAID, I THINK.

12               THE COURT:  NO, YOU'RE JUST ANSWERING

13    THIS QUESTION.

14               THE WITNESS:  OKAY.

15               THE COURT:  NO, YOU'RE NOT ASKED WHAT YOU

16    SAID.  HE'S ASKING WHETHER IT CONTAINS ANY CONTACTS

17    OTHER THAN YOU INCLUDED IN YOUR QUESTION.

18               THE WITNESS:  WELL, AGAIN, I DON'T

19    BELIEVE IT DOES.  I COULD LOOK AT IT JUST TO SEE IF

20    IT HAS ANY LISTINGS OF LETTERS OR --

21               THE COURT:  I'M SATISFIED THAT YOU HAVE

22    COVERED THIS AREA SUFFICIENTLY.

23               MR. HUMPHREYS:  I AM, TOO.

24               THE COURT:  DO YOU HAVE OTHER AREAS OF

25    CROSS-EXAMINATION?  MOVE TO THEM.
```

490

1          MR. HUMPHREYS:  YES, YOUR HONOR.

2     Q    DID YOU SAY IT WAS CREDIT NOT REPORTED TO THE

3     CREDIT REPORTING AGENCY FROM 2000, DURING THIS

4     TIMEFRAME WHEN THE LAWSUIT WAS DISMISSED?

5     A    ACTUALLY, I THINK THAT AT A POINT THAT THE

6     ACCOUNT WAS NO LONGER REPORTED TO THE CREDIT

7     REPORTING AGENCY ACCORDING TO OUR RECORDS IT WAS

8     STOPPED.

9     Q    OKAY.  SO THERE WASN'T CREDIT REPORTING?

10    A    AT A POINT IN TIME THE CREDIT REPORTING WAS

11    STOPPED.

12    Q    YOU SPOKE ABOUT FLAGS AND KIM ERVIN BEING

13    RESPONSIBLE IN THE DISPUTE RESOLUTION TEAM.  IS

14    THAT WHAT YOU SAID A MOMENT AGO?

15    A    SHE WAS ONE MEMBER OF THE DISPUTE RESOLUTION

16    TEAM.

17    Q    AND DID YOU SAY THAT SHE WAS THE ONE THAT WAS

18    SUPPOSED TO RAISE THE FLAG AND SHE DID NOT?

19    A    IN THIS CASE, IN MR. FAUSTO'S CASE, CORRECT.

20    Q    AND HAVE YOU PREVIOUSLY TESTIFIED UNDER OATH

21    THAT IT WAS SHLONDA BLACKWELL, A DIFFERENT PERSON

22    WHO WAS SUPPOSED TO RAISE THE FLAG IN THIS CASE?

23    A    I DID.

24    Q    AND LOOKING AT THIS SUMMARY THAT WE HAVE THAT

25    YOU SPRUNG ON US IN 2005.

1     A    YES.

2              THE COURT:  COUNSEL, THAT'S ARGUMENTATIVE

3     TO SAY, "SPRUNG ON US."  YOU CAN FRAME YOUR

4     QUESTIONS WITHOUT SUGGESTING ANY MOTIVE ON THE PART

5     OF THE WITNESS.

6     BY MR. HUMPHREYS:

7     Q    YOU CAN ACKNOWLEDGE, SIR, THAT THIS EXHIBIT

8     205 WAS JUST GIVEN TO US?  YOUR LAWYER JUST

9     DELIVERED IT TO ME WHILE YOU WERE BEING QUESTIONED.

10    YOU CAN ACKNOWLEDGE THAT; RIGHT?

11    A    YES.

12    Q    OKAY.  AND THIS EXHIBIT 205 THAT YOU PREPARED,

13    SHLONDA BLACKWELL, HOW MANY FLAGS DID SHE RAISE

14    DURING 2006 TO 2009?

15    A    ONE.

16    Q    AND DID YOU TELL US THAT THIS EXHIBIT 155 IS A

17    RECORD OF ALL OF THE FLAGS THAT WERE RAISED, THE

18    DISPUTE FLAGS THAT WERE RAISED AT CREDIGY DURING

19    2006 TO 2008?

20    A    OF THE CEASE AND DESIST FLAGS, THERE'S A

21    RECORD OF THE CEASE AND DESIST FLAGS.

22    Q    OKAY.  YOU CAN CONFIRM FOR THE JURY THAT THERE

23    ARE HUNDREDS IF NOT THOUSANDS OF THESE ACCOUNTS

24    THAT THE FLAG WAS SUPPOSEDLY RAISED ON DECEMBER

25    14TH OF 2006.

                                                    492

1     A     THAT'S CORRECT.

2     Q     AND THE REASON THERE ARE THOUSANDS OF FLAGS

3     RAISED ON ONE DAY, IS THAT'S THE DAY THAT THE

4     INFORMATION WAS UPLOADED INTO THE SYSTEM?

5     A     WELL, THAT'S THE DAY THAT THE -- THOSE

6     ACCOUNTS WERE ACTIVATED ON THE CEASE AND DESIST

7     FLAG SYSTEM.  THAT WAS A NEW SYSTEM THAT WE

8     INSTALLED TO BETTER TRACK AND MANAGE THE CEASE AND

9     DESIST.

10          AND SO THE ACCOUNTS THAT WERE PREVIOUSLY

11    IDENTIFIED BY ANOTHER METHOD WERE TRANSFERRED INTO

12    THIS SYSTEM.  SO THAT'S RIGHT.

13    Q     OKAY.  SO EVERYTHING THAT WAS DONE BEFORE

14    DECEMBER 14TH OF 2006 IS LISTED AS HAVING DONE --

15    BEEN DONE ON DECEMBER 14TH, 2006?

16          MR. GILLESPIE:  OBJECTION.  IT MISSTATES

17    HIS PRIOR TESTIMONY.

18          THE COURT:  OVERRULED.

19          THE WITNESS:  NO, THAT'S NOT WHAT I SAID.

20    BY MR. HUMPHREYS:

21    Q     OKAY.  BECAUSE THERE ARE DATES IN HERE BEFORE

22    DECEMBER OF 2006; RIGHT?

23    A     YES.

24    Q     AND SO YOUR EXPLANATION THAT EVERYTHING --

25    WELL, TELL ME YOUR EXPLANATION AGAIN.

493

1    A    SURE.  THE SYSTEM WAS CREATED AND OVER TIME

2    EITHER ACCOUNTS WERE MIGRATED INTO THE SYSTEM AND

3    THAT THEY WERE PREVIOUSLY IDENTIFIED AS CEASE AND

4    DESIST USING ANOTHER METHOD.  AND THEY WERE

5    IDENTIFIED WITH A SPECIAL STATUS CODE.

6              AND THEY WERE MIGRATED INTO THIS OR IN

7    SOME CASES A SPECIAL PORTFOLIO CODE AND THEY WERE

8    MIGRATED INTO THIS FLAG SYSTEM WHICH WAS SOMETHING

9    NEW THAT WAS CREATED IN 2006.

10             SO AT VARIOUS TIMES OF THAT PROCESS

11   BATCHES OF ACCOUNTS THAT WERE PREVIOUSLY IDENTIFIED

12   WERE MIGRATED INTO THIS NEW SYSTEM AND ONE OF THOSE

13   TIMES WAS DECEMBER 14TH, 2006.

14   Q    AND CAN YOU EXPLAIN WHY ON PAGE 2086 THERE WAS

15   JUST ONE THAT WAS MIGRATED OVER ON SEPTEMBER 27TH,

16   2006 TO THAT WERE SUPPOSEDLY MIGRATED ON NOVEMBER

17   7TH, 2006 AND THEN THOUSANDS IN DECEMBER?

18   A    WELL, AGAIN, THE SYSTEM BECAME ACTIVE.  SO IT

19   WAS BEING USED.  AS NEW CEASE AND DESIST ACCOUNTS

20   WERE IDENTIFIED, THOSE WERE BEING USED ACTIVELY AND

21   THEN ON CERTAIN DATES OR BATCHES OF ACCOUNTS THAT

22   WERE MIGRATED INTO THE NEW SYSTEM FROM THE OLD

23   METHOD.

24   Q    WERE YOU HAVING ANY PROBLEMS WITH THE FLAG,

25   WITH THE FLAG SYSTEM?

494

1      A    NO, I THINK THE FLAG SYSTEM, YOU KNOW, TO MY

2      KNOWLEDGE WORKED QUITE WELL.

3      Q    OKAY.  YOU'RE NOT AWARE OF ANY TESTIMONY FROM

4      ANY OF THE PEOPLE THAT ACTUALLY WORKED IN THE

5      DEPARTMENT SAYING THAT THE COLLECTORS WOULD

6      ACTUALLY TURN THE FLAGS OFF?

7      A    TO MY KNOWLEDGE THE COLLECTORS WERE NOT ABLE

8      TO TURN OFF THE FLAGS, A CEASE AND DESIST FLAG THAT

9      WAS RAISED BY THE DISPUTE RESOLUTION TEAM.

10     Q    AND IF THAT WAS THE CASE THEN YOU WOULD HAVE A

11     PRETTY SERIOUS MISUNDERSTANDING OF HOW THE CEASE

12     AND DESIST LETTER WORKS AT CREDIGY; RIGHT?

13     A    WELL, AGAIN, THAT'S MY UNDERSTANDING OF HOW

14     THE CEASE AND DESIST SYSTEM WORKS THAT ONLY AN

15     AUTHORIZED USER, WHICH WOULD NOT INCLUDE A

16     COLLECTOR, CAN DEACTIVATE THE CEASE AND DESIST

17     FLAG.

18     Q    DO YOUR RECORDS HERE SHOW HOW MANY TIMES THE

19     FLAGS WERE LOWERED?

20     A    THIS --

21     Q    DID YOU PRINT THAT OFF?

22     A    THIS RECORD DOES SHOW.  IT HAS A COLUMN IN

23     COLUMN 5 CALLED "UNFLAGGED DATE."

24          SO, FOR EXAMPLE, IF I LOOKED ON PAGE 2163

25     ON ABOUT TEN LINES DOWN FROM THE TOP, IT DOES

                                                  495

1       INDICATE AS AN ACCOUNT ON 1-29-2007 BRETT BOYDE

2       LOWERED A FLAG.

3       Q    OKAY.

4       A    AND THERE ARE OTHER NAMES HERE OF PEOPLE THAT

5       LOWERED A FLAG LISTED.

6       Q    OKAY.  WOULD YOU CHARACTERIZE THE SIMPLECT

7       SYSTEM THAT YOU USED AS A SOPHISTICATED SYSTEM?

8       A    WELL, I MEAN, I THINK IT'S A, IT'S A GOOD

9       SYSTEM FOR RECEIVABLES MANAGEMENT.

10      Q    OKAY.  DOES IT -- DO YOU USE THAT SYSTEM TO,

11      TO SCAN IN THE LETTERS THAT THE PEOPLE SEND IN IF

12      THEY'RE DISPUTING THE ACCOUNT OR GIVING A CEASE AND

13      DESIST SO THAT THAT INFORMATION COULD BE AVAILABLE

14      TO THE COLLECTORS DOWN IN BRAZIL?

15      A    TO MY KNOWLEDGE THE NORMAL PRACTICE WITH CEASE

16      AND DESIST LETTERS IS THAT THE CEASE AND DESIST

17      FLAG IS RAISED AND A NOTE ENTRY IS MADE IN THE LOG

18      AND THAT THAT ACTUAL LETTER IS MAINTAINED BY THE

19      DISPUTE RESOLUTION.

20      Q    OKAY.  YOU DO HAVE A DOCUMENT TAB ON THE

21      SIMPLECT SYSTEM WHERE YOU COULD CLICK ON THAT AND

22      SCAN IT IN SO THAT IT COULD BE AVAILABLE TO THE, TO

23      THE FOLKS IN BRAZIL SO THAT THEY WOULD HAVE MORE

24      INFORMATION; ISN'T THAT TRUE?

25      A    IT'S POSSIBLE TO SCAN DOCUMENTS INTO THE

                                                      496

1    SIMPLECT SYSTEM.

2    Q    OKAY.  BUT YOU DON'T THINK IT'S IMPORTANT FOR

3    THE COLLECTORS IN BRAZIL TO SEE THE LETTERS TO SEE

4    ALL WHAT IS HAPPENING ON THE ACCOUNT?

5    A    THE COLLECTORS IN BRAZIL, AGAIN, BASED ON MY

6    EXPERIENCE AND MY KNOWLEDGE THEY'RE TRAINED TO

7    FOLLOW A CERTAIN PROCEDURE WHEN COLLECTING AN

8    ACCOUNT AND THAT'S WHAT THEY DO.  THEY DON'T REVIEW

9    ALL OF THE INFORMATION ABOUT EACH AND EVERY ACCOUNT

10   EVERY TIME THEY LOOK AT AN ACCOUNT.

11   Q    AND DID CREDIGY HAVE AN OPPORTUNITY TO TAMPER

12   WITH OR ALTER ANY OF THE DATA THAT IT SAYS IT

13   RECEIVED FROM FIRST SELECT OR WELLS FARGO?

14   A    NO.  THE WAY THAT THE SYSTEM IS CONSTRUCTED IS

15   IT'S NONDESTRUCTIVE.

16   Q    OKAY.  SO YOU DIDN'T CHANGE THE DATA YOU GOT

17   FROM WELLS FARGO IN ANY WAY?

18   A    THAT WE GOT FROM FIRST SELECT?

19   Q    RIGHT.  LET ME STRIKE THAT.  THANK YOU.

20        YOU DIDN'T CHANGE THE DATA THAT YOU

21   RECEIVED FROM FIRST SELECT ABOUT FIRST SELECT?

22   A    YEAH, WE JUST UPLOADED IT, CREDIGY, INTO THE

23   SYSTEM.

24   Q    AND YOU DIDN'T ADD ANYTHING TO THE INFORMATION

25   THAT FIRST SELECT PROVIDED YOU THAT YOU SAID YOU

497

1    GOT FROM WELLS FARGO; RIGHT?

2    A    WELL, IF YOU LOOK AT EXHIBIT 157 AS AN

3    EXAMPLE --

4            THE COURT:  YOU'RE GIVING US AN EXAMPLE

5    OF AN ANSWER.

6            THE WITNESS:  WE DIDN'T DELETE ANYTHING.

7    BY MR. HUMPHREYS:

8    Q    ALL RIGHT.  WELL, EVERY ONE OF THESE HAVE BEEN

9    ALTERED TO ADD INFORMATION AT LEAST?

10   A    WE DIDN'T ALTER ANY RECORDS.  WE ADDED

11   INFORMATION.

12   Q    YOU DON'T CONSIDER ADDING INFORMATION TO WHAT

13   YOU CONSIDER A HISTORICAL DATA TO BE ALTERATION?

14   A    NO.

15   Q    AND THIS HAS RECORDS IN HERE, IT HAS DATA IN

16   THE WELLS FARGO RECORDS YOU SAY YOU GOT AND THE

17   FIRST SELECT RECORDS THAT YOU SAY YOU GOT THAT YOU

18   PUT IN THERE AT CREDIGY; RIGHT?

19   A    CREDIGY RECEIVED THE DATA FROM FIRST SELECT

20   AND LOADED IT TO THE SYSTEM, THAT'S CORRECT.

21   Q    OKAY.  YOU CHANGED WHAT YOU RECEIVED AND ADDED

22   INFORMATION TO IT?

23   A    NO, WE DIDN'T CHANGE WHAT WE RECEIVED AT ALL.

24   Q    OKAY.  AND THE DISAGREEMENT WOULD BE OVER THE

25   WORD WHETHER AN ADDITION IS CHANGING; RIGHT?

498

1    THAT'S WHY YOU SAY YOU DIDN'T ADD ANYTHING?

2    A    AGAIN, WE DIDN'T ADD ANYTHING.  WE JUST

3    STAMPED AN ACCOUNT I.D. IN ADDITION TO THE

4    INFORMATION THAT WE RECEIVED.  WE DIDN'T ALTER THE

5    INFORMATION RECEIVED.

6    Q    OKAY.  DID THE -- WE LOOKED EARLIER AT SOME

7    RECORDS THAT WERE PRODUCED BY WAMU FROM FIRST

8    SELECT THAT HAD A ZERO BALANCE AS OF NOVEMBER OF

9    1999.  DO YOU RECALL THAT?

10   A    YES.

11   Q    NOW, DID CREDIT -- ARE THOSE THE RECORDS THAT

12   CREDIGY USED THAT ABOUT THE ACCOUNT BALANCE?

13   A    NO.

14   Q    SO YOU HAVE A DIFFERENT SET OF RECORDS?

15   A    NO.  WE HAVE THE PRIMARY RECORDS FROM WHICH

16   THAT LETTER THAT YOU ARE REFERENCING IS PRODUCED

17   WHICH IS THE UNDERLYING ELECTRONIC DATA RELATED TO

18   THE ACCOUNTS.

19   Q    OKAY.  WOULDN'T YOU AGREE WITH ME THAT WHAT

20   YOUR LAWYERS HAVE PUT TOGETHER IS EXHIBIT 157 IS

21   ACTUALLY THREE DIFFERENT SETS OF RECORDS THAT YOU

22   HAVE STAPLED TOGETHER, PRINTED OUT AND STAPLED

23   TOGETHER?

24        MR. GILLESPIE:  OBJECTION TO THE

25   CHARACTERIZATION.  IT'S ARGUMENTATIVE.

1           THE COURT:  OVERRULED.  I THINK THE

2    IMPORT OF THE QUESTION IS WHETHER THIS IS -- I, I

3    WILL ACTUALLY SUSTAIN THE OBJECTION ON VAGUENESS.

4    I'M NOT SURE WHAT YOU ARE REFERRING TO AS THREE

5    SETS OF RECORDS.

6    BY MR. HUMPHREYS:

7    Q    OKAY.  DOES EXHIBIT 157, IS IT ACTUALLY A

8    PRINTOUT OF DATA FROM OTHER SOURCES THAT HAVE BEEN

9    PUT TOGETHER FOR THE PURPOSES OF MAKING AN EXHIBIT

10   FOR THIS JURY?

11   A    IT'S A PRINTOUT FROM ONE SOURCE WHICH IS

12   SIMPLECT AND IT CONTAINS RECORDS OF CREDIGY, SOME

13   OF WHICH WERE OBTAINED FROM FIRST SELECT AND SOME

14   OF WHICH FIRST SELECT OBTAINED FROM WELLS FARGO.

15   Q    WELL, IF YOU LOOK AT FA 1052 WHICH HAS A

16   COPYRIGHT FOR CREDIGY TECHNOLOGIES, AND IT SAYS

17   IT'S PAGE 5 OF 5; RIGHT?

18   A    YES.

19   Q    AND AT THE BOTTOM OF THE PAGE IT HAS THE WEB

20   ADDRESS WHERE THIS INFORMATION WAS DOWNLOADED OFF

21   OF THE FIRM INTRANET?

22   A    YES, THIS IS WHERE THE INFORMATION WAS

23   ACCESSED FROM SIMPLECT.

24   Q    AND SO THIS IS PAGE 1 THROUGH 5 IS IN THE TOP

25   RIGHT-HAND CORNER IT SAYS PAGE 1 OF 5, 2 TO 5, ET

500

1    CETERA, DOWN TO PAGE 5 OF 5.

2    A    RIGHT.

3    Q    AND THAT IS WHAT WE HAVE MARKED AS EXHIBIT 2;

4    RIGHT?

5    A    I BELIEVE THAT'S CORRECT, YES.

6    Q    AND THEN, OKAY.  AND THIS IS SOMETHING -- IT

7    DOESN'T HAVE ANY PAGE NUMBERS ON THE TOP RIGHT-HAND

8    CORNER AND IT DOESN'T HAVE A WEB ADDRESS ON THE

9    BOTTOM, DOES IT?  WHAT STARTS AS 1066?

10   A    ON 1066?  LET ME LOOK.  HOLD ON A SECOND.

11   1066?  NO, IT DOESN'T HAVE THE WEB ADDRESS OR --

12   Q    SO IT HAS BEEN PRINTED OFF OF FIVE PAGES;

13   RIGHT?

14   A    IT'S ACTUALLY PRINTED OFF A DIFFERENT TAB.  SO

15   THE SIMPLECT SYSTEM IS A TAB SYSTEM, AND IT

16   OPERATES IN A WEB BROWSER AND THIS HAS BEEN PRINTED

17   OFF A DIFFERENT TAB.  IT'S JUST THAT THE FOOTER

18   CONTAINING THE QUERY STRING AND THE PAGE NUMBER IS

19   NOT ON THIS.

20   Q    OKAY.  SO YOU'RE SAYING THAT IT HAS COME OFF

21   OF A WEB INTERFACE, BUT IT DOESN'T PRINT THE WEB

22   ADDRESS ON THE BOTTOM LIKE THE FIRST FIVE PAGES DO;

23   IS THAT WHAT YOU'RE SAYING?

24   A    IT LOOKS LIKE TO ME THAT 1066 WAS PROBABLY

25   USED -- SCREEN CAPTURED, THE SOFTWARE WAS PROBABLY

501

1    USED FOR 1066 WHEREAS THE BUILT-IN PRINT

2    FUNCTIONALITY OF THE INTERNET EXPLORER WAS USED TO

3    PRINT THE FIRST FIVE PAGES.

4    Q    OKAY.  AND THERE'S A DIFFERENT COPYRIGHT ON

5    THE VERY LAST PAGE 1076 SHOWING THAT IT'S BEEN THE

6    END OF THE DOCUMENT; RIGHT?

7    A    1076?  HOLD ON A SECOND.

8    Q    YES.

9    A    THIS IS A FOOTER THAT APPEARS ON THE BOTTOM OF

10   EACH TAB OR THE SCREEN ON THE SIMPLECT SYSTEMS.  SO

11   THIS WOULD APPEAR -- ACTUALLY IT COULD APPEAR ON

12   ANY TAB.  IT MAY ONLY BE ON CERTAIN TABS.  I'M NOT

13   QUITE SURE.  BUT IT'S DEFINITELY SOMETHING THAT

14   APPEARS ON THE BOTTOM OF THE TAB THIS KIND OF A

15   FOOTER.

16   Q    DID YOU PERSONALLY TALK TO ANYBODY WHO MADE

17   ANY OF THESE ENTRIES AT FIRST SELECT?

18   A    ARE YOU TALKING ABOUT THE TEXT NOTES?

19   Q    RIGHT.

20   A    YES.

21   Q    WHICH ARE THE PERSONS WHO MADE THESE NOTES?

22   WHICH PERSON?

23   A    WELL, MOST OF THESE NOTES THAT DON'T REFERENCE

24   A SPECIFIC PERSON WAS MADE UNDER THE SUPERVISION OF

25   DOUG FULLER.

502

1    Q    SO HE WAS THE COLLECTOR SPEAKING TO -- MAKING

2    THESE PHONE CALLS, DOUG FULLER?

3    A    NO.  I'M TALKING ABOUT THE AUTOMATED SYSTEM

4    NOTES THAT ARE REFLECTED THROUGHOUT MUCH OF THE

5    HISTORICAL NOTES FROM FIRST SELECT.

6    Q    I GUESS I WASN'T BEING CLEAR.  THERE ARE SOME

7    NOTES THAT YOU WERE TRYING TO SAY AND INTERPRET

8    EARLIER THAT ARE SUPPOSEDLY CONVERSATIONS.

9         I WAS WONDERING WHETHER YOU HAD A CHANCE

10   TO VISIT WITH ANY OF THOSE PEOPLE WHO TOOK NOTES

11   SUCH AS THESE?

12   A    NO, I DIDN'T SPEAK WITH THE PEOPLE THAT

13   RECORDED THIS CONVERSATION --

14   Q    OKAY.

15   A    -- I TALKED ABOUT EARLIER.

16        THE COURT:  ARE YOU LIKELY TO BE DONE

17   WITH THIS WITNESS IN THE NEXT TWO MINUTES OR SO?

18        MR. HUMPHREYS:  IMMEDIATELY.  I'LL HAVE

19   NOTHING FURTHER.  THANK YOU, YOUR HONOR.

20        THE COURT:  DO YOU HAVE FURTHER QUESTIONS

21   OF THE WITNESS?

22        MR. GILLESPIE:  MAY THIS WITNESS BE

23   EXCUSED, YOUR HONOR.

24        THE COURT:  WELL, I'M ASKING, DO YOU HAVE

25   FURTHER QUESTIONS?

503

1           MR. GILLESPIE:  NO, I DO NOT.

2           THE COURT:  IS THERE ANY OBJECTION TO

3    EXCUSING HIM?

4           MR. HUMPHREYS:  NONE.

5           THE COURT:  VERY WELL.  THE WITNESS MAY

6    BE EXCUSED.  MEMBER OF THE JURY, AS WE ADJOURN FOR

7    THE DAY -- YOU MAY STEP DOWN -- LET ME MAKE TWO

8    COMMENTS.

9           FIRST OF ALL, I WANT TO ACKNOWLEDGE YOUR

10   SERVICE AGAIN, AND HERE ON THE FIRST DAY OF SPRING

11   YOU HAVE SPENT A SPRING DAY WITH US INVOLVED IN

12   THIS.  AND I WANT TO EMPHASIZE TO YOU HOW IMPORTANT

13   YOUR TIME AND ATTENTION TO THIS MATTER IS TO BOTH

14   PARTIES.

15          AS YOU CAN IMAGINE IN OUR ECONOMY THESE

16   ARE MATTERS OF GREAT IMPORTANCE AND TO ORDINARY

17   CITIZENS THESE ARE MATTERS OF GREAT IMPORTANCE TO

18   HAVE A COURT AND A JURY COME TO LOOK AT THE FACTS

19   OF THE CASE AND TO MAKE ITS DECISION.  IT IS WHAT

20   WE OWE TO THOSE WHOSE TRUST IN THE JUDICIAL SYSTEM

21   IS PLACED.

22          AND SO SOMETIMES IT'S TEDIOUS AND LONG I

23   REALIZE, BUT I REALLY WANT TO APPRECIATE YOU.  AND

24   WE HAVE A BUDGET FOR THE CASE, AND I GIVE THE

25   PARTIES A RECORD OF HOW MUCH TIME.  AND I LEAVE IT

504

1    UP TO THEM IF THEY SPEND IT ON ONE WITNESS OR SO,

2    BUT AS YOU CAN SEE I SOMETIMES URGE THEM ALONG.  I

3    HOPE YOU DON'T TAKE MY COMMENTS AS FAVORING ONE

4    SIDE OR THE OTHER.  I'M JUST TRYING TO MOVE THE

5    CASE ALONG.

6              AND BECAUSE I'M MANAGING THAT, YOU SHOULD

7    RELAX AND ALLOW THEM TO PRESENT THE CASE AND THE

8    EVIDENCE TO YOU WITHOUT ANY CONCERN ABOUT WHETHER

9    OR NOT THEY'RE SPENDING TOO MUCH TIME IN ONE PLACE

10   OR ANOTHER.  THAT'S MY JOB.

11             I WILL GIVE YOU A WRITTEN INSTRUCTIONS ON

12   THE LAW.  YOU HAVE HEARD SOME COMMENTS ABOUT THE

13   LAW AND WHAT IS REQUIRED OR NOT REQUIRED.  ANY

14   PERTINENT LAW I'LL GIVE YOU INSTRUCTIONS ON.

15             THE SECOND MATTER HAS TO DO WITH OUR

16   SCHEDULE.  WE'RE GOING TO SWITCH TO A SCHEDULE THAT

17   WE'RE WORKING BOTH MORNING AND AFTERNOON.  AND I

18   DECIDED TO DO THAT BECAUSE, ONE, I WAS AVAILABLE

19   AND I THOUGHT IF WE DID THAT WE WOULD GET MORE DONE

20   DURING THE DAY AND PERHAPS GET THE CASE TO YOU

21   SOONER.

22             ALTHOUGH WE HAVE A BUDGET, SOMETIMES IT'S

23   THE OCCASION THAT THE PARTIES DON'T USE ALL OF

24   THEIR TIME, AND I WILL ALWAYS BE ASKING QUESTIONS

25   TRYING TO MAKE SURE THAT THEY USE YOUR TIME WELL.

505

1          SO I'M GOING TO DISMISS YOU FOR THE

2     WEEKEND, AND I HOPE YOU HAVE A GOOD WEEKEND AND

3     COME BACK TO US ALL SAFE AND HEALTHY.

4          AND YOU GET OVER THAT COLD SO YOU CAN

5     JOIN THE REST OF THE GROUP, BUT YOU'RE FREE TO SIT

6     OVER THERE BY YOURSELF IF YOU WISH.

7          JUROR:  NO, I'LL BE HEALTHY NEXT WEEK.

8          THE COURT:  SO WE'LL COME BACK TO THIS

9     MATTER AT 9:00 O'CLOCK ON TUESDAY, MARCH 24TH.

10          I'LL SEE YOU THEN.  STAND IN ADJOURNMENT.

11          (WHEREUPON, THE PROCEEDINGS IN THIS

12     MATTER WERE HELD OUT OF THE PRESENCE OF THE JURY:)

13          THE COURT:  I WANTED TO SPEND JUST A

14     SECOND BEFORE I LET YOU GO TO COMMENT THAT THERE

15     ARE A COUPLE OF INSTANCES WHERE YOU ALL MENTION THE

16     LAW, AND I DIDN'T HAVE IN MIND THAT I HAD PROPOSED

17     INSTRUCTIONS COVERING SOME OF THOSE AREAS.

18          NOW, I CAN'T FIND MY NOTES QUICKLY, BUT

19     THERE WERE INSTANCES WHERE YOU WERE REFERRING TO

20     MATTERS HAVING TO DO WITH DEBT COLLECTION

21     PRACTICES, AND PROCEDURES THAT HAVING TO DO WITH

22     REFERENCE AS TO WHETHER OR NOT MATTERS STAY ON

23     CREDIT REPORTS.  THERE WAS REFERENCE TO WHETHER OR

24     NOT IF THE LOAN WAS FOR A CERTAIN AMOUNT OF MONEY,

25     WHETHER IT WOULD REMAIN ON A CREDIT REPORT LONGER.

506

1           I COULDN'T TELL WHETHER THAT WAS THE

2    ORIGINAL LOAN OR THE LOAN TO WHICH A PERSON WAS

3    APPLYING BECAUSE IT SEEMED TO ME THAT THE TESTIMONY

4    WAS MIXED THAT IF THEY WERE APPLYING FOR A $100,000

5    LOAN, SOMETHING MIGHT APPEAR ON THE REPORT WHICH

6    OTHERWISE WOULDN'T AS OPPOSED TO THERE BEING A

7    $100,000 LOAN WHICH WAS WRITTEN OFF WHICH MIGHT

8    LAST LONGER.

9           AND THERE WAS SOME CONFUSION.  I DECIDED

10   NOT TO STOP AND GET IT CLARIFIED AT THAT POINT.

11   BUT THOSE ARE MATTERS THAT I'M SURE THE JURY MIGHT

12   BE CURIOUS OF SINCE YOU HAVE RAISED IT AND IT MAY

13   BE A MATTER OF A POLICY OR PRACTICE OR AN INDUSTRY

14   STANDARD.

15           AND SO THAT IS SOMETHING THAT YOU SHOULD,

16   AS YOU PREPARE YOUR PROPOSED INSTRUCTIONS, CONFER

17   WITH ONE ANOTHER TO SEE WHETHER OR NOT THERE'S ANY

18   DISAGREEMENT WITH RESPECT TO WHAT I SHOULD TELL THE

19   JURY WITH RESPECT TO THAT OR ANY OF THE OTHER LEGAL

20   MATTERS AND BE PREPARED EARLY IN THE WEEK.

21           THIS IS A CASE WHERE PERHAPS ON THURSDAY

22   OR SO YOU SHOULD START TO PUT TOGETHER WHAT YOU

23   WOULD ASK ME TO CONSIDER AS YOUR INSTRUCTIONS ON

24   THE LAW WITH RESPECT TO THESE MATTERS.

25           ANYTHING YOU WANT TO BRING UP OUT OF THE

1    PRESENCE OF THE JURY?

2              MR. HUMPHREYS:  NO, YOUR HONOR.

3              MR. NARITA:  NO, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  SEE YOU TUESDAY

5    MORNING.

6              MR. NARITA:  THANK YOU, YOUR HONOR.

7              (WHEREUPON, THE EVENING RECESS WAS

8    TAKEN.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25